PAGE 1  SHEET 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

SHARON B. IGLESIAS,

    PLAINTIFF,

VS.

    Civil Action No:
    05:07-CV-00437-D

JOHN VOLFORD, Chief of Police
of Oxford, N.C., in his
official and individual
capacities; THOMAS MARROW,
City Manager of Oxford, N.C.,
in his official and individual
capacities; DON JENKINS,
Human Resources Manager
for the City of Oxford, N.C.,
in his official and individual
capacities, and, the CITY OF
OXFORD, N.C.,

    DEFENDANTS.

RALEIGH, NORTH CAROLINA
SEPTEMBER 9, 2008
9:10 A. M.

- - - - - - -

DEPOSITION
OF
SHARON B. IGLESIAS

- - - - - - -

---

PAGE 2

SHARON IGLESIAS                                    2

1

2

3  APPEARANCES

4

5  FOR THE PLAINTIFF:  MONTEITH & RICE, PLLC, by
                        SHELLI M. RICE, ESQUIRE, and
6                       CHARLES E. MONTEITH, JR., ESQUIRE
                        422 Saint Mary's Street
7                       Suite 6
                        Raleigh, North Carolina  27605

8  FOR THE DEFENDANT:  CRANFILL, SUMNER &
                        HARTZOG, L.L.P. by
9                       M. ROBIN DAVIS, ESQUIRE
                        Post Office Box 27808
10                      Raleigh, North Carolina  27611-7808

11                      and

12                      EDMUNDSON & BURNETTE, L.L.P., by
                        THOMAS BURNETTE, ESQUIRE
13                      100 Main Street
                        Oxford, North Carolina  27565

14  ALSO PRESENT:      FRANK MILLER

---

PAGE 3

SHARON IGLESIAS                                    3

1                    I N D E X

2            DIRECT CROSS REDIRECT RECROSS

3  SHARON B. IGLESIAS

4      By Ms. Davis           8

5      By Mr. Monteith       272

6       - - - - - - -

7

8            E X H I B I T S

9                                              PAGE

10  Exhibit Number 1 -   2007 Tax Return         27

11  Exhibit Number 2 -   2006 Tax Return         31

12  Exhibit Number 3 -   List of Job Applications 36

13  Exhibit Number 4 -   Letter dated 1/30/06    48

14  Exhibit Number 5 -   E-mail dated 1/30/06    49

15  Exhibit Number 6 -   Confidential           143

16  Exhibit Number 7 -   Confidential           143

17  Exhibit Number 8 -   2 page untitled document 143

18  Exhibit Number 9 -   Confidential           143

19  Exhibit Number 10-   Personal Notes         158

20  Exhibit Number 11-   Affidavit of Susan Wolford
                         dated 10/11/04         159

21

22  Exhibit Number 12-   Letter dated 11/7/05   161

23  Exhibit Number 13-   Letter dated 9/8/04    196

24  Exhibit Number 14-   Letter dated 9/7/04    196

25  Exhibit Number 15-   E-mail dated 10/9/04   197

---

PAGE 4

SHARON IGLESIAS                                    4

1            E X H I B I T S

2                                              PAGE

3  Exhibit Number 16-   E-mail dated 12/1/05    225

4  Exhibit Number 17-   E-mail dated 12/1/05    225

5  Exhibit Number 18-   E-mail dated 11/22/05   225

6  Exhibit Number 19-   E-mail dated 1/6/06     225

7  Exhibit Number 20-   E-mail dated 1/10/06    225

8  Exhibit Number 21-   E-mail dated 1/25/06    225

9  Exhibit Number 22-   E-mail dated 12/18/05   225

10  Exhibit Number 23-   E-mail dated 12/18/05   225

11  Exhibit Number 24-   E-mail dated 12/18/05   225

12  Exhibit Number 25-   E-mail dated 1/1/06     225

13  Exhibit Number 26-   E-mail dated 12/4/05    225

14  Exhibit Number 27-   E-mail dated 12/11/05   225

15  Exhibit Number 28-   E-mail dated 12/17/05   225

16  Exhibit Number 29-   WRAL Transcript         234

17  Exhibit Number 30-   Packing slip with notes 235

18  Exhibit Number 31-   Written Warning dated 11/06/01 237

19  Exhibit Number 32-   Memo dated 10/23/01     239

20  Exhibit Number 33-   Memo dated 5/17/04      240

21  Exhibit Number 34-   Letter dated 5/17/04    241

22  Exhibit Number 35-   Letter dated 5/18/04    243

23  Exhibit Number 36-   Memo dated 5/25/04      244

24  Exhibit Number 37-   Personnel Policy Excerpt 245

DOVIE L. HANFORD, COURT REPORTER (336) 674-2430

SHARON IGLESIAS                                    5

1                    E X H I B I T S

2                                                    PAGE

3   Exhibit Number 38-  Internal Inquiry/Final Warning    247
                        dated 9/24/04
4
5   Exhibit Number 39-  Notice of Appeal dated 9/27/04     248

6   Exhibit Number 40-  Letter dated 10/6/04               249

7   Exhibit Number 41-  Letter dated 10/07/04              250

8   Exhibit Number 42-  Letter dated 10/8/04               250

9   Exhibit Number 43-  Supplement to Grievance/Name       251
                        Clearing Hearing dated 10/14/04
10  Exhibit Number 44-  Letter dated 10/22/04              252

11  Exhibit Number 45-  Letter dated 5/23/05               252

12  Exhibit Number 46-  Letter dated 7/11/05               255

13  Exhibit Number 47-  Letter dated 7/18/05               255

14  Exhibit Number 48-  Letter dated 8/4/05                255

15  Exhibit Number 49-  E-mail dated 8/23/05               256

16  Exhibit Number 50-  Memo dated 1/20/06                 256

17  Exhibit Number 51-  Termination Notice dated 1/24/06   257

18  Exhibit Number 52-  Ms. Iglesias' notes                258

19  Exhibit Number 53-  Ms. Iglesias' notes                258

20  Exhibit Number 54-  Ms. Iglesias' notes                258

21  Exhibit Number 55-  Amended Complaint                  260

22  Exhibit Number 56-  Plaintiff's Responses              260

23
24  Reporter's Note:  This transcript contains quoted
    material.  Such material is reproduced as read or quoted
25  by the speaker.

---

SHARON IGLESIAS                                    7

1
2                       STIPULATION
3              It is stipulated and agreed by and
4   between the parties to this proceeding that all
5   questions are deemed objected to and that a motion to
6   strike is made as to all answers, which objections and
7   motions to strike may be ruled upon at an appropriate
8   time by the court, except that objections to the form
9   of the questions shall be lodged at the time the
10  questions are propounded to the witness.
11              - - - - - - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

SHARON IGLESIAS                                    6

1              The deposition of SHARON B. IGLESIAS was
2   taken by the Defendants for use as evidence in the
3   above-referenced matter, wherein SHARON B. IGLESIAS is
4   the Plaintiff, and the JOHN WOLFORD, Chief of Police of
5   Oxford, North Carolina, in his official and individual
6   capacities; THOMAS MARROW, City Manager of Oxford,
7   North Carolina, in his official and individual
8   capacities; DON JENKINS, Human Resources Manager for
9   the City of Oxford, North Carolina, in his official and
10  individual capacities, and, the CITY OF OXFORD, NORTH
11  CAROLINA are the Defendants, pending in the United
12  States District Court, Eastern District of North
13  Carolina, Western Division, pursuant to notice, before
14  Dovie L. Hanford, Verbatim Court Reporter and a Notary
15  Public in and for the County of Guilford and State of
16  North Carolina, at the law offices of Cranfill Sumner &
17  Hartzog, LLP, 5420 Wade Park Boulevard, Suite 300,
18  Raleigh, North Carolina, on the 9th day of September,
19  2008, commencing at 9:10 o'clock, A.M.
20              - - - - - - - -
21
22
23
24
25

---

SHARON IGLESIAS                                    8

1   Thereupon:
2                   SHARON B. IGLESIAS
3   was called as a witness pursuant to notice, in the
4   above cause and, being first duly sworn in the manner
5   provided by law, was examined and testified upon her
6   oath as follows:
7                   DIRECT EXAMINATION
8   BY MS. DAVIS:
9   Q.   Ms. Iglesias, just for the record, would you just
10       state your full name and your current home
11       address so the court reporter has that down?
12   A.   Sharon Belcher Iglesias, 4536 Airport Road,
13       Oxford, North Carolina, 27565.
14   Q.   And how long have you lived at that address?
15   A.   Since 1994.
16   Q.   Ms. Iglesias, the reason we're here, of course
17       you know, is that you filed a lawsuit against the
18       City of Oxford, Tonny Marrow, Don Jenkins, and
19       John Wolford.  And you understand at this point
20       that I represent the City and all three of the
21       individual defendants.  We've met several times
22       before during these proceedings.
23   A.   I do.
24   Q.   And the reason you're here today is for your
25       deposition.  Now, I know that we've had several

SHARON IGLESIAS                                          9

```
1              grievance proceedings and several hearings.  But
2              have you ever had a deposition taken before?
3     A.       No.
4     Q.       Have you ever been involved in any case other
5              than this one where somebody took your statement?
6     A.       No.  No.  You mean a lawsuit or---
7     Q.       Yes, ma'am.
8     A.       No.
9     Q.       All right.  Now, I'm going to go over what a
10             deposition is and what we're going to do today.
11             It's a little different than a hearing.  During a
12             hearing both sides present their version of the
13             evidence, and lots of witnesses are called.
14             Today you're the only witness, and your job is
15             very simple.  It is simply to listen carefully to
16             my questions and answer my questions truthfully,
17             okay?
18    A.       Okay.
19    Q.       One of the things I'm going to talk to you about
20             is what happens.  The court reporter is here.
21             She's going to record what I ask you.  She's
22             going to record what you say back to me.  In
23             order for her to be able to do that accurately
24             it's very important that when you respond to my
25             questions that you do a couple of things.  First
```

SHARON IGLESIAS                                          10

```
1              of all, that you answer out loud as opposed to
2              nodding your head or shaking your head.
3     A.       Okay.
4     Q.       Okay?
5     A.       Uh-huh.
6     Q.       And it's also helpful if you say either yes or no
7              or full words as opposed to uh-huh, huh-uh,
8              because those are very difficult to transcribe
9              properly.  And you might mean huh-uh, and she
10             will transcribe it as uh-huh.
11    A.       Okay.
12    Q.       And so a negative would be affirmative, et
13             cetera.
14    A.       Okay.
15    Q.       Okay?
16    A.       Yes.
17    Q.       All right.  And I'll try to keep reminding you,
18             and I'm sure the court reporter will remind you
19             if we need to do that.
20    A.       Okay.
21    Q.       The other thing that's important is that, if you
22             would, let me finish my question before you start
23             your answer.
24    A.       Okay.
25    Q.       All right?
```

SHARON IGLESIAS                                          11

```
1     A.       All right.
2     Q.       And the other thing that's very, very important
3              is that at any time you, for any reason, couldn't
4              hear my question or just didn't understand it or
5              need me to repeat it, please let me know that you
6              either didn't understand it or couldn't hear it
7              or need me to repeat it.
8     A.       Okay.
9     Q.       Because as we go through the day today, I don't
10             have any way of knowing whether you understood it
11             or not unless you tell me you did.
12    A.       Okay.
13    Q.       Or didn't.
14    A.       Okay.
15    Q.       All right?
16    A.       Uh-huh.
17    Q.       And I'm going to have to assume that you did
18             unless you tell me you didn't.
19    A.       Yes, right.
20    Q.       All right.  Do you have any questions about how
21             the procedure goes today?
22    A.       Not right now, no.
23    Q.       And there's a couple of questions I have to ask
24             you on the record.  None of these are designed to
25             embarrass you, but I just have to get them on the
```

SHARON IGLESIAS                                          12

```
1              record.
2     A.       Okay.
3     Q.       As we sit here today, is there any medical
4              condition that you're under that would cause you
5              to have problems either hearing my questions,
6              understanding my questions, or answering them
7              truthfully?
8     A.       No.
9     Q.       Are you taking any medication that would impact
10             your ability to either hear, understand, or
11             answer my questions?
12    A.       No.
13    Q.       All right.  And as we sit here today -- again, I
14             have to ask this question.  Are you under the
15             influence of any drugs or alcohol?
16    A.       No.
17    Q.       All right.  Ms. Iglesias, I would like to start
18             with a little bit of background, if I could.
19             Could you tell me what your education is?
20    A.       Yes.  I finished high school, and I went on to
21             attend Vance-Granville Community College.  And I
22             received my degree in radiologic technology.
23    Q.       And is that an associates degree?
24    A.       Yes.
25    Q.       Have you ever used that degree in any---
```

SHARON IGLESIAS                                    13

1   A.   Yes.
2   Q.   ---of your employment?
3   A.   Briefly, yes.  I did.
4   Q.   And that's essentially an x-ray technician.  Is
5        that what that is?
6   A.   Yes, it is.  Yes, it is.
7   Q.   And at some point I gather you decided that x-ray
8        technician wasn't for you and you moved on to a
9        career in administration, is that correct?
10  A.   I was a single parent, and I had childcare
11       problems.  And it was difficult to work a third
12       shift and a second shift.  So, yes, I changed
13       careers.  I retired.  I took early retirement
14       from radiology, and I moved on to the
15       secretarial/clerical field.
16  Q.   Okay.  What kind of training do you have in
17       secretarial training?
18  A.   I briefly went to Vance-Granville -- well, prior
19       to Vance-Granville it was Vance-Granville
20       Technical Institute, and I took some courses.  I
21       actually started the program for secretarial
22       science, but I never completed it.  I received a
23       job, and I went on into work, so just basically
24       experience through the years.
25  Q.   And how many years experience do you have as a

SHARON IGLESIAS                                    14

1        secretary/administrative assistant?
2   A.   I'm going to say approximately 20, approximately.
3   Q.   And of those 20 years, how many were with the
4        City of Oxford?
5   A.   Six.
6   Q.   Okay.  What year did you obtain your associates
7        degree?
8   A.   1984.
9   Q.   And you practiced as an x-ray technician for how
10       many years?
11  A.   I worked probably for two months with Granville
12       Hospital.  Then I moved to West Virginia, and I
13       worked briefly up there.  I would say about four
14       months there.  Then I moved back to Oxford, and I
15       did not go back into radiology at that time.  I
16       went into the secretarial field, and I did not --
17       I did not go back into radiology.
18  Q.   So when you said you took early retirement from
19       radiology, your total practice time in radiology
20       was actually about six months?
21  A.   All through training, so two years and six months
22       probably.  We were trained on the job, so to
23       speak, and then also the classroom.
24  Q.   So two and a half years, including your school
25       time?

SHARON IGLESIAS                                    15

1   A.   Right.  Right.
2   Q.   And after that you moved into the
3        secretarial/administrative assistant field?
4   A.   Yes.  Yes.
5   Q.   What was your first job in the
6        secretarial/administrative assistant field?
7   A.   Let me think.  My very first job would have been
8        with Dr. Finch in 1970.  I worked -- I went to
9        school, high school -- you said first job, right?
10  Q.   In the secretarial/administrative assistant
11       field.
12  A    I'm sorry.  I'm sorry.  Okay.  That would have
13       been probably Master Woodcraft, and I believe
14       that would be 1979.  That's in Oxford.
15  Q.   And that was before you went back to school for
16       radiology?
17  A.   Yes, it is.  Yes, it is.
18  Q.   How long were you employed with Master Woodcraft?
19  A.   I'm going to say -- well, '79, '80, '81.
20       Approximately three years, approximately.
21  Q.   All right.  And what was your job title there?
22  A.   It would be secretary/receptionist.
23  Q.   And why did you leave?
24  A.   I went back to school.  I went to school, Vance-
25       Granville.  I attended school full time.

SHARON IGLESIAS                                    16

1   Q.   So you started school in 1982?
2   A.   1982, September.
3   Q.   And then you went to school for two years and
4        worked in the radiology field for about six
5        months.  So that brings us up to about middle '86
6        or early '87, is that right?
7   A.   Yes.
8   Q.   And your next employment after---
9   A.   I believe it---
10  Q.   ---leaving radiology
11  A.   I'm sorry.
12  Q.   That's okay.
13  A.   I believe it was Max Factor.  Actually, at Max
14       Factor I worked in the quality assurance lab and
15       did some minor clerical work, very minor.
16  Q.   What was your job title at Max Factor?
17  A.   Quality assurance technician.
18  Q.   How long did you work at Max Factor?
19  A.   I really cannot recall.  Approximately a year,
20       maybe a little over a year.
21  Q.   And what was your reason for leaving Max Factor?
22  A.   I had childcare problems.
23  Q.   Did you leave voluntarily or were---
24  A.   Yes.
25  Q.   ---you terminated?

DOVIE L. HANFORD, COURT REPORTER (336) 674-2430

SHARON IGLESIAS                                          17

1   A.   Yes.  I left voluntarily.
2   Q.   Your next employment after Max Factor?
3   A.   I believe that would be with the Oxford
4        Orphanage.
5   Q.   And what was your job title at the Oxford
6        Orphanage?
7   A.   I worked in the printing department, and I was a
8        typesetter.
9   Q.   Did you have any administrative or secretarial
10       duties there?
11  A.   No.
12  Q.   How long did you work for the Oxford Orphanage?
13  A.   1990.  I worked there through, I believe,
14       September or October of 1990.
15  Q.   If my calculations are correct that's about a
16       year and a half to two years?
17  A.   No.  It was -- it was four years.  I believe I
18       was there about four years.
19  Q.   We started at Max Factor in 1987, worked there
20       for about a year.  That would put us to 19---
21  A.   Max Factor in '87?
22  Q.   Graduated from Granville in '84?
23  A.   I graduated in '84.  Okay, then -- no.  I went to
24       work with Max Factor in '84.  I worked two months
25       at Granville Hospital, then went to work with Max

SHARON IGLESIAS                                          18

1        Factor, then moved to West Virginia.  I worked
2        with Max Factor probably a year.  That was
3        somewhere around 1986.  I know I went to work
4        with Oxford Orphanage in -- it had to be around
5        1986.  I do know that.
6   Q.   And so---
7   A.   Can I -- I'm sorry.
8   Q.   That's okay.  So you worked at Oxford Orphanage
9        for---
10  A.   Until 1990, I know.  September, around September
11       because I believe that's when I moved to West
12       Virginia and then turned around and moved back in
13       February of '91.  My father was terminally ill.
14  Q.   So Oxford Orphanage for approximately four years?
15  A    Yes.
16  Q.   Then to West Virginia and back to North Carolina?
17  A.   Yes.
18  Q.   And we're now in approximately 1991, is that
19       correct?
20  A.   Yes.
21  Q.   And what was your employment once you returned to
22       North Carolina?
23  A.   When I returned to North Carolina I went to work
24       with temporary agencies.
25  Q.   Which agencies?

SHARON IGLESIAS                                          19

1   A.   Olsteen Temporary Agency, and eventually I worked
2        with Blethen Temporary services.  And I believe
3        the other one was Tarheel Staffing.
4   Q.   How long did you work for temporary services?
5   A.   I worked with then off and on, so that would be
6        hard for me to say.  I really can't say.  I just
7        worked with then off and on.  I had adopted a
8        baby, and the child was very sick.  And so I was
9        working -- I do know I went to work with John
10       Unstead Hospital in November of '91.
11  Q.   Was that a permanent position?
12  A.   Yes.  That was with the personnel department, and
13       I was the receptionist.
14  Q.   You were a receptionist in personnel?
15  A.   Yes.
16  Q.   Who was your supervisor at John Unstead Hospital?
17  A.   Gail Harvey.
18  Q.   G-A-I-L H-A-R-V-E-Y?
19  A.   Yes.
20  Q.   How long were you at the hospital?
21  A.   Until January of '93, then I went back with
22       temporary agencies.  The baby was very sick.
23  Q.   Why did you leave the hospital?
24  A.   Because of the baby -- sick.
25  Q.   Did you leave voluntarily?

SHARON IGLESIAS                                          20

1   A.   Oh, yes.
2   Q.   Okay.  And you went back to temp.  When is the
3        next time you took full-time employment?
4   A.   Okay, this is '93.  That would be with the -- I
5        believe it was with the Granville County Library,
6        and that would be -- no, it wasn't.  I'm wrong.
7        I'm sorry.  It was with Lace Lastics, and that
8        would have been -- that was in February of '95.
9   Q.   So you took a job in February 1995 with Lace
10       Plastics?
11  A.   Lace Lastics, L-A-S-T-I-C-S.
12  Q.   Lastics?
13  A.   Yes, ma'am.
14  Q.   And what was your job at Lace Lastics?
15  A.   Administrative assistant---
16  Q.   Administrative---
17  A.   ---to executive vice-president.
18  Q.   And who was your supervisor there?
19  A.   Nancy Hoffman.
20  Q.   And Nancy Hoffman was---
21  A.   Hoffman.
22  Q.   ---the executive vice-president?
23  A.   Yes, ma'am.
24  Q.   How long were you with Lace Lastics?
25  A.   Until October of '95.  Ms. Hoffman resigned, and

SHARON IGLESIAS                                                21

1    ny position -- because of her resignation ny
2    position was elininated.
3  Q.  Okay.  October of '95?
4  A.  Uh-huh.
5  Q.  And what's the next full-tine employment you took
6    after that?
7  A.  Okay.  That would have been Granville County
8    Library, Richard H. Thornton Library.  And that
9    would be in October of '96.
10 Q.  So you had a full year before you were able to
11   obtain employment?
12 A.  Yes.
13 Q.  Were you looking for full-tine employment during
14   that tine?
15 A.  Oh, yes.  Yes.
16 Q.  What was your job at the Granville County
17   Library?
18 A.  Technical services assistant.
19 Q.  You'll have to tell ne what that neans exactly.
20 A.  I was assistant to the technical services
21   Librarian.  I cataloged books.
22 Q.  And when did you leave employment with the
23   Granville County Library?
24 A.  Oh.  That would be November of '99, the very end
25   of November.

SHARON IGLESIAS                                                22

1  Q.  Who was your supervisor at the Granville County
2    Library?
3  A.  Any Bartow.
4  Q.  She was your supervisor the entire time?
5  A.  I think I went -- I went to work first, and I
6    believe Any was hired Later.  And I think the
7    first one, her nane was Ernestine.  And I cannot
8    renember her last name.  She was -- she was only
9    there a short tine.
10 Q.  Okay.  Why did you leave employment with the
11   Granville County Library?
12 A.  Because I was hired at Oxford Police Department
13   in the position of adninistrative assistant to
14   the Chief of police.
15 Q.  Who hired you at Oxford?
16 A.  Chief Roger Paul.
17 Q.  How long was Chief Paul there after having hired
18   you?
19 A.  Approximately two nonths.
20 Q.  And then the position of police Chief was vacant
21   for a while, is that correct?
22 A.  Yes.
23 Q.  Who did you report to while the position was
24   vacant?
25 A.  Captain Villianson.

SHARON IGLESIAS                                                23

1  Q.  Captain Bob Williamson?
2  A.  Yes, na'an.
3  Q.  Was he a captain at that tine?
4  A.  Yes, na'an.  He was -- I'n sorry.  Excuse ne.  He
5    was a captain, but he was acting interin Chief.
6  Q.  During the time period between Chief Paul's
7    departure and Chief Wolford's hire, was anyone
8    else your direct supervisor?
9  A.  During -- repeat that, please.
10 Q.  During the time between Chief Paul's departure
11   and Chief Wolford's hire, was there anyone else
12   who supervised you directly other than Captain
13   Bob Villianson?
14 A.  No.
15 Q.  You reported to no one else?
16 A.  No.
17 Q.  Okay.  You nentioned children earlier.  How nany
18   children do you have?
19 A.  I have two children.
20 Q.  And if I understood you correctly, one is
21   adopted?
22 A.  Yes -- no.  The adoption was of ny granddaughter.
23   I adopted ny granddaughter.  My daughter becane
24   pregnant, and I adopted the baby because she was
25   too young.  And I raised her for five years, and

SHARON IGLESIAS                                                24

1    ny daughter becane -- or cane to a position where
2    she could take the child and take care of her, so
3    she adopted her back.
4  Q.  Can you tell ne what your daughter's name is?
5  A.  My daughter's name is Stacy Viles, V-I-L-E-S.
6  Q.  And did you have any other children other than
7    your daughter and your adopted granddaughter?
8  A.  My son.
9  Q.  Your son is?
10 A.  Noel, N-O-E-L, Ryan, R-Y-A-N.
11 Q.  Any others?
12 A.  No, that's all.  Grandchildren.
13 Q.  How many grandchildren do you have?
14 A.  Two grandchildren.
15 Q.  And the one granddaughter we already spoke of?
16 A.  Yes.
17 Q.  Her nane is?
18 A.  Jessica.
19 Q.  ALL right.
20 A.  And grandson is Lenny.
21 Q.  And they're both your daughter's children?
22 A.  Children, yes, na'an.
23 Q.  Your son doesn't have any children?
24 A.  No, na'an.
25 Q.  And you are currently narried, is that correct?

SHARON IGLESIAS                                    25

1   A.   That's correct.
2   Q.   And who is your husband?
3   A.   His name is Bernardo Iglesias.
4   Q.   When did you marry Mr. Iglesias?
5   A.   In May of 2003.
6   Q.   Were you married prior to Mr. Iglesias?
7   A.   Yes.
8   Q.   How many marriages have you had prior to
9        Mr. Iglesias?
10  A.   Three.
11  Q.   And if you would, just real quickly list the
12       person you were married to and the length of time
13       you were married.
14  A.   Okay.  The first -- the first marriage was
15       William Ryan.
16  Q.   R-Y-A-N?
17  A.   Yes, ma'am.  We were married approximately four
18       years.
19  Q.   Any children by that marriage?
20  A.   That's Noel and Stacy.
21  Q.   All right.  Next?
22  A.   That would be Bobby Reaves, R-E-A-V-E-S.  No
23       children, and that was -- let's see, we were
24       approximately two years, approximate.
25  Q.   And next?

SHARON IGLESIAS                                    26

1   A.   John Goff, G-O-F-F.
2   Q.   G-O-F-F, okay.  All right?
3   A.   That was approximately four years.
4   Q.   And then after that was Mr. Iglesias, correct?
5   A.   Yes.
6   Q.   How long were you single between Mr. Goff and
7        Mr. Iglesias?
8   A.   From '95 to -- Roy and I were married in 2003.
9   Q.   And we know that you were employed with the City
10       of Oxford from 1999 until early 2006.  Since you
11       left the City of Oxford, have you been employed
12       anywhere else other than where you're currently
13       employed?
14  A.   No.
15  Q.   Tell me where you're currently employed, please.
16  A.   Food Lion in Henderson on Dabney Drive, part-
17       time.
18  Q.   All right?
19  A.   And Freedom Federal Credit Union in Henderson,
20       and that's part-time as well.
21  Q.   Between the two part-time jobs, how many hours a
22       week approximately do you work?
23  A.   It varies.  The position I have with Freedom
24       Federal is a permanent part-time, and that's
25       approximately 22 -- 22 and a half or 23 and a

SHARON IGLESIAS                                    27

1        half hours.  Food Lion, there's no guarantee on
2        the number of hours.  It's whether or not they
3        schedule me to work, but approximately -- I can
4        get at least four to nine hours a week,
5        approximately, if I'm scheduled.
6   Q.   Are you currently seeking full-time employment?
7   A.   Yes.
8   Q.   Other than these two part-time jobs, do you have
9        any other sources of income?
10  A.   No.
11  Q.   No rental income?
12  A.   No.
13  Q.   No investment income?
14  A.   No.
15  Q.   Nothing from working at home or anything like
16       that?
17  A.   No.
18  Q.   I just have a couple of more questions for you
19       here.  I'm going to show you what we're marking
20       as Deposition Exhibit Number 1.
21            (The 2007 Tax Return is marked as Deposition
22            Exhibit Number 1.)
23            MS. DAVIS:  And Shelli -- can we go off
24            the record for just a minute?
25       (There is a discussion off the record.)

SHARON IGLESIAS                                    28

1   Q.   (By Ms. Davis)  Ms. Iglesias, I'm going to ask
2        you to take a look at what we've marked as
3        Deposition Exhibit Number 1, which I'm going to
4        represent to you has been represented to me as
5        being a true and accurate copy of your 2007 tax
6        return, which was produced to me in discovery.
7        Does that appear to be a true and accurate copy
8        of your 2007 tax return?
9   A.   (The witness reviews document.)
10  Q.   I need you to answer "yes" or "no," Ms. Iglesias.
11  A.   Okay, I will.  (The witness reviews document.)
12       It appears -- yes, it appears to be.
13  Q.   And that is a joint tax return---
14  A.   Yes, it is.
15  Q.   ---filed with your husband?
16  A.   Yes.
17  Q.   Okay.  If you would, flip to -- if you notice at
18       the bottom of the page, the pages are numbered.
19       If you would, flip to page 279.
20  A.   (The witness complies with request.)  Oh, okay.
21  Q.   What is the nature of the business that you're
22       conducting out of your home?
23  A.   It would be rental.  That's a rental -- that is
24       for the rental, a mobile home that's in my front
25       yard that we did rent but we no longer rent.

SHARON IGLESIAS                                    29

1   Q.   Okay.  So in 2007 you were renting a mobile home?
2   A.   Right.
3   Q.   And you were deducting a percentage?
4   A.   Yes, uh-huh, because we keep records.
5   Q.   So the only business use of your home in 2007 was
6        the rental of a trailer?
7   A.   Mobile home, yeah.
8   Q.   If you would, flip back to page 277 for me.
9   A.   (The witness complies with request.)
10  Q.   On Schedule E, which is marked as page 277 -- I
11       think it's the third page in of Exhibit Number 1.
12       That appears to indicate that there is a mobile
13       home on that sheet as well?
14  A.   There's only one mobile home.
15  Q.   Okay.
16  A.   Is that what you're saying?
17  Q.   Yes, ma'am.
18  A.   Okay.
19  Q.   So you have listed the mobile home as
20       supplemental income and loss on Schedule E?
21  A.   Right.
22  Q.   Correct?
23  A.   Correct.
24  Q.   And then flipping over to page 279 on expenses
25       for business use of your home you have also

SHARON IGLESIAS                                    30

1        deducted a 14.29 percent of your home also for
2        the rental of the mobile home, is that correct?
3   A.   For office, yeah.  Office use.
4   Q.   So the deduction for the business use of your
5        home is an office deduction related to the rental
6        of your mobile home?
7   A.   That's my understanding, yes.  That's my
8        understanding, because I don't do these taxes.
9        Somebody else does them for me.
10  Q.   Who does your taxes?
11  A.   My daughter.
12  Q.   So the only business -- I just want to make sure
13       I'm clear.  The only business you're conducting
14       from your home is the rental of a mobile home
15       that is also contained on the same property as
16       your home?
17  A.   Correct, use to.
18  Q.   And you no longer do that?
19  A.   (The witness does not respond.)
20  Q.   I'm sorry.  You'll have to answer that as---
21  A.   I know.  I'm thinking here because -- that's
22       correct.  That is correct.
23  Q.   And why do you no longer rent the mobile home?
24  A.   Because my daughter moved into the mobile home.
25  Q.   So your daughter currently lives there?

SHARON IGLESIAS                                    31

1   A.   Yes.
2            MR. BURNETTE:  Can we go off the record
3        for just one second?
4            MS. DAVIS:  Sure.
5        (A recess was taken from 9:44 to 9:48 a.m.)
6            (The 2006 Tax Return is marked as Deposition
7            Exhibit Number 2.)
8   Q.   (By Ms. Davis)  Ms. Iglesias, I'm going to show
9        you what I have marked as Deposition Exhibit
10       Number 2, which I'll represent to you has been
11       produced in discovery and appears to be a copy of
12       your 2006 tax returns.  Could you take a look at
13       Exhibit Number 2 and just confirm that that does
14       appear to be a true and accurate copy of your
15       2006 return?
16  A.   (The witness reviews document.)  Yes, it appears
17       to be.
18  Q.   And looking on the first page of Exhibit Number
19       2, which is the page that has the number 260
20       attached to it, at line 19 there's a listing of
21       unemployment compensation in the amount of
22       $4,788.  Is that unemployment compensation for
23       yourself or for your husband?
24  A.   I believe that's for myself.  That is for --
25       excuse me.  That is for myself.

SHARON IGLESIAS                                    32

1   Q.   And you, indeed, did receive $4,788 in
2        unemployment?
3   A.   Yes, I did.
4   Q.   Have you had to pay all or a portion of that
5        back?
6   A.   None of it.
7   Q.   Going on to the third page of Exhibit Number 2,
8        which is paged numbered 262 at the bottom.  If
9        you would, take a look at line number 22.
10  A.   (The witness complies with request.)  22.
11  Q.   It says, "Legal Expenses"?
12  A.   Uh-huh.
13  Q.   Can you tell me, the legal expenses that you have
14       listed here, are those legal expenses related to
15       this case that is pending?
16  A.   Yes.
17  Q.   And are those expenses a part of the compensation
18       that you're seeking to be reimbursed as a part of
19       this case?
20  A.   Yes, it would be.
21  Q.   So who did you pay those legal expenses to?
22  A.   This was paid to Al McSurely and Shelli Henderson
23       Rice.
24  Q.   And did you actually pay that money out of your
25       own pocket?

DOVIE L. HANFORD, COURT REPORTER (336) 674-2430

SHARON IGLESIAS                                          33

| 1 | A. | My husband and I together paid this money. |
| 2 | Q. | Did anyone else contribute to the payment of that |
| 3 | | money? |
| 4 | A. | No. |
| 5 | Q. | Is this the full extent of legal expenses that |
| 6 | | you have actually paid as of the present date? |
| 7 | A. | No. |
| 8 | Q. | What other legal expenses have you paid through |
| 9 | | the present date that you are seeking |
| 10 | | reimbursement for? |
| 11 | A. | Are you asking for an amount? |
| 12 | Q. | Actually, what I'm asking for is to whom they |
| 13 | | were paid and the amount. |
| 14 | A. | Oh, okay. That would -- that would be Chuck |
| 15 | | Monteith and Shelli Henderson Rice. And the |
| 16 | | amount, I'm going to say approximately $2,400, |
| 17 | | approximately. |
| 18 | Q. | And that's the amount paid? |
| 19 | A. | Paid, yes. |
| 20 | Q. | And again, did you actually pay this money out of |
| 21 | | your own pocket? |
| 22 | A. | My husband and I together. |
| 23 | Q. | Did anyone else contribute to the payment of this |
| 24 | | money? |
| 25 | A. | My mother. |

SHARON IGLESIAS                                          34

| 1 | Q. | Anyone else? |
| 2 | A. | No. |
| 3 | Q. | Any other legal expenses that you have incurred |
| 4 | | for which you are seeking reimbursement as a part |
| 5 | | of this case? |
| 6 | A. | Not that I can recall any. |
| 7 | Q. | And just so I'm clear, the legal expenses that |
| 8 | | are listed on Exhibit Number 2 at line 22 in the |
| 9 | | amount of $2,235 is different than the $2,400? |
| 10 | A. | Yes, ma'am. |
| 11 | Q. | During the time period from 2006 to the present, |
| 12 | | have you received any payments or income that are |
| 13 | | not reflected on your 2006 or 2007 tax returns? |
| 14 | A. | Well, the two positions I hold now. |
| 15 | Q. | Other than -- excuse me, and you're correct. Let |
| 16 | | me go back. Other than the income listed on your |
| 17 | | 2006 tax returns, your 2007 tax returns, and the |
| 18 | | income earned from the two jobs that you have |
| 19 | | described to me as having held, have you received |
| 20 | | any income or any other source of support? |
| 21 | A. | I don't think my daughter paid me very much. She |
| 22 | | may have paid me, like, a month or two in rent, |
| 23 | | and that would have been around $600. But other |
| 24 | | than that she's financially not able, and I can only |
| 25 | | really know if she has done that. So I can only |

SHARON IGLESIAS                                          35

| 1 | | assume that right now. |
| 2 | Q. | Any other sources of income other than your |
| 3 | | daughter? |
| 4 | A. | Not that I can recall. |
| 5 | Q. | And you have provided me with a list and a lot of |
| 6 | | documentation related to your job search after |
| 7 | | leaving the City of Oxford? |
| 8 | A. | Correct, yes. |
| 9 | Q. | Did you actually prepare a rsum after you left |
| 10 | | the City? |
| 11 | A. | Yes, I did. |
| 12 | Q. | Do you have a copy of that rsum? |
| 13 | A. | Yes, I do. |
| 14 | Q. | On your--- |
| 15 | A. | I'm sorry. Do you mean with me? |
| 16 | Q. | No. I mean, I'm assuming you don't have that |
| 17 | | tucked in your pocket somewhere, but if you do, I |
| 18 | | would love to see it. |
| 19 | A. | Okay. |
| 20 | Q. | You have a copy of that rsum at home, I would |
| 21 | | presume? |
| 22 | A. | Yes, ma'am. |
| 23 | | MS. DAVIS: Ms. Rice, we obviously |
| 24 | | would like to get a copy of that--- |
| 25 | | MS. RICE: Certainly. |

SHARON IGLESIAS                                          36

| 1 | | MS. DAVIS: ---so we could supplement |
| 2 | | the discovery. |
| 3 | | MS. RICE: Absolutely. |
| 4 | Q. | On your rsum, what do you list as the reason |
| 5 | | for your termination of employment with the City |
| 6 | | of Oxford? |
| 7 | A. | I don't. I don't list it on my resume. |
| 8 | Q. | Not even list the employment on your resume? |
| 9 | A. | I list the employment, but I do not list for any |
| 10 | | positions I've held reason -- you know, whether I |
| 11 | | resigned or otherwise. |
| 12 | Q. | All right. I'm going to show you what we're |
| 13 | | marking as Deposition Exhibit Number 3, which, |
| 14 | | again, I'll represent to you is a document that |
| 15 | | was produced by your attorneys to me in |
| 16 | | discovery. |
| 17 | | (The List of Job Applications is marked as |
| 18 | | Deposition Exhibit Number 3.) |
| 19 | Q. | It is a -- for identification purposes, it is a |
| 20 | | nine-page document numbered at the bottom pages 1 |
| 21 | | through 9, which appears to be a listing of all |
| 22 | | jobs applied for during the 2006 time period. |
| 23 | | Does that appear to be a correct description of |
| 24 | | that document to you? |
| 25 | A. | (The witness reviews document.) It is a correct |

SHARON IGLESIAS                                    37

```
 1          description, but these are really not all of the
 2          jobs I applied for.
 3     Q.   Do you have somewhere a list of all the jobs you
 4          applied for?
 5     A.   During this particular time, no.  I don't have a
 6          list.  This really doesn't seem to be -- excuse
 7          me.  I kept a record, I believe, all the way
 8          up -- oh.  This is out of order, okay.
 9     Q.   It appears to be out of order.  You're correct.
10     A.   Okay.
11     Q.   But I'm giving it to you in the order in which it
12          was produced to me---
13     A.   Okay.
14     Q.   ---just so that the numbers are sequential on the
15          bottom of the page.
16     A.   All right.  Let me -- I'm sorry.  Please give me
17          a chance to look at this.
18     Q.   Sure.
19     A.   (The witness reviews document.)  Yeah.  All the
20          way up to approximately December, actually.  It
21          looks like October.  But I believe I kept a
22          record all the way up through---
23     Q.   If you look at page---
24     A.   Here it is, December.
25     Q.   Yeah.  On page 8 it looks -- it goes through
```

SHARON IGLESIAS                                    38

```
 1          December of 2006?
 2     A.   Yeah, okay.
 3     Q.   So is it your testimony, then, that Exhibit
 4          Number 3 is a comprehensive list of all jobs that
 5          you applied for during the 2006 calendar year?
 6     A.   I don't believe it's all of the jobs I applied
 7          for.  I believe it is a majority.
 8     Q.   During the year -- calendar year 2006, did you
 9          receive any job offers?
10     A.   No.
11     Q.   No offers for part-time or full-time?
12     A.   Not to my -- no, not to my recollection.  I do
13          not -- I did not receive offers of employment.
14     Q.   Do you recall how many interviews you went on in
15          the calendar year 2006?
16     A.   I do not recall the exact number of interviews,
17          no.
18     Q.   More than ten?
19     A.   I would say ten is a good -- is probably an
20          approximate number.
21     Q.   Approximately ten?
22     A.   Approximate.
23     Q.   All right.  And in 2007, do you have a list of
24          all jobs that you applied for in 2007?
25     A.   Yes.  I think I have a list of the majority of
```

SHARON IGLESIAS                                    39

```
 1          all positions.
 2     Q.   Do you have an estimate as to how many jobs that
 3          would be for the calendar year 2007?
 4     A.   No.  I don't know an exact number.
 5     Q.   Did you receive any offers of employment during
 6          the calendar year 2007?
 7     A.   Food Lion.
 8     Q.   The Food Lion offer of employment that you
 9          received in 2007, is that the employment that you
10          currently hold?
11     A.   Yes.
12     Q.   So did you accept that employment immediately?
13     A.   I did.
14     Q.   And in 2008 you continued to seek employment?
15     A.   Yes.
16     Q.   And did you receive any job offers in 2008?
17     A.   Freedom Federal Credit Union.
18     Q.   When did you start your employment with Food
19          Lion?
20     A.   September of 2007.
21     Q.   During the entire period of time it's been varied
22          hours, between four to nine per week?
23     A.   Well, when I originally started out it was a
24          little more.  I would say approximately 15 to 20
25          hours a week because it was the only position I
```

SHARON IGLESIAS                                    40

```
 1          had.  Now that I'm working with Freedom Federal
 2          three days a week the Food Lion schedule I'm only
 3          scheduled to work Tuesdays and Wednesdays.  And
 4          that's if---
 5     Q.   Go ahead.
 6     A.   And that's if they schedule me to work.
 7     Q.   And you started with Freedom Federal when?
 8     A.   March the 31st, I think, 2008.
 9     Q.   And during that entire period of time you have
10          been employed three days a week?
11     A.   Yes, ma'am.
12     Q.   Monday, Thursday, and Friday?
13     A.   That's correct.
14     Q.   After you received the employment at Freedom
15          Federal, did you go back to Food Lion and tell
16          them that you were no longer available on Monday,
17          Thursday, Fridays?
18     A.   Yes.
19     Q.   What about your availability on Saturday, Sunday?
20     A.   I was not available Saturday and Sunday.
21     Q.   What precludes you from accepting employment on
22          Saturday and Sunday?
23     A.   I wanted some time off.
24     Q.   Has Food Lion indicated that you could work more
25          hours if you were willing to work Saturday and
```

SHARON IGLESIAS                                        41

```
1          Sunday?
2    A.    No.
3    Q.    Have you asked?
4    A.    Most recently, yes.  And I've told them now that
5          I am available for Saturdays.
6    Q.    Okay.  Have you been scheduled on any Saturdays?
7    A.    Not yet.
8    Q.    When did you tell them that you were available on
9          Saturdays?
10   A.    I believe it was last week I put that in writing
11         to them.
12   Q.    But you're not willing to work on Sundays?
13   A.    No.
14   Q.    Have you received any offers of employment in
15         2008 other than Freedom Federal?
16   A.    No.
17   Q.    Since your termination from the City of Oxford,
18         have you received any offers of employment that
19         you have rejected?
20   A.    Not to my knowledge, no.
21   Q.    No offers at all that you've declined?
22   A.    No.
23   Q.    Have you declined any job interviews since your
24         termination from the City of Oxford?
25   A.    No.
```

SHARON IGLESIAS                                        42

```
1    Q.    With regard to any of the jobs that you applied
2          for and did not receive, whether it's in -- at
3          any time since your termination with the City of
4          Oxford, have you been advised by any employer of
5          the reasons you were rejected?
6    A.    Yes.
7    Q.    And what were those reasons?
8    A.    It would be a conflict of interest.
9    Q.    And which employer are we talking about?
10   A.    State Employees Credit Unit.
11   Q.    Who told you that would be a conflict of
12         interest?
13   A.    Her name is Daphine Wright -- or Daphne, excuse
14         me.  Daphne Wright.
15   Q.    And Ms. Daphne Wright said what exactly?
16   A.    That she wanted to hire me, but her supervisors
17         wouldn't allow it because I believe the City had
18         complained that there would be a conflict of
19         interest because City employees do business with
20         State Employees Credit Union.
21   Q.    What position does Ms. Daphne Wright hold?
22   A.    I believe she is a supervisor over the tellers.
23         That was the position I was applying for, a bank
24         teller position.
25   Q.    Did you actually go in for an interview?
```

SHARON IGLESIAS                                        43

```
1    A.    Yes, twice.
2    Q.    Two interviews?
3    A.    Yes.
4    Q.    Who did you interview with?
5    A.    Ms. Wright.
6    Q.    And anyone else?
7    A.    No.
8    Q.    Did you receive an offer of employment?
9    A.    I did not receive an offer, because she told me
10         there was a conflict.  And she -- oh.  She wanted
11         to hire me.  She said, "If this is approved then
12         you've got the job."  So her supervisors, whoever
13         that was, she had to go to them.  And that's when
14         she said it was a conflict of interest.
15   Q.    Okay.  And how did Ms. Wright communicate that to
16         you?
17   A.    She told it to me in a meeting.
18   Q.    You had a meeting with her?
19   A.    Yeah -- wait just a minute.  Excuse me, please.
20         That was my second interview.  She told me over
21         the phone when she called me.
22   Q.    So after your second interview?
23   A.    Yes.
24   Q.    Ms. Wright said, "I would like to hire you"?
25   A.    She conveyed that to me in my second meeting with
```

SHARON IGLESIAS                                        44

```
1          her.
2    Q.    Your second interview?
3    A.    Yes.
4    Q.    Okay?
5    A.    And then she called me and told me that she could
6          not hire me.
7    Q.    Approximately when did you interview with State
8          Employees Credit Union?
9    A.    April 2007.
10   Q.    Do you know when approximately Ms. Wright called
11         to say she could not hire you?
12   A.    It would be around the same time.
13   Q.    And did Ms. Wright actually tell you that someone
14         from the City complained, or are you assuming
15         that someone from the City complained?
16   A.    No, I believe she actually said that.
17   Q.    Did she tell you who complained?
18   A.    No.
19   Q.    Is there anything else with regard to that, that
20         Ms. Wright told you?
21   A.    She told me that she called my references and
22         they all checked out fine, except for the City's.
23         She said she first spoke to Glen Boyd, and
24         Glen -- she said Glen refused her information
25         stating that she would have to provide a
```

SHARON IGLESIAS                                          45

1        signature, my signature stating that he could
2        give her information. And she said, "All right."
3        She -- this is what she told me. She said that
4        she told him that that wouldn't be a problem --
5        oh. Excuse me. She said that Glen told her that
6        she needed a signature. And he said to her, "And
7        I don't think she's going to do that for you,"
8        referring to me.
9               So Ms. Wright said to him -- this is what
10       she told me she said to him that that wouldn't be
11       a problem, she would have it to him within the
12       hour, which she did. And I believe she then
13       called Don Jenkins.
14   Q.  So backing up, it's your understanding that she
15       faxed to Mr. Boyd---
16   A.  Yes, ma'am.
17   Q.  ---a release?
18   A.  Yes, ma'am.
19   Q.  Okay. And then she called---
20   A.  Don Jenkins. And she said that Mr. Jenkins had
21       told her that he could not give her information,
22       but that she needed to be very careful and to do
23       a thorough background on me and wanted to know
24       from her who my references were. Ms. Wright told
25       me that she refused to tell him that. He said to

SHARON IGLESIAS                                          46

1        her, she said, "Who are her references? Maybe I
2        can help you with that."
3    Q.  And then Ms. Wright responded with, "No"?
4    A.  Yes, ma'am.
5    Q.  Is that correct?
6    A.  Correct.
7    Q.  Anything else?
8    A.  That's all I recall at this time.
9    Q.  So you did not receive an offer of employment?
10   A.  No.
11   Q.  Other than---
12   A.  Can I say something?
13   Q.  Of course.
14   A.  In December of 2006 I came close. I interviewed
15       for a position in Raleigh with Training &
16       Standards Private Protective Services, and they
17       were very interested in doing a second interview
18       with me and sent me an interview package, a
19       second interview package. In other words, the
20       information they would need to go through a
21       second interview with me. So I filled out the
22       information, but I did not get a second
23       interview. They sent me a letter stating that --
24       thanking me, actually, for my interest and that
25       they had hired someone else.

SHARON IGLESIAS                                          47

1    Q.  Were you told by anyone from Training & Standards
2        why you were not selected for a second interview?
3    A.  No.
4    Q.  Is there any other perspective employer who had
5        specific discussions or advised you in any way
6        why you were not being hired?
7    A.  No, not that I recall.
8    Q.  Did any other employers other than the credit
9        union, Training & Standards, and of course the
10       two jobs that you currently have get past the
11       initial interview stage?
12   A.  Can you say that again, please?
13   Q.  Sure. Did any other perspective employers other
14       than the four that you have just listed, which
15       are the State credit union, Training & Standards
16       Protective Services, and of course the two jobs
17       which you currently hold---
18   A.  Right.
19   Q.  Did any of the others -- did you ever get past
20       the first interview stage?
21   A.  No.
22   Q.  Did any of the other -- with any of the other
23       employers other than the four we have just
24       discussed, did anyone ever check references?
25   A.  I don't know.

SHARON IGLESIAS                                          48

1    Q.  All right, Ms. Iglesias. I would like to talk to
2        you a little bit about your employment with the
3        City of Oxford, if I can. I would like to start
4        first a little bit backwards. I want to start
5        with your termination. I'm going to show you
6        what I'm marking as Deposition Exhibit Number 4
7        and just ask you to take a moment to look at
8        that.
9               (The letter by Ms. Iglesias is marked as
10              Deposition Exhibit Number 4.)
11   A.  (The witness reviews document.)
12   Q.  Are you finished reviewing it?
13   A.  Yes, ma'am.
14   Q.  Okay. I'm going to represent to you that
15       Exhibit 4, which is a two-page document with
16       numbers at the bottom of 121 and 122 is a
17       document that was produced by your attorneys
18       during discovery. It appears to be a letter
19       written by you appealing your termination, is
20       that correct?
21   A.  That's correct.
22   Q.  All right. Now I'm going to show you what's been
23       marked as Exhibit Number 5, which appears to be
24       an e-mail rendition of the letter that we have
25       marked as Exhibit Number 4. Is that correct?

SHARON IGLESIAS                    49

1           (The e-mail by Ms. Iglesias is marked as
2       Deposition Exhibit Number 5.)
3   A.  Yes.
4   Q.  Okay.  So you transmitted Exhibit Number 4 via
5       hand delivery and e-mail, is that correct?
6   A.  That's correct.
7   Q.  And that is your signature on Exhibit Number 4?
8   A.  That's correct.
9   Q.  I would like to talk to you about the reasons
10      that you state that you believe you were
11      discharged.  On number 1 it says, "I believe that
12      I was terminated without just cause."  Can you
13      tell me what that meant to you when you wrote the
14      letter, what does just cause mean -- or without
15      just cause?
16  A.  All four of these reasons listed were determined
17      by my attorney, Mr. Al McSurely.  And I wrote
18      them as he told me to.
19  Q.  So do you have any factual basis as you sit here
20      today for saying that you were terminated without
21      just cause?
22  A.  I do believe that I was terminated without just
23      cause because I don't believe my -- that I did
24      all of the things that they claim that I did.
25      Excuse me.

SHARON IGLESIAS                    50

1   Q.  All right.  Well, let's start there then.  What
2       are the things, as you phrased it, that they
3       claim you did?
4   A.  Well, in the termination letter I believe it
5       stated that John Volford believed that I had a
6       personal vendetta against him.  He also stated
7       that numerous agencies had already investigated.
8       He also stated that I -- he believed my behavior
9       to be disruptive, and I disagree.
10  Q.  You disagree with all three of those?
11  A.  Yes, ma'am.
12  Q.  Were there other things that you were, for lack
13      of a better word, accused of that you don't
14      believe that you did?
15  A.  Yes.
16  Q.  And what were they?
17  A.  Breach of confidentiality.
18  Q.  Anything else?
19  A.  All of the accusations they were making against
20      me, whatever they may be, I do not believe that I
21      was guilty of them.
22  Q.  None of them?
23  A.  That's correct.
24  Q.  Is there any other basis for your belief that you
25      were terminated without just cause other than as

SHARON IGLESIAS                    51

1       you stated, that you do not believe you did all
2       of the things you just enumerated to me, that is
3       engage in a personal vendetta, that numerous
4       agencies investigated, that your behavior was
5       disruptive, that there was a breach of
6       confidentiality, or that any of the other
7       accusations against you, you were not guilty of?
8   A.  I believe I was not guilty of them, yes.
9   Q.  Is there any other basis for your allegation that
10      you were not terminated with just cause -- or
11      that you were terminated without just cause?
12  A.  No, I don't think so.
13  Q.  Then let's move on to number 2.  It says, "I
14      believe I was terminated because of my
15      gender/sex."  Can you tell me what the basis of
16      that allegation is?
17  A.  No, I don't know.  I just -- Mr. McSurely advised
18      me to do that, and so I did it.
19  Q.  Do you, as you sit here today, have any reason to
20      believe that your gender or your sex had anything
21      to do with your termination?
22  A.  I don't know.  I'm not sure about that.
23  Q.  Well, during your employment were there ever any
24      inappropriate comments made to you that could
25      have been gender or sex based?

SHARON IGLESIAS                    52

1   A.  I don't -- I don't know.  I don't recall.
2   Q.  You don't recall any?
3   A.  I don't recall that there were, yeah.
4   Q.  You don't recall that there were.  Were there any
5       statements or accusations or any other conduct
6       that would have led you to believe that your
7       gender or your sex, being female, was a basis for
8       your termination?
9   A.  I don't know.  I don't know about that.
10  Q.  When you say you don't know about that---
11  A.  I don't know.  I don't -- I can't say, because I
12      don't know if it was.
13  Q.  Well, as you sit here today, do you believe that
14      your gender or your sex played any role in the
15      decision to terminate you?
16  A.  I believe it may be possible.
17  Q.  And on what do you base that belief?
18  A.  I believe anything is possible.
19  Q.  Do you have any evidence or comments or anything
20      tangible that would support a claim that your
21      termination was in part, at least, because of
22      your gender or your sex?
23  A.  No, nothing other than what I've said.
24  Q.  Just to be clear, what you said is that at this
25      point you can't think of anything, correct?

SHARON IGLESIAS                                    53

1   A.   I said anything is possible.
2   Q.   But you, as you sit here today---
3   A.   It's a possibility.
4   Q.   But as you sit here today you can't point to any
5        particular thing that would lead you to that
6        conclusion?
7   A.   No.
8   Q.   Okay. Moving on to number 3, it says, "I believe
9        that my termination was in violation of my First
10       Amendment Rights: protected speech." Do you see
11       that?
12  A.   Yes.
13  Q.   And what speech were you referring to?
14  A.   Where I spoke out and told my suspicions that the
15       Chief was embezzling money from a police fund at
16       the police department.
17  Q.   And you first spoke out about that in 2004, is
18       that correct?
19  A.   That's correct.
20  Q.   Is there any other speech that you believe you
21       engaged in that led to your termination other
22       than speaking out about your suspicion that the
23       Chief embezzled money from the drug fund?
24  A.   Any other speech -- can you say that again,
25       please?

SHARON IGLESIAS                                    54

1   Q.   Sure. Sure. Number 3 -- let's take it one at a
2        time. If you look at Exhibit Number 4, item
3        number 3 on Exhibit 4 says, "I believe that my
4        termination was in violation of my First
5        Amendment Rights: protected speech."
6   A.   Okay.
7   Q.   What I'm asking is for you to list for me all the
8        speech that you claim led to your termination.
9   A.   Oh, okay.
10  Q.   Okay. So we've said the first speech is that you
11       spoke out about your suspicion about the drug
12       fund, right?
13  A.   Uh-huh.
14  Q.   Any other speech that you think contributed to
15       your termination?
16  A.   I don't know. You know, at this very moment I
17       can't think of anything right at this moment. I
18       believe that it all stemmed from the fact that I
19       spoke out in May of 2004, and that was the
20       beginning. And any other speech that was after
21       that, I'm sure that they -- that it was
22       attributed, probably.
23  Q.   Moving onto Exhibit 4, number 4 you say, "I
24       believe that my termination was due to my
25       engagement in a City audit." Which audit are you

SHARON IGLESIAS                                    55

1        referring to?
2   A.   In May of 2004?
3   Q.   I don't know. I'm asking you what you're
4        referring to in the letter.
5   A.   No. I'm saying the audit that took place in May
6        of 2004.
7   Q.   Are you referring to the internal audit or the
8        external audit in May of 2004?
9   A.   Internal.
10  Q.   Okay. Tell me how you participated in that
11       audit. It says, "engagement." How you engage in
12       the audit?
13  A.   The auditors came to my office. They were
14       auditing all of the funds at the police
15       department, and so I showed them the funds that
16       were in the safe. And I told them my suspicions
17       and gave them copies. This was during an audit
18       that was taking place surrounding the Warren
19       Hicks embezzlement of funds, and this was around
20       the first -- approximately the first week in May
21       of 2004.
22  Q.   Was that audit occurring before -- excuse me.
23       Let me back up. Did that audit occur before or
24       after the announcement was made about Warren
25       Hicks?

SHARON IGLESIAS                                    56

1   A.   After, it was after. That is the reason that the
2        auditors were there.
3   Q.   So everyone knew about Warren Hicks at that
4        point?
5   A.   Yes.
6   Q.   And the auditors were there to look into that
7        matter, correct?
8   A.   The Warren Hicks matter?
9   Q.   Yes.
10  A.   And to audit all funds at the department for
11       security reasons, protection.
12  Q.   All right. Let's talk about your involvement in
13       the audit. In May of 2004 the internal auditor
14       was in the department, correct?
15  A.   Correct.
16  Q.   Do you remember the name of the internal auditor?
17  A.   Jim Winston.
18  Q.   So Mr. Winston was in the department and
19       interviewed you, is that correct?
20  A.   Mr. Winston came in and asked me about the funds
21       in the safe. He asked to see everything. And I
22       said -- and well, and I showed him everything.
23       And I told him my suspicions. And when I did he
24       wanted copies of everything, and that was it.
25       When you say you told him of your suspicions,

SHARON IGLESIAS                                                    57

1       recite for me exactly what you told him.
2   A.  I told him that I was very suspicious that the
3       Chief was removing money from the police
4       undercover drug fund to use for his own personal
5       use.  I told him that he was taking money either
6       during the night, after working hours, after
7       normal regular working hours, and -- or either
8       during the morning before I arrived to work.
9   Q.  Anything else you told him?
10  A.  I believe that I told him about the two phone
11      calls that I had overheard the Chief being
12      argumentative with a female, and it was a loud
13      conversation.  So that's why I heard it.  And the
14      Chief called out certain amounts of money, and
15      then the next day the money would be gone.
16  Q.  Anything else you told him?
17  A.  I don't recall at this time.
18  Q.  And you said you showed him everything.  What did
19      you show him?
20  A.  I showed him everything in the undercover drug
21      fund, the receipts, the ledger sheet.
22  Q.  Did you show him the official copy of the
23      undercover drug fund, or did you show him your
24      separate notes with regard to transactions on the
25      undercover drug fund?

SHARON IGLESIAS                                                    59

1       Mr. Winston.
2   A.  Manie Pleasants was the first person.
3   Q.  Who is Ms. Pleasants?
4   A.  Manie's position is record supervisor -- records.
5       I'm sorry.  Records supervisor.
6   Q.  She's an employee with the City of Oxford Police
7       Department?
8   A.  Yes, she is.  She previously held the position on
9       an interim basis until I was hired.
10  Q.  So Ms. Pleasants was an employee of the Oxford
11      Police Department at that time in the position of
12      records supervisor.  And previous to that she
13      held your job as administrative assistant to the
14      Chief on an interim basis, is that correct?
15  A.  Yeah.  She helped out until they could hire
16      someone to fill that position, but she held her
17      position of records supervisor as well.
18  Q.  And she helped out in your position before you
19      were hired?
20  A.  Correct.
21  Q.  All right.  When did you confide in Ms. Pleasants
22      about your suspicions?
23  A.  In 2002, I believe it was -- I believe it was
24      after he took the $240, because that was very
25      disturbing to me.  That caused a lot of

SHARON IGLESIAS                                                    58

1   A.  Both copies of the ledger were computer
2       generated, and I don't -- you know what?  I
3       really don't recall.  I don't know what he was
4       shown, but I do know that I did tell him that the
5       Chief took -- the last two times he took money it
6       was -- he didn't leave a note or an explanation
7       of any kind, and never filled out the proper
8       paperwork to accommodate the extraction of funds.
9   Q.  And did Mr. Winston take copies of the documents
10      that you gave him?
11  A.  Yes.
12  Q.  Did he tell you what he was going to do with
13      those copies?
14  A.  No.
15  Q.  Did he tell you he was going to look into it?
16  A.  I believe he did say, "I'm going to check this
17      out," something like that.
18  Q.  And do you have any idea what Mr. Winston did
19      after that?
20  A.  No.
21  Q.  Is Mr. Winston the first person you confided in
22      about your suspicions with regard to the drug
23      fund?
24  A.  No.
25  Q.  Tell me who you had confided in prior to

SHARON IGLESIAS                                                    60

1       suspicion.
2   Q.  What did you tell Ms. Pleasants?
3   A.  I went to her and asked her.  I didn't tell her.
4       I said, "Manie."  I said, "Can -- is it right for
5       the Chief to take money from the undercover drug
6       fund?"
7           And so she wanted to hear me repeat it, and
8       she said, "No, it's not right."
9   Q.  In 2002 when you asked Ms. Pleasants -- and I
10      think I'm going to quote you back, "Is it right
11      for the Chief to take money from the undercover
12      drug fund?"  Did you know for what purpose he was
13      taking money?
14  A.  Did I know?
15  Q.  Yes.
16  A.  I believed he took the money because of the phone
17      call.  The $240 was because of a personal need, a
18      personal expense or a bill.
19  Q.  I understand that's what you believed.  But did
20      you know for sure---
21  A.  Oh.
22  Q.  ---the purpose for which that money was being
23      taken out of the undercover drug fund?
24  A.  No.  No, I didn't.
25  Q.  At the time you asked Ms. Pleasants whether it

SHARON IGLESIAS                                          61

1    was right for the Chief to take money out of the
2    undercover drug fund, had you asked the Chief or
3    anybody else for what purpose he had taken the
4    money from the drug fund?
5    A.   No. I didn't have to ask him. I believe he sent
6         me an e-mail.
7    Q.   And what did he say in his e-mail?
8    A.   I don't recall without looking at the e-mail.
9    Q.   Did the e-mail give an explanation for why the
10        money was taken?
11   A.   I believe it did. I believe it did.
12   Q.   All right. And do you recall what that
13        explanation was?
14   A.   Not without looking at the e-mail.
15   Q.   Would it be accurate to say that you did not
16        believe the explanation that was given in that e-
17        mail?
18   A.   That would be accurate.
19   Q.   So as of 2002 you suspected that the Chief was
20        using money from the drug fund for something
21        other than drug fund purposes, correct?
22   A.   That is correct.
23   Q.   And as of the time you talked to Ms. Pleasants
24        the Chief had sent you an e-mail explaining why
25        he had taken the money, is that correct?

SHARON IGLESIAS                                          62

1    A.   The following morning after I overhead the
2         conversation there was an e-mail, yes.
3    Q.   So he sent an e-mail explaining. You did not
4         believe the explanation?
5    A.   No.
6    Q.   In 2002 did you tell anyone other than
7         Ms. Pleasants?
8    A.   Yes. I went to detective Mark Blair.
9    Q.   Let me back up. With regards to Ms. Pleasants,
10        did you show Ms. Pleasants any documents?
11   A.   No.
12   Q.   Did you have any conversations with Ms. Pleasants
13        other than this initial conversation in 2002?
14   A.   I don't recall any other conversation
15        specifically surrounding the Chief taking money
16        from the drug fund. There could have been one
17        later on. I just don't recall. Mamie would ask
18        me occasionally, you know, "Is he taking money?
19        Has he taken anymore money?" There was a
20        concern.
21   Q.   There was a concern by Ms. Pleasants after you
22        spoke to her?
23   A.   Yes.
24   Q.   And after you spoke to Ms. Pleasants, did she
25        continue to work in the Oxford Police Department?

SHARON IGLESIAS                                          63

1    A.   Yes.
2    Q.   Did she continue to work under the supervision of
3    ·    Chief Wolford?
4    A.   Yes.
5    Q.   Why did you confide in Ms. Pleasants?
6    A.   Mamie had trained me. I trusted her, and I went
7         to her and asked her.
8    Q.   Did Ms. Pleasants have any authorization to
9         investigate the allegations?
10   A.   No.
11   Q.   Did Ms. Pleasants have any authorization to
12        discipline the Chief?
13   A.   No.
14   Q.   Ms. Pleasants wasn't in the chain of command over
15        the Chief, was she?
16   A.   No.
17   Q.   And Ms. Pleasants wasn't your supervisor?
18   A.   No.
19   Q.   She was a peer?
20   A.   Friend, we were friendly. I don't think we were
21        very close, but we were friendly.
22   Q.   But in terms of employment she was your peer, she
23        was at the same level as you?
24   A.   I would say so, yes.
25   Q.   Did she report to you in any way?

SHARON IGLESIAS                                          64

1    A.   No.
2    Q.   And you did not report to her?
3    A.   No.
4    Q.   All right. What was Ms. Pleasants's response
5         when you confided in her your suspicions?
6    A.   She was concerned.
7    Q.   Did she give you any advice about what to do?
8    A.   Yes.
9    Q.   What did she tell you to do?
10   A. · She told me to document everything.
11   Q.   And had you, at that point, been documenting
12        everything?
13   A.   No. No, I had not.
14   Q.   After Ms. Pleasants gave you that advice, did you
15        go back and start documenting?
16   A.   Yes, I did.
17   Q.   Did you go back and document things that had
18        happened previously?
19   A.   Yes.
20   Q.   Do you recall approximately when your discussion
21        with Ms. Pleasants was?
22   A.   Shortly after he took the $240. It was in 2002,
23        I believe the early part of 2002.
24   Q.   Were there events that happened after you spoke
25        to Ms. Pleasants with regard to the drug fund?

SHARON IGLESIAS                                    65

1    A.   Such as?  I don't understand.
2    Q.   Were there additional withdrawals -- let me
3         phrase it that way -- after you spoke to
4         Ms. Pleasants the first time in 2002?
5    A.   Oh, yeah.
6    Q.   When there were those additional withdrawals, did
7         you go back and talk to Ms. Pleasants about each
8         of those?
9    A.   He took the $240 around about -- I believe it was
10        July, approximately July of 2002.  And I believe
11        that he took -- he took some more money that
12        year, and I believe I did go back and tell her,
13        yes.
14   Q.   All right.  And did Ms. Pleasants give you any
15        advice when you went back to her a second time?
16   A.   She -- yes.  She told me to keep documenting.
17   Q.   Did she ever suggest to you that you ought to
18        perhaps report it to the Chief's supervisor?
19   A.   No, she didn't.
20   Q.   And you did not, in fact, report it to anyone?
21   A.   No.  Not a City official I did not, not his --
22        not his supervisor, no.
23   Q.   Why not?
24   A.   Because I was afraid of retaliation.
25   Q.   In 2002, what you made afraid of retaliation?

SHARON IGLESIAS                                    66

1    A.   Because I had seen what the Chief had done to an
2         officer by setting him up and firing him.
3    Q.   Who are you referring to?
4    A.   I'm referring to Officer Lyle Gagnon.
5    Q.   Were you involved in the termination of
6         Mr. Gagnon?
7    A.   No.
8    Q.   When was Mr. Gagnon terminated?
9    A.   May of 2002, approximately May.
10   Q.   On what do you base your belief that the Chief
11        set Mr. Gagnon up and terminated him?
12   A.   There were several things.  One was a video that
13        was taken out of the car that Officer Gagnon was
14        driving.  There was nothing -- there was nothing
15        on the video that would cause a concern.  The
16        Chief lied about the video.  I saw parts of the
17        video myself, because of the position my desk was
18        in and the television in his office with the VCR.
19        I saw him and Lieutenant Charles Crudup watching
20        the video and laughing about it.  Don Jenkins had
21        come over to view this video, and the Chief met
22        him out in the hall and told him that the video
23        had been destroyed, when actually the video was
24        still in the VCR and he and Charles Crudup were
25        looking at it.  So he lied to Mr. Jenkins about

SHARON IGLESIAS                                    67

1         it.  Then he took the video, I believe after
2         several had viewed it, took it down to Warren
3         Hicks and asked him to destroy it.  I --
4         Ms. Davis?
5    Q.   Uh-huh?
6    A.   I need a break.
7    Q.   Absolutely.
8    A.   Thank you.
9              MS. DAVIS:  Let's take a break.
10       (A recess is taken from 10:51 to 11:07 a.m.)
11   Q.   (By Ms. Davis)  Okay, Ms. Iglesias.  When we left
12        you were giving me the reasons that you believe
13        that the Chief had retaliated against Lyle
14        Gagnon, and you had listed some incidents with a
15        video that was taken out of a car.  Are there any
16        other reasons that you believe the Chief
17        retaliated against Lyle Gagnon?
18   A.   I don't believe that was the reason he retaliated
19        against Lyle.  Do you want the reason he
20        retaliated against Lyle or -- this was -- or you
21        mean to describe this as his retaliation against
22        Lyle?
23   Q.   Perhaps I misunderstood, but I thought the
24        question that I had asked you was what caused you
25        to believe that the Chief had retaliated against

SHARON IGLESIAS                                    68

1         Lyle Gagnon.  And you started with saying that
2         your witnessing the events related to the video
3         caused you to believe that he had retaliated
4         against Lyle Gagnon.  Did I misunderstand your
5         testimony?
6    A.   I believe so.  I believe I misunderstood your
7         question.  I'm sorry.
8    Q.   That's okay.  What does the video have to do with
9         retaliation then?
10   A.   Okay.  I believe that Lieutenant Crudup filed a
11        complaint against Lyle Gagnon with the Chief, and
12        the Chief I believe -- I believe that the
13        complaint was that Lyle was a racist.  Crudup was
14        a black officer, and I remember the day the
15        Chief -- after talking to Crudup -- this was
16        late, like the Chief was leaving to go home from
17        work.  I was still in the office, and he had met
18        with Charles Crudup.  And I was walking into the
19        office, and the Chief was coming out.  And we
20        almost ran into each other.  And he stepped back
21        from me, and he said, "I'm going to get him.  I'm
22        going to get him."  So I stepped back.  I didn't
23        know who he was talking about.  And then I
24        realized this was after he had met with Crudup,
25        and then I assumed that it was Lyle Gagnon he was

SHARON IGLESIAS                                          69

1      talking about.
2   Q.  So just to make sure I understand, it was the
3      Chief's statement, "I'm going to get him," that
4      made you believe that the Chief was going to
5      retaliate against you?
6   A.  Against Lyle.
7   Q.  Okay. And then the incident with Lyle made you
8      believe that the Chief might retaliate against
9      you, is that correct?
10  A.  After what I saw him do to Lyle Gagnon, yes.
11  Q.  Do you have any personal knowledge of the
12     complaint that Lieutenant Crudup filed against
13     Lyle Gagnon?
14  A.  No.
15  Q.  Did you ever read it?
16  A.  No.
17  Q.  Ever participate in the investigation of the
18     complaint at all?
19  A.  No.
20  Q.  Did you ever see any video of Lyle Gagnon?
21  A.  No. I saw parts of the video that came out of
22     his car.
23  Q.  From the parts that you could see, could you
24     actually tell what you were looking at?
25  A.  You -- yeah. You could tell that it was the

SHARON IGLESIAS                                          70

1      front of the car, but you couldn't see anything.
2      You couldn't see anybody. It was just the front
3      of the car.
4   Q.  You, from your vantage point, couldn't see
5      anything?
6   A.  Yeah, right. I mean, yeah. I could not see any
7      people in the video. You could see that it --
8      the camera was going through the windshield out
9      to the -- out of the front of the car. But there
10     was nobody in the view that I saw in the video,
11     and that's the only glimpse that I got.
12  Q.  All right. And after receiving a complaint from
13     Lieutenant Crudup about Lyle Gagnon being a
14     racist you heard the Chief say, "I'm going to get
15     him," is that right?
16  A.  Twice.
17  Q.  And the Chief was, in your opinion, referring to
18     Lyle Gagnon when he said, "I'm going to get him"?
19  A.  Yes.
20  Q.  Okay. Did the Chief seem upset that an officer
21     of his had been accused of racism?
22  A.  No. That's not how I took his -- his anger. I
23     believe that -- I took it to mean that he was
24     angry against Lyle. His anger was against Lyle
25     Gagnon.

SHARON IGLESIAS                                          71

1   Q.  And the only complaint you're aware of that was
2      made against Lyle was that Lyle was a racist?
3   A.  That's what I heard. Because like you said, I
4      didn't see anything.
5   Q.  Okay. All right. Any other reason other than
6      Lyle Gagnon that you were afraid of retaliation
7      in 2002?
8   A.  No. I can't -- I can't recall there to be any
9      other reason at this time.
10  Q.  All right. And we were -- before we took the
11     break we were talking about your discussions with
12     Manie Pleasants. During the break have you
13     recalled anything else about your discussions
14     with Manie Pleasants---
15  A.  No.
16  Q.  ---that you didn't tell me earlier?
17  A.  Huh-uh.
18  Q.  All right. And you indicated that in 2002 you
19     also went to Detective Mark Blair with your
20     suspicions about the drug fund, is that correct?
21  A.  Correct.
22  Q.  Tell me about your discussions with Mark Blair.
23  A.  I told Blair that the Chief was removing money
24     from the undercover drug fund and that I was
25     suspicious of his actions. And I believe that I

SHARON IGLESIAS                                          72

1      related to him the incident of the $240 and the
2      phone call.
3   Q.  Did you tell Blair about the e-mail where the
4      Chief explained why he had taken the money?
5   A.  I don't recall that.
6   Q.  What else did you tell Mark Blair?
7   A.  That I was suspicious of the Chief using the
8      money for his own personal use.
9   Q.  Anything else you told Detective Blair?
10  A.  That's all I can recall.
11  Q.  Did you show Detective Blair any documents?
12  A.  No.
13  Q.  What was Detective Blair's response when you told
14     him about this?
15  A.  Blair looked concerned, and he told me to
16     document everything.
17  Q.  Did he suggest that you report your concerns?
18  A.  No.
19  Q.  Why did you select Detective Blair to confide in?
20  A.  I trusted Blair. Blair appears to me to be a
21     good officer, and I trusted him. And also, he
22     was in Investigations. And I do recall this, I
23     asked Blair what I could do, "What can I do?"
24     Blair -- that's when he told me to document
25     everything.

SHARON IGLESIAS                                              73

1   Q.   Did Detective Blair ask to see the documentation
2        that you had so far?
3   A.   No.
4   Q.   And at that point had you put together
5        documentation like Ms. Pleasants had suggested
6        you do?
7   A.   I was documenting.
8   Q.   And Detective Blair didn't ask to see any of that
9        documentation?
10  A.   No.
11  Q.   Did Detective Blair offer to investigate?
12  A.   No.
13  Q.   Is your understanding that Detective Blair has
14       the authority to investigate?
15  A.   No, not without permission to investigate.
16  Q.   Do you know if Detective Blair did any
17       investigation concerning your allegations?
18  A.   No, I do not know.
19  Q.   Anything else you can recall about your
20       discussions with Detective Blair?
21  A.   I don't recall anything more at this time.
22  Q.   After the 2002 discussion, did you have any
23       subsequent discussions with Detective Blair about
24       your suspicions?
25  A.   I'm sure I did, yes.

SHARON IGLESIAS                                              75

1   Q.   And did you ever suggest to anybody that you
2        wanted to report it?
3   A.   Yes, I'm sure I did. I'm sure that I did.
4   Q.   Did you -- do you recall suggesting to
5        Ms. Pleasants that you wanted to report the
6        conduct?
7   A.   I don't recall that.
8   Q.   Do you recall talking to Detective Blair about
9        wanting to report the conduct?
10  A.   I believe so, yes.
11  Q.   And Detective Blair didn't tell you how to report
12       it?
13  A.   I don't recall.
14  Q.   In 2002, did you know who the Chief's supervisor
15       was?
16  A.   Yes.
17  Q.   And who was that?
18  A.   The city manager.
19  Q.   In 2002, had you ever spoken with or gone to see
20       the city manager, Tonny Marrow?
21  A.   No.
22  Q.   Did you have any experience with him at all?
23  A.   No.
24  Q.   And in 2002 the human resources director was Don
25       Jenkins, is that correct?

SHARON IGLESIAS                                              74

1   Q.   At any point after 2002, your first discussion,
2        did Detective Blair obtain the authority to
3        investigate the allegations?
4   A.   No.
5   Q.   Did he, at any point after 2002, obtain any
6        authority to take disciplinary action with regard
7        to the Chief?
8   A.   No.
9   Q.   After 2002, did Detective Blair continue to work
10       in the Oxford Police Department?
11  A.   Yes.
12  Q.   Did he continue to report to the Chief?
13  A.   Yes.
14  Q.   What did you have to accomplish by talking to
15       Detective Blair?
16  A.   Help.
17  Q.   Help for what?
18  A.   I was looking for answers, and I was looking for
19       help in how to go about reporting this, reporting
20       it, what to do. What can I do?
21  Q.   Did you ask Detective Blair, "How do I report
22       this"?
23  A.   I asked Blair, "What can I do?"
24  Q.   And his response was, "Document"?
25  A.   Right.

SHARON IGLESIAS                                              76

1   A.   Yes, I believe so.
2   Q.   And the human resources director is someone that
3        hears employee complaints and concerns, is that
4        correct?
5   A.   I believe that, yes.
6   Q.   At any point in 2002, did you attempt to contact
7        the city manager about your concerns?
8   A.   No.
9   Q.   Did you at any point in 2002 attempt to contact
10       the human resources director about your concerns?
11  A.   No.
12  Q.   Other than Ms. Pleasants or Detective -- and
13       Detective Blair, was there anybody else that you
14       recall talking to about your concerns in the
15       calendar year 2002?
16  A.   I don't recall anyone else in 2002, at this time.
17  Q.   Let's move on to 2003. Do you recall
18       talking to anyone in 2003 about your concerns
19       with regard to the Chief and the drug fund?
20  A.   Yes.
21  Q.   Who?
22  A.   I spoke to Lieutenant Glen Boyd.
23  Q.   Anyone else in 2003 besides Lieutenant Boyd?
24  A.   Kevin Dickerson, Lynn Curl, they were the drug
25       officers.

SHARON IGLESIAS                                    77

1   Q.   Anybody else?
2   A.   Angelia Downey, Angelia was a dispatcher.
3   Q.   Anybody else in 2003?
4   A.   I don't recall anyone else at that -- at this
5        time. I don't -- I know I spoke to Kevin Cook,
6        but I don't know if it was in 2003.
7   Q.   Anyone else that you specifically recall talking
8        to in 2003?
9   A.   I do not recall.
10  Q.   All right. Let's take them one at a time then.
11       When do you recall talking to Glen Boyd?
12  A.   After the Chief took $400, and that was in April
13       of 2003.
14  Q.   With regard to the April '03 withdrawal of the
15       $400, had the Chief provided you with an
16       explanation for that withdrawal?
17  A.   By e-mail.
18  Q.   Do you recall what the Chief's explanation was?
19  A.   Not without looking at the e-mail, no.
20  Q.   And I gather that you did not believe the
21       explanation that was contained in the Chief's e-
22       mail?
23  A.   No.
24  Q.   So at the time you talked to Lieutenant Boyd in
25       2003 there had been a withdrawal of $400 from the

SHARON IGLESIAS                                    78

1        drug fund, and there had been an e-mail
2        explanation by the Chief to you as to why that
3        withdrawal was made, correct?
4   A.   Correct.
5   Q.   All right. And you still elected to talk to
6        Lieutenant Boyd?
7   A.   Yes.
8   Q.   And so tell me what you talked to Lieutenant Boyd
9        about.
10  A.   After the Chief withdrew $400, prior to his
11       withdrawal he had another phone conversation with
12       a female, a conversation concerning car repairs.
13       And he was loud and somewhat argumentative, and
14       the door was open, and I heard the conversation.
15       That night he came down after normal working
16       hours and removed the funds, $400. And the next
17       morning I got an e-mail. And while I was reading
18       that e-mail the Chief came in, and he was
19       standing there ringing his hands. And he said,
20       "I feel so guilty about taking this money after
21       what Pat Gresham has done at the Sheriff's
22       Department." I was just looking at him. I could
23       not believe what he was saying, and I turned back
24       around to my computer.
25  Q.   Okay. So again, what did you say to Lieutenant

SHARON IGLESIAS                                    79

1        Boyd?
2   A.   I told Lieutenant Boyd that the Chief had taken
3        $400 out of the police undercover fund. And he
4        said, "$400?"
5            I said, "Yes."
6            He said, "What for?"
7            And I said, "I don't know." I said, "Is it
8        all right for him to do that?"
9            So Glen sat there for a moment and didn't
10       respond. He kind of hesitated, and then he said
11       to me, "Well, oh, yeah. Okay, yeah. He can do
12       that. He's Chief. He can do anything."
13           And I said, "Okay." And that was it.
14  Q.   At the time you talked to Lieutenant Boyd, did he
15       have any authorization to investigate the alleged
16       missing money from the drug funds?
17  A.   I don't know if he did or not.
18  Q.   Did you ask him?
19  A.   The reason I told Glen was because he was the --
20       in charge, excuse me. He was in charge over the
21       drug team. So he would be aware of money that
22       the drug officers requested or needed for their
23       work. So he was aware. He was the special
24       operations commander, which covered the drug
25       team, and that's why I told Glen, supervisory.

SHARON IGLESIAS                                    80

1   Q.   Glen Boyd was supervisor of the drug team, is
2        that correct?
3   A.   Yes. Yes.
4   Q.   Was Glen Boyd supervisor in any way over Chief
5        Wolford?
6   A.   No.
7   Q.   Did Glen Boyd have any authorization to
8        discipline or take any action at all against the
9        Chief as far as you knew?
10  A.   No.
11  Q.   After you talked to Glen Boyd in 2002, did Glen
12       Boyd continue to work with the Oxford Police
13       Department?
14  A.   Yes.
15           MR. MONTEITH: Can I -- I'm sorry.
16       Just for the sake of the record, I think the
17       question you just asked, Robin, you said,
18       "After you talked to Glen Boyd in 2002."
19       Did you mean to say 2003?
20           MS. DAVIS: Indeed I did. Thank you.
21           MR. MONTEITH: Okay. Just to---
22  Q.   After you talked to Glen Boyd in 2003, did Glen
23       Boyd continue to work for the Oxford Police
24       Department?
25  A.   Yes.

SHARON IGLESIAS                                    81

1   Q.   All right.  And did he continue to report to
2        Chief Wolford?
3   A.   Yes.
4   Q.   And did he continue to report to Chief Wolford?
5   A.   Yes.
6   Q.   Do you have any idea whether Glen Boyd
7        investigated at all the allegations that you had
8        made?
9   A.   No, I don't.
10  Q.   Do you recall showing Glen Boyd any
11       documentation?
12  A.   No.
13  Q.   You're sure you did not show him documentation?
14  A.   I'm very sure.
15  Q.   Did you ask Glen Boyd what you should do?
16  A.   No, I didn't.
17  Q.   Did Glen Boyd give you any advice as to what to
18       do?
19  A.   No, he didn't.
20  Q.   Did you tell Glen Boyd that the Chief had given
21       you an explanation for taking the $400 out of the
22       undercover fund?
23  A.   I don't -- I don't recall.  I don't recall if I
24       did that.  All I recall about that was the $400
25       that he had taken, and I told Glen about it.

SHARON IGLESIAS                                    82

1   Q.   Do you recall telling Lieutenant Boyd about the
2        phone conversation that you overheard?
3   A.   No, I don't recall.
4   Q.   All right.  You allege that you heard a phone
5        conversation in 2002 with regard to a $240
6        withdrawal and that you heard a phone
7        conversation in 2003 with regard to a $400
8        withdrawal?
9   A.   Correct.
10  Q.   Did you ever tell anyone up until -- up until and
11       through 2003 about either of those phone
12       conversations?
13  A.   Mark Blair.
14  Q.   You told Mark Blair about the first phone
15       conversation?
16  A.   Yes, and also the second.
17  Q.   So you went back and told Mark Blair about the
18       second?
19  A.   And I also believe Manie Pleasants.
20  Q.   You told Ms. Pleasants about both?
21  A.   Yes.
22  Q.   And what year do you recall telling Ms. Pleasants
23       about the 2002 phone conversation that's with
24       regard to the $240?
25  A.   I told her right after it happened, the $240.

SHARON IGLESIAS                                    83

1   Q.   When do you recall telling her about the $400
2        conversation?
3   A.   Not long after it happened.
4   Q.   So sometime in 2003?
5   A.   Yes.
6   Q.   The same questions with regard to Detective
7        Blair.  When do you recall telling Detective
8        Blair about the 2002 phone conversation?
9   A.   Not long after it happened.
10  Q.   What about the $400 conversation?
11  A.   Not long after it happened.
12  Q.   So that would be in 2003?
13  A.   '03, yes.
14  Q.   Other than Ms. Pleasants and Detective Blair,
15       through the end of the calendar year 2003, did
16       you ever share with anyone else those phone
17       conversations?
18  A.   I do not recall at this time.  I don't think that
19       I did.  I spoke to Kevin and Lynn Curl, but I
20       don't know or can recall whether or not I
21       mentioned phone conversations.
22  Q.   All right.  Do you recall anything else about
23       your conversation with Lieutenant Boyd?
24  A.   No.
25  Q.   All right.  Then let's move on to Kevin

SHARON IGLESIAS                                    84

1        Dickerson.  Approximately when did you talk to
2        Kevin Dickerson about your suspicions about the
3        Chief?
4   A.   It would be after the Chief had taken the $400,
5        sometime after.
6   Q.   Can you recall whether it was before or after you
7        talked to Lieutenant Boyd?
8   A.   After I spoke with Lieutenant Boyd.
9   Q.   What was Kevin Dickerson's position with the
10       police department?
11  A.   I need to change that answer, because I'm really
12       not sure.  I don't know if it was after I spoke
13       to Lieutenant Boyd or after -- I really do not
14       recall as far as talking to Kevin Dickerson.  I
15       feel like it was after I spoke to Glen.
16  Q.   So you're not sure, but you think it was
17       probably---
18  A.   Yes.
19  Q.   ---after talking to Glen?
20  A.   That's correct.
21  Q.   And what was Kevin Dickerson's position with the
22       police department?
23  A.   He was a drug officer.
24  Q.   He reported to Lieutenant Boyd?
25  A.   Yes, he did.

SHARON IGLESIAS                                        85

1   Q.   Okay. All right. What did you say to Kevin
2        Dickerson?
3   A.   I spoke to Kevin and Lynn together. They came
4        into my office.
5   Q.   And that's Lynn Curl?
6   A.   Lynn Curl, yes.
7   Q.   All right. And what was Lynn Curl's position?
8   A.   She was also a drug officer, and I don't -- I
9        don't know if at that time she had rank. I know
10       she was promoted to corporal. I don't know if
11       she was already corporal.
12  Q.   At that time she also reported to Lieutenant
13       Boyd?
14  A.   Yes.
15  Q.   So you spoke to Dickerson and Curl together?
16  A.   Yes.
17  Q.   And where did that conversation occur?
18  A.   In my office.
19  Q.   Did you ask them to come in, or did they come in
20       without asking?
21  A.   No, they were there -- I don't remember. I don't
22       remember. I know they were there that day.
23  Q.   And you don't recall if they were there for
24       another purpose---
25  A.   Right.

SHARON IGLESIAS                                        86

1   Q.   ---or whether you called them specifically to
2        talk about this?
3   A.   I don't -- I didn't call them in, you know,
4        specifically to talk about this. They were there
5        at the police department, and I spoke to them in
6        my office.
7   Q.   Tell me what you recall saying to them.
8   A.   I asked them if they knew about the Chief taking
9        money from the drug fund, and they said no.
10       Kevin spoke up and said, "Is he taking money?"
11            And I said, "Yes."
12            He said, "Well, I'm not aware of it." And
13       Lynn said the same thing.
14            And I asked them, I said, "Is he" - I said,
15       "Would you know whether or not he's paying
16       informants and buying drugs?"
17            And Kevin looked at me kind of funny and
18       said -- well, you would have to know Kevin to
19       know how he talks. He said, "Naw, nan." So they
20       didn't know.
21  Q.   So Kevin said, "Naw, nan," which---
22  A.   Naw, N-A-W, I think.
23  Q.   Right. Which you interpreted to mean---
24  A.   No.
25  Q.   ---no. I don't know---

SHARON IGLESIAS                                        87

1   A.   Right.
2   Q.   ---whether he is or not?
3   A.   That's -- yeah. Naw, I didn't know he was, or I
4        don't know if he is. That's how I took it.
5   Q.   Anything else you recall saying to Officer
6        Dickerson or Curl?
7   A.   I would say not at this time, I do not.
8   Q.   Did you tell Officers Dickerson and Curl that the
9        Chief had advised you that the reason for these
10       withdrawals was informant buys?
11  A.   Oh, yes. Yes, I did, informant and purchase of
12       drugs.
13  Q.   Did you tell them that Lieutenant Boyd had said
14       he -- that the Chief had authorization to do
15       that?
16  A.   Can you repeat that, please?
17  Q.   Did you tell Officers Dickerson and Curl that
18       Lieutenant Boyd had advised you that the Chief
19       would have authorization to take money out of the
20       drug fund?
21  A.   No.
22  Q.   Did you tell either of them about the phone
23       conversations that you overheard?
24  A.   No. I don't recall that.
25  Q.   All right. At the time you spoke with Officers

SHARON IGLESIAS                                        88

1        Dickerson and Curl, did either of them have
2        authorization to investigate the Chief's taking
3        of money from the drug fund?
4   A.   No.
5   Q.   Did either of them have supervisory or
6        disciplinary authority over the Chief?
7   A.   No.
8   Q.   Did you ask them any questions about what you
9        should do?
10  A.   No.
11  Q.   Did they give you any advice about what to do?
12  A.   No.
13  Q.   And what was your purpose for sharing this
14       information with Officers Dickerson and Curl?
15  A.   I wanted to see if the Chief was involved in a
16       case paying informants and purchasing drugs. And
17       if he was, surely Lynn Curl and Kevin Dickerson
18       would know this, because they are the drug team.
19  Q.   And if Officer Dickerson and Officer Curl had
20       known about investigations, is it your contention
21       that they would have had the authorization to
22       inform you, bring you into the loop, on
23       confidential investigations?
24  A.   I don't understand. I don't understand your
25       question.

SHARON IGLESIAS                                              89

1  Q.  Let me try it another way. Were you aware of all
2      the drug buys that were going on in the
3      department?
4  A.  Of course not.
5  Q.  Because you're not a sworn officer?
6  A.  No.
7  Q.  And the drug team ordinarily would not share with
8      a non-sworn officer specific information related
9      to drug buys, correct?
10 A.  Or any investigated matters, correct.
11 Q.  So even if Officer Dickerson and Officer Curl had
12     known about an investigation, would they have
13     necessarily been able to share that with you?
14 A.  I don't know. I wanted to know if they were
15     aware, and they looked really confused about the
16     Chief taking money and claiming to make drug buys
17     and paying informants. And that was it.
18 Q.  And they did not share with you any information
19     that they may have known or not known about those
20     drug buys?
21 A.  All they said was, "No, we're not aware of that."
22 Q.  Did you consider the possibility that they were
23     telling you they were not aware of it because
24     they were not at liberty to share the details
25     with you?

SHARON IGLESIAS                                              90

1  A.  No.
2  Q.  Did you consider the possibility that they were
3      not aware of it because the drug buys were in
4      connection with an investigation that was
5      confidential even to the drug team?
6  A.  What was the first part of that question again?
7  Q.  Did you consider the possibility---
8  A.  Okay. The answer would be no.
9  Q.  Did either Officer Dickerson or Officer Curl tell
10     you they were going to do any investigation?
11 A.  Into what?
12 Q.  Into your suspicions about the drug fund?
13 A.  No.
14 Q.  Do you know whether they did or not?
15 A.  No.
16 Q.  Do you know whether they ever went back and asked
17     the Chief what was going on?
18 A.  No, I don't know.
19 Q.  And Officers Dickerson and Curl in 2003 continued
20     to work for the Oxford Police Department, is that
21     correct?
22 A.  Correct.
23 Q.  And they continued to report to the Chief?
24 A.  Correct.
25 Q.  The next person you listed was Angelia Downey.

SHARON IGLESIAS                                              91

1      Before we move on to Ms. Downey, is there
2      anything else that you can recall about your
3      conversations with Officers Curl and Dickerson
4      that you haven't already told me?
5  A.  Not at this time.
6  Q.  Angelia Downey, I believe you said she was a
7      dispatcher?
8  A.  Uh-huh.
9  Q.  And you talked to her sometime in 2003?
10 A.  Yes.
11 Q.  What was your purpose for talking with Angelia?
12 A.  Angelia was a friend, and I confided in her.
13 Q.  She had no authority to do any investigation?
14 A.  No.
15 Q.  And she had no authority to undertake any
16     disciplinary action against the Chief?
17 A.  No.
18 Q.  What do you recall about your conversation with
19     Angelia?
20 A.  I told Angelia that the Chief was taking money
21     out of the police undercover fund and that I
22     suspected he was using it for his own personal
23     use.
24 Q.  Did you tell Angelia that he had provided you
25     with an explanation for each of the withdrawals?

SHARON IGLESIAS                                              92

1  A.  No.
2  Q.  Did you share with her any of the phone
3      conversations that you overheard?
4  A.  I don't recall.
5  Q.  Anything else about your conversation with
6      Angelia that you recall?
7  A.  Not at this time.
8  Q.  Did Angelia give you any advice as to how to
9      proceed?
10 A.  No.
11 Q.  Did you ask her for any advice?
12 A.  No.
13 Q.  Did you ask her to do anything?
14 A.  No.
15 Q.  And you didn't ask Officers Curl or Dickerson to
16     do anything either?
17 A.  No.
18 Q.  Do you know whether Angelia Downey, Officer Curl,
19     or Officer Dickerson did anything in response to
20     your report?
21 A.  No.
22 Q.  Anything else you recall about your conversation
23     with Angelia Downey that we haven't already
24     covered?
25 A.  Not at this time.

SHARON IGLESIAS                                                          93

1   Q.   The next person you mentioned was Kevin Cook?
2   A.   Uh-huh.
3   Q.   All right. What's Mr. Cook's position with the
4        police department?
5   A.   He was hired as a police officer, patrol officer.
6   Q.   Was he a patrol officer in 2003 when you spoke to
7        him?
8   A.   I believe it was 2003, the latter part of 2003 or
9        the earlier part of 2004. I am not sure. I am
10       not sure of the dates.
11  Q.   So of the ones we were discussing Kevin Cook was
12       the most recent conversation that you can recall?
13  A.   That -- yes.
14  Q.   And it may have been late 2003 or early 2004?
15  A.   Correct.
16  Q.   And what precipitated your discussion with Kevin
17       Cook?
18  A.   Kevin had investigative background. He worked
19       with the Wake County District Attorney's Office
20       as an investigator. And I knew Kevin had a lot
21       of experience when he was hired, so I approached
22       Kevin. I felt confident with him. He was very
23       friendly towards me and a very nice person, and I
24       mentioned it to him.
25  Q.   So you mentioned it to him just because he was a

SHARON IGLESIAS                                                          94

1        nice person?
2   A.   No, because of his investigative background.
3   Q.   Okay. Well, did you ask him to do an
4        investigation?
5   A.   No. I asked him what he thought.
6   Q.   Tell me first what you told him.
7   A.   I told him that the Chief had removed funds from
8        the police undercover fund. I told him about the
9        phone conversations. I told him about -- up to
10       that point the extractions that the Chief had
11       made and the reasons. I believe I discussed the
12       Chief's reasons.
13  Q.   That would be the e-mail explanations---
14  A.   The e-mails.
15  Q.   ---that you're talking about?
16  A.   Yes, correct.
17  Q.   Okay?
18  A.   Kevin said to me, he said, "This doesn't sound
19       right."
20  Q.   Anything else that Kevin said to you?
21  A.   I believe Kevin said, "It looks to me like he's
22       guilty."
23  Q.   At the point you talked to Kevin Cook, how long
24       had he been with the Oxford Police Department?
25  A.   Not long.

SHARON IGLESIAS                                                          95

1   Q.   Just a few weeks?
2   A.   I don't know. I knew Kevin wasn't there very
3        long.
4   Q.   It would be fair to call him a new officer to the
5        department then?
6   A.   Yes. Yes.
7   Q.   And Officer Cook didn't have any investigative
8        authority?
9   A.   No.
10  Q.   He didn't have any disciplinary authority?
11  A.   No.
12  Q.   Did you ask him to do anything?
13  A.   No.
14  Q.   Did you ask him for any advice on how to handle
15       anything?
16  A.   I believe I did, yes.
17  Q.   What do you recall asking him?
18  A.   What can I do?
19  Q.   And what was his response?
20  A.   I don't remember his exact response, "Keep" -- I
21       believe he said, "Keep records of everything.
22       Make your notes, keep your documentation, protect
23       yourself."
24  Q.   Did you show Officer Cook the documentation that
25       you already had?

SHARON IGLESIAS                                                          96

1   A.   Yes, I did.
2   Q.   And that included the documentation you had
3        prepared in response to Ms. Pleasant's suggestion
4        that you go back and document the things you
5        knew?
6   A.   I showed Kevin what was -- yes, the documentation
7        that I had. Yes, I showed him that.
8   Q.   Did he review it?
9   A.   He reviewed my documentation, yes.
10  Q.   Did he keep a copy?
11  A.   No.
12  Q.   Did he suggest that you show the documentation to
13       anyone else?
14  A.   No.
15  Q.   All right. And the documentation that you showed
16       Officer Cook, was that the actual official file,
17       or was that the separate file that had your
18       notes---
19  A.   Separate file.
20  Q.   It was your personal file?
21  A.   My personal file, yes.
22  Q.   All right. Do you know whether Kevin took any
23       action?
24  A.   No, I don't know.
25  Q.   Did you ever ask him if he did anything?

SHARON IGLESIAS                                                97

1   A.   No.
2   Q.   Anybody else that you recall talking to in the
3        2003, early 2004 time frame?
4   A.   Not that I can recall at this time.
5   Q.   So now we're in 2004.  I would like to talk to
6        you about the time period between January of 2004
7        or the beginning of 2004 up and until you talked
8        to the auditor, Mr. Winston.  And I think you
9        said May of 2004, is that correct?
10  A.   Correct.
11  Q.   Did you speak to anyone during this period of
12       time about your concerns?
13  A.   I just thought -- I just recalled something.
14  Q.   Okay.
15  A.   In December of 2003 that's when the Chief took
16       the $20 -- excuse me.  I'm sorry.  It was in
17       February, February 2004 that I spoke to Glen Boyd
18       again.  I apologize for that.
19  Q.   So let me get this straight.  In February of 2004
20       you spoke to Glen Boyd again?
21  A.   Yes, concerning the Chief taking money out of the
22       drug fund.
23  Q.   And the reason for the second conversation with
24       Glen Boyd?
25  A.   The Chief had taken $60 out of the fund, I

SHARON IGLESIAS                                                98

1        believe, that morning before I arrived to work.
2        He was leaving to go out of town to
3        Charlottesville, and I believe he drove the City
4        car.  Glen -- the Chief had taken the $60.  I
5        called Glen -- I went in, and I started my
6        duties.  I was taking care of my work.  I counted
7        the money, and $60 was missing.  And the Chief
8        had already left.  So I called Glen, and I said,
9        "Glen, do you know about $60 missing out of the
10       undercover fund?"
11           He said, "No."
12       I said, "Do you know whether or not the
13       Chief took $60?"
14           He said, "No, I don't."  And that was all I
15       recall saying to him.
16           In a few minutes Glen came to my office.  He
17       stood in the doorway, and he said, "How often
18       does he take money out of that fund?"
19           And I said, "Glen, as often as he needs it."
20           And he -- he screwed his face up, and he
21       slammed his fist on the door.  And he said, "How
22       am I going to talk to him about this?"
23  Q.   Anything else you recall about that conversation?
24  A.   That's all I recall at this time.
25  Q.   Did you ever receive an explanation from the

SHARON IGLESIAS                                                99

1        Chief or anyone else with regard to that $60?
2   A.   No.
3   Q.   No explanation at all?
4   A.   No, nor the time before that when he took the $20
5        in December of 2003.
6   Q.   Well, let's go back to the -- so $60 was missing
7        in February of '04.  Was that $60 later replaced?
8   A.   Yes.  He put it back.  He took the money on a
9        Wednesday.  He got paid on Friday, and so he put
10       it back sometime between Friday and Monday.  When
11       I came in Monday morning I counted the money, and
12       the $60 had been put back.
13  Q.   And you -- it's your testimony here today that
14       the Chief never explained to you what had
15       happened with that $60?
16  A.   No, he never did.
17  Q.   Did the Chief tell you that he took the $60?
18  A.   No.
19  Q.   Did the Chief tell you that he replaced $60?
20  A.   No.
21  Q.   How do you know that the Chief took $60?
22  A.   Because only he and I have the key.
23  Q.   Glen Boyd doesn't have a key?
24  A.   No.
25  Q.   No one else has a key?

SHARON IGLESIAS                                                100

1   A.   No.
2   Q.   And your testimony is you counted the money on a
3        Wednesday.  It was $60 short.  Did you count the
4        money on Thursday?
5   A.   I believe I did.
6   Q.   So you counted it on Wednesday and you counted
7        the money on Thursday?
8   A.   Yes.
9   Q.   And was it---
10  A.   And Friday.
11  Q.   Was it $60 short on Thursday?
12  A.   Yes.
13  Q.   And on Friday it was $60 short?
14  A.   Yes.
15  Q.   And on Monday -- I assume you did not work on
16       Saturday and Sunday?
17  A.   Correct.
18  Q.   So you could not have counted the money during
19       that time?
20  A.   Correct.
21  Q.   And you counted the money on Monday?
22  A.   Monday morning.
23  Q.   And the money was not short anymore?
24  A.   Right.
25  Q.   Did you ever ask the Chief about the money?

SHARON IGLESIAS                                                      101

1    A.   No.
2    Q.   Did you ever talk to anyone except Glen Boyd
3         about that money?
4    A.   No.  I don't recall -- I don't recall at this
5         time.  I didn't talk to anyone about the $60.  I
6         believe in the time prior to that, when he took
7         $20 in December, I went to make -- well, actually
8         Mamie called me at home.  It was -- this was
9         during Thanksgiving because---
10   Q.   So it was in November of '03 then?
11   A.   Yes.  This is November of '03.
12   Q.   And we're talking about $20?
13   A.   $20.  I was out on Thanksgiving vacation.  Mamie
14        called me at home, early afternoon, and she said,
15        "I saw the Chief go in your office.  I heard him
16        open the drawer, take the keys, and I heard him
17        open the safe."  The safe was squeaky sound, so
18        you could recall the -- that's how she said she
19        knew.  And she said the door was open a little to
20        where she could see.  She said, "When you get
21        back to work you count the money."
22             And I said, "Okay."
23   Q.   And when did you come back to work?
24   A.   In December, I was out a week, the week of
25        Thanksgiving.  I believe I came back in December.

SHARON IGLESIAS                                                      102

1    Q.   All right.  You came back to work.  Did you count
2         the money?
3    A.   Yes.
4    Q.   Was it $20 short?
5    A.   Yes.
6    Q.   Did you ask the Chief about the $20?
7    A.   Yes, I did.
8    Q.   What was his response?
9    A.   He said, "I haven't been in the safe."
10             And I looked at him and told him, I said,
11        "Well, I haven't either."
12             And then he said, "Well, just give me a
13        minute."  And so then he went in his office, he
14        got his car keys, and he left.  He came back in
15        about 15-20 minutes.  I heard him shuffling
16        papers, and I went to the fax machine.  And the
17        Chief came in the dispatch office where the fax
18        machine was located, and he opened up a file.
19        And there I saw $20 clipped, paper clipped with a
20        blue piece of paper.  And he said, "Oh, here it
21        is."  Then he handed me the $20.
22   Q.   Okay.  Did he give you any explanation for why he
23        had the $20 in a file?
24   A.   "Oh, I forgot I had it."
25   Q.   Did he tell you why he had it?

SHARON IGLESIAS                                                      103

1    A.   No.
2    Q.   What type of file was it he took the $20 from?
3    A.   I don't know.
4    Q.   Did it look like an investigative file?
5    A.   No.
6    Q.   What was on the blue piece of paper?
7    A.   I believe it had a date written on it, November.
8         I believe it had November, something November on
9         it.
10   Q.   Was there any e-mail or note left for you with
11        regard to the $20 or the $60?
12   A.   No.
13   Q.   All right.  And was there anything else you
14        recall about that $20 withdrawal?
15   A.   No, not at this time.
16   Q.   Do you have any idea what the Chief used that $20
17        for?
18   A.   No.
19   Q.   Do you have any idea why the Chief took that $20
20        out of the safe?
21   A.   No.
22   Q.   Do you know for certain that the Chief did take
23        the $20 out of the safe?
24   A.   I can only assume he did, because he's the one
25        that returned it.

SHARON IGLESIAS                                                      104

1    Q.   You did not see him take it out of the safe?
2    A.   No.
3    Q.   The only person who reported to you that the
4         Chief was in the safe was Ms. Pleasants?
5    A.   Correct.
6    Q.   And it's your contention that only you and the
7         Chief have keys to the safe?
8    A.   Correct.
9    Q.   Did the Chief ever deny having the $20?
10   A.   No.  He said he had not been in the safe.  That
11        implied to me that he didn't take the money, that
12        he was saying that he didn't take the money.
13   Q.   But then he brought the money to you, and it was
14        located in a file?
15   A.   Correct.
16   Q.   At that point, did you ask the Chief why he had
17        taken the money?
18   A.   No.
19   Q.   You didn't ask him for any explanation at all?
20   A.   No.
21   Q.   All right.  With regard to the February 2004 $60,
22        did the Chief ever advise you that he had taken
23        the money and replaced it?
24   A.   No.
25   Q.   And there was no explanation given for the $60?

SHARON IGLESIAS                                    105

1   A.   No.
2   Q.   Do you have any documentation with regard to a
3        daily reconcilliation of the drug fund?
4   A.   No.
5   Q.   When you counted the money in the drug fund every
6        morning, how did you keep track of what was in
7        there?
8   A.   Just memory.
9   Q.   So when you're talking about the $60, you counted
10       it on Wednesday.  You remembered what you
11       counted.  Did you make any notes about what you
12       counted?
13  A.   I don't recall that I did.
14  Q.   And you counted it again on Thursday.  Did you
15       make any notes on Thursday?
16  A.   No.
17  Q.   How about Friday?
18  A.   No.
19  Q.   How about Monday?
20  A.   No.  I didn't make any notes other than making a
21       notation on the ledger sheet.  I noted that the
22       $60 was missing.  I dated it.  I don't recall
23       that date.  I believe -- you know what?  I
24       believe it was February the 11th.  I am not
25       certain of that, but I believe it was February

SHARON IGLESIAS                                    106

1        11, 2004.  And I believe that the money was
2        returned on the 16th, February 16th.  That was
3        documented in my notes.
4   Q.   And these, again, are your personal notes?
5   A.   Uh-huh.
6   Q.   Did you document them on the official ledger
7        sheet anywhere?
8   A.   Not on the ledger sheet, that was actually kept
9        in the file in the safe.  On the computer ledger
10       sheet, yes.
11  Q.   And the computer ledger sheet is part of your
12       personal notes?
13  A.   It's a -- It's a ledger sheet that I used every
14       time an officer would request funds and funds
15       were given.  I would print out a new ledger
16       sheet, and that was my sheet that I used.
17  Q.   Okay.  So we've talked about a conversation with
18       Glen Boyd in February of '04.  Any other
19       conversations that you can recall up to the time
20       that you spoke with the auditor in May of '04?
21  A.   No, not that I recall.
22  Q.   All right.  With regard to your conversations
23       with Glen Boyd, did you ask Glen to do any
24       investigation in February of '04?
25  A.   No.

SHARON IGLESIAS                                    107

1   Q.   Do you know whether Glen did do any
2        investigation?
3   A.   No.
4   Q.   Do you know if Glen followed up with the Chief to
5        ask any questions?
6   A.   No.
7   Q.   Did the Chief know that you counted the money
8        every day?
9   A.   I don't think he did.
10  Q.   Was it part of your job duties to count the money
11       every day?
12  A.   I don't believe my job duty stipulated that I
13       should count the money every day.  I just did.
14  Q.   What was the reason for you counting the money
15       every day?
16  A.   Because I suspected John Wolford of taking money
17       for his own personal use.
18  Q.   So you made a decision to count the money every
19       day, but you did not keep a log of the dollar
20       amount that you counted every day?
21  A.   No.
22  Q.   All right.  In February of '04, did Glen Boyd
23       give any advice about what to do?
24  A.   No.
25  Q.   Okay.  In February of '04, did Glen Boyd have any

SHARON IGLESIAS                                    108

1        disciplinary authority over Chief Wolford?
2   A.   No.
3   Q.   Did Glen Boyd suggest that you report anything?
4   A.   No.
5   Q.   All right.  Did you show Glen Boyd any documents
6        in February of '04?
7   A.   No.
8   Q.   Are there any other conversations at all that you
9        recall prior to your conversation with the
10       auditor in May of '04 with regard to your
11       suspicions regarding the drug fund?
12  A.   Not that I recall.
13  Q.   All right.  And after the $60 that we're talking
14       about in February of '04, were there any
15       additional withdrawals from the drug fund?
16  A.   I believe February of '04 was the last withdrawal
17       by the Chief.
18  Q.   And I should rephrase that.  Obviously there with
19       withdrawals by people other than the Chief.  Were
20       there withdrawals after February of '04 by the
21       Chief that you were suspicious of?
22  A.   No.
23  Q.   So by May of '04 there were no longer any
24       withdrawals being made that you were suspicious
25       of?

SHARON IGLESIAS                                    109

1   A.   No.
2                  MS. DAVIS: All right. Let me take a
3        quick break. It's a little earlier, but I am
4        at a good breaking point if you all want to
5        break for lunch. What do you think you'll
6        need to run out?
7        (A lunch recess was taken from 12:10 to 1:27 p.m.)
8   Q.   (By Ms. Davis) Ms. Iglesias, before lunch we
9        were talking about all conversations you had had
10       with anybody up until May of 2004 when you spoke
11       to the auditor.
12  A.   Okay.
13  Q.   And then other than the individuals that you have
14       enumerated for me, can you recall any other
15       person that you spoke to up and until May of 2004
16       when you spoke to Mr. Winston?
17  A.   Not at this time, I cannot recall anyone else.
18  Q.   And just to be clear, up through May of 2004 had
19       you talked to anybody outside of the Oxford
20       Police Department or outside the City of Oxford,
21       outside the -- someone who didn't work with the
22       City of Oxford with regard to your suspicions?
23  A.   My husband.
24  Q.   Anyone else?
25  A.   No.

SHARON IGLESIAS                                    110

1   Q.   What about Susan Wolford?
2   A.   Susan Wolford, I spoke to her in July of 2003.
3        But they were not about the concerns. That
4        was -- at that time particular time was not about
5        my concerns.
6   Q.   Okay. What was your discussion with Susan
7        Wolford in July of 2003?
8   A.   Susan called me at the police department, and she
9        was crying and she was upset. And this was July
10       of 2003. John Wolford had gone on a trip to, I
11       think, Atlantic Beach for a conference. And she
12       was actually scheduled to go with him, as well as
13       their daughter. And for some reason she didn't
14       go, and when she called me she was crying and
15       upset. And she said, "Can I come down there and
16       talk to you?"
17            I said -- I said, "I don't know if that
18       would be a good idea. You're upset."
19            She said, "Well, how about lunch?"
20            I said, "I'm not available for lunch today."
21            And she said, "Well, can you come by? Can I
22       talk to you?"
23            And I said, "Well, yeah."
24            And so I notified Glen Boyd that I was going
25       over to Susan's, to the home -- to the home and

SHARON IGLESIAS                                    111

1        talk to her, something seemed to be wrong.
2            And he said, "Okay, go ahead." So I did.
3   Q.   Okay. And just to be clear, at that point Susan
4        Wolford and Chief John Wolford were married,
5        correct?
6   A.   Yes, that's correct.
7   Q.   And they were living together?
8   A.   Yes, correct.
9   Q.   They had not yet separated?
10  A.   No.
11  Q.   Do you have any idea why Susan Wolford would call
12       you?
13  A.   No.
14  Q.   Is that the first conversation you had had with
15       her of substance?
16  A.   Yes, that's correct.
17  Q.   Just out of the blue she called and said, "I want
18       to talk to you about some things"?
19  A.   Yeah, that's correct.
20  Q.   All right. And so---
21  A.   Can I add something to that, please?
22  Q.   Sure.
23  A.   She had been down to the police department
24       several times. She would come in my office. She
25       would sit down, and she would make light general

SHARON IGLESIAS                                    112

1        conversation. And that would be the extent of
2        it. But this was the first time that she wanted
3        to actually have a long conversation, probably
4        about other things than light conversation.
5   Q.   Okay. Did Susan Wolford perceive you to be close
6        to her husband?
7   A.   I don't know.
8   Q.   All right. So she called you. She asked you
9        first if she could come to the police department
10       and talk to you?
11  A.   Uh-huh.
12  Q.   And you said, "That's not a good idea"?
13  A.   Uh-huh.
14  Q.   She was obviously upset, is that correct?
15  A.   That's correct.
16  Q.   And so then you decided after talking to Glen
17       Boyd or before talking to Glen Boyd that you
18       would go to her?
19  A.   Well, I thought that I would go, and I told Glen,
20       and he said, "Okay."
21  Q.   All right. And so that very same day you went
22       there?
23  A.   Uh-huh. Right after she called and I spoke to
24       Glen I left, and it was probably late morning.
25  Q.   Okay. Tell me what happened after you go there.

SHARON IGLESIAS                          113

1   A.   When it got there she seemed to be calm.  She
2        didn't -- I mean, calmed down.  She wasn't
3        crying.  And so she asked me to come on in, and
4        we went in, I assume, the den and sat down.  And
5        I asked her what was wrong and why did she want
6        to, you know, talk to me.  And she said, "I just
7        needed somebody to talk to."
8   Q.   Did she seen distressed?
9   A.   Yes.  She seemed very distressed.
10  Q.   Do you know if Ms. Wolford has any emotional
11       problems or had any emotional problems at that
12       time?
13  A.   No.  No, I can't say that I did.
14  Q.   What did she talk to you about?
15  A.   She told me that she and John were having
16       problems, John being her husband, Chief Wolford,
17       that he was running around on her, he was seeing
18       another woman, that she was anticipating that she
19       was going to probably leave.  And I remember
20       asking her why she didn't go with John to the
21       beach, because she was scheduled to go.  And
22       that's how she started into the conversation of,
23       "Well, we're having problems, and I didn't go."
24            And she said -- I asked her where Lauren
25       was.  I said, "Is she all right?"  And she said

SHARON IGLESIAS                          114

1        that she was staying with friends.
2   Q.   Lauren is their daughter?
3   A.   Yes, the daughter.
4   Q.   How old was her daughter at that time?
5   A.   Somewhere between 10 and 12.  I really don't know
6        her exact age.
7   Q.   Anything else Ms. Wolford told you during this
8        conversation?
9   A.   Oh, yeah.  She -- she talked about their past
10       life, how he had had numerous affairs with other
11       women.  She talked about his previous marriage,
12       talked about how John Wolford had actually run
13       around on his first wife with Susan, and she
14       became pregnant.  And John left his first wife
15       and married Susan.  And she said that their
16       marriage was good for about a year, and then he
17       started seeing other women.  And they were -- she
18       said every place that they lived he would -- he
19       would always find another woman to be with.
20  Q.   Okay.  Anything else?
21  A.   Yes.  I'm trying to think.  She was -- she said,
22       "I just can't take it anymore, the lies, the
23       other women."  She said, "He's" -- she put it to
24       me like it was chronic, the lying, that he was --
25       as if he had a story or a lie to tell for every

SHARON IGLESIAS                          115

1        move he made.  And that's how I took it.  She
2        didn't trust him anymore, that the marriage was
3        over.  She talked about other affairs -- oh,
4        yeah.  She talked about other affairs in other
5        police departments, and she talked about an
6        affair he had in Kinston, an affair he had in
7        Chillocathe, that he was actually having an
8        affair with his secretary in Chillocathe.
9             And she talked about how he had been
10       involved in insurance fraud, that he had devised
11       a plan, a scheme.  And I think she said it was
12       State Farm Insurance.  And he went to the
13       insurance company and claimed that he had --
14       there had been a theft and that they had stolen a
15       diamond ring and several guns that he had.  And
16       they believed him and gave him the money, and she
17       described that.  That's all I can recall right
18       now.
19  Q.   Okay.  Did you make any notes of your
20       conversation with---
21  A.   Yes.  Yes, I did.
22  Q.   Where did you make those notes?
23  A.   At home.
24  Q.   On your computer?
25  A.   Yes.

SHARON IGLESIAS                          116

1   Q.   When did you make the notes?
2   A.   Probably it wasn't too long after that.
3   Q.   The same week as your conversation?
4   A.   Oh, yeah.  It would be within the same week.
5   Q.   And you have produced a copy of those notes in
6        your discovery?
7   A.   I don't know.
8   Q.   All right.  We'll get to that then.
9   A.   Okay.
10  Q.   Do you have any idea why Ms. Wolford chose to
11       confide in you?
12  A.   No.
13  Q.   Well, you mentioned that Chief Wolford had had an
14       affair with his secretary in Chillocathe.  I
15       think that's how you say that.
16  A.   Chillocathe.
17  Q.   Chillocathe.  Did you get the impression she
18       thought he was having an affair with you?
19  A.   No.
20  Q.   Did you get the impression she thought you might
21       know something about his affairs?
22  A.   No, I didn't.  She didn't ask me anything.  She
23       just wanted to talk.
24  Q.   Did you get the impression she was trying to warn
25       you about anything?

SHARON IGLESIAS                                        117

1   A.   No, I didn't.
2   Q.   Did it strike you as a little unusual that
3        Ms. Wolford would confide in you after---
4   A.   Yes, it did.
5   Q.   And so what was your response to Ms. Wolford?
6   A.   I told her, I said, "In the position I'm in it's
7        very difficult." I said, "You know, what you've
8        said here today is definitely going to be
9        confidential between us. I cannot, you know, do
10       anything." And she said -- I said, "certainly
11       not do anything."
12            And she said, "Well, I don't expect you to."
13       She said, "I just needed somebody to talk to,"
14       and that was basically it.
15  Q.   And she offered no explanation as to why she
16       chose you?
17  A.   No, she didn't.
18  Q.   Okay. At that point, did you confide in her any
19       of your concerns about the drug fund?
20  A.   No, not at that point.
21  Q.   The missing monies, none of that?
22  A.   No.
23  Q.   So you assured her it would remain confidential?
24  A.   No. She -- she seemed concerned that it -- she
25       didn't want me to say anything, and that was odd.

SHARON IGLESIAS                                        118

1        And I said, "Well, you know, I'm certainly not
2        going to say anything. It's none of my
3        business," you know, to John Wolford. In other
4        words, her concern was don't say anything to
5        John. That was her concern. And I said I would
6        not dare. I said, "It's none of my business."
7   Q.   So then did you go back to the department after
8        you---
9   A.   Yes, I did.
10  Q.   ---had your meeting with her?
11  A.   Uh-huh.
12  Q.   And when you got back to the department, did you
13       talk to Glen Boyd?
14  A.   Yes, I did.
15  Q.   Did you tell him what she had said?
16  A.   I told him that it was personal problems and that
17       she was -- had some concerns about Lauren as far
18       as leaving, if she were to leave. She said
19       something about school. She also said some
20       things about Lauren, about leaving, about going
21       back to Virginia. And I believe it was in
22       relation to school, and I don't know why. But
23       that's what I remember. And I told Glen that.
24       And I said, "It's personal problems between her
25       and John," and I am not going to get involved.

SHARON IGLESIAS                                        119

1        And that was all I remember saying to Glen.
2   Q.   Did you tell anybody else about that
3        conversation?
4   A.   No. I didn't tell anyone. Pat Ford, later on in
5        2004, after I, of course, had made my
6        documentation -- Pat Ford saw my notes, yes. But
7        I didn't tell her. She saw my notes.
8   Q.   Did Glen Boyd ever see your notes?
9   A.   No.
10  Q.   Anybody else other than Pat Ford ever see your
11       notes?
12  A.   No, not that. Not about Susan, not that I can
13       recall.
14  Q.   And Pat Ford didn't see those notes until
15       sometime in 2004, is that correct?
16  A.   May.
17  Q.   May of 2004?
18  A.   Uh-huh.
19  Q.   But those notes were created back in 2003 when
20       Ms. Wolford talked to you?
21  A.   I believe so.
22  Q.   Okay. How did the news about -- if I call it
23       news. How did the information conveyed to you by
24       Ms. Wolford about Chief Wolford's alleged affairs
25       affect you?

SHARON IGLESIAS                                        120

1   A.   You know, I really was not concerned about it. I
2        did not want to hear what she had to tell me. I
3        did not like having that information because
4        it -- it was really none of my business and
5        nothing I could possibly do about it or in any
6        way to help her. I did not like knowing it.
7   Q.   Did you feel sorry for her?
8   A.   Yes, I did. I did feel sorry for her.
9   Q.   Did you believe at that point that Chief Wolford
10       was having an affair?
11  A.   I didn't know. I didn't know.
12  Q.   At some point, you did come to the belief that he
13       was having an affair?
14  A.   Later on I did.
15  Q.   When did you come to believe that he was having
16       an affair?
17  A.   When Kathy Jenkins kept coming to the police
18       department to visit.
19  Q.   Was that after Mrs. Wolford had already left for
20       Charlottesville?
21  A.   I recall something.
22  Q.   Okay?
23  A.   Susan mentioned in my visit to her that it was --
24       she called some names. She said that his affair
25       in Kinston was with a police officer by the name

DOVIE L. HANFORD, COURT REPORTER (336) 674-2430

SHARON IGLESIAS                                                                                    121

1          of Betty Reynolds. I do recall that name. And
2          also, she suspected that it was -- I believe she
3          said this, that she was having an affair -- or
4          that Wolford was having an affair with the lady
5          down at the newspaper. Now, I believe she said
6          that, which I did not know who she was referring
7          to at the time. I did not know about her until
8          later on.
9     Q.   But you later came to believe that there was, in
10         fact, an affair going on between Chief Wolford
11         and Kathy Jenkins?
12    A.   Yeah. Yes, I did.
13    Q.   All right. When did you first come to believe
14         that there was an affair going on?
15    A.   After Susan left. And I think she left in
16         August, not long after she had -- she and I had
17         talked, after she had called me over to the
18         house. And Kathy started coming down to the
19         police department, and they would go in the
20         Chief's office and close the door. And she would
21         stay a while. And then eventually Kathy moved in
22         with him, not long after that.
23    Q.   But at this point, Susan Wolford had already
24         left?
25    A.   Yes.

SHARON IGLESIAS                                                                                    122

1     Q.   And gone back to Charlottesville?
2     A.   I believe so, yes.
3     Q.   And you kept in touch with Susan Wolford after
4          she left?
5     A.   No.
6     Q.   How many times did you talk to Susan Wolford
7          after she left North Carolina?
8     A.   I didn't speak to Susan -- Susan did call me when
9          she left, and she asked me for the name of an
10         attorney. And I gave her the name of an
11         attorney, and then that's the last that I
12         remember speaking to her until March, March of
13         2004. That's correct. I believe that's correct,
14         March of 2004.
15    Q.   You spoke to her in March of 2004 about what?
16    A.   She called the office, wanted to talk to John
17         Wolford. And I told her he wasn't in, and so
18         then she wanted to talk to me. She talked to me
19         a little bit and started telling me about
20         problems that she was having. And I told her, I
21         said, "Well, Susan, I -- you know, this is not
22         the place. I don't think this is the place to
23         discuss all of this." I said, "You know, if you
24         want to talk about this you can call me, you
25         know, at home." And so she did.

SHARON IGLESIAS                                                                                    123

1     Q.   That same day?
2     A.   That evening.
3     Q.   So sometime in March of 2004 Susan Wolford called
4          you at home?
5     A.   Yes, she did.
6     Q.   Do you have a recording of that conversation?
7     A.   No.
8     Q.   Do you recall what it said, what you discussed?
9          Excuse me.
10    A.   Yeah. Yes. Yeah. She told me that she was
11         having trouble with John Wolford, and that he was
12         not paying his child support, that she definitely
13         knew that he had been having an affair with the
14         newspaper woman, which she -- which now had a
15         name, Kathy Jenkins, I believe. And she talked
16         about the insurance fraud again. She -- she
17         talked about how John had treated her in the
18         past, how he had been abusive, that -- I believe
19         she said that he had actually hit her one time
20         while they were living out in Chillocathe. And
21         in this conversation I asked her, I said, "Susan,
22         did John ever take money from other police
23         departments, other agencies that he had worked
24         in?"
25              And she said, "Yes." She said, "Every

SHARON IGLESIAS                                                                                    124

1          agency that he worked in where he had a position
2          of authority he took money." Then she told me
3          how -- she started talking about how he was
4          practically run out of Charlottesville. And I
5          asked her why, and she said, "Well, because --
6          because of all the lies that he had told, because
7          of his -- the treatment of the officers, because
8          of misuse of funds, because his lack of
9          credibility and integrity."
10    Q.   Did you believe what she was telling you?
11    A.   At the time I didn't really know.
12    Q.   Do you believe it now?
13    A.   Oh, yes. I do.
14    Q.   When did you start believing that it was true?
15    A.   Probably in May of 2004.
16    Q.   So as of May 2004 you believed the allegations
17         that Susan Wolford had made against her assumed
18         to be -- we'll call it "assumed to be ex-
19         husband." Correct?
20    A.   Yeah. Yes.
21    Q.   Did you approve of the conduct that Ms. Wolford
22         had described?
23    A.   The conduct of having an affair, adultery?
24    Q.   Yes.
25    A.   No. I do not approve of adultery.

SHARON IGLESIAS                                        125

1   Q.   What about the other conduct that she described,
2        do you approve of that?
3   A.   No.  Being dishonest, lying, lack of integrity,
4        mistreatment of officers and misuse of funds, no,
5        I do not.
6   Q.   As you sit here today, do you believe that Chief
7        Wolford if dishonest?
8   A.   Yes, I do.
9   Q.   Do you believe he had a lack of integrity?
10  A.   Yes, I do.
11  Q.   Do you believe he's an adulterer?
12  A.   Yes, I do.
13  Q.   Do you believe he's mistreated officers?
14  A.   Oh, yes, I do.
15  Q.   At some point, did you ask Ms. Wolford to help
16       you with your claims against Chief Wolford?
17  A.   Yes, I did.
18  Q.   When was that?
19  A.   October of 2004.
20  Q.   Did you have conversation with Ms. Wolford
21       between the March telephone conversation, March
22       2004 telephone conversation, and October 2004?
23  A.   Yes.
24  Q.   How many?
25  A.   I really -- I don't know.  I don't know how many.

SHARON IGLESIAS                                        126

1   Q.   More than two?
2   A.   I would say yes, more than two.
3   Q.   More than five?  Now, I'm talking about between
4        March of '04 and October of '04.
5   A.   Okay.  Probably more than five.
6   Q.   Let's see, March, April, May, June, July, August,
7        September, October, that's eight months?
8   A.   Uh-huh.
9   Q.   More than once a month?
10  A.   No.  I wouldn't -- I wouldn't say that it was.  I
11       wouldn't say that it was more than once a month.
12       Maybe -- maybe one month it might be two phone
13       calls.  Maybe the next month it might be another
14       phone call.  And then after that maybe just one
15       phone call.  It's hard to say, but there were
16       phone calls, and there were conversations.
17  Q.   Can I ask you to recite as best you can the
18       substance of those conversations between March
19       and October of '04?
20  A.   I know we talked about -- we continued to talk
21       about John taking money from other agencies.  And
22       I asked her, "why did he take the money, why
23       would he do it?"
24            She said because they were short on funds,
25       or a need would come up and they didn't have the

SHARON IGLESIAS                                        127

1        money.  She said that he had financial problems.
2        She told me that he used his badge -- he used his
3        badge to get whatever it was he wanted and to get
4        out of whatever it was he got into, that he felt
5        that he was above the law and that whatever he
6        did was okay.
7   Q.   Did you believe that?
8   A.   According to what was going on at the time, yes,
9        I would believe that.
10  Q.   So between -- during these conversations between
11       March of '04 and October of '04 you believed the
12       allegations Ms. Wolford was making about her soon
13       to be ex-husband?
14  A.   Yes.
15  Q.   All right.  What else did she tell you?
16  A.   She told me that he hated me, that he would call
17       her and tell her how much he disliked me.  He
18       would call me names, using profanity, "I'm going
19       to get her.  I'm going to get rid of her."  She
20       told me that he commented to her that he's got
21       the city manager and Jenkins and the DA in his
22       back pocket, and nothing can stop him, "I'm going
23       to get rid of her."
24  Q.   And this was between March of '04 and October of
25       '04?

SHARON IGLESIAS                                        128

1   A.   That's correct.
2   Q.   Up until that point, did you know that the Chief
3        didn't like you?
4   A.   Yes.
5   Q.   When did you first start believing the Chief
6        didn't like you?
7   A.   In May of '04.
8   Q.   Well, when did Ms. Wolford leave North Carolina?
9   A.   She left, I believe, in August of 2003.
10  Q.   And these conversations that she had had
11       supposedly with Chief Wolford about his dislike
12       for you, was it your understanding that they
13       occurred before she left North Carolina?
14  A.   No.
15  Q.   They occurred after?
16  A.   Yes.  They occurred between March -- no.  Excuse
17       me.  May '04 and October '04.
18  Q.   So Ms. Wolford told you that between May of '04
19       and October of '04 Chief Wolford had called her
20       on the phone to say how much he disliked you?
21  A.   That was not his purpose in calling her.  That
22       was in their conversation.
23  Q.   How would you describe your relationship with
24       Chief Wolford before May of '04?
25  A.   I would say that I don't think it was a close

SHARON IGLESIAS                                    129

1   relationship.  I think it was all right as far as
2   getting the work done, getting the job done.  I
3   didn't see any problems other than the fact that
4   he was suspiciously taking money from the drug
5   fund.
6   Q.   Do you ever recall telling anybody that Chief
7        Wolford's days were numbered?
8   A.   That was a conversation that took place in
9        Manie's office.  And it was a newspaper article
10       that Kenneth Woodlief, who was the parking ticket
11       attendant -- he had brought in the -- I think it
12       was the Durham Morning Herald, and there was an
13       article in there about Frank Strickland and John
14       Wolford.  And he was reading the article.  And
15       when he got through some comments were made about
16       how Strickland was going after John Wolford.  And
17       I said, "Yeah.  According to that article, it
18       looks like Strickland's got his days -- Wolford's
19       day's numbered."
20  Q.   When was that conversation?
21  A.   I don't remember an exact date on that.  It would
22       have to be during the time of Lyle Gagnon because
23       that's when it occurred.  That's what I believe
24       it was about.  I'm not real sure.
25  Q.   So about 2001, 2002-ish?

SHARON IGLESIAS                                    130

1   A.   '02, something like that, I believe.  I'm not
2        exact on that.
3   Q.   Would it be fair to say that as of May 2004 you
4        didn't have a lot of respect left for Chief
5        Wolford?
6   A.   No, not as of May, I believe after May when he
7        started coming after me.
8   Q.   So after May of 2004 not much respect---
9   A.   Right.
10  Q.   ---left for Chief Wolford?
11  A.   Correct.
12  Q.   Okay.  All right.  Have you given me all the
13       information that you can recall about
14       conversations with Susan Wolford between March of
15       '04 and October of '04?
16  A.   In October I called Susan and asked her if she
17       would do an affidavit.
18  Q.   Did she do an affidavit?
19  A.   Yes.
20  Q.   Did you give her any money for that affidavit?
21  A.   No.  I didn't give her money.  She needed gas.
22       She asked me for gas money, and I put gas in her
23       car.  I think I gave her $20 for gas.  Actually,
24       I followed her to the service station, and she
25       put $20 worth of gas in her car.

SHARON IGLESIAS                                    131

1   Q.   So in October of '04 she signed an affidavit for
2        you?
3   A.   No.  She didn't sign it.  She wrote it, and she
4        wrote up the whole thing.  And I drove up to
5        Richmond and picked it up.
6   Q.   So you drove to Richmond to pick up the
7        affidavit?
8   A.   I believe it was Colonial Heights that I drove
9        to.  It's right -- right before you get into
10       Richmond.
11  Q.   So you drove to Richmond -- or Colonial Heights
12       to pick up the affidavit?
13  A.   Correct.
14  Q.   And while you were there you filled up her car
15       with gas?
16  A.   No.  I didn't fill up her car.  I gave her $20
17       for gas as the pump.
18  Q.   This was in 2004?
19  A.   October 2004.
20  Q.   Did Ms. Wolford spend any gas coming to see you?
21  A.   Coming to see me?
22  Q.   I'm trying to figure out why, if you drove to
23       pick up the affidavit, why you would be
24       reimbursing her for gas when you were the one
25       that was driving.

SHARON IGLESIAS                                    132

1   A.   I wasn't reimbursing her.  She said that John had
2        not sent her child support.  She didn't have any
3        money, and she was on empty.  Could I please put
4        some gas in her vehicle, and I said yes, I would.
5   Q.   Did she ask you to put gas in her vehicle as a
6        condition to giving you the affidavit?
7   A.   No.
8   Q.   Did Ms. Wolford sign any other statements for
9        you?
10  A.   No, just the affidavit.
11  Q.   All right.  There came a time later on when you
12       did ask her to sign a second statement, isn't
13       that true?
14  A.   Yes.
15  Q.   And did she ever sign that?
16  A.   No.  She never wrote it.
17  Q.   And you sent her money that second time as well?
18  A.   Yes.
19  Q.   Did she cash the check you sent her?
20  A.   Yes.
21  Q.   Did she ever reimburse you for that money?
22  A.   No.
23  Q.   And what was that check for?
24  A.   It was for gas and for a notary.
25  Q.   And that was a $50 check?