SHARON IGLESIAS                                                    133

1    A.    Correct.
2    Q.    And the notary would have been to use for the
3          affidavit?
4    A.    Yes.
5    Q.    But you never got the affidavit?
6    A.    No.
7    Q.    Going back to between March and October of '04,
8          any other conversations you can recall with
9          Ms. Wolford that you haven't already told me
10         about?
11   A.    Susan would mention she wanted to know about
12         Kathy Jenkins, if she was living in the house
13         with John. And I told her yes. I'm not sure
14         when Kathy moved in. I believe it was November
15         of 2003. I believe it was November of 2003, but
16         I'm not real sure. So she wanted to know about
17         that. And she -- she basically talked about how
18         bad he was treating her, how he wouldn't pay
19         child support and how they didn't have insurance
20         and he wouldn't provide insurance, or something
21         had had happened to her car while she was in
22         Virginia, and he wouldn't help with that. And it
23         was a lot of complaints. She complained a lot
24         about his behavior towards her and -- and the
25         daughter.

SHARON IGLESIAS                                                    134

1    Q.    During any of these conversations, did you share
2          anything with her regarding what was going on in
3          the department or your concerns about the drug
4          fund monies?
5    A.    Yes. Yes, I did. That's why -- that's why I
6          asked her for the affidavit, if she would be
7          willing to do an affidavit. That's when I asked
8          her -- I asked her that back in March of '04,
9          "Did he take money out of other -- funds out of
10         other agencies?"
11               And she said, "Oh, yeah." She said she had a
12         history of that. She said every agency he had
13         ever -- that he had worked in where he was in a
14         position of authority, he took money.
15   Q.    Did you ever share with her any of your
16         documentation regarding the drug fund?
17   A.    No.
18   Q.    Anything else you can recall about those
19         conversations between March of '04 and October of
20         '04?
21   A.    Not at this time.
22   Q.    Now, you have mentioned two in-person meetings
23         with Susan Wolford. One was when you went to her
24         house back in 2003 before she left North
25         Carolina?

SHARON IGLESIAS                                                    135

1    A.    Uh-huh.
2    Q.    And the other one was when you met her up in
3          Richmond?
4    A.    Colonial Heights.
5    Q.    Colonial Heights?
6    A.    Uh-huh.
7    Q.    Are there any other in-person meetings that
8          you've had with her other than those two?
9    A.    Yes. I recall one other meeting, and I do not
10         remember -- oh. There was two. There was two
11         more. She came down -- she had a friend by the
12         name of Dawn, I believe, that lived in Henderson.
13   Q.    Dawn, D-A-W-N?
14   A.    Yes. I don't know her last name. And she would
15         come down to visit her, and she came down to see
16         her in -- I really don't -- it was in 2004, but I
17         don't know exactly when. And I told her, I said,
18         "When you come down you give me a call, and we'll
19         go out and have dinner." So we did. She came
20         down to visit Dawn, and she called me. And we
21         went out to dinner.
22   Q.    Where did you go to dinner?
23   A.    We went to Raleigh to Sweet Tomatoes. And then
24         we went shopping afterwards, Lifeway Christian
25         Bookstore right there next to Sweet Tomatoes.

SHARON IGLESIAS                                                    136

1    Q.    So you went to the Sweet Tomatoes on Capital
2          Boulevard?
3    A.    Yes.
4    Q.    Do you recall if that dinner was before or after
5          your grievance hearing in October?
6    A.    Before.
7    Q.    Before, okay. Was it before or after your
8          discussion with the auditor in May?
9    A.    I believe it was before.
10   Q.    Did Chief Wolford know that you had a meeting
11         with Susan Wolford?
12   A.    No.
13   Q.    And then the next meeting that you had in person
14         with her was when?
15   A.    I believe it was after May of 2004. She came
16         down to visit her friend Dawn again. And that
17         time we met for lunch at Wendy's in Henderson.
18   Q.    And you said you thought that was after May of
19         2004?
20   A.    I believe it was.
21   Q.    Was before your grievance hearing in October of
22         2004?
23   A.    Yes.
24   Q.    Going back to the Sweet Tomatoes meeting, what
25         did you all discuss at that meeting?

SHARON IGLESIAS                                    137

1   A.   We talked about likes and dislikes in food.
2        There was more general conversation, what she was
3        doing, I believe her job. I believe she had
4        gotten a position at a hospital. I believe
5        that's what she said, and how Lauren was doing.
6        She did complain about John a little bit. I
7        don't believe it was too much. I believe that
8        she did say that Lauren was upset about the fact
9        of Kathy being in the house, so this -- being in
10       the house or seeing John. Or else, Lauren had
11       come down to visit him, and she caught John and
12       Kathy in the bed together, and that was upsetting
13       to her. That's what it was.
14  Q.   So Susan Wolford told you that prior to May of
15       2004 -- or she told you prior to May of 2004 that
16       her daughter had caught Kathy Jenkins and---
17  A.   This is after May of 2004, I believe -- no, no.
18       No, it wasn't. The meeting at Wendy's was after
19       May of '04, yes. This meeting, the dinner, yes.
20  Q.   And at the dinner meeting Ms. Wolford was upset
21       about the fact that her daughter had caught John
22       and Kathy in the bed?
23  A.   Yes. And it surprised me that she said all of
24       that in front of Lauren.
25  Q.   Lauren was there at the dinner?

SHARON IGLESIAS                                    138

1   A.   She sure was.
2   Q.   Okay. Did Lauren seem upset by the discussion?
3   A.   If she was, she didn't show it.
4   Q.   All right. Anything else you all discussed at
5        Sweet Tomatoes?
6   A.   Not that I can recall.
7   Q.   Did you discuss with her at that point your
8        concerns about the drug fund?
9   A.   I don't think we talked too much more about it.
10       I didn't say too much, because Lauren was there.
11       I didn't say any -- I don't recall mentioning
12       it -- mentioning it in front of Lauren.
13  Q.   And who paid for dinner?
14  A.   My husband.
15  Q.   Your husband was with you?
16  A.   Yes.
17  Q.   Anybody else with you?
18  A.   No, just the four of us.
19  Q.   And then you went shopping at the bookstore?
20  A.   Uh-huh.
21  Q.   Did you guys purchase anything there?
22  A.   Lauren did.
23  Q.   Did she pay for it herself, or did you pay for it
24       for her?
25  A.   No, Susan did.

SHARON IGLESIAS                                    139

1   Q.   Okay. And then shortly after that you had your
2        discussion with Mr. Winston, the auditor?
3   A.   Yes.
4   Q.   And then sometime that summer or after your
5        discussion with the auditor you all had lunch at
6        Wendy's in Henderson?
7   A.   Yes.
8   Q.   The Wendy's off of 815?
9   A.   On Dabney Drive.
10  Q.   Who was present at the lunch at Wendy's?
11  A.   Just me and Susan. Lauren was with her, but she
12       was at the skating rink, so she met me for lunch
13       while Lauren was skating.
14  Q.   And what was discussed at that lunch?
15  A.   Some more of how John Wolford had mistreated
16       Susan and what he was doing and not paying his
17       child support, and more talk about Kathy and
18       infidelity, that type of conversation.
19  Q.   Any further discussion about drug fund or your
20       meetings with the auditor?
21  A.   I don't recall saying anything about that. It
22       was all basically about Susan.
23  Q.   All right. And at that point, other than the
24       people within the department that we've talked
25       about this morning, and the auditor, had you

SHARON IGLESIAS                                    140

1        spoken to anyone else about your concerns about
2        the drug fund?
3   A.   I don't recall at this time, at this time.
4   Q.   What about Frank Strickland, had you spoken with
5        him by that point?
6   A.   Yes.
7   Q.   When did you first speak with Frank Strickland
8        about your concerns?
9   A.   June of 2004.
10  Q.   Tell me about that conversation. How did that
11       occur?
12  A.   This happened in June 2004. I was -- I was
13       really upset, because I was -- I was afraid. I
14       was afraid, because I knew Wolford was now coming
15       after me. So I called Mr. Strickland, because I
16       knew he had tried to help Lyle. And I asked him,
17       I said, "Mr. Strickland, is it -- is it
18       appropriate for a Chief to take money out of a
19       fund."
20            And at this time I knew the Chief had given
21       a reason saying that he was conducting his own
22       private investigation. So I said that to Frank
23       Strickland, and Strickland told me no. And he
24       said, "That would be very unethical." And he
25       said, "If he's the keeper of the fund" -- is how

SHARON IGLESIAS                                        141

1   he put it.  John Wolford was the auditor of the
2   fund, and he maintained it.  He said, "If he is
3   all that then it's -- it's not proper or
4   appropriate for him to extract money."
5   Q.  Did you share with Mr. Strickland at that point
6       the documentation that you had?
7   A.  No.  Now, do you -- can you be a little more
8       clear about that?  Like, for instance, are you
9       talking about paperwork, or are you talking about
10      verbally?
11  Q.  Well, I'm actually talking about both.  But let's
12      break then out.
13  A   Okay.
14  Q.  Did you share with Mr. Strickland what was in the
15      documentation, did you share with him orally what
16      was in the documentation that you had?
17  A.  Yes, I did.
18  Q.  Did you actually verbatim read it to him?
19  A.  Yes, I did.
20  Q.  Did you record that conversation?
21  A.  No.
22  Q.  Did you record any of your conversations with
23      Susan Wolford?
24  A.  No.
25  Q.  All right.  Do you know if Mr. Strickland

SHARON IGLESIAS                                        142

1   recorded your conversation with him about this
2   information?
3   A.  No, I don't.
4   Q.  So you read to Mr. Strickland verbatim the
5       documentation that you had compiled about the
6       drug fund, is that correct?
7   A.  Correct.
8   Q.  And when we're talking about the documentation
9       we're talking about a copy of the drug fund
10      ledger, correct -- the printout from the
11      computer?
12  A.  Uh-huh.
13  Q.  And your handwritten notes on receipts, et
14      cetera, regarding your concerns?
15  A.  At that time all I read to him was what was on
16      the ledger sheet.
17  Q.  So you read to him verbatim what was on the
18      ledger sheet?
19  A.  Yes.
20          MS. DAVIS:  Let me take just a minute
21      and mark an exhibit, if we could.  I'm going
22      to mark a series of exhibits.  We want to
23      take five minutes and go off the record.
24      (A recess is taken from 2:20 to 2:32 p.m.)
25      Pages 143 through 157 are marked confidential.

SHARON IGLESIAS                                        158

1           (The notes dated 7/14/03 are marked as
2           Deposition Exhibit Number 10.)
3   Q.  I'm going to show you what we've marked as
4       Exhibit Number 10.  Is Exhibit Number 10 the
5       notes that you're referring to that you made
6       after your first discussion with Susan Wolford?
7   A.  I'm sorry, Ms. Davis.  Did you ask me a
8       question?
9   Q.  I did.
10  A.  I'm sorry.
11  Q.  That's okay.  If that only happens once today
12      that will be perfect.  Let me try that again.
13  A.  Okay.
14  Q.  Okay.  Exhibit Number 10---
15  A.  Yes, ma'am.
16  Q.  Have you had a chance to review it?
17  A.  Yes, ma'am.
18  Q.  Is Exhibit Number 10 the notes that you referred
19      to earlier today that you made shortly after your
20      first conversation with Susan Wolford?
21  A.  Yes, they are.
22  Q.  Thank you.  I'm going to show you what we're
23      marking as Exhibit Number 11.  Is Exhibit Number
24      11, Ms. Iglesias, the affidavit that Ms. Wolford
25      signed for you up in Colonial Heights in October

SHARON IGLESIAS                                        159

1   of 2004 that we were talking about earlier today?
2           (The affidavit dated 10/11/04 is marked as
3           Deposition Exhibit Number 11.)
4   A.  This is the affidavit that Susan typed and signed
5       and presented to me when I arrived in Colonial
6       Heights.
7   Q.  I'm looking at the second page of Exhibit Number
8       11, which has at the bottom of it number 210.
9   A.  Uh-huh.
10  Q.  In about the middle of that page it has a
11      signature of a Paula S. Wolford.  Is that the
12      person that we've been referring to as Susan
13      Wolford?
14  A.  That is correct.
15  Q.  And "S" standing for Susan to the best of your
16      knowledge?
17  A.  Correct.
18  Q.  And looking at the second and the third full
19      paragraph of Exhibit Number 11 on page 1, if you
20      would, take a moment to read the second and third
21      paragraph.
22  A.  (The witness complies with request.)  Okay.
23  Q.  Do paragraphs two and three of Exhibit Number 11
24      refresh your recollection about the time period
25      during which Ms. Wolford relayed to you

SHARON IGLESIAS                                    160

1      statements had been made to her by Chief Wolford
2      about his dislike for you?
3   A.  Not really, because Susan and I didn't talk much
4      after -- after she left we talked maybe once,
5      because I know she called and asked about an
6      attorney.  And then after that she didn't say
7      anything until 2004 when we talked, and that's
8      when she did say -- say these things.  And then
9      she really said -- she said -- some of this I did
10     not know about until actually October of 2004.
11  Q.  So she didn't tell you about these things until
12     sometime in 2004?
13  A.  Not in this manner, I knew some things but not
14     all of this.
15  Q.  And just to be clear, 2004 is when she told you
16     about these things, not when she said they
17     actually occurred.  Am I correct about that?
18  A.  Correct, that's correct.
19  Q.  And looking down at paragraph number five, which
20     starts, "My husband John is very close friends
21     with"---
22  A.  Okay.
23  Q.  Do you see which paragraph I'm referring to?
24  A.  Yes, ma'am.
25  Q.  All right.  If you would, take a moment to read

SHARON IGLESIAS                                    161

1      that paragraph.
2   A.  All right.  (The witness complies with request.)
3   Q.  Do you have any knowledge as to what time
4      frame she's referring to when she says that
5      Lieutenant Glen Boyd, her husband John, and Don
6      Jenkins, when they would get together socially
7      they would make very negative comments about
8      Sharon discussing how much they did not like her
9      and how they wanted to get rid of her?
10  A.  That to me would be probably 2002, probably
11     starting in 2002-2003, probably there on up.  I
12     could tell a difference.
13  Q.  In 2002 and 2003?
14  A.  Yes.
15  Q.  In any event, for Ms. Wolford to have had
16     knowledge of it those would have had to have
17     occurred before she left North Carolina, correct?
18  A.  Oh, yeah.
19          (The letter and attached affidavit are
20          marked as Deposition Exhibit Number 12.)
21  Q.  Okay, Sharon.  I'm going to show you what
22     we're marking as Deposition Exhibit Number 12.
23     Take a look at that for me, please.
24  A.  (The witness reviews document.)  Okay.
25  Q.  Deposition Exhibit Number 12, does that appear to

SHARON IGLESIAS                                    162

1      be a true and accurate copy of correspondence
2      that you sent to Susan Wolford on or about
3      November the 7th, 2006?
4   A.  Yes, it does.
5   Q.  And pages 2, 3, and 4 of Exhibit 12 numbered 214,
6      215, and 216, does that appear to be an accurate
7      copy of an affidavit that you prepared and asked
8      Ms. Wolford to sign for you?
9   A.  No.  This is not -- this is an example.  These
10     are the questions that I was hoping she would be
11     able to answer.  I don't really -- this is not
12     actually an affidavit.  These are questions.
13  Q.  So you would describe the second, third, and
14     fourth pages of Exhibit 12 as a list of questions
15     you were asking Ms. Wolford to answer for you?
16  A.  Uh-huh.
17  Q.  Is that a yes?
18  A.  I'm sorry.  Yes, it is.  Yes.  I'm sorry.
19  Q.  Okay.  And did Ms. Wolford ever answer these
20     questions for you?
21  A.  No.
22  Q.  Have you heard from Ms. Wolford since you sent
23     this letter on November the 7th, 2006?
24  A.  We talked one time after this, and I asked her if
25     she had received it.  And she said yes, and that

SHARON IGLESIAS                                    163

1      she would do the best she could in responding.
2      And that was the last I heard from you.
3   Q.  And she never did respond?
4   A.  No.
5   Q.  And the last page of Exhibit Number 12, that's a
6      copy of the check that you sent to Ms. Wolford for
7      notary fees, et cetera?
8   A.  Correct.
9   Q.  And Ms. Wolford did cash the check?
10  A.  Correct.
11  Q.  Okay.  Now, in -- I believe we've talked about
12     all the discussions that you've had with anybody
13     about your suspicions about the drug fund where
14     the Chief was taking money from the drug fund up
15     and until October of 2004.  Am I correct?
16  A.  I believe that to be correct.
17  Q.  After October of 2004, can you just list for me
18     anyone else that you have discussed your concerns
19     about the drug fund with?
20  A.  When I came back, I believe, at the end of
21     October of 2004 -- when I came back to work at
22     the police department my office had been moved.
23     I had received a letter from Tommy Marrow telling
24     me that I was to be reinstated, and the letter
25     was a final warning.  And when I came back to

SHARON IGLESIAS                                    164

1    work several had questions about where I had been
2    and what had happened, what was going on. One
3    was Ronnie Davis. The other was Shelly Chaveaux.
4    I believe the other was Mark Blair. I believe
5    there were a couple of officers. I believe it
6    was Gary Ward, Eric Coghill, and that's all I can
7    recall -- Kenneth Woodlief, and that's all I can
8    recall at this time.
9    Q.   So in about October of 2004 when you came back to
10        work after being transferred to dispatch and then
11        being on paid administrative leave, that's the
12        time period we're talking about, is that correct?
13   A.   Correct.
14   Q.   When you came back you talked to Ronnie Davis,
15        Shelly Chaveaux, Mark Blair, Eric Coghill -- I'm
16        sorry. I didn't get Officer Ward's name.
17   A.   Gary.
18   Q.   Gary Ward and Kenneth Woodlief?
19   A    Kenneth Woodlief. Not all at one time, I didn't
20        talk to them all at one time.
21   Q.   But you talked to them around that time period?
22   A.   Around that time period, yes.
23   Q.   Tell me what Ronnie Davis's position is with the
24        Oxford PD.
25   A.   Building maintenance.

SHARON IGLESIAS                                    165

1    Q.   He's not a sworn officer?
2    A.   Excuse me. No, he's not.
3    Q.   And what is Shelly Chaveaux's position?
4    A.   Shelly is a detective, investigation division.
5    Q.   Okay. And Mark Blair is a detective as well?
6    A.   Correct.
7    Q.   Eric Coghill?
8    A.   Corporal.
9    Q.   Gary Ward?
10   A.   Corporal.
11   Q.   Kenneth Woodlief?
12   A.   Parking ticket attendant.
13   Q.   Is Mr. Woodlief a sworn officer?
14   A.   No.
15   Q.   All right. And tell me what you recall about
16        your conversations with Ronnie Davis after
17        October of 2004, or during that time frame.
18        Excuse me.
19   A.   Right. That's all right. Ronnie came in my
20        office, the new office, and made comments about
21        my new office. And I had been moved on to the
22        other side of the building, and he said, "What
23        happened?"
24             And I said, "Well, I've been out on leave."
25        I said, "There's been some problems." I told him

SHARON IGLESIAS                                    166

1    that I had been accused of breach of
2    confidentiality and that I had a grievance
3    hearing and that I had been reinstated, that I
4    believed it was all due to the fact that I had
5    discovered the Chief had been taking money out of
6    the drug fund.
7    Q.   So you told Ronnie Davis at that point that you
8        believed that the real reason you had been
9        disciplined was because you had discovered the
10       Chief taking money out of the drug fund?
11   A    Yes. I saw it as retaliation.
12   Q.   Why did you share that with Ronnie Davis?
13   A.   He asked me, I told him.
14   Q.   Mr. Davis didn't have any authorization to
15       investigate or take disciplinary action, did he?
16   A.   No.
17   Q.   And he wasn't in the chain of command?
18   A.   No.
19   Q.   All right. And at the time you shared that with
20       Mr. Davis you had received a final warning about
21       confidentiality, am I correct?
22   A.   I had -- I had received a letter that stated,
23       "Reinstatement and Final Warning and Warnings."
24       And also a paragraph in there that said I had a
25       right to speak out on matters of public concern,

SHARON IGLESIAS                                    167

1    yes.
2    Q.   So your answer to my question is yes?
3    A.   Yes.
4    Q.   Anything else you recall about your conversation
5        with Mr. Davis?
6    A.   At that time, no.
7    Q.   When you spoke to Mr. Davis at that time, did you
8        share with him that the Chief had provided you
9        with an explanation for every withdrawal?
10   A.   Oh, no. No.
11   Q.   Did you share with him that the Chief had told
12       you in May of 2004 that the reason he had taken
13       the money without your signature or your
14       knowledge was because he was conducting and
15       internal investigation with regard to the
16       department?
17   A.   I don't recall telling Ronnie that.
18   Q.   Okay. Is there anything else you recall about
19       your conversation with Mr. Davis?
20   A.   Not at this time, no.
21   Q.   Did you have any conversations with Mr. Davis
22       after October of '04 that you can recall?
23   A.   Ronnie and I had many conversations.
24   Q.   ALL of them about this topic?
25   A.   Oh, no. Our conversations were centered around

SHARON IGLESIAS                                        168

1  the Bible.  Ronnie is -- Ronnie claims that he is
2  a minister, and I do a lot of study in Greek and
3  Jewish history and culture, plus the Bible.  And
4  so we had a lot of conversations about that.
5 Q. Well, I'm only here today to talk to you about
6  the conversations you had that were work-related?
7 A. Correct.
8 Q. So tell me, if you will, any conversation that
9  you recall having with Ronnie Davis about your
10  concerns about the Chief and drug fund.
11 A. Okay.  Well, like I said, there were many
12  conversations, and I cannot remember other than
13  actually what I've already told you.  That was
14  the basis of our conversations.  I did not share
15  documents with Ronnie.  I did not show documents
16  to Ronnie.  And I believe that I did eventually
17  tell Ronnie that I had overheard phone calls that
18  really made me very suspicious.  And that was
19  about the extent of it at that time.
20 Q. And you're 100 percent sure that you did not
21  confide in Ronnie what you knew about work---
22  Excuse me.  ---what the Chief had told you about
23  the reason he was taking money out of the drug
24  fund, that is that there was an internal
25  investigation going on with regard to his

---

SHARON IGLESIAS                                        169

1  officers?
2 A. I do believe I did tell him later on.
3 Q. So you did tell Ronnie that the Chief's reason---
4 A. I told Ronnie the Chief claimed that he was doing
5  his own personal private investigation.
6 Q. But you didn't believe that?
7 A. No, I didn't.
8 Q. Did you tell Ronnie you didn't believe it?
9 A. Yes, I did.
10 Q. Did you ask Ronnie to do anything for you?
11 A. No.
12 Q. Did you, at any point, ask Ronnie to go to the
13  black ministers and ask them to rally,
14  essentially, against the Chief?
15 A. No.
16 Q. Did you ask him to spread the word about what you
17  knew about the Chief or what you suspected about
18  the Chief taking money from the drug fund around
19  the black community?
20 A. No.
21 Q. And your purpose for talking to Ronnie about this
22  topic was because he asked you.  Is that what I
23  understood?
24 A. He came in and asked me, yes, asked me where I
25  had been.

---

SHARON IGLESIAS                                        170

1 Q. And on each occasion after that -- you said you
2  had many conversations with Ronnie Davis.  On
3  each occasion after that, prior to discussing it
4  with him, did he ask you about it?
5 A. Not too much after that.
6 Q. But you continued to have discussions with him?
7 A. Occasionally, not very much.  And they were not
8  very lengthy.
9 Q. Anything else you can recall about your
10  conversations with Ronnie Davis?
11 A. Not at this time.
12 Q. And you don't ever recall sharing documents with
13  him?
14 A. Oh, no.
15 Q. What about Detective Chaveaux?
16 A. Shelly.  Shelly wanted to know the same thing,
17  "Where have you been?  What's been going on?"
18  And I told her the same thing, the same thing I
19  told Ronnie.
20 Q. And your purpose for telling her was?
21 A. Because she asked me.
22 Q. She had no authorization to investigate?
23 A. None.
24 Q. She had no disciplinary authority?
25 A. No.

---

SHARON IGLESIAS                                        171

1 Q. And she wasn't in the Chief's chain of command?
2 A. No.
3 Q. Did you share with her anything related to the
4  phone conversations?
5 A. No.
6 Q. Did you share with her any documentation?
7 A. No, documentation.  I may have told her about the
8  phone conversations, verbally.
9 Q. Did you tell her about the Chief's explanation?
10 A. Yes, that he claimed he was doing his own private
11  personal investigation.
12 Q. Did you have any other conversations with
13  Detective Chaveaux after this initial
14  conversation---
15 A. Many, many conversations.  Shelly would come to
16  see me after the Chief would leave the building.
17 Q. And what was her purpose in coming to see you?
18 A. Just to talk, just to visit.
19 Q. To talk about the Chief?
20 A. No.  Not all the time, no.
21 Q. But sometimes?
22 A. Occasionally, yeah.
23 Q. Did Shelly have her own concerns about the Chief?
24 A. No.  She never said anything.
25 Q. Did you ever tell Detective Chaveaux that you

SHARON IGLESIAS                                      172

1       thought the Chief was dishonest?
2   A.  Oh, yes, I did.
3   Q.  Did you ever tell Ronnie Davis you thought the
4       Chief was dishonest?
5   A.  Yes, I did.
6   Q.  Do you recall telling either of then that the
7       Chief was untrustworthy?
8   A.  I don't recall saying that, but I do believe him
9       to be untrustworthy.
10  Q.  Do you recall telling either of then that the
11      Chief had lied?
12  A.  In ny opinion he had lied.
13  Q.  Do you recall telling either Mr. Davis or
14      Detective Chaveaux that the Chief had lied?
15  A.  I don't recall telling then that.
16  Q.  Any other information that you recall telling
17      Detective Chaveaux?
18  A.  Not at this tine.
19  Q.  And did you ask Detective Chaveaux to do anything
20      with regard to the information you conveyed to
21      her?
22  A.  No.
23  Q.  And what about Mark Blair? Tell ne about the
24      conversations with Mark Blair.
25  A.  Blair cane to see ne, and he was sympathetic to

---

SHARON IGLESIAS                                      173

1       the fact of what I had been through, so to speak.
2       And he wanted to know what had happened, and I
3       told him the sane thing. And he wanted to know
4       if I had documented everything as he had advised
5       ne to, and I said I did. And we didn't talk very
6       nuch. In fact, after that initial good to have
7       you back, how was it, you know, and are you okay
8       type of conversation, we didn't talk about it
9       anynore very nuch that I can recall. After that
10      it was work, we talked about work.
11  Q.  Did you ever share your documentation with
12      Detective Blair?
13  A.  No.
14  Q.  Did you ever talk to Detective Blair about the
15      phone conversations?
16  A.  I may have nentioned it to him. I don't recall,
17      but I nay have nentioned it to him.
18  Q.  Do you recall telling Detective Blair about the
19      Chief's explanation for taking the money out of
20      the drug funds?
21  A.  Yes, I did.
22  Q.  Do you recall what Detective Blair's response
23      was?
24  A.  I do not. I don't recall what he said.
25  Q.  Do you believe the Chief was conducting an

---

SHARON IGLESIAS                                      174

1       internal investigation of his officers?
2   A.  No.
3   Q.  Did the Chief ever tell you what officer or
4       officers he supposedly was investigating?
5   A.  No.
6   Q.  Do you have any knowledge with regard to that at
7       all?
8   A.  I heard a rumor.
9   Q.  What was the rumor you heard?
10  A.  The rumor that he was investigating Floyd
11      Griffin.
12  Q.  Who did you hear that rumor fron?
13  A.  I don't know who it was fron, but I know it was
14      out of the police department.
15  Q.  All right. When you shared with Ronnie Davis,
16      Detective Chaveaux, and Mark Blair---
17  A.  Excuse me. I renember now. It was Mark Blair.
18  Q.  Mark Blair told you?
19  A.  Mark Blair, yeah. Mark Blair nentioned that.
20  Q.  So Mark Blair told you when that he had heard --
21      let's back up. What did Mark Blair tell you, as
22      best you can recall?
23  A.  I cannot be sure. I cannot be definite. I just
24      renember that it was Floyd Griffin.
25  Q.  And as best you recall, it was Mark Blair that

---

SHARON IGLESIAS                                      175

1       told you---
2   A.  As best I can recall, but I an not sure. I do
3       know it was a rumor in the department.
4   Q.  So there was a rumor in the department that you
5       heard when?
6   A.  In 2000 -- it was either -- I believe it was
7       2005.
8   Q.  After you had already been back to work for a
9       while?
10  A.  Yeah. I believe that to be correct.
11  Q.  So sonetine in 2005 you heard a rumor that the
12      Chief had been investigating an officer back in
13      2004?
14  A.  No. All I heard was that there was an
15      investigation or that there had been talk of an
16      investigation surrounding Floyd Griffin.
17  Q.  So sonetine in 2005 you heard that there had
18      either been an investigation or talk of an
19      investigation of Floyd Griffin?
20  A.  Correct. Correct.
21  Q.  And you're not sure who you heard that fron?
22  A.  I cannot be sure.
23  Q.  And after hearing that there had either been an
24      investigation or talk of an investigation of
25      Floyd Griffin, you still did not believe the

SHARON IGLESIAS                                        176

1           Chief had actually engaged in an investigation?
2   A.   No.
3   Q.   All right. Back to your initial discussion in
4        October of 2004 with Mark Blair, you did not show
5        him any documents at that time?
6   A.   At any time.
7   Q.   Did you ask Mark Blair to do anything?
8   A.   No.
9   Q.   Did Mark Blair give you any advice about what you
10       ought to do?
11  A.   No.  No, not at that time.
12  Q.   Do you recall telling Mark Blair that you thought
13       the Chief was dishonest?
14  A.   Oh, yes.
15  Q.   How many times?
16  A.   How many times did I tell him that John Wolford
17       was dishonest?
18  Q.   Uh-huh -- yes, ma'am.  I'll follow my own rules,
19       I promise.
20  A.   I don't know.  I don't know.  I don't know how
21       many times.
22  Q.   Several times?
23  A.   I wouldn't say several.  You know, once kind of
24       gets the message across.
25  Q.   And do you recall telling Mark Blair that you

SHARON IGLESIAS                                        177

1        thought the Chief was a liar?
2   A.   I believe -- I'm sure I did, because I believe
3        John Wolford to be a liar, yes.
4   Q.   Anything else you recall about your conversations
5        with Mark Blair?
6   A.   Not at this time.
7   Q.   How about your conversations with Eric Coghill?
8   A.   The conversations with Eric Coghill were
9        basically the same as they were Shelly Chaveaux
10       and Mark Blair.  He came to my office, and he was
11       asking questions, and I told him.
12  Q.   And again, Officer Coghill had no authorization
13       to investigate?
14  A.   No.
15  Q.   You didn't ask him to investigate?
16  A.   No.
17  Q.   He had no disciplinary authority over the Chief?
18  A.   No.
19  Q.   And had -- was not in the Chief's chain of
20       command?
21  A.   No.
22  Q.   Did you also tell Eric Coghill that you thought
23       the Chief was dishonest?
24  A.   Yes.
25  Q.   Did you also tell Eric Coghill that you thought

SHARON IGLESIAS                                        178

1        the Chief was a liar?
2   A.   Yes.
3   Q.   Did you show Eric Coghill any documentation?
4   A.   No.
5   Q.   Did you discuss with him the alleged reasons for
6        the withdrawals from the drug fund?
7   A.   Yes.
8   Q.   Did Officer Coghill opine on those reasons?
9   A.   I don't recall that he did.  If he -- I'm sure he
10       made a comment, is what I'm trying to say.  I
11       just don't recall what his comment was.
12  Q.   Do you recall telling Officer Coghill that you
13       didn't believe that the Chief had done an
14       investigation?
15  A.   Yes.
16  Q.   Anything else you can recall about your
17       conversations with Eric Coghill?
18  A.   Yes.  Eric came to me in late 2005 right after
19       Thanksgiving -- well, no, prior to Thanksgiving.
20       It was prior to Thanksgiving.
21  Q.   Around November the 18th?
22  A.   No.  I believe it was before that.  And he -- he
23       suggested to me that I go to WRAL.  You know,
24       Ms. Davis, I am not clear if it was prior to --
25       I'm thinking now it was after Thanksgiving.  I

SHARON IGLESIAS                                        179

1        believe now it was after Thanksgiving that Eric
2        came to me and made that suggestion, because we
3        had a luncheon on Thanksgiving or close to
4        Thanksgiving, that week of.  And that is the
5        luncheon, the meeting that the Chief called me a
6        liar and a slanderer in front of the officers.
7        And Eric was one of the officers that told me
8        that the Chief had done this, and another officer
9        told me that as well.
10  Q.   So Eric Coghill told you that the Chief had
11       called you a liar and a slanderer?
12  A.   Yes, in a meeting that he had with sworn
13       officers.
14  Q.   Before Thanksgiving of 2005?
15  A.   It was the week of Thanksgiving.  We had the
16       luncheon.
17  Q.   And another officer also told you that.  Who was
18       that officer?
19  A.   Gary Ward.
20  Q.   And was there something that precipitated this
21       discussion that you're aware of?
22  A.   I would only be assuming.
23  Q.   Well, tell me what you assume.
24  A.   There had been an election that year, 2005, of
25       mayors, the mayors race among, I think,

SHARON IGLESIAS                    180

1    commissioners as well. And after the election Al
2    Woodlief was reelected. And I believe that the
3    Chief felt free in making those comments because
4    he knew there would be no recourse from
5    management on his part. And he was obviously out
6    to get rid of me.
7  Q. So as of November of '05 you felt that the Chief
8    was out to get rid of you?
9  A. Oh, long before that I felt that.
10 Q. Well, according to Susan Wolford's affidavit he
11   had stated that as early as 2003, correct?
12 A. That's correct.
13 Q. After you heard from Eric Coghill and Gary Ward
14   that the Chief had called you a liar and a
15   slanderer, did you come to any conclusions about
16   whether or not you could continue to work in the
17   department?
18 A. No. I came to the conclusion that people needed
19   to know that -- you know, I came to the
20   conclusion that there was not going to be an
21   investigation. Claims that they had made
22   concerning or claiming that they had
23   investigated, I did not believe them to be true.
24   And so I decided that embezzlement and basically
25   all that had had happened was a matter of grave

SHARON IGLESIAS                    181

1    public concern. And I believed going to WRAL
2    would present it to the people and hopefully
3    cause an investigation.
4  Q. So as of November 2005 you didn't believe that
5    any investigation had occurred?
6  A. That's correct.
7  Q. And as of November of 2005 you didn't believe --
8    excuse me. Let me back up. You didn't believe
9    that any investigation of the Chief had occurred?
10 A. That's correct.
11 Q. And as of November of 2005 you didn't believe
12   that the Chief had actually conducted an internal
13   investigation of one of his officers?
14 A. That's correct.
15 Q. And as of November 2005 you didn't believe the
16   Chief's statements about why he had taken money
17   from the drug fund?
18 A. That's correct.
19 Q. And as of November 2005 you didn't believe that
20   any of the discipline that had been taken against
21   you was related to anything other than the
22   allegations you had made against the Chief?
23 A. I believed all that had -- all of this action
24   against me was retaliation because I had reported
25   to the auditors my suspicions.

SHARON IGLESIAS            .       182

1  Q. So in November of '05, did anyone else other than
2    Eric Coghill and Gary Ward tell you that the
3    Chief had called you a liar and a slanderer in
4    the meeting?
5  A. I don't recall anyone else telling me.
6  Q. And Eric Coghill suggested you go to WRAL?
7  A. Uh-huh -- yes. I'm sorry. Yes.
8  Q. That's good. Did he tell you why he thought you
9    ought to go to WRAL?
10 A. I believe he suggested that I might be able to
11   get help if I went to the public to voice a
12   public concern, that it was very important that
13   the people know. He said, "You" -- he basically
14   conveyed to me that I might be able to get help
15   that way, that there could be an investigation,
16   that it would cause an investigation and that the
17   truth would come out. And by "investigation" I'm
18   talking about an SBI investigation or another
19   outside police agency to investigate -- law
20   enforcement. Excuse me. Law enforcement agency
21   to come in and investigate.
22 Q. So the only type of investigation that you felt
23   was appropriate was an investigation by either
24   the SBI or another law enforcement agency?
25 A. Yes, I did because it was a criminal -- you know,

SHARON IGLESIAS                    183

1    embezzlement is a criminal act.
2  Q. All right. You also said you had some
3    conversations with Gary Ward in October of '04.
4    Tell me about those conversations.
5  A. They were the same, the same as Eric. It's,
6    "Where have you been?" It was -- I relayed to
7    him the same information.
8  Q. Did Gary Ward -- did you show Gary Ward any
9    documentation?
10 A. No.
11 Q. Did you share with Gary Ward the Chief's
12   explanation for why the monies were taken from
13   the drug fund?
14 A. I believe I did.
15 Q. Did you share with Gary Ward the phone
16   conversations that you had overheard?
17 A. Yes, I believe I did.
18 Q. Did you ask Gary Ward to do anything?
19 A. No.
20 Q. And Gary Ward had no authorization to
21   investigate?
22 A. No.
23 Q. No disciplinary authority over the Chief?
24 A. No.
25 Q. And was not in the chain of command with regard

SHARON IGLESIAS                                          184

1         to the Chief?
2   A.    No.
3   Q.    Did you tell Gary Ward that you thought the Chief
4         was dishonest?
5   A.    Yes.
6   Q.    Did you tell Gary Ward that you thought the Chief
7         was a liar?
8   A.    I'm sure I did.
9   Q.    Anything else you recall about your conversations
10        with Gary Ward?
11  A.    Not that I can recall right now.
12  Q.    All right.  And Kenneth Woodlief, the parking
13        ticket attendant, you had conversations with him
14        in October of 2004 or about that time frame?
15  A.    Yes.  Yeah, when I came back.  Well, Mr. Woodlief
16        always came in to see me prior to and after.
17  Q.    How long had Woodlief been employed with the
18        City?
19  A.    I don't -- I don't remember.  It hadn't been too
20        long.
21  Q.    And Mr. Woodlief, again, was not a sworn officer,
22        is that correct?
23  A.    No.
24  Q.    And do you recall what your basic conversations
25        with Mr. Woodlief were?

SHARON IGLESIAS                                          185

1   A.    I didn't tell Mr. Woodlief -- I don't remember
2         telling him a whole lot, just that I had been on
3         leave and my basic reason was because -- because
4         they claimed I had breached confidentiality, and
5         I believed it to be for the reason that I had
6         reported the Chief for, misuse of funds.
7   Q.    So you did tell Kenneth Woodlief that you
8         believed that the Chief had misappropriated
9         funds?
10  A.    Yes.
11  Q.    Did you tell him that you thought the Chief was
12        dishonest?
13  A.    Yes.  I conveyed that to him.  I may not have
14        said, "I believe the Chief is dishonest," but I
15        conveyed it to him.
16  Q.    Did you tell him that the Chief was a liar?
17  A.    I said something like, "I don't believe he's
18        telling the truth."
19  Q.    Did you tell Kenneth Woodlief the explanation
20        that the Chief had given you?
21  A.    I don't remember telling him all that.
22  Q.    Did you show Woodlief any documentation?
23  A.    No.
24  Q.    Did you talk to him about any of the
25        documentation you had?

SHARON IGLESIAS                                          186

1   A.    I don't recall.  I don't recall doing that.
2   Q.    Did you talk to any of the folks that we've just
3         discussed, Ronnie Davis, Shelly Chaveaux, Mark
4         Blair, Eric Coghill, Gary Ward, or Kenneth
5         Woodlief about the documentation that you had?
6   A.    What was the first part of that question?
7   Q.    Did you talk with any of them about the
8         documentation that you had?
9   A.    Documentation as in---
10  Q.    The document that we previously marked as
11        Exhibits 6, 7, and 9?
12  A.    I believe I did, because I didn't believe -- I
13        mean, I did not share documents, but I'm sure I
14        mentioned the phone calls to a couple of them.  I
15        know I did to Blair.
16  Q.    Would it be fair to say that all of these folks,
17        as of October of 2004, Ronnie Davis, Shelly
18        Chaveaux, Mark Blair, Eric Coghill, Gary Ward,
19        and Kenneth Woodlief, were fairly clear you
20        didn't like the Chief?
21  A.    I believe they would say that, yes.
22  Q.    All right.  And at the time you were having these
23        discussions with them they all worked with the
24        Chief in the Oxford Police Department, is that
25        correct?

SHARON IGLESIAS                                          187

1   A.    We all worked together, yes.
2   Q.    And they all reported to the Chief?
3   A.    Correct.
4   Q.    Did you talk to any of these folks about your
5         belief that the Chief was an adulterer?
6   A.    I don't recall doing that.
7   Q.    Do you recall talking to any of them about your
8         suspicion that the Chief was either sleeping with
9         or living with the "newspaper woman," as you put
10        it, prior to getting married?
11  A.    I don't think so.  All of that occurred in 2003.
12        I don't -- I don't think I did, no.  And it
13        was -- that was something that was all over the
14        department.  The officers were talking about it
15        for quite some time.  I mean, it had been awhile
16        back, you know.
17  Q.    Other than the folks we've already talked about,
18        you have indicated that you also spoke to Jack
19        Carey, the SBI.  Anyone else that we haven't
20        mentioned today that you talked to?
21  A.    Pat Ford.  Pat Ford, Detective Pat Ford.
22  Q.    Detective Pat Ford.
23  A.    Jason Tingen.
24  Q.    Jason Tingen.  Anyone else?
25  A.    I don't recall anybody right now other than

SHARON IGLESIAS                                             188

```
1        those.
2    Q.  Okay.  So we've got the ones we've already talked
3        about, plus we've got Jack Carey?
4    A.  Uh-huh.
5    Q.  We've got the SBI.  And when you're talking about
6        the SBI you're talking about Teresa West?
7    A.  Agent West.
8    Q.  All right.  Pat Ford and Jason Tingen?
9    A.  Correct.
10   Q.  All right.  Anyone else you can recall talking to
11       about your suspicions about the Chief and the
12       drug fund?
13   A.  Not at this moment.
14   Q.  And of course, you talked to WRAL?
15   A.  Yes.
16   Q.  All right.  And did you talk to any other news
17       media sources?
18   A.  I spoke to Bill West
19   Q.  He's with the Oxford Herald?
20   A.  No.  Bill West is with the Durham Morning Herald,
21       and I believe they bought out the Daily Dispatch
22       or something, or they have -- or are affiliated
23       with them.  And I also spoke to Al Wheless, but I
24       believe that was---
25   Q.  W-H-E-E?
```

SHARON IGLESIAS                                             189

```
1    A.  W-H-E-L-E-S-S, Wheless.
2    Q.  Wheless, okay.  And who is Al Wheless?
3    A.  He's a reporter with the Daily Dispatch.  That
4        was after I had been terminated.  I believe that
5        was after I had been terminated.
6    Q.  Do you recall speaking to WTBO?
7    A.  No.
8    Q.  Do you recall sending any correspondence to any
9        other news sources?
10   A.  I may have.  I just don't recall who.
11           MS. DAVIS:  Okay.  Let's take a quick
12       break.
13       (A recess is taken from 3:50 to 4:05 p.m.)
14   Q.  (By Ms. Davis)  Okay, Ms. Iglesias.  Before the
15       break you indicated that you had -- in addition
16       to the folks that we discussed earlier, you had
17       also spoken to Pat Ford, Jason Tingen, Jack
18       Carey, Agent Teresa West with the SBI, WRAL, Bill
19       West, and Al Wheless.  Is there anybody else that
20       you have recalled since we took our break that
21       you have spoken to about your concerns about the
22       drug fund?
23   A.  No.
24   Q.  And have we covered all the conversations you
25       have had with Frank Strickland regarding your
```

SHARON IGLESIAS                                             190

```
1        concerns?
2    A.  Oh, yeah.  Yeah.
3    Q.  So the only conversation you've had with Frank
4        Strickland was in 2004?
5    A.  No.  I've had -- I've had a few conversations
6        with him.
7    Q.  All right.  I believe the only one you described
8        to me was a conversation that occurred between
9        March of '04 and October of '04, along about the
10       time you were talking to Ms. Wolford, Susan
11       Wolford?
12   A.  June, I spoke to Frank in June.
13   Q.  That was the first time you spoke to Frank
14       Strickland?
15   A.  Uh-huh, concerning---
16   Q.  And tell me -- just list for me, if you will, all
17       the other times that you have talked to Frank
18       Strickland about your concerns in this regard.
19   A.  Well, in 2004 it was probably quite a few times.
20       I would say at least once a week in 2004.  In
21       2005 we didn't -- probably in the earlier part of
22       the year we didn't talk very much.  And later on,
23       when he started running or mayor, I did talk to
24       him when he was running mayor -- running for
25       mayor.
```

SHARON IGLESIAS                                             191

```
1    Q.  You worked on his campaign, right?
2    A.  Not -- not a whole lot.  Some, yes.  Some, as
3        much as I could.
4    Q.  And Mr. Strickland was adamant that during his
5        campaign that if he was elected he would fire the
6        police chief, correct?
7    A.  I don't know that.
8    Q.  So you talked to him a lot during the campaign at
9        the latter part of 2005.  How about 2006?
10   A.  Yes.  I talked to him in 2006.
11   Q.  And if you would, describe for me the general
12       nature of the conversations you had with
13       Mr. Strickland in '04.
14   A.  Well, I discussed with him my concerns about the
15       Chief taking money out of the drug fund, and
16       after that it was mostly -- I had asked him if he
17       could help me.  He said he would see what he
18       could do.  He tried to talk to some people, I
19       think, and he would call me back and ask me how I
20       was doing.  And one time in particular was he
21       called me, and I believe it was around the first
22       part of August of '04, and told me that Jack
23       Carey had called him and told him to call me and
24       tell me that Tonny Marrow, John Wolford, and Don
25       Jenkins were going to set me up to be fired or
```

SHARON IGLESIAS                                    192

```
1            either to lose ny job.
2     Q.     So in 2004?
3     A.     August of -- the first part -- the first week in
4            August, probably.
5     Q.     So August of '04 Strickland called you?
6     A.     Yes.
7     Q.     And by that point you had already talked to him
8            about your concerns?
9     A.     Yes.  That was in June.
10    Q.     Uh-huh.  And he said, "Jack Carey told ne to tell
11           you"?
12    A.     "To call you and tell you"---
13    Q.     That Wolford, Jenkins, and Harrow were going to
14           set you up to be fired?
15    A.     That's correct.  He told ne to be very careful,
16           to be on the lookout.
17    Q.     Anything else you recall about your conversations
18           with Mr. Strickland in 2004?
19    A.     When they set ne up I did speak to Mr. Strickland
20           about it, and what they had done to ne.
21    Q.     And when was -- when do you contend that they,
22           quote, "set you up"?
23    A.     It wasn't too long, probably a week maybe --
24           maybe a week or ten days after Strickland had
25           called ne.
```

SHARON IGLESIAS                                    193

```
1     Q.     So in August---
2     A.     '04.
3     Q.     ---September '04?
4     A.     No.  It was August '04.
5     Q.     So you contend that in August of '04 that
6            Jenkins, Wolford, and Harrow set you up?
7     A.     Yes, na'an.
8     Q.     And I presune you're referring to the tine period
9            when you were disciplined for discussing
10           personnel information?
11    A.     That's what they said.  That's what they clained.
12    Q.     And you were laterally transferred to the
13           position of dispatcher?
14    A.     I was denoted to the position of dispatcher.
15    Q.     Did you receive any reduction in pay?
16    A.     No.
17    Q.     All right.  So when you were transferred to the
18           position of dispatcher you then grieved that
19           transfer?
20    A.     Yes.
21    Q.     And you were actually reinstated to your prior
22           position at the police department, is that
23           correct?
24    A.     That is not correct.
25    Q.     Okay.  You were transferred back to an
```

SHARON IGLESIAS                                    194

```
1            administrative position with the police
2            department, were you not?
3     A.     I was now administrative support specialist to
4            the Oxford Police Department.
5     Q.     Did your job duties change fron the tine when you
6            were administrative assistant to the Chief?
7     A.     Yes, they did.
8     Q.     How did they change?
9     A.     I didn't do as much for the Chief as I did
10           previously in ny previously position.  He did
11           nost all of his own -- as far as I can renember
12           he did all of his own letters.  He even nade --
13           took care of sone financial transactions with
14           City Hall Finance Department.  He skipped over ne
15           a lot and started doing a lot of his own work.
16           My duties as far as payroll were the sane, and
17           several other things that were the sane.  The
18           basics of the position were the sane a lot.
19           There was less contact with John Wolford and less
20           work concerning hin.  I did not answer the phone
21           as much.  My phone didn't ring as much anynore.
22    Q.     Any other differences?
23    A.     Not that I can recall at this tine.  The letter
24           that I had received fron Tonny Harrow was very
25           confusing in the fact that it was a reinstatenent
```

SHARON IGLESIAS                                    195

```
1            letter and a final warning all at the same tine.
2     Q.     And the final warning was with regard to what,
3            Ms. Iglesias?
4     A.     What they clained, their claims against ne.
5     Q.     Which was with regard to confidentiality, is that
6            correct?
7     A.     That's correct.
8     Q.     Okay.  We were continuing to talk about your
9            discussions with Frank Strickland.  In August of
10           2004 Mr. Strickland called you.  Have you had any
11           discussions in 2004 after that discussion?
12    A.     Yes, I'n sure we did.
13    Q.     And what was the nature of those discussions?
14    A.     Probably about the set up, what Wolford and
15           Harrow and Jenkins had set ne up and what they
16           were doing to ne.
17    Q.     And Wolford -- I mean, excuse ne.  Strickland, in
18           fact, contacted the SBI for you, did he not?
19    A.     Not to ny knowledge.
20    Q.     Did he contact Training & Standards?
21    A.     I don't know that, that he did.
22    Q.     Did he contact the U.S. Attorneys Office?
23    A.     I don't know that he did.
24           MS. DAVIS: Can we go off the record
25           and let ne nark a few exhibits, please?
```

SHARON IGLESIAS                                    196

1       (A discussion was held off the record.)
2       (The letter dated 9/8/04 is marked as
3       Deposition Exhibit Number 13.)
4       (The letter dated 9/7/04 is marked as
5       Deposition Exhibit Number 14.)
6   Q.  Ms. Iglesias, we're back on the record. I'm
7       going to ask you to take a look at Exhibits --
8       what we've marked as Exhibits Number 13 and 14,
9       which I will represent to you are copies of
10      documents that were produced to me by your
11      attorneys in discovery. Exhibit Number 13
12      appears to be a letter to Scott Perry at the
13      Director of Training and Standards from Frank
14      Strickland. Does that refresh your recollection
15      as to whether Frank Strickland contacted Training
16      and Standards about your allegations concerning
17      Chief Wolford?
18  A.  Well, it looks like he did. I just don't
19      remember the letter.
20  Q.  Can you tell me how you got a copy of the letter?
21  A.  I'm sure Mr. Strickland sent me a copy. He would
22      have to.
23  Q.  And taking a look at Exhibit Number 14---
24  A.  I do remember this one now. I remember this one.
25  Q.  That's Exhibit Number 14 you're referring to?

SHARON IGLESIAS                                    197

1   A.  I do.
2   Q.  All right. And does Exhibit Number 14 refresh
3       your recollection as to whether Mr. Strickland
4       contacted the U.S. Attorneys Office?
5   A.  It looks like he did.
6   Q.  And Mr. Strickland also suggested to you that you
7       ought to have discussions with Susan Wolford, is
8       that correct?
9   A.  That I ought to have discussions?
10  Q.  Yes.
11  A.  I don't recall him saying that to me, because I
12      was already, you know, speaking to Susan up until
13      November 2006.
14          MS. DAVIS: Let's mark as Deposition
15      Exhibit Number 15---
16      (The E-mail dated 10/9/04 is marked as
17      Deposition Exhibit Number 15.)
18  Q.  Ms. Iglesias, if you would, take a look at
19      Deposition Exhibit Number 15.
20  A.  (The witness complies with request.)
21  Q.  If you would, look at the third to the last
22      paragraph. It starts, "I sent you a copy of an
23      e-mail that I had sent to T. Marrow just to let
24      you know that you have a friend who is on your
25      side. Wolford's wife called me and made some

SHARON IGLESIAS                                    198

1       very serious statements about your boss. I will
2       not use those statements unless I have to. You
3       may want to call her and talk to her. She really
4       seems like a nice lady who has been victimized by
5       Wolford."
6   A.  The question again?
7   Q.  Does this refresh your recollection with regard
8       to whether or not Mr. Strickland suggested you
9       have discussions with Susan Wolford?
10  A.  I mean, that might be a suggestion.
11  Q.  But at the time this e-mail was sent, which was
12      October the 9th, 2004, you had already had
13      discussions with Susan Wolford---
14  A.  Oh, yes.
15  Q.  Had you not?
16  A.  Yes.
17  Q.  Do you recall any other conversations you had
18      with Mr. Strickland since -- in 2004? Excuse me.
19  A.  In 2004?
20  Q.  Yes.
21  A.  No. Basically it was about the setup, being set
22      up and what was going on with that.
23  Q.  All right. And you said that in '05, the first
24      part of '05, you didn't have many conversations
25      with Mr. Strickland?

SHARON IGLESIAS                                    199

1   A.  I don't recall many.
2   Q.  And the fall of '05 was an election year, is that
3       correct?
4   A.  Correct.
5   Q.  Mr. Strickland ran against Al Woodlief for Mayor
6       in that election?
7   A.  Correct.
8   Q.  And you supported Mr. Strickland for Mayor?
9   A.  Correct.
10  Q.  You had several conversations with Mr. Strickland
11      in the fall of '05?
12  A.  Yes, correct.
13  Q.  All right. Talk to me about those conversations,
14      please.
15  A.  Well, I don't know -- I don't recall what they
16      were, but I know that I did speak to him.
17  Q.  Did you talk to him about your concerns about the
18      department?
19  A.  Nothing other than what had already been
20      discussed. They were my concerns.
21  Q.  Did you talk to him about your desire to the
22      Chief fired?
23  A.  No.
24  Q.  Is it your testimony today that you've never told
25      Frank Strickland that you would like to see Chief

DOVIE L. HANFORD, COURT REPORTER (336) 674-2430

SHARON IGLESIAS                                    200

1        Volford fired?
2    A.  No. My -- what I wanted was an investigation.
3    Q.  Okay. And you never shared with Frank Strickland
4        or said anything along the lines of you share his
5        desire to see Chief Volford out of the position
6        of Chief of Police?
7    A.  I don't recall that.
8    Q.  All right. And Frank Strickland lost the
9        election, is that correct?
10   A.  That's correct.
11   Q.  You don't recall -- I believe you testified
12       earlier you don't recall Frank Strickland saying
13       during the election that one of the things he
14       would do if he were elected was to make sure that
15       Chief Volford was no longer Chief?
16   A.  No.
17   Q.  Now, I'm talking about the 2005 election.
18   A.  Right. The only thing I recall him saying was
19       that he would do an investigation, he would make
20       sure an investigation was done, a proper one.
21   Q.  And as of the fall of '05 you did not believe
22       that a proper investigation had been done?
23   A.  No.
24   Q.  And in fact, you didn't believe that any
25       investigation had been done?

SHARON IGLESIAS                                    201

1    A.  That's correct.
2    Q.  But you had been told that several investigations
3        had been done?
4    A.  That's what were the claims, yes.
5    Q.  And you didn't believe any of those?
6    A.  No.
7    Q.  After Mr. Strickland lost the election, did you
8        have conversations with Mr. Strickland?
9    A.  Oh, yes. I'm sure I did.
10   Q.  Did Mr. Strickland contact WRAL for you?
11   A.  No, I did. I contacted them.
12   Q.  Did Mr. Strickland -- do you recall
13       Mr. Strickland offering to assist you in your,
14       quote, "battle," against the City?
15   A.  Yes.
16   Q.  When did Mr. Strickland offer to assist you in
17       your battle?
18   A.  Well, he's been trying to help me since June
19       2004.
20   Q.  And since 2005, since your termination in 2006,
21       has Mr. Strickland continued to assist you with
22       your litigation against the City of Oxford?
23   A.  I think that he has, yes.
24   Q.  He's provided you with information?
25   A.  At times, yes.

SHARON IGLESIAS                                    202

1    Q.  He's provided you with documentation?
2    A.  He has sent me e-mails. I get e-mails.
3    Q.  Has he provided you with any financial support?
4    A.  No.
5    Q.  And Jack Carey has provided you with documents?
6    A.  No.
7    Q.  Jack Carey has provided you with information?
8    A.  Information.
9    Q.  Yes?
10   A.  Yes.
11   Q.  Has Jack Carey provided you with any financial
12       support?
13   A.  No.
14   Q.  Has any commissioner, current or former, of the
15       City of Oxford provided you with any financial
16       support?
17   A.  No.
18   Q.  Has any other person, other than yourself or your
19       immediate family, provided you with any financial
20       support---
21   A.  No.
22   Q.  ---with regard to your litigation---
23   A.  No.
24   Q.  ---against the City of Oxford?
25   A.  I'm sorry. No.

SHARON IGLESIAS                                    203

1    Q.  All right, okay. Let's talk about discussions
2        with Pat Ford. How many discussions have you had
3        with Pat Ford with regard to your concerns about
4        the Chief?
5    A.  I believe that started in May of 2004. It was
6        either during the time the SBI was there, or it
7        was around that time. And I told her what my
8        suspicions were concerning the Chief taking money
9        out of the drug fund, and she seemed to be upset
10       about it. Now -- now that I look back on it, I
11       believe she was not being honest. I'm sorry, go
12       ahead.
13   Q.  Nope, that's fine. Go ahead.
14   A.  She -- I discussed with her -- they were doing
15       the investigation, and I discussed with her
16       concerning Warren Hicks, his embezzlement. And
17       there was a receipt where Volford had given
18       Warren Hicks money out of the drug fund to cover
19       missing money out of the property and evidence
20       room, and she was very interested in that and
21       wanted to see it. I actually called her. I
22       called her and told her about it. She had
23       already gone home from work. I called her and
24       told her about it, and she said, "Okay. You
25       know, stop by on your way home."

DOVIE L. HANFORD, COURT REPORTER (336) 674-2430

SHARON IGLESIAS                    204

1        So I did, and I showed her the receipt and
2   my notes. I had my notes with me in my folder
3   concerning the meeting with Susan Wolford in
4   2003.
5   Q.   And in addition to your notes about the meeting
6        with Susan Wolford -- and those notes I believe
7        were marked as Exhibit Number 12. Am I correct
8        about that?
9   A.   10.
10  Q.   Excuse me, 10. The notes you're referring to
11       we've marked as Exhibit Number 10?
12  A.   Yes.
13  Q.   Did you also have copies of Exhibits Number 6, 7,
14       or 9 with you when you went to talk to Pat Ford?
15  A.   No.
16  Q.   Did you ever show Pat Ford copies of Exhibits 6,
17       7, or 9?
18  A.   No.
19  Q.   Okay. And when was this conversation with Pat
20       Ford when you showed her the notes, which we have
21       marked as Exhibit Number 10?
22  A.   May 2004.
23  Q.   Was this discussion with Pat Ford before or after
24       you talked to the auditor?
25  A.   I cannot remember.

SHARON IGLESIAS                    205

1   Q.   Along about the same time?
2   A.   Yes.
3   Q.   Did you ask Pat Ford to do anything with regard
4        to those allegations?
5   A.   I don't recall that I did. Pat suggested to me.
6        She said, "I'm going to Cindy Bostic and talk to
7        her about it." She and Cindy were friends.
8        Cindy is, I believe, an assistant DA. And so I
9        can only assume that Pat did that. She came
10       back, and I was out in the parking lot. And she
11       said that she had talked to Cindy, and she
12       suggested to me that I go and talk to her about
13       my concerns. And I told her no, that I wasn't
14       going to do that.
15  Q.   So Pat suggested that you go talk to the
16       assistant DA?
17  A.   Yes.
18  Q.   And that's the assistant DA in Granville County?
19  A.   Yes.
20  Q.   And you told Pat that you were not going to do
21       that?
22  A.   Right.
23  Q.   And why did you decide not to do that?
24  A.   I didn't trust Pat.
25  Q.   This was in May of 2004?

SHARON IGLESIAS                    206

1   A.   Yeah. I felt kind of funny about it, and I
2        decided it was not a good idea to take her word
3        for it.
4   Q.   In May of 2004, did you believe that Chief
5        Wolford had engaged in criminal activity?
6   A.   In May of 2004?
7   Q.   Yes.
8   A.   Yes.
9   Q.   And you stated earlier today that you believed
10       that the criminal activities should have been
11       investigated by a law enforcement agency, is that
12       correct?
13  A.   That's correct.
14  Q.   All right. And in your opinion, does the
15       assistant DA qualify as a law enforcement agency
16       or agent qualified to conduct a criminal
17       investigation?
18  A.   I don't believe they're sworn law enforcement.
19  Q.   It's your understanding that the assistant DA
20       cannot engage in criminal investigations?
21  A.   That would be my understanding, that they are not
22       sworn law enforcement.
23  Q.   Is it your understanding that they can order a
24       criminal investigation if they see fit?
25  A.   Yes.

SHARON IGLESIAS                    207

1   Q.   Okay. So just so I understand, in May of 2004
2        you thought that criminal activity had occurred?
3   A.   Yes.
4   Q.   It was suggested to you by Pat Ford that you
5        ought to go talk to the assistant DA?
6   A.   Uh-huh.
7   Q.   You understood at that time that the assistant DA
8        could order a criminal investigation if they saw
9        fit?
10  A.   I did not know that the assistant DA could. I do
11       know that the DA can.
12  Q.   Well, the assistant DA works under the direct
13       supervision of the DA, correct?
14  A.   Yes, I -- yes.
15  Q.   And knowing all of that you declined to go talk
16       to Cindy Bostic?
17  A.   That's correct.
18  Q.   All right. Any other conversations you recall
19       with Pat Ford?
20  A.   In August of 2004 Pat Ford came to my office.
21       She turned in lunch receipts where she had been
22       training and asked for reimbursement. So she sat
23       down, and she said to me all of a sudden -- she
24       said, "Did you hear that Melba Knott got fired
25       last week?"

SHARON IGLESIAS                                    208

1          And I was getting money out of the safe to
2     reimburse her, and I -- it shocked me really bad
3     what she said.  So I turned around and I said,
4     "What did you say?"
5          And she said, "Did you hear that Melba Knott
6     got fired last week?"
7          I said, "No."  I said, "Pat, where did you
8     hear this from?"
9          And she said, "Well, I don't know.  I don't
10    know."  Then she stood up.  She wanted to really
11    get out of my office.  And then she was holding
12    out her hand for the money, so I handed her the
13    money, and she left.
14 Q.   And what did you do after she left?
15 A.   After she left I called the finance office and
16    spoke to Sultana Ferrell.  And I asked Sultana, I
17    said, "Is Melba okay?"
18         And she said, "Yeah."
19         And I said, "Is she -- is she still there?
20    Is she working?"  And Sultana said, "Yeah, she's
21    working."
22         And I told her, I said, "Well, Pat Ford just
23    left my office and just said to me, 'Did you know
24    that Melba Knott got fired last week?'"
25         And so Sultana made conversation about it.

SHARON IGLESIAS                                    209

1          She said that was a terrible thing for her to
2     say, and she said, "I don't -- I've not heard any
3     such thing."  She said, "You might want to call
4     Phyllis.  She might know something."
5          So I called Phyllis, and I asked her the
6     same thing.  And Phyllis said, "No.  Everything
7     seemed to be fine over there," and that was the
8     end of it.
9  Q.   Okay.  Do you recall having any further
10    conversations with Pat Ford about your concerns
11    about the Chief taking money out of the drug
12    fund?
13 A.   I don't recall at this time any other.
14 Q.   Do you recall ever telling Pat Ford that you
15    thought the Chief had lied about taking money out
16    of the drug fund?
17 A.   I'm pretty sure I did.
18 Q.   And you do not recall sharing with Pat Ford any
19    documents related to your records of the Chief
20    taking money out of the drug fund?
21 A.   No.
22 Q.   Do you recall a time when you went to Pat Ford's
23    house to talk to her about your concerns?
24 A.   No.  I didn't go to her house to talk about my
25    concerns.  I had a copy of a receipt of the Chief

SHARON IGLESIAS                                    210

1     giving Warren Hicks money to cover missing money,
2     and I showed her that.  And I had my notes with
3     me.
4  Q.   And the notes that you had did not include
5     Exhibits Number 6, 7, or 9?
6  A.   No.
7  Q.   All right.  Is there anything else you recall
8     about your discussions with Pat Ford?
9  A.   Oh.  Well, she was telling me some really
10    terrible things about -- about John Wolford and
11    Glen Boyd, talking about their sexual behavior.
12    What did she tell you?
13 A.   She said that John Wolford and Glen Boyd were
14    swapping -- well, it was John Wolford's
15    girlfriend, Kathy, and Glen Boyd's wife.  And her
16    name is Sharon.  They were swapping partners, and
17    that's what she told me.  And she conveyed to me
18    an incident that happened at Christmas -- and I
19    don't recall what Christmas she was talking
20    about -- where they were over at Pat's house,
21    drinking.  And there was a party -- I believe it
22    was Pat's house.  And there was a party, and they
23    were drinking.  And something was said.  I
24    believe -- I believe it was Glen's wife.
25    Something was said, "Well, we've had too much to

SHARON IGLESIAS                                    211

1     drink.  We don't need to be driving back, or
2     driving that far" -- so it must have been Glen's
3     wife.
4          And Pat suggested that they could stay at
5     her place, and then Wolford suggested that, "No,
6     they can stay at our place."
7          And Glen's wife got upset and said, "No, I
8     am not going over there.  I'm not staying over
9     there."
10         She insinuated that if she -- Pat was
11    insinuating to me that if Glen and his wife
12    stayed with Wolford that they would expect sexual
13    favors, I guess, or swapping.  That's what she
14    was conveying to me.
15 Q.   Did Pat specifically say that to you?
16 A.   Yes.
17 Q.   And I take it from the look on your face that you
18    don't approve of that kind of behavior?
19 A.   No.
20 Q.   And Pat told you that in 2004?
21 A.   Yes, May of 2004.
22 Q.   She told you all of that in May of 2004?
23 A.   Yeah.  She told me that the day I went over and
24    showed her the receipt.
25 Q.   All right.  Anything else you recall about your

SHARON IGLESIAS                                          212

1          conversations with Pat?
2     A.   No.
3     Q.   And you believe that Pat Ford participated in
4          your setup in August of 2004, is that correct?
5     A.   That's correct.
6     Q.   Have you had conversations with Pat Ford since
7          August of 2004?
8     A.   Not that I recall.
9     Q.   Talk to me about your conversations with Jason
10         Tingen.  When do you recall your first
11         conversation being with Jason Tingen about your
12         concerns with regard to the Chief?
13    A.   2004.
14    Q.   All right.  Before or after you talked to the
15         auditor?
16    A.   Before.
17    Q.   What was the nature of your conversations with
18         Jason Tingen?
19    A.   I had asked Jason to be a witness in a meeting
20         between myself and Chief Wolford that was going
21         to take place on May the 13th, 2004.  And I
22         briefly told Jason that I had spoken to auditors
23         that had come in and expressed that my concerns,
24         my suspicions, that he was removing money from
25         the drug fund.  And Wolford was going to be

SHARON IGLESIAS                                          213

1          meeting with me, and I wanted a witness of my
2          choosing.  And Jason agreed, and that was the
3          extent of that conversation.
4     Q.   And did you have any conversations with Jason
5          Tingen after 2004?
6     A.   After 2004?
7     Q.   Yes.  Excuse me.  After that conversation in May
8          of 2004?
9     A.   Yes.
10    Q.   Talk to me about those conversations.
11    A.   At some point in May of 2004 Jason came back to
12         me -- and I'm not sure if this was after -- I
13         believe this was after the City auditors, prior
14         to my meeting with John Wolford on May 13th.
15         Jason expressed a concern about me, and he said,
16         "You need to protect yourself."  He suggested
17         that I buy a tape recorder.
18    Q.   Did you buy a tape recorder?
19    A.   Yes, I did.
20    Q.   And did you begin recording your conversations?
21    A.   Yes, I did.
22    Q.   You began recording those sometime in May of '04,
23         is that correct?
24    A.   That's correct.
25    Q.   All right.  And you recorded a substantial number

SHARON IGLESIAS                                          214

1          of conversations that have been turned over to us
2          in discovery.  Other than the recordings that
3          have been turned over in discovery, are there any
4          additional recordings that you've made that have
5          not yet been disclosed to your attorneys or to
6          us?
7     A.   No.
8     Q.   All right.  Any other discussions you recall
9          having with Jason Tingen?
10    A.   Not that I can recall.
11    Q.   And neither Jason nor Pat Ford had any authority
12         to investigate the allegations against Chief
13         Wolford?
14    A.   No.
15    Q.   And they had no authorization to discipline the
16         Chief?
17    A.   No.
18    Q.   And they were not in the Chief's chain of
19         command?
20    A.   No.
21    Q.   Did you discuss with Jason Tingen or show him any
22         of the documents that have been marked as
23         Exhibits 6, 7, or 9 in this deposition?
24    A.   No.  No.
25    Q.   Did you ask Jason to do anything?

SHARON IGLESIAS                                          215

1     A.   Other than be a witness, no.
2     Q.   Did you ever share with Jason the comments that
3          Pat Ford had made to you about the Chief's
4          lifestyle?
5     A.   I don't recall that.  I don't recall if I did or
6          if I didn't.
7     Q.   And by "lifestyle," I mean the---
8     A.   Right.
9     Q.   The partner swapping that you referred to
10         earlier?
11    A.   I don't recall if I did.
12    Q.   Do you recall telling Jason that you thought
13         the Chief was a liar?
14    A.   I don't recall if I said those exact words.
15    Q.   Do you recall stating or implying to Jason that
16         you believed the Chief to be untrustworthy?
17    A.   Yes, I probably did say that.
18    Q.   Moving on to your next person on the list, which
19         is SBI agent Teresa West.  Tell me about your
20         first conversation with Teresa West.
21    A.   Teresa West called me in July.
22    Q.   Of 2004?
23    A.   2004, around the end of the month and scheduled a
24         meeting with me in Raleigh.
25    Q.   And you went to the meeting?

SHARON IGLESIAS                                          216

1   A.   I did.
2   Q.   During the phone conversation to set up the
3        meeting, did you talk in substance about
4        anything?
5   A.   I don't think so. I'm not sure about that.
6   Q.   So you went to the meeting in Raleigh. Do you
7        know approximately what date that was?
8   A.   Probably -- I'm going to say around July 23rd,
9        approximately.
10  Q.   Did anyone come with you to the meeting?
11  A.   No.
12  Q.   Did you take any documents with you to the
13       meeting?
14  A.   Yes.
15  Q.   What documents did you take with you?
16  A.   The documents -- the documents that you see in
17       Exhibit -- the documents, I had copies of the
18       documents that were in probably Exhibit 9.
19  Q.   What about Exhibit 6, did you---
20  A.   And -- yeah, Exhibit 6. Yeah, because I had the
21       two where he did not submit any explanation for
22       the $20 and the $60.
23  Q.   So you actually took her the documents that are
24       marked as Exhibit 6 and Exhibit 7?
25  A.   No. Exhibit 9, 6 and 9.

SHARON IGLESIAS                                          217

1   Q.   6 and 9?
2   A.   Uh-huh.
3   Q.   So you took her two versions of the drug ledger?
4   A.   And 7 is -- 7 is receipts, too?
5   Q.   Uh-huh.
6   A.   Well, then you can say 7 also.
7   Q.   Any other documents that you took her?
8   A.   I took her my tape recorder.
9   Q.   All right. And which recordings did you share
10       with her?
11  A.   I believe I only had two recordings, and that was
12       a recording from May 13 and a recording from May
13       17.
14  Q.   Those are both with John Wolford?
15  A.   Yes.
16  Q.   Okay. Did you leave her copies of those
17       recordings?
18  A.   No. I just gave her my tape recorder, and she
19       said she tried to listen to it, and she couldn't
20       make it out. She mailed it back to me.
21  Q.   Did you leave her copies of the documents?
22  A.   Yes.
23  Q.   All right. And did she interview you with regard
24       to your concerns?
25  A.   She made notes.

SHARON IGLESIAS                                          218

1   Q.   So you told her the whole story---
2   A.   I told her my suspicions, yes.
3   Q.   And she made notes?
4   A.   Yes.
5   Q.   All right. And then when is the next time you
6        talked to Teresa West?
7   A.   She called me -- I believe she called me the
8        following week or not too long -- it wasn't too
9        long after that, and told me that she had talked
10       with the district attorney, San Currin, and that
11       he was not interested in doing an investigation
12       and that I was free to seek other avenues if I
13       chose to do so.
14  Q.   Did she tell you that she had shared all the
15       documentation with San Currin?
16  A.   No.
17  Q.   Did she tell you that she had looked at all the
18       documentation you had sent her?
19  A.   No, she didn't.
20  Q.   Do you know what, if anything, she did with
21       regard to the documentation you sent her?
22  A.   No, I don't.
23  Q.   Did you have any follow-up conversations with
24       Teresa West?
25  A.   Just those two phone calls -- well, the two phone

SHARON IGLESIAS                                          219

1        calls and the meeting then. And then again I
2        spoke to her in January of 2006, and met with her
3        again.
4   Q.   You spoke to Ms. West in January of 2006. Was
5        that before or after your termination?
6   A.   Before.
7   Q.   What did you talk to her about at that time?
8   A.   I told her I wanted to talk to her again, if I
9        could -- if she would be willing to see me that I
10       had other documentation that I thought might be
11       important, and I would like for her to look at
12       it.
13  Q.   What other documentation were you referring to?
14  A.   I had -- I don't -- I don't recall. I don't
15       recall. I had -- well, the tape recordings, I do
16       know that.
17  Q.   You had additional tape recordings?
18  A.   Yes. I had additional tape recordings. I
19       believe that was what it was, because I took --
20       she told me on the phone that she had thrown away
21       all the documentation that I had brought her
22       previously and asked me to bring it back to her
23       again. So I did.
24  Q.   So in January of '06 you took back to Ms. West
25       all your tape recordings through that time

SHARON IGLESIAS                                    220

1        period?
2    A.  Through that time period.
3    Q.  And you also took her, again, copies---
4    A.  Yes.
5    Q.  ---of the documents that we have marked as
6        Exhibits 5, 7, and 9?
7    A.  9 and 6 I know for sure.  7, yes.  These are
8        receipts.
9    Q.  All right.  And you, again, came down to Raleigh
10       to meet with Ms. West?
11   A.  Yes.
12   Q.  And did you, again, go through the entire story
13       of your concerns with her?
14   A.  Yes.
15   Q.  Did she advise you at that time as to what she
16       was going to do?
17   A.  No.
18   Q.  At any point thereafter, did she tell you what
19       she was going to do with the information?
20   A.  No.
21   Q.  Do you know whether Ms. West followed up on the
22       information?
23   A.  No, I don't.  She never called me back.
24   Q.  All right.  And you said you also spoke with
25       Jack Carey?

SHARON IGLESIAS                                    221

1    A.  That's correct.
2    Q.  When did you first speak with Jack Carey?
3    A.  In October of 2004.
4    Q.  And Mr. Carey was a City commissioner at that
5        point, correct?
6    A.  That's correct.
7    Q.  What did you ask Jack Carey to do?
8    A.  I took copies of Exhibit 9, 6 -- now, wait a
9        minute.  Let me be sure.  (The witness reviews
10       documents.)  The ledger sheet that is attached to
11       Exhibit 9, I didn't take that ledger sheet.  It
12       was Exhibit 6 ledger sheet with the receipts.  I
13       believe it was a copy of the receipts.
14   Q.  So essentially Exhibits 6 and 7 then?
15   A.  Yes.  That would be correct.
16   Q.  Did you take any recordings to Mr. Carey?
17   A.  No.
18   Q.  Did you record that initial conversation with
19       Mr. Carey?
20   A.  No.
21   Q.  And tell me about the conversation with
22       Mr. Carey.
23   A.  I told Mr. Carey my concerns about the Chief, and
24       I showed him the documentation.  And by this time
25       Mr. Carey knew what was going on because he was

SHARON IGLESIAS                                    222

1        the one that had asked Frank Strickland to give
2        me a call back in August of 2004 to warn me that
3        Marrow and Jenkins and Volford were going to set
4        me up.  So he was -- Mr. Carey didn't really
5        looked surprised.  He looked disheartened
6        concerning this.
7    Q.  And what else did you discuss?
8    A.  My concerns, just -- just my concerns.  And he
9        looked over the paperwork.  And I asked him if
10       there was anything he could do to help me, and he
11       said that he didn't know.  And that was basically
12       it.
13   Q.  And when you asked Mr. Carey to help you, what
14       were you asking him to help you with?
15   A.  To help me with the fact that they were falsely
16       accusing me of breach of confidentiality and
17       whatever other accusations they were making
18       against me, that I was not guilty of those
19       claims, and that they were doing this because
20       Volford wanted to get rid of me.  And he had
21       recruited Marrow and Jenkins into assisting him
22       and had conspired to do so.  So Mr. Carey was
23       aware.  He did not say to me he was aware, but I
24       knew he was aware because of the phone call.
25   Q.  So the reason you went to Mr. Carey in October of

SHARON IGLESIAS                                    223

1        '04 was to ask him to help you with the
2        disciplinary action that was going on against
3        you?
4    A.  No.  If he could help me at all as far as
5        requesting an investigation to clear the air, to
6        clear my name, to set things right.
7    Q.  Do you have any idea what, if anything, Mr. Carey
8        did?
9    A.  No, I don't.  I don't know.  I should say I don't
10       recall.  Mr. Carey spoke out.  When he retired as
11       commissioner he did make a comment at his
12       retirement that he had hoped City officials
13       would do an investigation.
14   Q.  Did Mr. Carey ever advise you that he had been
15       told an investigation had been done?
16   A.  No.
17   Q.  Any other conversations you had with Jack Carey?
18   A.  Yes, in November 2006.
19   Q.  And that was the conversation that's been
20       recorded---
21   A.  Yes.
22   Q.  ---and transcribed and given to us, correct?
23   A.  Well, we didn't transcribe it.  I mean, if you've
24       got it transcribed.
25   Q.  I misspoke.  That's the conversation that's been

SHARON IGLESIAS                                                    224

1         recorded and sent to us?

2    A.   Yes, ma'am.

3    Q.   Other than your conversation with Mr. Carey in

4         October of '04 and the conversation in November

5         of '06, have there been any other conversations

6         with Mr. Carey?

7    A    I believe I did have one other conversation, but

8         I don't recall what it was about. And I believe

9         it was in '04.

10   Q.   Was it after your initial conversation, after

11        your October '04 conversation?

12   A.   Yes.

13   Q.   Anything else you can recall about your

14        conversations with Jack Carey?

15   A.   No, not at this time.

16   Q.   And in -- I believe you testified earlier that in

17        November of '05, right after Thanksgiving, that's

18        when you decided to go to WRAL, is that correct?

19   A.   Yes.

20   Q.   And you also contacted Bill West?

21   A.   Yes.

22   Q.   And Al Wheless?

23   A.   Yes.

24   Q.   Do you recall whether or not you contacted WTBD?

25   A.   I may have written a letter, but I received no

SHARON IGLESIAS                                                    225

1         contact.

2              MS. DAVIS:  Let's go off the record and

3         let me mark these exhibits real quick.

4              (Off the record from 4:55 to 5:07 p.m.)

5              (The e-mail correspondences are marked as

6         Deposition Exhibit Numbers 16 through 28.)

7    Q.   (By Ms. Davis)  Ms. Iglesias, I've just handed

8         you what I've marked as Deposition Exhibits

9         Number 16 through Deposition Exhibit Number 28.

10        I'm going to represent to you that these, at

11        least as far as I can tell, appear to be the full

12        extent of documents produced by your attorneys to

13        me in discovery containing correspondence, which

14        I presume to be between yourself -- e-mail

15        correspondence between yourself at an e-mail

16        address of royiglesias@earthlink.net to Kelcey

17        Carlson, who I believe is a news reporter for

18        WRAL TV, is that correct?

19   A.   That's correct.

20   Q.   If you could, take a minute to just look at

21        Exhibits 16 through 28 and let me know if you

22        believe that any of those are not accurate, true

23        and accurate copies of actual correspondence

24        exchanged between yourself and Kelcey Carlson at

25        WRAL.

SHARON IGLESIAS                                                    226

1    A.   (The witness reviews documents.)

2    Q.   And I think to solve Mr. Monteith's concern, I'm

3         going to rephrase my question. I note as

4         Mr. Monteith was pointing out that Exhibit Number

5         18 actually is not addressed to Ms. Carlson.

6         It's addressed to someone by the name of

7         Laliberte, L---

8    A.   Laliberte, Monica Laliberte.

9    Q.   Monica Laliberte at WRAL?

10   A    Yeah.

11   Q.   So let me ask the question another way. As you

12        look through here, is there anything in Exhibits

13        16 through 28 that does not appear to be a true

14        and accurate copy of correspondence between

15        yourself and someone at WRAL TV concerning your

16        desire that they run a story or do a news article

17        on your allegations with regard to the Chief?

18   A.   It appears that way.

19   Q.   It appears that they are all true and accurate

20        copies?

21   A.   It appears to be.

22   Q.   As you sit here today, Ms. Iglesias, do you have

23        any knowledge with respect to whether Tommy

24        Harrow conducted an investigation with regard to

25        your allegations against Chief Wolford?

SHARON IGLESIAS                                                    227

1    A.   No.

2    Q.   As you sit here today, do you have any knowledge

3         with regard to whether or not Teresa West

4         conducted any investigation into your allegations

5         against Chief Wolford?

6    A.   I do have knowledge about that. I know that

7         there was no SBI investigation.

8    Q.   Did Teresa West tell you that she did not look

9         into the allegations at all?

10   A.   No. She didn't say that. She said she spoke to

11        San Currin.

12   Q.   Did she tell you that San Currin did not want to

13        investigate?

14   A.   She told me that he was not interested in doing

15        an investigation.

16   Q.   Are you sure that she said he was not interested

17        in doing an investigation as opposed to him

18        saying he was not interested in prosecuting the

19        allegations?

20   A.   I'm very sure of what I said. He is not

21        interested in doing an investigation.

22   Q.   Did Teresa West tell you why Mr. Currin was not

23        interested in doing an investigation?

24   A.   No.

25   Q.   All right. Do you have any knowledge with regard

SHARON IGLESIAS                                                228

1       to whether Teresa West looked at the documents
2       and listened to the recordings that you provided
3       to her?
4   A.  I don't know.
5   Q.  Do you have knowledge with regard to whether or
6       not Teresa West or anybody else provided the
7       district attorney, San Currin, with copies of
8       documents and/or the recordings that you gave to
9       Teresa West?
10  A.  I don't know that either.
11  Q.  Do you have any knowledge with regard to what, if
12      any, investigation the auditor did?
13  A.  No.
14  Q.  Do you have any knowledge with regard to -- and
15      by "the auditor," I mean Mr. Winston.
16  A.  Correct.
17  Q.  Okay. Do you have any knowledge with regard to
18      whether or not the City's internal auditor did
19      any investigation with regard to your
20      allegations?
21  A.  Who is that, who is the internal auditor?
22  Q.  Her name, Kelly Howard.
23  A.  The finance director, Kelly Howard?
24  Q.  Yes.
25  A.  No.

SHARON IGLESIAS                                                229

1   Q.  You don't know?
2   A.  I have no knowledge, and I do not know.
3   Q.  Do you have any knowledge with regard to whether
4       or not Tom Burnette, the City attorney, looked at
5       any of the documentation that you provided to
6       Teresa West or conducted an investigation---
7   A.  No.
8   Q.  ---regarding this matter?
9   A.  No. I have no knowledge of that.
10  Q.  We've gone through a lot of folks today. Have
11      I -- is there anyone that you have talked to
12      about your allegations about Chief Wolford that
13      we have not discussed today?
14  A.  Ms. Davis, there may be, but I just simply cannot
15      recall.
16  Q.  At this time you can't recall anybody else that
17      we haven't already talked about?
18  A.  At this time.
19  Q.  And other than Jack Carey, have you discussed
20      your suspicions with any other commissioners?
21  A.  Alice Currin.
22  Q.  Okay. Tell me about your discussions with Alice
23      Currin.
24  A.  When Chief Wolford -- I believe it was when he
25      took the $400, I called Ms. Currin and I told

SHARON IGLESIAS                                                230

1       her about it. And I told her my concerns that he
2       was taking this money for his own personal use.
3       And she understood, and she was upset about it.
4       She didn't like it, and she said that she was
5       going to try and do something about it. And I
6       believe that Ms. Currin instigated an audit,
7       which Jim Winston came down and went through the
8       drug file. And I -- let's see, I believe he
9       actually spoke to John Wolford. Jim Winston
10      spoke with John Wolford.
11  Q.  In May of 2004?
12  A.  No. This was right after he took the $400, so
13      that would be in 2003, in April 2003.
14  Q.  So you believe that Jim Winston spoke with John
15      Wolford in April of 2003?
16  A.  Jim Winston came to the police department, and I
17      believe that is what happened.
18  Q.  In 2003, did Jim Winston talk to you?
19  A.  No. There was no interview with me.
20  Q.  Did he talk to you at all?
21  A.  I believe he did speak to me. He greeted me.
22      And other than that, I don't recall anything.
23  Q.  Did you share with Jim Winston in 2003 the
24      documents that you shared with him in 2004?
25  A.  No, I didn't. I don't even know if the file --

SHARON IGLESIAS                                                231

1       if he took the file. I feel like he had to take
2       the file, but I didn't share documents with him.
3       I didn't share any concerns with him at that
4       time.
5   Q.  Why didn't you share the concerns with him in
6       2003?
7   A.  I knew as soon as I shared concerns that there
8       was going to be retaliation. I expected that.
9   Q.  But at that point you had shared those concerns
10      with Alice Currin?
11  A.  Yes.
12  Q.  All right. Are there any other commissioners
13      that you spoke with?
14  A.  No.
15  Q.  Other than Jim Carey and Alice Currin?
16  A.  No.
17  Q.  Any other employees that you spoke with other
18      than the ones that you have listed for me today?
19  A.  I don't recall any other at this time.
20  Q.  And any other discussions with persons outside
21      the department other than the ones that you have
22      described to me today?
23  A.  Other than my husband, my immediate family, no.
24  Q.  Your husband. And by immediate family, do you
25      mean your daughter?

SHARON IGLESIAS                                                    232

1   A.   My son.
2   Q.   Your son.  Have you shared this information with
3        your daughter?
4   A.   Yes.  She's aware of it.
5   Q.   How about any of your grandchildren?
6   A.   No.  No.
7   Q.   Parents, in-laws?
8   A.   No -- ny nother.  Now, ny nother knows, yeah.  My
9        nother knows, and ny two brothers.
10  Q.   Your two brothers?
11  A.   Uh-huh.
12  Q.   Do they all live in Oxford?
13  A.   No.  My nother lives in Angier, and ny two
14       brothers also live in Angier.
15  Q.   Anyone else in your family?
16  A.   No.
17  Q.   How about anyone at your church?
18  A.   No.
19  Q.   No pastor?
20  A.   No.  Recently -- I nost recently told -- told
21       then of concerns and that I had hired attorneys,
22       you know, to help me.
23  Q.   You told your pastors?
24  A.   No, ny Sunday school class.
25  Q.   You told your Sunday school class?

SHARON IGLESIAS                                                    233

1   A.   Yes.  They were asking, "Are there any prayer
2        requests?"  And I asked for prayer.
3   Q.   When you told your Sunday school class, did you
4        share with them the nature of your concerns?
5   A.   I told then basically that I had made a discovery
6        that the Chief had renoved funds, and I had hired
7        attorneys, and I was going through the legal
8        process, and I needed prayer.
9   Q.   And where do you attend church?
10  A.   I attend church at Living Stones Church of God.
11  Q.   Is that in Oxford?
12  A.   Yes, out in the County.
13  Q.   In Granville County?
14  A.   Uh-huh.
15  Q.   And how many people are in your Sunday school
16       class?
17  A.   There's five.
18  Q.   Anyone else that you've shared your concerns
19       with?
20  A.   Not that I can recall.
21  Q.   Do you have any recollection of talking with
22       Scott Perry or anyone with Training and Standards
23       regarding your concerns?
24  A.   No.
25  Q.   You never received any contact at all from

SHARON IGLESIAS                                                    234

1        Training and Standards?
2   A.   No.
3   Q.   Do you have any knowledge with regard to whether
4        or not Training and Standards conducted any
5        investigation with regard to this natter?
6   A.   No.
7   Q.   Do you have any recollection of talking with Eric
8        Evanson or anyone with the U.S. Attorneys Office
9        regarding this natter?
10  A.   No.
11  Q.   Do you have any knowledge with regard to whether
12       or not the U.S. Attorneys Office or anyone with
13       the U.S. Attorneys Office conducted any
14       investigation with regard to this natter?
15  A.   No.
16            MS. DAVIS:  I think we're on Exhibit
17       Number 29, is that correct?
18            COURT REPORTER:  Yes.
19            (The WRAL transcript is narked as Deposition
20       Exhibit Number 29.)
21  Q.   Ms. Iglesias, I'n going to show you what we've
22       narked as Exhibit Number 29, and I'n going to
23       represent to you that Exhibit Number 29 is a
24       transcript that we had made here in our office of
25       the WRAL article, for lack of a better word, the

SHARON IGLESIAS                                                    235

1        WRAL piece from January of 2006.  I would ask you
2        to take a quick look at that, if you would.
3   A.   (The witness conplies with request.)
4   Q.   And just tell me, based on your first glance,
5        does that appear to be a fairly accurate
6        transcription of the WRAL piece that was run in
7        January of '06?
8   A.   (The witness reviews document.)
9   Q.   Do you want us to go off the record so you can
10       read that?
11  A.   This seens to be a close -- you know, as close as
12       I know.
13  Q.   Okay.  That's fine.  I'n going to show you what
14       I've narked as Exhibit Number 30.
15            (The packing slip with notes is narked as
16       Deposition Exhibit Number 30.)
17  A.   (The witness reviews document.)
18  Q.   If you could, could you just tell ne what Exhibit
19       Number 30 is?
20  A.   It's a packing slip for some Christian books that
21       I ordered, and I nade sone notes on it.
22  Q.   The notes you're referring to are actually at the
23       botton of Exhibit 30, but you have to turn
24       Exhibit 30 upside down to read the notes?
25  A.   Yeah.

SHARON IGLESIAS                    236

1   Q.   Is that what you're referring to?
2   A.   Yes.
3   Q.   And if you could, translate for me what the
4        meaning of those notes is with regard to this
5        case.
6   A.   It says, "Minutes for open request for
7        investigation." And then it's got, "July,
8        August, September, October, and December 2005."
9        This is where I believe that they went -- private
10       session--- I don't know what you call it. The
11       commissioners, I'm talking about.
12  Q.   Went into closed session?
13  A.   ---closed session at a commissioners meeting.
14       And the reason I wrote, "July, August, September,
15       October," I did not remember when that occurred.
16       They went into closed session and discussed
17       whether or not to conduct an investigation into
18       my concerns of Wolford taking money from the drug
19       fund. I believe that's what that is.
20  Q.   And so it's your understanding that the
21       commissioners went into closed session sometime
22       between July and December of 2005 to decide
23       whether or not to conduct an investigation into
24       your allegations?
25  A.   I believe that, yes.

SHARON IGLESIAS                    237

1   Q.   All right. Who advised you that the
2        commissioners had taken this action in closed
3        session, or discussed this matter in closed
4        session?
5   A.   I believe it was Frank Strickland. I am not
6        sure. It was either Mr. Carey or Mr. Strickland.
7   Q.   I'm going to run through the next documents
8        rather quickly, if we can. I'm going to show you
9        what we're marking as Exhibit Number 31.
10            (The Written Warning dated 11/6/01 is marked
11            as Deposition Exhibit Number 31.)
12  Q.   Just take a quick look at that and tell me if you
13       recall having received this memorandum for
14       November the 6th, 2001, from Chief Wolford
15       entitled "Written Warning."
16  A.   No. No. This -- I have never received this from
17       John Wolford.
18  Q.   So you don't recall having received this warning
19       at all?
20  A.   No.
21  Q.   All right, okay. If you look at the second
22       paragraph, the second sentence, it states, "You
23       also told her in related terms that, quote, 'my
24       days were numbered,' end quote, or, 'my day is
25       coming,' quote, something in that related type of

SHARON IGLESIAS                    238

1        language." Earlier in the day you were talking
2        about a discussion you had with Ms. Pleasants---
3   A.   Ms. Davis, this is a fabricated document. This
4        is fictitious. He -- he made this up. This
5        never happened. I never saw this. I never
6        received this. I remember this being presented
7        at my grievance hearing with the City after I had
8        been terminated, but that's what this is. I'm
9        sorry I interrupted you. Please continue.
10  Q.   So we're clear, your testimony is that you have
11       never before received Exhibit Number 31 and that
12       you did not receive this written warning, is that
13       correct?
14  A.   That is correct.
15  Q.   All right. And we were talking about the second
16       sentence of the second paragraph where it
17       references a discussion with Mamie Pleasants
18       where you're alleged to have said something along
19       the lines of my days were numbered or my day is
20       coming, presumably about Chief Wolford. Earlier
21       in the day today we were having a discussion
22       about an allegation that you had made that sort
23       of a statement to Mamie Pleasants. Do you recall
24       that?
25  A.   I made the statement not directly to her, but I

SHARON IGLESIAS                    239

1        made the statement. Mr. Woodlief was in there as
2        well. Mr. Woodlief had read the article, and I
3        said, "Well, it sounds like Strickland has got
4        Wolford's days numbered."
5   Q.   And was that statement made around the November
6        2001 time frame, as best you recall?
7   A.   No, I don't. I don't -- you know, I cannot
8        verify a date.
9   Q.   Moving on to what we're going to mark as Exhibit
10       Number 32, can you take a look at Exhibit Number
11       32 and tell me whether you recall having ever
12       received that warning?
13            (The memo dated 10/23/01 is marked as
14            Deposition Exhibit Number 32.)
15  A.   (The witness reviews document.) This is not a
16       warning.
17  Q.   Do you recall ever having received a copy of what
18       we've marked as Exhibit Number 32?
19  A.   Oh, yes.
20  Q.   You, along with several people, received a copy
21       of what we've marked as Exhibit Number 32, is
22       that correct?
23  A.   Yes, along with Captain Williamson and Lieutenant
24       Charles Crudup.
25  Q.   And the subject of Exhibit Number 32 is the

SHARON IGLESIAS                                    240

```
1           importance of reporting concerns through the
2           chain of command, is it not?
3      A.   I don't know. Can I read it?
4      Q.   Absolutely.
5      A.   (The witness reviews document.) Okay. Your
6           question again, please?
7      Q.   My question was with regard to the topic of the
8           memo that's Exhibit Number 32. The topic is the
9           importance of confidentiality and proceeding with
10          complaints through the chain of command within
11          the City, is it not?
12     A.   It is, correct.
13     Q.   Moving on to what we're going to mark -- what
14          we've marked as Exhibit Number 33. Would you
15          take a look at Exhibit Number 33 and let me know
16          if you've seen that document before?
17              (The memo dated 5/17/04 is marked as
18               Deposition Exhibit Number 33.)
19     A.   (The witness reviews document.) Yes.
20     Q.   And you do not deny having received that written
21          warning, do you?
22     A.   No.
23     Q.   I'm going to show you what we've marked as
24          Exhibit Number 34. If you would, take a look at
25          that document.
```

SHARON IGLESIAS                                    241

```
1               (The Letter dated 5/17/04 is marked as
2                Deposition Exhibit Number 34.)
3      A.   (The witness reviews document.)
4      Q.   Exhibit Number 34, for the record, is a three-
5           page document dated Monday, May 17th, 2004. And
6           on the last page it appears to be authored by
7           Sharon B. Iglesias. Ms. Iglesias, let me know
8           when you've had a chance to review that, please.
9      A.   Yes, this is it.
10     Q.   This is, in fact, a true and accurate copy of a
11          letter you authored to Chief Wolford in response
12          to the written warning that we just identified as
13          Exhibit Number 33, is it not?
14     A.   It appears to be -- Exhibit Number 34.
15     Q.   Right. If you look at the fifth line up in the
16          first paragraph, the line starts with the word
17          "Funds," but I would like you to start with the
18          first full sentence of that line which starts,
19          "If you had trusted me enough." Do you see what
20          I'm referring to?
21     A.   Uh-huh.
22     Q.   I'm going to read that into the record. It says,
23          "If you had trusted me enough to explain the
24          internal corruption investigation I would have
25          actively assisted you in every way possible. So
```

SHARON IGLESIAS                                    242

```
1           I am at this point requesting that you not memo
2           this perceived, quote, 'breach of
3           confidentiality' to my employee file based on the
4           grounds that I was unaware of your internal
5           investigation and the sensitivity of it, and in
6           fact, was only doing my job. If you had confided
7           in me, had a little faith in me, this problem
8           would never have developed." Do you see what I'm
9           referring to?
10     A.   Yes.
11     Q.   And as of the author -- as of the writing of this
12          letter Chief Wolford had explained to you that
13          the reason he was taking money out of the drug
14          fund was because he was conducting an internal
15          investigation, is that correct?
16     A.   He said he was doing his own private
17          investigation into crime -- into corruption
18          within the police department.
19     Q.   Well, you refer to it in the first line I read as
20          an internal corruption investigation?
21     A.   Okay.
22     Q.   All right?
23     A.   Uh-huh.
24     Q.   And at that point, did you believe that Chief
25          Wolford had in fact conducted an investigation?
```

SHARON IGLESIAS                                    243

```
1      A.   No.
2      Q.   But you wrote this letter anyway?
3      A.   Yes, I did.
4      Q.   Ms. Iglesias, I'm going to show you what we're
5           marking as Exhibit Number 35, which is a one-page
6           document that says it's to Tonny Marrow from
7           Sharon B. Iglesias, dated May the 18th, 2004.
8           And it's titled regarding -- or reference,
9           "Notice of Appeal to Disciplinary Action." And
10          it appears to be signed by you, is that correct?
11              (The Letter dated 5/18/04 is marked as
12               Deposition Exhibit Number 35.)
13     A.   That's correct.
14     Q.   And this is an appeal of the disciplinary action
15          imposed upon you by Chief Wolford as reflected in
16          what we've marked as Deposition Exhibit Number
17          33, is that correct?
18     A.   Yes. Say that again, 33?
19     Q.   Yes---
20     A.   Did you say Exhibit 33?
21     Q.   Exhibit Number 35 is an appeal of the
22          disciplinary action that is reflected in the
23          memo, which we have previously marked as Exhibit
24          Number 33?
25     A.   Ok.
```

SHARON IGLESIAS                                     244

1   Q.   Is that correct?
2   A.   Okay.  (The witness reviews document.)  Oh, yes.
3        Okay.  Yes, I see what you're saying.
4   Q.   I'm going to show you what we're marking as
5        Deposition Exhibit Number 36, which appears to be
6        a memo to Sharon Iglesias dated May the 25th,
7        2004 from Tommy Marrow responding to your memo
8        dated May the 18th, 2004, which we have
9        previously marked as Exhibit Number 35?
10            (The memo dated 5/25/04 is marked as
11            Deposition Exhibit Number 36.)
12  A.   That's correct.
13  Q.   And on the bottom of this there's a note that
14       appears to be in your handwriting, is that
15       correct?
16  A.   That's correct.
17  Q.   Would you read that note into the record for me?
18  A.   "I was following procedure."
19  Q.   Mr. Marrow said in Exhibit 36 that he was
20       encouraging you to follow the appropriate
21       procedure to appeal, is that correct?
22  A.   That's correct.
23  Q.   And it's your contention, I gather from this
24       note, that you were, in fact, following the
25       proper procedure by appealing directly to

SHARON IGLESIAS                                     245

1        Mr. Marrow?
2   A.   That is correct.
3   Q.   Is it your understanding that the City of
4        Oxford's personnel policy allows direct appeals
5        to the City manager in the case of all
6        grievances?
7   A.   That's what the policy implied.  It said you
8        could appeal to either the human resources
9        manager or the City manager directly.
10  Q.   I'm going to show you what we're marking as
11       Exhibit Number 37.
12            (The personal policy excerpt is marked as
13            Deposition Exhibit Number 37.)
14  A.   (The witness reviews document.)
15  Q.   For the record, Exhibit Number 37 is a five-page
16       document, which I will represent is an excerpt of
17       the City of Oxford's personnel policies, which
18       were actually produced by you, Ms. Iglesias, in
19       discovery as your discovery documents numbered
20       319 through 323?
21  A.   Yes.
22  Q.   And I'm going to refer you to page -- it's the
23       next to the last page of the exhibit.  It's page
24       numbered 322.  It's also numbered 60.  Section 6,
25       the grievance -- the section titled, "Grievance

SHARON IGLESIAS                                     246

1        and Adverse Action Appeal Procedure for
2        Discrimination," is that the section of the
3        personnel policy that you're referring to that
4        allows direct appeal to the human resources
5        director or the city manager?
6   A.   Yes.  Yes, it is.
7   Q.   Is it your contention, then, that the
8        disciplinary action that was taken against you in
9        May of 2004 was on the basis of discrimination?
10  A.   I don't know that it was on the basis of
11       discrimination.  It says, "Grievance and Adverse
12       Action Appeal Procedure for Discrimination."  I
13       just took it as grievance.
14  Q.   Okay.  So you understood the policy to be saying
15       that regardless of the type of grievance you were
16       proceeding with, you had the right to appeal
17       directly to HR or the city manager?
18  A.   That's correct.
19  Q.   And you did not understand that in cases other
20       than discrimination you should proceed through
21       the five-step procedure outlined in Section 4 of
22       the policy, which starts at page 59, also
23       numbered 321, which is the third page in of
24       Exhibit 37?
25  A.   Please repeat your question.

SHARON IGLESIAS                                     247

1   Q.   Okay.  Actually, let me just strike that
2        question.
3             Is it your contention that the disciplinary
4        action that was taken against you in 2004 by
5        Chief Wolford was because of either your race,
6        your gender, that is your sex, or because of some
7        other protected characteristic that you have?
8   A.   That it was?
9   Q.   Yes.
10  A.   That's what was stated in my appeal to Tommy
11       Marrow when I was terminated, I believe.
12  Q.   So you believe that Chief Wolford -- the
13       disciplinary action taken against you in 2004 was
14       on the basis of what, your gender?
15  A.   No.  I don't believe it was based solely on my
16       gender.
17  Q.   Do you believe it was based in part on your
18       gender?
19  A.   I don't know.  We've been through this.  I
20       believe that it's possible.
21  Q.   Okay.  Ms. Iglesias, I'm going to show you what
22       we're marking as Deposition Exhibit Number 38.
23       Do you recall having received this warning?
24            (The final warning is marked as Deposition
25            Exhibit Number 38.)

SHARON IGLESIAS                          248

1   A.   (The witness reviews document.)  Yes.
2   Q.   You have already testified that despite what this
3        warning says you do not believe that the real
4        reason for the issuance of the warning was
5        because of a breach of confidentiality, is that
6        correct?
7   A.   That is correct.
8   Q.   Ms. Iglesias, I'm going to show you what we've
9        marked as Exhibit Number 39.  Does that appear to
10       be a true and accurate copy of your notice of
11       appeal to Tommy Marrow and Don Jenkins with
12       regard to the disciplinary action?
13            (The notice of appeal is marked as
14             Deposition Exhibit Number 39.)
15  A.   (The witness reviews document.)  Yes, it does.
16  Q.   Which we've marked as Exhibit Number 38?
17  A.   Yes.
18  Q.   Ms. Iglesias, I'm going to show you what's marked
19       as Exhibit Number 39.  This appears, for the
20       record---
21                 MR. MONTEITH:  Number 40.
22                 MS. DAVIS:  40, I'm sorry.
23                 MR. MONTEITH:  Go ahead.  No, you're
24       right -- well?
25                 COURT REPORTER:  That's 39.

---

SHARON IGLESIAS                          249

1                 MS. DAVIS:  Why don't we mark that.
2        Thank you.
3   Q.   Okay, Ms. Iglesias, I'm going to show you what we
4        have now remarked as Exhibit Number 40, which,
5        for the record, appears to be a two-page document
6        dated October the 6th, 2004 addressed to Tommy
7        Marrow and written by you, is that correct?
8             (The memo to Tommy Marrow is marked as
9              Deposition Exhibit Number 40.)
10  A.   (The witness reviews document.)  That's correct.
11  Q.   And that was a statement that was submitted by
12       you in advance -- I'm sorry.  After you had a
13       grievance hearing with Don Jenkins, is that
14       correct?
15  A.   That's correct.
16  Q.   All right.  Ms. Iglesias, I'm going to show you
17       what I've marked as Deposition Exhibit Number 41,
18       which, for the record, is a one-page document
19       addressed to Sharon Iglesias from Don Jenkins
20       indicating that after considering the information
21       presented to you at the grievance hearing and the
22       letter, which we have previously marked as
23       Exhibit Number 40 that Mr. Jenkins sees no reason
24       to overturn his original decision, is that
25       correct?

---

SHARON IGLESIAS                          250

1             (The Memo to Ms. Iglesias is marked as
2              Deposition Exhibit Number 41.)
3   A.   (The witness reviews document.)  That's correct.
4   Q.   Do you recall receiving this document?
5   A.   Yes.
6   Q.   All right.  I'm going to show you what we're
7        marking as Deposition Exhibit Number 42, which
8        appears to be a one-page letter dated October the
9        8th, 2004, to Sharon Iglesias from Tommy Marrow.
10       Do you recall having received this document?
11            (The letter to Ms. Iglesias is marked as
12             Deposition Exhibit Number 42.)
13  A.   Yes.
14  Q.   And did Mr. Marrow, in fact, put you on paid
15       administrative leave through -- I'm sorry.
16       Starting October the 8th through the date of your
17       grievance/name clearing hearing?
18  A.   I would have to say I don't know that this is the
19       exact date, but it was around this time.  It was
20       around this time.
21  Q.   In any event, in October of 2004 you didn't lose
22       any days that were unpaid, did you?
23  A.   No.  No.
24  Q.   All of your leave was paid leave?
25  A.   Yes.

---

SHARON IGLESIAS                          251

1   Q.   I'll show you what we're marking as Exhibit 43,
2        which, for the record, is a two-page document
3        which is entitled, "Supplement to Grievance/Name
4        Clearing Hearing held Thursday, October 14th,
5        2004," and it appears to be authored by Sharon
6        Iglesias?
7             (The Supplement to Grievance/Name Clearing
8              Hearing is marked as Deposition Exhibit
9              Number 43.)
10  A.   That's correct.
11  Q.   And you do recall preparing and submitting this
12       document to Mr. Marrow?
13  A.   Yes.
14  Q.   I'll direct you to the bottom of the first page
15       of Exhibit 43.  There's a note on there that
16       appears to be in your handwriting.  It says -- I
17       believe it says, "You did this to me"?
18  A.   Uh-huh.
19  Q.   Can you tell me what that means?
20  A.   It means that Wolford set me up.
21  Q.   It means that you believed at that time that
22       Wolford set you up?
23  A.   Yes.
24  Q.   Let me show you what we're marking as Exhibit
25       Number 44, which, for the record, is a two-page

SHARON IGLESIAS                                    252

1    document dated October the 22nd, 2004, addressed
2    to Sharon B. Iglesias from Thomas Marrow, City
3    manager, which is a determination or appears to
4    be a determination of Mr. Marrow of the
5    grievance/name clearing hearing that was
6    conducted in October of '04, is that correct?
7         (The letter dated 10/22/04 is marked as
8         Deposition Exhibit Number 44.)
9    A.   That's correct.
10   Q.   And in this memo Mr. Marrow reinstates you, is
11        that correct?
12   A.   And gives me a final warning.
13   Q.   And the subject of that final warning is once
14        again the confidentiality, correct?
15   A.   Yes.
16   Q.   And you do recall receiving this document?
17   A.   Yes.
18   Q.   Ms. Iglesias, I'm going to show you what we're
19        marking as Exhibit Number 45, which, for the
20        record, appears to be a three-page document
21        addressed to Tommy Marrow from Sharon Iglesias?
22        (The letter to Mr. Marrow is marked as
23         Deposition Exhibit Number 45.)
24   A.   Uh-huh.
25   Q.   Requesting essentially two things, payment of

SHARON IGLESIAS                                    253

1         attorneys fees---
2    A.   Yes.
3    Q.   ---and clearing of your file of all letters and
4         memos of accusations, is that correct?
5    A.   False accusations, yes.
6    Q.   All right.  And looking at Exhibit Number 45,
7         there are two documents attached to the back of
8         it numbered 549 and 550.  Can you tell me what
9         those documents are?
10   A.   This is an employee performance appraisal that's
11        dated February the 3rd, 2005, that was done by
12        Captain Bob Williamson.
13   Q.   And was that personnel appraisal attached to your
14        letter to Mr. Marrow when you gave it to
15        Mr. Marrow?
16   A.   No.  I didn't give this letter to Mr. Marrow.
17        This letter was not sent to Tommy Marrow.  I went
18        to see him in person.
19   Q.   Excuse me.  You're exactly right.  So let's talk
20        about the notes that are on Exhibit Number 45.
21        In the upper right-hand corner you have a
22        notation that says, "This letter was not sent to
23        T. Marrow.  I went to see him in person on May
24        the 23rd, '05 and said to him personally what's
25        in this letter," is that correct?

SHARON IGLESIAS                                    254

1    A.   Yes, that's correct.
2    Q.   And at the very top of the page it says, "CD
3         Track 14."  What does that refer to?
4    A.   A tape recording.
5    Q.   A tape recording of your conversation with
6         Mr. Marrow?
7    A.   Yes.
8    Q.   During the conversation with Mr. Marrow on May
9         the 23rd, 2005, do you recall Mr. Marrow asking
10        you if you were recording the conversation?
11   A.   Yes.
12   Q.   Do you recall telling him---
13   A.   No.
14   Q.   ---that you were not recording the conversation?
15   A.   That's correct.
16   Q.   And you were, in fact, recording the
17        conversation?
18   A.   Yes.
19   Q.   So you lied to Mr. Marrow?
20   A.   Yes.
21   Q.   And the notes at the bottom of the page say,
22        "Mr. Marrow ignored my request and at the end of
23        30 days I received no response from him,
24        nothing"?
25   A.   That's correct.

SHARON IGLESIAS                                    255

1    Q.   And you also have a note, "Mr. Marrow wanted to
2         know if I had a tape recorder on"?
3    A.   Yes.
4    Q.   Do you recall during your conversation on May the
5         23rd, 2005, asking Mr. Marrow for a raise?
6    A.   Yes.
7    Q.   Do you recall telling Mr. Marrow that you just
8         received a good performance review from Captain
9         Williamson?
10   A.   No.
11             MS. DAVIS:  We'll take a quick break
12        and mark the rest of these, and then we
13        should be able to push through.
14        (A recess is taken from 5:56 to 6:10. p.m.)
15        (The letters dated 7/11, 7/18, and 8/4/05
16         are marked as Deposition Exhibit Numbers
17         46, 47, and 48.)
18   Q.   (By Ms. Davis)  I'm going to ask you to take a
19        look at Exhibits Number 46, 47, and 48.  Do you
20        have any reason to dispute the authenticity of
21        any of those three documents?
22   A.   No.
23   Q.   All right.  Looking at Exhibit Number 49, that
24        appears to be an e-mail from you to the entire
25        department?

SHARON IGLESIAS                                          256

1              (The e-mail 8/23/05 is identified as
2         Deposition Exhibit Number 49.)
3    A.   Uh-huh.
4    Q.   I assume that means to the entire Oxford Police
5         Department?
6    A.   Yes.
7    Q.   And that's in response to, I guess, a want ad
8         that was placed in your box?
9    A.   Yes, that's correct.
10   Q.   And you do recall sending that e-mail to the
11        entire department?
12   A.   Yes.
13   Q.   I'm going to show you -- have you take a look at
14        what's been marked as Exhibit Number 50.
15             (The memo dated 1/20/06 is identified as
16        Deposition Exhibit Number 50.)
17   A.   (The witness reviews document.)
18   Q.   Do you recall sending the e-mail that's
19        attached--- Excuse me. ---that's marked as
20        Exhibit Number 50 to Glen Boyd in response to the
21        e-mail that's on the second page of Exhibit 50
22        from Glen Boyd?
23   A.   I sent it to Glen Boyd and Captain Williamson,
24        Tommy Marrow, yes.
25   Q.   And this appears to be a true and accurate copy

SHARON IGLESIAS                                          257

1         of the memo that you sent?
2    A.   It appears to be.
3    Q.   Looking at Exhibit Number 51.
4              (The termination memo is identified as
5         Deposition Exhibit Number 51.)
6    A.   (The witness reviews document.)
7    Q.   It appears to be a termination memo dated January
8         the 24th, 2006, signed by John Wolford but
9         unsigned by anybody else?
10   A.   Correct.
11   Q.   Do you recall receiving a copy of this memo?
12   A.   Yes.
13   Q.   Is there a reason that you elected not to sign
14        the memo?
15   A.   Yes.
16   Q.   Why is that?
17   A.   I didn't agree with it.
18   Q.   You didn't agree with the content of the memo?
19   A.   Yes.
20   Q.   But you don't dispute that you received the memo?
21   A.   Correct.
22   Q.   All right. I'm going to ask you to, again, take
23        a look at a group of documents, which are
24        Exhibits 52, 53, and 54. Just take a look at
25        those, please.

SHARON IGLESIAS                                          258

1              (Ms. Iglesias's notes are identified as
2         Deposition Exhibit Numbers 52, 53, and 54.)
3    A.   (The witness reviews documents.)
4    Q.   And do you want to take some time to read those?
5    A.   No.  They appear to be---
6    Q.   Do number -- documents Number 52, 53, and 54
7         appear to be true and accurate copies of
8         documents that you authored?
9    A.   They appear to be.
10   Q.   Referring to Exhibit Number 52, for what purpose
11        did you create that document?
12   A.   52?
13   Q.   Yes, ma'am.
14   A.   These were notes for myself, and it stated --
15        well, it says, "Notes for myself for grievance
16        process meetings." These are notes that I made.
17   Q.   Notes that you prepared in preparation for the
18        grievance hearing before Don Jenkins?
19   A.   I think so, yes.
20   Q.   And looking at Exhibit Number 53, for what
21        purpose did you prepare that document?
22   A.   This was prepared in response to Tommy Marrow not
23        meeting with me.  He sent me a letter stating
24        that he was not going to meet with me and
25        suggested -- that's where he suggested he wanted

SHARON IGLESIAS                                          259

1         me to go through Don Jenkins.
2    Q.   And you elected not to send this letter, if I
3         understand your notes at the top?
4    A.   Yes.
5    Q.   And you did not pursue an appeal with Don Jenkins
6         in May of 2004 either, did you?
7    A.   That's correct.  Not at that time I didn't, no.
8    Q.   Looking at Exhibit Number 54, for what purpose
9         did you create that document?
10   A.   I believe this was created for -- there's no
11        date, but it looks like the document I created
12        for the Employment Security Commission.
13   Q.   You created this for the purpose of preparing
14        yourself for the Employment Security Commission
15        hearing---
16   A.   No.
17   Q.   ---or you created this for submission to the
18        Employment Security Commission?
19   A.   To submit when I made my initial claim.
20   Q.   Did you, in fact, submit this---
21   A.   Yes.
22   Q.   ---or do you recall?  Okay.
23   A.   I believe I did, yes.
24   Q.   All right.  And then I'm going to ask you, if you
25        would, to look at -- Just take a quick look at

SHARON IGLESIAS                                          260

1        · Exhibit Numbers 55 and 56, which I'll represent
2        to you are the amended complaint and -- which has
3        been filed by your attorneys on your behalf.  And
4        also Plaintiff's responses, your responses, to
5        interrogatories and request for production of
6        documents that were sent to you by the defendants
7        in this case.
8                (The Amended Complaint and Plaintiff's
9                 Responses are identified as Deposition
10               Exhibit Numbers 55 and 56.)
11   A.   (The witness reviews document.)
12   Q.   I assume that you've had an opportunity to review
13       both of those documents prior to today?
14   A.   Yes.
15   Q.   And you've had an opportunity to read the --
16       let's start first with Exhibit Number 55, the
17       Amended Complaint, which was filed on your
18       behalf?
19   A.   Yes.
20   Q.   Prior to it being filed---
21   A.   I'm sorry?
22   Q.   Have you had an opportunity to review Exhibit 55
23       prior to it being filed with the court?
24   A.   Yes.
25   Q.   And can you affirm to me that as we sit here

SHARON IGLESIAS                                          261

1        under oath that the contents of the Amended
2        Complaint were true and correct to the best of
3        your knowledge?
4    A.   Yes.
5    Q.   Moving on to Exhibit 56, which I'll represent to
6        you are the discovery responses sent from your
7        counsel to us.  I assume you've had an
8        opportunity to review these prior to then being
9        forwarded to us?
10   A.   Correct.
11   Q.   And you had an opportunity to check and make sure
12       that all the information contained in there is
13       correct?
14   A.   That is correct.
15   Q.   As you sit here today, are you aware of any
16       corrections, amendments, or changes that need to
17       be made to these responses to discovery?
18   A.   Not to my knowledge.  Not at this time, no.
19   Q.   And can you affirm for me as we sit here under
20       oath that these statements contained in the
21       responses to discovery are true and correct to
22       the best of your knowledge, information, and
23       belief?
24   A.   To the best of my knowledge they are.
25   Q.   I'm going to ask you to quickly take a look at

SHARON IGLESIAS                                          262

1        page 2 of Exhibit Number 56.
2    A.   (The witness complies with request.)
3    Q.   Interrogatory Number 2 and specifically your
4        answer to Interrogatory number 2 -- if you'll go
5        through the answer to interrogatory number 2, it
6        starts on page 2 and continues on through pages
7        3, 4, 5, and the top of page 6.
8    A.   (The witness reviews document.)
9    Q.   · As you sit here today, are you aware of any other
10       written statements by any witness or potential
11       witness to this action that were not included in
12       the list that is in response to question number 2
13       of Exhibit Number 56?
14   A.   To the best of my knowledge this would -- this
15       would be correct.
16   Q.   And are you aware of any other recordings that
17       are not contained on the list in response to
18       question number 2 of Exhibit Number 56?
19   A.   No.
20   Q.   Since the date of your responses, July the 22nd,
21       2008, have you recorded any additional
22       conversations with anyone that have not yet been
23       produced?
24   A.   No.  Excuse me.
25   Q.   Do you need some more water?

SHARON IGLESIAS                                          263

1    A.   I've got some.
2    Q.   All right.  Now, I'm going to ask you to refer
3        over, if you would, to question number 9, which
4        is on page 11 of Exhibit Number 56.
5    A.   (The witness complies with request.)
6    Q.   It's at the bottom of page 11.
7    A.   Okay.
8    Q.   And I'm referring -- I'm going to ask you a
9        couple of questions about the last two sentences
10       on page 11, starting with, "Plaintiff further
11       responds that she has sustained damages for pain
12       and suffering."  Do you see what I'm referring
13       to?
14   A.   Uh-huh.
15   Q.   All right.  And it says, "This amount is based on
16       the mental anguish and other harm caused to
17       Plaintiff as result of her discharge from
18       employment with the City of Oxford and conduct of
19       Defendants surrounding the same to include damage
20       to Plaintiff's reputation"?
21   A.   Yes.
22   Q.   Can you tell me what type of pain, suffering, and
23       mental anguish you have endured?
24   A.   The loss of my job, the loss of income, the loss
25       of benefits, immediately after it would be the

Deposition of Sharon Iglesias

PAGE 249  SHEET 63 | PAGE 251

SHARON IGLESIAS                264

1   loss of confidence and self-esteem.  The loss
2   created financial worries and problems.  The loss
3   created physical problems.  I suffered
4   psychologically, psychological trauma.  Physical
5   problems such as high blood pressure, increased
6   levels, blood sugar levels, I suffered symptons
7   of posttraumatic stress disorder.  I had -- oh.
8   I had nightmares.  I had at different times,
9   according to the stress, bouts of vomiting,
10  stomach ulcers, intestinal problems, muscle aches
11  and pains.  The stress was -- the stress was so
12  severe that it created muscle problems in my
13  neck, and actually my jaw became dislocated
14  because of it.  The muscles became so tight that
15  I dislocated my jaw.  Marital problems, that's
16  all I can think of right now.
17 Q. And all of this was as a result of your
18    termination of employment?
19 A. Yes.
20 Q. Have you seen any healthcare providers with
21    regard to any of these illnesses, injuries, or
22    symptons?
23 A. No.
24 Q. No healthcare providers at all?
25 A. Just the annual checkup, and that's how I

SHARON IGLESIAS                265

1   discovered the high blood pressure.
2  Q. Did your physician indicate that the high blood
3    pressure was as a result of the termination?
4  A. No.  I did not relate to my physician certain
5    things.  She knew I had problems, you know, on my
6    job -- well, pertaining to the job, of my
7    termination, and -- but we didn't go into it.
8  Q. Have you seen any mental healthcare practitioners
9    as a result of the mental health issues that
10   you've described?
11 A. No.
12 Q. Do you have any diagnosis of any mental disorder,
13   including a PTSD or any other such problems?
14 A. The only person I spoke to was my brother-in-law.
15   He is a doctor, and I related my symptoms to him.
16   And he told me what he thought.
17 Q. He is a medical doctor, or he's a---
18 A. He's a regular MD.
19 Q. What's his practice area?
20 A. Just general.
21 Q. A general practitioner?
22 A. General practitioner.
23 Q. Did you actually see him in the office?
24 A. No.  No.
25 Q. Did you speak to him just on the phone?

SHARON IGLESIAS                266

1  A. On the phone.
2  Q. Has he treated you for any of these conditions?
3  A. No.
4  Q. Has he rendered a medical opinion with regard to
5    causation -- the cause of any of these---
6  A. Yes, he did.
7  Q. He rendered a medical opinion?
8  A. Yes, he did.
9  Q. To you, orally?
10 A. Yes.
11 Q. What's your brother-in-law's name?
12 A. His name is Antonio Rea, R-E-A.
13 Q. And where does he practice?
14 A. In Mexico.  I do not know the name of the town.
15 Q. Is he licensed to practice in the United States?
16 A. No.
17 Q. And the only opinion he rendered was an oral
18    opinion to you?
19 A. Yes.
20 Q. Based on your description to him over the phone?
21 A. Yes.
22 Q. Have you ever met your brother-in-law in person?
23 A. No.
24    MS. DAVIS:  If you'll give me a minute,
25    I think I -- that's about all the questions

SHARON IGLESIAS                267

1   I have.
2   (A recess is taken from 6:25 to 6:30 p.m.)
3  Q. (By Ms. Davis) Ms. Iglesias, earlier in the
4    day -- I'm going to ask you to think back.  You
5    listed Tommy Marrow, Don Jenkins, Chief Wolford,
6    and Patricia Ford as folks who you believed had
7    participated in the conspiracy to set you up to
8    be terminated.  Is there anybody else other than
9    Pat Ford, Tommy Marrow, Don Jenkins, and Chief
10   Wolford that you believe has participated in that
11   conspiracy?
12 A. Yes, ma'am.
13 Q. Who else?
14 A. Glen Boyd, Lieutenant Glen Boyd.
15 Q. And the conduct that you're referring to, his
16   participation, is it anything other than the
17   conduct that you have already described to me in
18   your deposition today?
19 A. It would be pertaining to the last set of
20   exhibits pertaining to his e-mail to where I
21   responded back to him.  Let me see if I can find
22   that.
23 Q. I believe it will be Exhibit Number 54.
24 A. 54.  (The witness reviews document.)
25 Q. Excuse me.  50.

Case 5:07-cv-00437-D   Document 31-21   Filed 12/15/2006   Page 30 of 33
DOVIE C. HANFORD, COURT REPORTER (405) 674-2458

SHARON IGLESIAS                                                           268

1  A.   50?
2  Q.   50, yes, ma'am.
3  A.   So this was -- this was a setup also.  This was
4       the final setup.  They used this to -- I believe
5       to terminate me.  This happened January the 20th,
6       and I was terminated on January the 25th.
7  Q.   So do you contend that the -- you have testified
8       that the e-mail exchange did actually occur?
9  A.   Yes, it did.
10 Q.   What do you contend was set up about the e-mail
11      exchange?
12 A.   The incident was pertaining to Officer Donald --
13      I think his name, first name, is Donald Colbert.
14      And two days prior to this e-mail I had met with
15      Glen Boyd, and there was not a problem concerning
16      our meeting over Officer Colbert's time sheet.
17      Well, two days after that the officer had met
18      with John Wolford, and then this -- Glen's e-mail
19      was devised and sent to me after the issue
20      pertaining to my work as far as completing a
21      payroll had been completed.  This is almost like
22      an afterthought.
23           They are accusing me of purposely and
24      willingly, willfully calling this officer,
25      telling him that Glen Boyd is cheating him out of

SHARON IGLESIAS                                                           270

1       unhappiness.  His unhappiness was due to the fact
2       his time had been changed by another officer.
3  Q.   Other than this e-mail exchange, do you contend
4       that Glen Boyd participated in the conspiracy in
5       any other way?
6  A.   I'm not sure.
7  Q.   Other than Pat Ford, Tonny Marrow, Don Jenkins,
8       John Wolford, and Glen Boyd, is there anyone else
9       that you believe has participated in the
10      conspiracy to set you up to be terminated?
11 A.   I believe the mayor has a part in it.  I believe
12      the district attorney also has a part in it.
13 Q.   The mayor, Al Woodlief?
14 A.   That's correct.
15 Q.   And you believe the district attorney, San Currin
16      also participated in the conspiracy?
17 A.   That's correct.
18 Q.   How do you contend the mayor participated in the
19      conspiracy?
20 A.   He sent out a letter in -- when he was running
21      for mayor, and I believe it was November of 2005.
22      And in his letter he stated that all of these
23      agencies -- or he listed several different ones
24      like the district attorney, the city attorney,
25      the League of Municipalities, the SBI had

SHARON IGLESIAS                                                           269

1       hours, which is not the case at all.  I called
2       the sergeant, and then I called the officer.  He
3       didn't answer.  I left messages for the sergeant
4       and the officer, and the officer was the first
5       one to call me back.  I asked him to verify his
6       comp time.  His overtime was not an issue.  It
7       was his comp time that had been left off of his
8       regular time sheet.  And that's what I believe.
9       That this is a setup.  That he falsely accuses
10      me.  He even makes comments like I had been
11      warned, "You have been warned about such
12      conduct."  And I mean, I don't know what he's
13      talking about.  I don't get that.
14           So to me, this is the final setup, and I
15      actually believe that Wolford and Glen Boyd
16      devised this e-mail and sent it to me that
17      Friday morning, because five days later I was
18      terminated.
19 Q.   And Glen Boyd's e-mail dated Friday, January the
20      20th, which is on page 2 of Exhibit Number 50, he
21      says, "We have an officer -- we have an employee
22      that is not happy," about eight lines down.  Do
23      you contend that Officer Colbert was happy?
24 A.   No.  I'm not saying that the officer was happy,
25      but I'm saying that I was not the cause of his

SHARON IGLESIAS                                                           271

1       investigated the issues.
2  Q.   And how do you contend the district attorney, San
3       Currin, participated in the conspiracy?
4  A.   Because he did not investigate.  I believe that
5       he did not conduct an investigation personally,
6       himself, to start with where there was a claim
7       that he had.  No one spoke to me.  No one
8       interviewed me.  Nobody asked to see my
9       documents, hear my side of the story.  So I feel
10      like he was involved.  I feel like he should have
11      called for an investigation, where he didn't.  I
12      believe that he may have spoken to the city
13      manager or John Wolford, and based his
14      assumptions -- or based the fact that he didn't
15      investigate according to what they told him.
16 Q.   Is there anybody else that you believe has
17      participated in the conspiracy?
18 A.   Not that I can recall or say right now.
19 Q.   Is there anything with regard to any of the
20      testimony that you have given today that you feel
21      the need to correct, change, or elaborate on as
22      we sit here?
23 A.   Not that I can think of right now.
24 Q.   To the best of your knowledge as you sit here,
25      are all the answers that you've given me today

SHARON IGLESIAS                                          272

1          true and correct to the best of your knowledge?
2    A.    To the best of my knowledge they are true and
3          correct.
4              MS. DAVIS:  I don't have any further
5          questions.
6              MR. MONTEITH:  All right, just a
7          couple.  I promise.  Are you okay, Sharon?
8              WITNESS:  Yeah.
9              MR. MONTEITH:  All right.
10             MS. DAVIS:  Do you want to take a quick
11         break?
12             MR. MONTEITH:  Okay, sure.
13         (A recess is taken from 6:38 to 6:42 p.m.)
14                    CROSS-EXAMINATION
15   BY MR. MONTEITH:
16   Q.    Okay.  Ms. Iglesias, just a couple of quick
17         questions, I promise.  Very early on today you
18         were giving testimony concerning your legal fees
19         that you have incurred in this matter?
20   A.    Correct.
21   Q.    When you testified concerning those legal fees
22         and gave the amount, did that amount -- let me
23         just ask it this way.  Do you owe legal fees in
24         addition to what you've already paid?
25   A.    Yes.

SHARON IGLESIAS                                          273

1    Q.    Do you know what that amount is as of right now,
2          as we sit here today?
3    A.    No.
4    Q.    You also testified at the end of the deposition
5          concerning the mental anguish that you suffered
6          as a result of your termination.  Was your
7          termination reported in the local media and
8          newspapers?
9    A.    Yes, it was.
10   Q.    And how -- how did that impact you?
11   A.    It was actually recorded in, I think, three
12         newspapers, The Henderson Daily Dispatch, The
13         Oxford Public Ledger, and The Durham Morning
14         Herald.  The Henderson Dispatch and the Herald
15         simply told a story of my termination.  The
16         Oxford Public Ledger listed my termination under
17         crime reports and making it look as if I had
18         committed a crime as -- and briefly telling the
19         story of my termination.  And that was extremely
20         devastating.  I actually had people saying things
21         to me about that, relatives wanting to know what
22         crime I had committed that I was terminated.
23         "Did you steal the money," was the number one
24         question.  And that was very devastating.
25   Q.    Thank you.

SHARON IGLESIAS                                          274

1              MR. MONTEITH:  I have no other questions.
2              MS. DAVIS:  Neither do I.
3          - - - - - - - - - - - - - - - -
4          AND FURTHER DEPONENT SAITH NOT.
5          (Deposition completed: 6:45 p.m.)
6          - - - - - - - -
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SHARON IGLESIAS                                          275

1          I HAVE READ THE FOREGOING PAGES, 1 THROUGH 274
2    INCLUSIVE, AND FIND THAT THEY CONTAIN A CORRECT
3    TRANSCRIPTION OF THE ANSWERS MADE BY ME TO THE
4    QUESTIONS THEREIN RECORDED, WITH THE EXCEPTION OF
5    CORRECTIONS AS LISTED ON A SEPARATE SHEET OF PAPER AND
6    INCORPORATED INTO THIS RECORD.
7
8
9                    SHARON B. IGLESIAS
10   SWORN TO AND SUBSCRIBED BEFORE ME THIS
11   THE _____ DAY OF _____, 2008.
12
13   _____
14   NOTARY PUBLIC
15   MY COMMISSION EXPIRES: _____
16
17
18
19
20
21
22
23
24
25

PAGE 261 SHEET 66

SHARON IGLESIAS                                    276

1                          ERRATA SHEET
2
3       PLEASE READ YOUR DEPOSITION CAREFULLY.  DO NOT MARK OR
        WRITE ON THE DEPOSITION ITSELF.  LIST ANY CORRECTIONS
4       YOU MAY HAVE BY PAGE AND LINE NUMBER ON THIS SHEET AND
        RETURN TO DOVIE L. HANFORD, 4004 COLTSWOOD DRIVE,
5       GREENSBORO, NC 27406 WITHIN 30 DAYS.
6       PAGE NO.   LINE NO.   CORRECTIONS
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

PAGE 262

SHARON IGLESIAS                                    277

1       STATE OF NORTH CAROLINA          CERTIFICATE
2       COUNTY OF GUILFORD
3
4              I, DOVIE L. HANFORD, Notary Public in and
5       for the County of Guilford, State of North Carolina at
6       Large, do hereby certify:
7              That there appeared before me the foregoing
8       witness at the time and place herein aforementioned;
9       that the foregoing pages numbered 1 through 274,
10      inclusive, constitute a true and correct transcription
11      of the proceedings.
12             I do further certify that the persons were
13      present as stated in the appearances.
14             I do further certify that I am not of
15      counsel for, or in the employment of, either of the
16      parties in this action, nor am I interested in the
17      results of this action.
18             In witness whereof, I have hereunto set my
19      hand this the ____ day of _____, 2008.
20
21
22                      Dovie L. Hanford, Notary Public
23                      Notary Number: 19950110022
24
25