COMPRESSED COPY

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF NORTH CAROLINA

 3                       WESTERN DIVISION

 4              CIVIL ACTION NO. 5:07-CV-00437-D

 5

 6       ------------------------------X

 7    SHARON B. IGLESIAS,              :

 8              Plaintiff,             :

 9       V.                           :

10    JOHN WOLFORD, Chief of Police   :

11    of Oxford, N.C., in his official:

12    and individual capacities;       :

13    THOMAS MARROW, City Manager of   :

14    Oxford, N.C., in his official    :

15    and individual capacities;       :

16    DON JENKINS, Human Resources     :

17    Manager for the City of Oxford,  :

18    N.C., in his official and        :

19    individual capacities; and       :

20    The CITY OF OXFORD, N.C.,        :

21              Defendants.            :

22       ------------------------------X

23                       Raleigh, North Carolina

24                       Tuesday, October 7, 2008

25          VIDEOTAPED DEPOSITION OF JOHN WOLFORD,
```

2

1  a witness herein, called for examination by counsel
2  for the Plaintiff, in the above-entitled matter,
3  pursuant to notice, the witness being duly sworn by
4  DARLENE M. BRYANT, Registered Professional Reporter
5  and Notary Public in and for the State of North
6  Carolina, taken at the Law Offices of Cranfill Sumner
7  & Hartzog, LLP, 5420 Wade Park Boulevard, Suite 300,
8  Raleigh, North Carolina, at 10:13 a.m., October 7,
9  2008, and the proceedings being taken down by
10 Stenotype by DARLENE M. BRYANT and transcribed under
11 her direction.

3

1  APPEARANCES:
2  On behalf of the Plaintiff:
3    CHARLES E. MONTEITH, JR., ESQ.
4    - and -
5    SHELLI HENDERSON RICE, ESQ.
6    Monteith & Rice, PLLC
7    422 St. Mary's Street, Suite 6
8    Raleigh, North Carolina 27605-1734
9    (919) 821-2053
10
11 On behalf of the Defendants:
12   M. ROBIN DAVIS, ESQ.
13   Cranfill, Sumner & Hartzog, LLP
14   5420 Wade Park Boulevard, Suite 300
15   Raleigh, North Carolina 27607
16   (919) 828-5100
17
18 Also Present: Videographer, Brent Troublefield,
19           Sharon B. Iglesias, Frank Miller &
20           Tom Burnette
21
22
23
24
25

4

1       S T I P U L A T I O N S
2       It was stipulated by and between counsel
3  representing the respective parties, and the witness,
4  as follows:
5       1.  That any defect in the notice of the
6  taking of this deposition, either as to time or place,
7  or otherwise as required by statute is expressly
8  waived, and this deposition shall have the same effect
9  as if formal notice in all respects as required by
10 statute had been given and served upon the counsel in
11 the manner prescribed by law.
12      2.  That this deposition shall be taken for
13 the purpose of discovery or for use as evidence in the
14 above-entitled action, or for both purposes.
15      3.  That this deposition is deemed opened and
16 all formalities and requirements with respect to the
17 opening of the same, expressly including notice of the
18 opening of this deposition, are hereby waived, and
19 this deposition shall have the same effect as if all
20 formalities in respect to the opening of the same had
21 been complied with in detail.
22      4.  That the undersigned, Darlene M. Bryant, a
23 Registered Professional Reporter and Notary Public in
24 and for the State of North Carolina, is duly qualified
25 and constituted to take this deposition.

5

1       5.  Objections to questions, except as to the
2  form thereof, and motions to strike answers need not
3  be made during the taking of the deposition, but may
4  be reserved until any pretrial hearing held before any
5  judge of any court of competent jurisdiction for the
6  purpose of ruling thereon, or at any other hearing or
7  trial of said case at which said deposition might be
8  used, except that an objection as to the form of a
9  question must be made at the time such a question is
10 asked or objection is waived as to the form of the
11 question.
12      6.  That the witness will reserve the reading
13 and signing of the transcript to the deposition.
14      7.  That the Federal Rules of Civil Procedure
15 shall control concerning the use of the deposition in
16 court.
17
18
19
20
21
22
23
24
25

---

**6**

CONTENTS

THE WITNESS        EXAMINATION BY COUNSEL FOR

JOHN WOLFORD:        Plaintiff        Defendants

By Mr. Monteith:        8

EXHIBITS

EXHIBIT NO.                PAGE NO.

57 - Statement, 10-27-05        18

58 - 8-4-05 Memo        25

59 - Defendants' Answer        31

60 - Defendant Wolford's Responses    31

61 - Special Funds Report        44

62 - 7-22-02 Handwritten Memo        52

63 - 11-16-01 Typed Narratives        65

64 - 5-5-04 Memo        80

65 - Belcher Evaluation        87

66 - 5-17-04 Letter Iglesias/Wolford  96

67 - 5-17-04 Memo Wolford/Belcher   101

68 - 10-23-01 Memo        103

69 - 9-24-04 Memo Wolford/Iglesias  110

70 - Memo Jenkins/Marrow        113

71 - 10-31-05 Memo        115

72 - 5-7-04 Email        121

73 - 11-22-05 Email        128

74 - 1-3-06 Memo        136

---

**7**

EXHIBITS:  (Continued.)

EXHIBIT NO.                PAGE NO.

75 - 1-9-05 Memo        141

76 - 1-10-06 Email        142

77 - 1-24-06 Letter        145

78 - Drug & Alcohol Law
     Enforcement Special Funds    155

79 - Documentation of Personnel
     Issues        160

80 - 8-19-04 Memo        168

81 - 8-24-04 Memo        171

82 - 8-31-04 File Memo        173

83 - Release        174

***CONFIDENTIAL DESIGNATIONS***

Beginning Confidential Portion   Page 21, Line 19

Ending Confidential Portion      Page 84, Line 14

Beginning Confidential Portion   Page 155, Line 16

Ending Confidential Portion      Page 183, Line 7

---

**8**

1    PROCEEDINGS

2  Whereupon,

3      THE VIDEOGRAPHER:  On record at 10:12 a.m..

4      Would the Court Reporter please swear in the

5  Witness.

6          JOHN WOLFORD,

7  business address at Oxford, North Carolina, was called

8  as a witness by counsel for the Plaintiff, and having

9  been duly sworn by the Notary Public, was examined and

10  testified as follows:

11  EXAMINATION BY COUNSEL FOR THE PLAINTIFF

12  BY MR. MONTEITH:

13    Q.  Good morning, Mr. Wolford.  My name is Chuck

14  Monteith.  I'm one of the attorneys, the two

15  attorneys, that are representing the Plaintiff in this

16  action, Sharon Iglesias.

17    A.  Uh-huh.

18    Q.  To my right is my co-counsel Shelli Rice.

19    A.  All right.

20    Q.  How are you today?

21    A.  Just fine.  Just fine.

22    Q.  I just have some introductory matters to take

23  care of first.

24      Have you ever been deposed before?

25    A.  Yes.

---

**9**

1    Q.  And do you recall how many times,

2  approximately?

3    A.  I think twice.

4    Q.  When was the last time that you were deposed?

5    A.  1998, maybe.

6    Q.  And what was the nature of the action in which

7  you were deposed at that time?

8    A.  It was an employment matter that came about

9  while I was the Chief of Police in Kinston, North

10  Carolina.

11    Q.  Okay.  Were you a defendant in that action?

12    A.  The city, I, and other parties, yes.

13    Q.  Okay.  You along with the city and other

14  individuals?

15    A.  Yes.  Yes, sir.

16    Q.  And when was the other time that you were

17  deposed?

18    A.  I believe it was also when I was in Kinston.

19  It was a -- possibly a use of force case, to my

20  knowledge, somewhere in the early '90s.

21    Q.  Okay.  So the use of force case did not

22  involve a personnel matter?

23    A.  No.

24    Q.  Or issue?

25    A.  No.  No.

10

1    Q.  How is your health today?
2    A.  Good.
3    Q.  Are you currently taking any sort of
4  medication that could affect your ability to
5  understand and/or answer questions?
6    A.  No, sir.
7    Q.  Are you under the influence of any other
8  substances that might affect your ability to
9  understand and/or answer questions?
10    A.  No, I'm not.
11    Q.  What did you do to prepare for the deposition
12  today?
13    A.  Spoke with an attorney, predominantly Robin
14  Davis.
15    Q.  Did you speak to anyone other than your
16  attorneys?
17    A.  No, I did not.
18    Q.  What documents did you review, if any?
19    A.  Many documents that have been involved in this
20  matter since its beginning.
21    Q.  Do you recall what those documents were?
22    A.  Memos that I sent; memos that were sent to me
23  by employees; that's the bulk of it, what I recall.
24    Q.  Any transcripts?
25    A.  No.

11

1    Q.  All right.  I'd like to ask you a few
2  questions about your background, sir.
3    A.  Uh-huh.
4    Q.  Where did you go to high school, let's start
5  there?
6    A.  Great Bridge High School, Chesapeake,
7  Virginia.
8    Q.  And what year did you graduate?
9    A.  1967.
10    Q.  Okay.  After you graduated from high school
11  did you pursue your education further?
12    A.  Started, but decided to go into the military.
13    Q.  When did you go into the military?
14    A.  The Fall of 1967, or Winter of 1967, somewhere
15  in there.
16    Q.  That was during the Vietnam War?
17    A.  Yes, sir, it sure was.
18    Q.  How long were you in the military?
19    A.  A little over three years.
20    Q.  Where were you stationed?
21    A.  In the beginning Fort Gordon, Georgia; and
22  then to Fort Benjamin Harrison, Indiana;
23  El Paso, Texas, what is that, Fort Bliss; Vietnam;
24  Fort Belvoir, Virginia, I think I left after Belvoir.
25    Q.  What sort of discharge did you have from the

12

1  Army; was it honorable discharge?
2    A.  Yes, sir.
3    Q.  Did you -- were you awarded a Purple Heart
4  during the time that you served in the Army?
5    A.  I was given a Purple Heart when I was laying
6  in a hospital bed in Japan; never received the
7  paperwork, so, officially, no.
8    Q.  Okay.  So after you got out of the Army, what
9  did you do next?
10    A.  Immediately started college.
11    Q.  And where was that?
12    A.  Virginia Commonwealth University in Richmond,
13  Virginia.
14    Q.  VCU?
15    A.  Yes, sir.
16    Q.  And how long were you there?
17    A.  I want to say three and a half years.  I
18  graduated in about three and a half years.
19    Q.  What year did you graduate?
20    A.  Finished in December of '73, and went to
21  graduation in May of '74.
22    Q.  What was your degree in?
23    A.  Criminal Justice, Administration of Justice;
24  they've changed the name a number of times.
25    Q.  So after you graduated from VCU, what happened

13

1  next with respect to your career?
2    A.  I was applying for law enforcement positions
3  with the localities in Tidewater and Richmond area,
4  Virginia, also with a couple of federal agencies.  My
5  wife at that time and I decided we didn't want to move
6  from the area, so I secured a job as a juvenile
7  probation officer for a couple of years.  They had
8  frozen the law enforcement positions in that area.
9  And then left there and went into law enforcement.
10    Q.  And where was your first position in law
11  enforcement?
12    A.  Chesterfield County, Virginia.
13    Q.  Was that for the Chesterfield Police
14  Department or --
15    A.  Yeah, police department.
16    Q.  When did you start there?
17    A.  I'd say it was around October of '76;
18  something like that.
19    Q.  How long were you there?
20    A.  Until 1983.
21    Q.  So about seven years?
22    A.  Yes, sir.
23    Q.  And what positions did you hold while you were
24  employed there in Chesterfield?
25    A.  I was a patrol officer, detective, sergeant,

**14**

1 and they had a position, I believe, we called watch
2 commander, it was a ranking sergeant, but that's what
3 I did there.
4    Q. Why did you leave Chesterfield?
5    A. Took a job as a police chief in Ashland,
6 Virginia.
7    Q. How large was that police department at that
8 time where you became chief?
9    A. Ashland?
10    Q. In terms of officers?
11    A. Probably 14 or 16; something like that.
12    Q. How long were you in Ashland?
13    A. About four years.
14    Q. While you were the police chief in Ashland,
15 who did you report to?
16    A. The town manager.
17    Q. Do you recall that person's name?
18    A. Yeah, it was Dave Ranell.
19    Q. Why did you leave Ashland?
20    A. Just wanted a little larger place, move along
21 in the career, that was why I left.
22    Q. Did you find a larger place?
23    A. A little bit larger, yes, sir.
24    Q. And where was that place?
25    A. Colonial Heights, Virginia.

**15**

1    Q. What position did you assume there?
2    A. Chief of Police.
3    Q. How large was that police department?
4    A. I think it was about 30; something like that,
5 30 sworn with civil positions.
6    Q. So what year did you start in Colonial
7 Heights?
8    A. 1986, I believe.
9    Q. How long were you in Colonial Heights?
10    A. Again, about four years.
11    Q. As the Chief of Police in Colonial Heights,
12 who did you report to?
13    A. The city manager.
14    Q. Do you recall that person's name?
15    A. Yeah, Bob -- I just went blank on his last
16 name. Robert -- I can't recall.
17    Q. Okay. And how did you come to leave Colonial
18 Heights?
19    A. I had remarried, was about to remarry, had
20 decided that it was -- I had done -- frankly, done
21 about all I could do there, and a vacancy came open
22 in -- in another state, and I took that job.
23    Q. What other state?
24    A. North Carolina; Kinston, North Carolina.
25    Q. So what position did you hold in Kinston?

**16**

1    A. Chief of Police.
2    Q. When did you begin there?
3    A. 1990, I'm not exactly sure what month.
4    Q. How long were you in Kinston?
5    A. About four years.
6    Q. How large was that police department during
7 the time that you were there?
8    A. I had about 80 sworn officers; 75 to 80,
9 somewhere in that area.
10    Q. You said a minute ago you had remarried. So
11 at the time you were in Kinston, who were you married
12 to?
13    A. Cathy. My wife's name is Cathy.
14       Excuse me, at the time I was where?
15    Q. In Kinston?
16    A. Susan.
17    Q. And Susan was your second wife?
18    A. Yes, sir.
19    Q. What's the name of your first wife?
20    A. Catherine.
21    Q. Catherine?
22    A. Right, with a C.
23    Q. With a C?
24    A. Right.
25    Q. You testified earlier that while you were --

**17**

1 that you had been deposed in 19, you thought, '98,
2 involving something that happened in Kinston; was it
3 the James Barwick lawsuit?
4    A. Yes, it was.
5    Q. Tell me about that lawsuit; what -- what was
6 Mr. Barwick alleging?
7    A. Mr. Barwick was alleging that -- that he was
8 terminated and we didn't have cause. We obviously
9 thought we did.
10    Q. Do you recall any -- anything else that he may
11 have alleged besides being terminated without cause?
12    A. Other than denying the -- the case that we had
13 made in order to judge -- to terminate him, I don't
14 recall any of the facts of that case.
15    Q. Do you recall if he alleged that he had been
16 set up to be discharged?
17    A. I don't recall anything like that.
18    Q. So what happened with respect to that lawsuit;
19 what was the outcome?
20    A. I believe that went on about seven years,
21 seems like it went on a long time, and ultimately --
22 my memory says that it was ultimately settled after
23 that length of time. I don't -- other than that, I
24 don't recall any other facts of it.
25    Q. Did it settle after you had left your position

**86**

1　that office. Other secretarial duties as assigned by
2　me or asked or requested by other people in the
3　department, command staff, that sort of thing.
4　　Q. Who was her immediate supervisor?
5　　A. I was.
6　　Q. And where was her work station physically
7　located in relation to your office?
8　　A. Right directly next to me.
9　　Q. Did she have her own office?
10　　A. Yes.
11　　Q. Specific room?
12　　A. Right.
13　　Q. Does the City of Oxford give performance
14　evaluations to its employees?
15　　A. As a whole we did for maybe once or twice in
16　the -- the years that I've been there, but not on a
17　regular basis.
18　　Q. Is there a reason why it's not done on a
19　regular basis in your department?
20　　A. Well, the last three years we've been doing
21　it, but that's not your question. No. No. The fact
22　that the city had decided not to do them, we didn't do
23　them ourselves for a couple years, and then I started
24　it up again within the PD, the police department.
25　　Q. So did the city decide not to do them or did

**87**

1　it just not get done in your department?
2　　A. It was the city.
3　　Q. You got directions; do not do it?
4　　A. No, we got no directions. We didn't do them.
5　No one did. And no one asked why they didn't do
6　them. They just weren't done. I don't -- I don't --
7　I can't tell you exactly why that it wasn't driven by
8　anybody to do those.
9　　Q. Do you recall how many performance evaluations
10　you would have done for Sharon Belcher or Iglesias?
11　　A. I think it was two, but I could be mistaken.
12　　Q. And do you recall how you evaluated her on
13　those performance evaluations, as far as her overall
14　rating?
15　　A. Pretty sure the first one, if that was
16　probably pretty good.
17　　　(Discussion off the record.)
18　　　(Pause.)
19　BY MR. MONTEITH: (RESUMED.)
20　　Q. Does this Exhibit 65, Chief, appear to be a
21　performance evaluation that you gave to Sharon Belcher
22　in February 2001?
23　　A. Yes.
24　　　(The document referred to was
25　　　marked Exhibit No. 65

**88**

1　for identification.)
2　BY MR. MONTEITH: (RESUMED.)
3　　Q. One thing that got my attention, I wanted to
4　ask you about, it's on the second page of that
5　evaluation, in areas of improvement, you mentioned,
6　I'm assuming you're referring to the police
7　department, being a paramilitary environment?
8　　A. Uh-huh.
9　　Q. And I think I've seen that phrase elsewhere in
10　documents.
11　　What do you mean when you say "paramilitary
12　environment?"
13　　A. Well, the police department has a -- has a
14　rank structure, number one. Number two, due to the
15　nature of the work that these officers do,
16　predominantly the sworn people, it requires a fairly
17　consistent and, hopefully, fair application of -- of
18　discipline; not only punitive discipline, but I'm
19　talking about discipline within the organization, in
20　terms of communication, in terms of -- of rank
21　structure and having an understanding how that works
22　in a police agency. That's what I'm referring to
23　here.
24　　Q. Looking at the very next page where it's got
25　working relationships with coworkers and supervisor?

**89**

1　　A. Uh-huh.
2　　Q. Under standard, I see, Number 6, it says,
3　Maintains appropriate confidentiality. And there's a
4　check and a star beside that.
5　　Is that your writing; did you put the check
6　there?
7　　A. I -- it looks -- if I -- I did this in
8　performance evaluation, I will stipulate that. It
9　looks like my checks. I don't know what my checks
10　look like.
11　　Q. Did you put a star there?
12　　A. I don't recall. But if it's there, it's
13　there. I don't know why I did it.
14　　Q. So at that time, as of the date of this
15　evaluation, you were satisfied with Ms. Iglesias
16　maintaining confidentiality?
17　　A. It appears so, yes, sir.
18　　Q. And looking at Number 10, you were also
19　satisfied with her following the chain of command?
20　　A. It appears so, yes, sir.
21　　Q. And you said some nice things about her in
22　this evaluation?
23　　A. I had been there a few months at that point,
24　Mr. Monteith, and it's my practice, unless I have some
25　major issue with an employee, I'm going to write a

90

1 pretty favorable performance evaluation if they're
2 doing their job and understand it well. She did up to
3 that point, and I was trying to make sure that she
4 knew that.
5    Q. So do you remember, you said earlier that you
6 may have given her a couple, do you -- do you
7 specifically remember a second performance evaluation?
8    A. I couldn't say. It seems to me we did at
9 least two while she was still employed there, but I --
10 I couldn't tell you when that was and produce it for
11 you. I don't know.
12    Q. Where are the performance evaluations
13 maintained once they've been completed?
14    A. My recollection, we -- as we do now, we keep a
15 copy in the file -- a copy in the file of the employee
16 in the original, two human resources office, in their
17 personnel file in human resources.
18    Q. Okay. And her overall rating for this
19 evaluation, which I believe is shown on page 98, was
20 exceeds standards; is that correct?
21    A. Yes, that's what's checked.
22    Q. So you started there in June -- you think
23 around June of 2000 with the City of Oxford?
24    A. I believe so.
25    Q. You gave her this performance evaluation

91

1 February '01, correct?
2    A. Is that -- I don't see the date on this.
3    Q. I believe it's on the --
4    A. I keep missing it.
5    MS. DAVIS: First page.
6    THE WITNESS: Is it on the first page?
7    BY MR. MONTEITH: (RESUMED.)
8    Q. Page 90.
9    A. I'm sorry, you're right, 2/1. Yes, sir.
10    Q. Okay. As the chief of police, are you
11 required to be sworn into office?
12    A. Yes.
13    Q. Okay.
14    A. At some point, yes.
15    Q. At some point. At what point were you sworn
16 in in Oxford?
17    A. When I -- shortly after I came there, I
18 started attending a basic training thing that I had to
19 finish to redo my certification, sometime while I was
20 in that role, I believe, I was sworn in. Then I was
21 sworn in again.
22    Q. Why did you have to be sworn in a second time?
23    A. That's a very good question that I can't
24 answer. I have no idea.
25    Q. Who asked you to be sworn in?

92

1    A. We decided that since they couldn't find the
2 swearing-in sheet or the documentation, that I be
3 sworn in again. There was an issue made by an
4 individual running for political office in the city,
5 and in order to be sure that we had fulfilled the
6 requirements of my office, they swore me in again.
7    Q. That individual is Frank Strickland?
8    A. That individual is Frank Strickland, yes, sir.
9    Q. So were you sworn in a second time then in,
10 what, October of 2001?
11    A. It could have been. I couldn't recall the
12 exact date.
13    Q. When you were sworn in the first time, who --
14 do you recall who swore you in that time, Chief
15 Wolford?
16    A. I think it was the clerk or the notary in my
17 office, and I honestly do not recall. One or the
18 other, one in the city clerk's office or it would have
19 been an employee by the name of Mamie Pleasants,
20 possibly. I honestly don't recall. There was no
21 ceremony in my swearing in. I went right to work.
22 Either time it was done in an office. So it was
23 nothing terribly memorable about it.
24    Q. Right. So, to your understanding, what's the
25 significance of being sworn in?

93

1    A. Well, I believe it -- it places me in office
2 in order to do my job, so probably a legal
3 requirement. Never became a question before, and I
4 didn't really anticipate it becoming a question now
5 until they couldn't find the form, so they swore me in
6 again, at least I think it was again.
7    Q. All right. Thank you, Chief.
8    MR. MONTEITH: Robin, if you don't mind, I'd
9 just like to break for lunch. I think this is a
10 natural stopping point in my questions, even though
11 the food may not exactly be right here.
12    THE VIDEOGRAPHER: Off record at 1:16 p.m..
13    (Discussion off the record.)
14    (Whereupon, at 1:16 p.m., a recess was taken
15 for lunch until 2:16 p.m..)
16    AFTERNOON SESSION
17    (2:16 p.m..)
18    JOHN WOLFORD,
19 having been called as a witness by counsel for the
20 Plaintiff, and having previously been duly sworn by
21 the Notary Public, was further examined and testified
22 as follows:
23    FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
24    BY MR. MONTEITH: (RESUMED.)
25    Q. All right. Chief Wolford, so sometime early

94

1 May 2004, you learned that Sharon Iglesias had spoken
2 to the auditors regarding what she believed to be some
3 discrepancies in the drug fund; is that correct?
4    A.  I believe so, yes, sir.
5    Q.  And do you recall a meeting that you had with
6 Ms. Iglesias in your office on May 13th, 2004?
7    A.  I had meetings with her, but I don't recall
8 exactly when they were.
9    Q.  Do you recall if you met with her and told her
10 that you thought that she had breached confidentiality
11 and that you were going to follow up with a written
12 memorandum; do you remember anything about that
13 meeting?
14    A.  Again, I don't recall the date of the meeting,
15 but I -- I believe I did have her in my office,
16 discussed with her some information that she had
17 passed on to one of my detectives relative to issues
18 involving the auditor or the fund.
19    Q.  Which detective?
20    A.  It would have been Detective Jason Tingen, I
21 believe.
22    Q.  Just, as best you can recall, tell me what was
23 discussed during that meeting that you had.
24    A.  I told her that I -- the best I can recollect,
25 that I felt that her notifying the auditors when they

95

1 came to the police department, I think, again, as
2 you've already stated, I was not there, about any
3 questions she had about any funds, any discrepancies
4 in a -- in a disbursement sheet or whatever was an
5 appropriate thing to do, and told her that was what
6 she should have done, but sharing that information and
7 those questions with anyone else in my agency was
8 inappropriate and was a breach of confidentiality.
9 That's what I remember.
10    Q.  Do you know what she had told Jason Tingen?
11    A.  Essentially, I believe, simply one had
12 questions about expenditures that I had made from the
13 drug fund.  To my knowledge, she may have showed him
14 the ledger, the disbursement fund sheet, and asked him
15 what he thought about that, or that they didn't look
16 right.  That's what I recall.
17    Q.  Do you remember if you spoke to her about
18 listening in on your conversations?
19    A.  I may have.  I may have.  That -- that -- if
20 that was the meeting that I did that, I know I had
21 talked to her about it.  I don't recall whether it was
22 at that meeting or another one.
23    Q.  All right.  Let me show you a letter now, and
24 maybe this document will help refresh your
25 recollection as to whether you did meet with Ms.

96

1 Iglesias on May 13th.
2    (Pause.)
3    MR. MONTEITH:  Make sure I don't give you the
4 highlighted portions again.
5    MS. DAVIS:  I'll check it.
6    BY MR. MONTEITH:  (RESUMED.)
7    Q.  I'll just give you a chance to review this
8 document.
9    A.  I've seen this letter, I remember that now.
10    Q.  Okay.  And we're up to Exhibit 66.
11        (The document referred to was
12        marked Exhibit No. 66
13        for identification.)
14    BY MR. MONTEITH:  (RESUMED.)
15    Q.  So based on the entry at the very top of this
16 letter, does it appear that you did meet with
17 Ms. Iglesias on May 13th, 2004?
18    A.  Yes, I did.
19    Q.  Okay.  When did you receive this letter from
20 Ms. Iglesias?
21    A.  Possibly on the 17th, this date here, I'm not
22 exactly sure.
23    Q.  All right.
24    A.  Or shortly thereafter.
25    Q.  The portions that you have -- the portions on

97

1 the document that you have in front of you that are
2 underlined, did you do that yourself; did you
3 underline those segments?
4    A.  Yeah, those are my -- my notes or marks on the
5 letter.
6    Q.  Okay.  So, on Page 1 of this letter, in the
7 right-hand column, can you read what you wrote?
8    A.  It looks like, then, now, or forever, or in
9 the future.
10    Q.  Okay.  The next page, I know it looks like
11 part of it's been cut off, and I'm sorry about that,
12 in the left-hand margin, from looking at what is
13 there, can you tell what it was you wrote in the
14 left-hand margin?
15    A.  I -- I really don't have any idea.  I don't
16 really know.
17    Q.  What about at the bottom, can you read that?
18    A.  My personal life is just that, mine.
19    Q.  The next page, first entry near the top
20 right-hand margin?
21    A.  But you did.
22    Q.  And then the next entry in the right-hand
23 margin?
24    A.  No letter should come from you to city
25 manager, communication or city, showing your support

98

1  for anything, or something like that.
2  Q. Okay. Was that in response to the portion on
3  this -- in the last paragraph where she says, I'll be
4  sending a brief letter to Tom Burnette, Tommy Marrow
5  and each of the three commissioners in support of you?
6  A. Yeah, sure was.
7  Q. So, why did -- why did you feel that it was
8  unnecessary for her to do a letter?
9  A. I didn't need Ms. Iglesias' support at that
10  time under any circumstances. I had had her in my
11  office, as you've indicated, apparently on the 13th.
12  She clearly indicates in this letter that she
13  understands what I was doing, as I tried to explain as
14  much as I possibly could without revealing any other
15  confidentialities in that meeting, that I was
16  conducting that inquiry. She apparently agrees with
17  that, and in this letter states that she understood
18  it. Many other comments that I have in here are
19  simply notes relative to the letter. And the last, as
20  you asked me why I said that, I don't -- I didn't need
21  her support in a letter.
22  Q. Did you give her back a copy of the -- the
23  letter with your comments written on it or do you
24  recall?
25  A. I don't recall doing that.

99

1  Q. Did you verbally tell her your comments that
2  you wrote in the margins of the letter?
3  A. I don't recall that I had any -- I don't
4  recall any conversation at all that I had with her
5  upon receipt of this letter.
6  Q. So how would you describe your reaction to
7  this letter?
8  A. I was pleased that she said that she
9  understood now why I was -- what I was doing. I was
10  also a bit irritated in that I was being apparently --
11  frankly, I found this disrespectful, to be frank with
12  you. I found that she -- even though she said she
13  agreed, I thought she was somewhat educating me here,
14  and I didn't appreciate it.
15  Q. Educating you on what specifically?
16  A. About how I should have conducted myself.
17  Q. So on the same day that you gave her -- or
18  that she gave you this letter, May 17th, did you issue
19  her a written warning?
20  A. I'm not sure what day I did that. I'd have to
21  see it.
22  MR. MONTEITH: While we're looking for a copy,
23  Robin, I apologize, I believe this was already marked
24  as a previous --
25  MS. DAVIS: Iglesias Deposition Exhibit Number

100

1  33.
2  MR. MONTEITH: 30?
3  MS. DAVIS: 33 is what I have.
4  MR. MONTEITH: That's correct. The letter was
5  34, right?
6  MS. DAVIS: Yes.
7  MR. MONTEITH: So you already have it in front
8  of you?
9  MS. DAVIS: I did.
10  MR. MONTEITH: Okay.
11  MS. DAVIS: But Mr. Burnette, if he could have
12  a copy, that would be great.
13  (Pause.)
14  BY MR. MONTEITH: (RESUMED.)
15  Q. So is this document which was Exhibit 33 a
16  copy of the warning that you gave her on May 17th?
17  A. Correct.
18  Q. And in fact this warning references both your
19  meeting on May 13th and your -- the letter she sent
20  you on May 17th?
21  A. Yes, it does.
22  Q. Did you have this warning drafted at least in
23  part before you received her letter on May 17th?
24  A. It's very possible that I had some of it
25  done. I didn't expect a letter from her in response

101

1  to our conversation, I don't recall that I asked for
2  one. So it's possible that I started to draft this.
3  MS. DAVIS: Mr. Monteith, just so I'm clear,
4  we are not going to mark this as Wolford Deposition
5  Exhibit Number 67, you're simply going to refer back
6  to Iglesias Deposition Exhibit Number 33?
7  MR. MONTEITH: That's fine.
8  MS. DAVIS: Whatever you want to do is fine, I
9  just want to make sure my records are clear on
10  exhibits.
11  MR. MONTEITH: You've got yours?
12  MS. DAVIS: I don't need an extra copy, I just
13  need to know if you want to mark it in his deposition.
14  MR. MONTEITH: I believe the one he has in
15  front of him is signed by her and yours isn't; is that
16  the only difference that you can tell? I'm sure
17  that's --
18  MS. DAVIS: That appears to be the only
19  difference.
20  MR. MONTEITH: Let's just stick with 67 then.
21  MS. DAVIS: Okay. All right.
22  (The document referred to was
23  marked Exhibit No. 67
24  for identification.)
25  BY MR. MONTEITH: (RESUMED.)

102

1 Q. In this warning you mentioned a
2 confidentiality agreement?
3 A. Uh-huh.
4 Q. What -- what was that confidentiality
5 agreement, Chief Wolford, as you recall?
6 A. To my memory, it was something that I had your
7 client sign along with two members of the command
8 staff in the department, maybe as far back as early
9 2002 or 2001.
10 Q. Do you recall who the other members of the
11 command staff were that signed this document, this
12 confidentiality agreement?
13 A. If I recollect correctly, it was Captain Bob
14 Williamson and Lieutenant Charles Crudup.
15 Q. Why did you select those three individuals?
16 A. They were the three people closest to me that
17 I had communication with on a daily basis.
18 Q. When you say closest to you, you mean worked
19 in close proximity to you or --
20 A. Close proximity, as well as who I would have
21 more verbal contact with during the day.
22 (Pause.)
23 Q. So you're looking at what's been marked as
24 Exhibit 68?
25 A. Uh-huh.

103

1 (The document referred to was
2 marked Exhibit No. 68 for
3 identification.)
4 BY MR. MONTEITH: (RESUMED.)
5 Q. Is this the copy of the confidentiality
6 agreement?
7 A. Yeah, that's what I called it, Confidentiality
8 Discussion and Rule, yes, sir.
9 Q. And did you just -- I noticed that at the top
10 it has, I believe, Crudup's name written and then it's
11 marked, striped through, and you wrote in
12 Ms. Iglesias' name, at that time Sharon Belcher; is
13 that correct?
14 A. Yeah.
15 Q. Would you --
16 A. Yes, sir.
17 Q. When you created these documents on your
18 computer, did you save them on there or not?
19 A. Some I do, some I -- some I did, some I
20 didn't. I don't recall if I did or not on this one.
21 Q. Okay. Did there come a point in time, Chief
22 Wolford, when you made the decision to transfer
23 Ms. Iglesias to another position?
24 A. Well, it was -- yeah, it was my -- ultimately
25 my decision, yes.

104

1 Q. And was that as a result of an incident that
2 involved Melba Knott?
3 A. I believe so.
4 Q. Could you describe that incident?
5 A. Well, from memory, I'm not sure, there was
6 apparently an investigation or inquiry, whatever we
7 choose to call it, involving an employee in the
8 finance department, i.e., Melba Knott, I believe was
9 the one.
10 MS. DAVIS: Mr. Monteith, I guess if we're
11 going to get into the substance of an investigation
12 regarding another employee's personnel information,
13 probably ought to mark this portion confidential as
14 well. So to the extent that we're going to have him
15 talk about the substance of --
16 MR. MONTEITH: So he's going to testify there
17 was no investigation involving Melba Knott?
18 MS. DAVIS: I presume that's where your
19 questions are going.
20 MR. MONTEITH: But if he says there wasn't,
21 then I won't have any further questions on that point,
22 so.
23 MS. DAVIS: Okay. Well, let's answer the
24 question.
25 THE WITNESS: The question again, sir?

105

1 BY MR. MONTEITH: (RESUMED.)
2 Q. To your knowledge, was there any sort of
3 investigation involving Melba Knott?
4 A. To my memory -- best of my memory, there was
5 some sort of an investigation, inquiry going on, yes,
6 sir.
7 MS. DAVIS: So, then, if you're going ask
8 further questions about the nature of the
9 investigation, that would be covered under North
10 Carolina General Statute 168, 160A as personnel
11 information, investigative information, related to a
12 nonparty, Melba Knott, so we have to make it
13 confidential.
14 MR. MONTEITH: I'll just come back to that
15 later. I want to ask him some questions now about
16 what happened with respect to Sharon Iglesias and that
17 Melba Knott incident, if I can call it that, without
18 asking about the details of the investigation.
19 MS. DAVIS: Yeah. Can we call it something
20 besides a particular employee's name, I'm just a
21 little concerned about --
22 MR. MONTEITH: Okay.
23 MS. DAVIS: -- how that fits in under 160A and
24 168.
25 MR. MONTEITH: Whatever.

---

**106**

1    MS. DAVIS: Can we call it the -- what month
2    was it in?
3    MR. MONTEITH: September.
4    MS. DAVIS: September?
5    MS. DAVIS: August or September 2004.
6    MS. DAVIS: Call it the Fall 2004
7    investigation?
8    MR. MONTEITH: Sure.
9    MS. DAVIS: I'm good with that. Thank you.
10   BY MR. MONTEITH: (RESUMED.)
11   Q.  All right.  So this Fall 2004 investigation,
12   Chief Wolford, what, if anything, did Ms. Iglesias do
13   that concerned you with respect to that investigation?
14   A.  Well, first of all, I wasn't the one directly
15   involved in the investigation.  I was requested,
16   again, to the best of my recollection, by the human
17   resources -- human resources director, Don Jenkins,
18   informed that this inquiry was going on, that he
19   understood that Sharon Iglesias had made a phone call
20   to another employee in the finance department
21   inquiring about an investigation that was going on.
22   His request of me was to ask her where she may have
23   learned that information.  I believe that's what I was
24   asked to do by the human resource director.
25   Q.  Did you ask Ms. Iglesias?

---

**107**

1    A.  I believe I did.  I think I called her in and
2    had this conversation with her, asked her.  She told
3    me that she had received the information, I believe
4    she said she received it from a Detective Pat Ford.  I
5    subsequently passed that information back to -- and
6    she also told me that she did call, I believe she said
7    she called that employee in the finance department, I
8    think it was a Phyllis Blackwell, and made -- asked
9    her a question about this inquiry.  I subsequently
10   passed that information back to human resource
11   director, and I was out of it after that.
12   Q.  Did you ultimately issue -- issue Ms. Iglesias
13   a warning as a result of this Fall 2004 investigation?
14   A.  Again, based on the information that I got
15   back from the inquiry done by human resources, we felt
16   that Ms. Iglesias again violated confidentiality by
17   calling over to the finance department.  I did issue
18   her a written warning at that time, I believe, at the
19   end of that.  I don't know what the date was.
20   Q.  Uh-huh.  Was Ms. -- to your knowledge, was
21   Ms. Iglesias aware of any investigation in the Fall of
22   2004?
23   A.  If involving this employee in the finance
24   department?
25   Q.  Yes, that's my question.  I'm sorry --

---

**108**

1    A.  Well, all I know is that the information that
2    was provided to this other employee in the finance
3    department was that she had received a phone call from
4    Ms. Iglesias, who asked specifically about an
5    investigation or inquiry, isn't there something going
6    on involving that employee; so I don't know how she
7    got that.
8    Q.  Uh-huh.  And Ms. Iglesias told you she got
9    that information from Pat Ford?
10   A.  I believe that's what it was.
11   Q.  And at that time Pat Ford's position with the
12   Oxford Police Department was what?
13   A.  Detective.
14   Q.  Did she have -- did her name change at some
15   point, I've seen it Ford, I've seen it --
16   A.  Yeah.
17   Q.  -- Messer; is that right?
18   A.  Yeah, it was Messer before Ford, so I don't
19   know whether -- who she was then.  I can't recall.
20   Q.  Okay.
21   A.  I think it was Ford.
22   Q.  Did the Detective Ford tell you -- what did
23   Detective Ford tell you concerning what, if anything,
24   she told Ms. Iglesias?
25   A.  Said she didn't tell her.

---

**109**

1    Q.  So who did you believe?
2    A.  Again, I didn't conduct the inquiry.  It was
3    conducted by human resources.  I was out of it.  I
4    didn't really make a judgment one way or the other
5    until I received the end of it, and I guess it -- not
6    guess, it boiled down to the fact that we believed
7    Ford.  And I took whatever action I deemed
8    appropriate.
9    Q.  Let me ask you this, if Ford did not tell
10   Ms. Iglesias about this Fall 2004 investigation, I
11   mean, didn't you wonder where did Iglesias get the
12   information then?
13   A.  Probably.  But I honestly don't recall whether
14   I determined or even Don -- Don, meaning the human
15   resource director, determined that, or even asked
16   her.  I didn't -- wasn't involved in that.
17   Q.  So do you know if there was any attempt to
18   determine where she might have gotten this
19   information?
20   A.  I honestly don't know.
21   MR. MONTEITH: Can we go off the record for
22   one second?
23   THE VIDEOGRAPHER: Off record at 2:40 p.m..
24   (Discussion off the record.)
25   THE VIDEOGRAPHER: I'll let you know when

**110**

1 we're on.
2     On record at 2:43 p.m..
3     FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
4     BY MR. MONTEITH: (RESUMED.)
5   Q. So you have now, Chief Wolford, what's been
6 marked as Exhibit 69, and to your knowledge, is this
7 the what's called Internal Inquiry/Final Warning you
8 gave Ms. Iglesias, September 24th, 2004?
9   A. Yes, sir.
10     (The document referred to was
11     marked Exhibit No. 69
12     for identification.)
13     BY MR. MONTEITH: (RESUMED.)
14   Q. Okay. And this related to her actions during
15 the Fall 2004 investigation; is that correct?
16   A. This particular warning, yes, specifically
17 dealt with that.
18   Q. And you also told her you were going to
19 transfer her to another position?
20   A. I did.
21   Q. Why did -- why did you decide to transfer her?
22   A. For a number of reasons, Mr. Monteith. At
23 that time I had been dealing with the allegations
24 made, to some extent by Ms. Iglesias, since the Summer
25 of -- late Summer or early Summer of 2004. There was

**111**

1 beginning to be significant disruption within my
2 department because of her allegations. When I met
3 with Ms. Iglesias, in the memo that you showed me, in
4 the May 13th, I explained to Ms. Iglesias what I had
5 done and why. Then, of course, she writes me a letter
6 on the 17th, explaining that she now understood. But
7 her continuing allegations that I did something
8 illegal, improper or whatever continued during the
9 Summer of 2004. Did not want Ms. Iglesias at that
10 point, when I issued this final written warning,
11 frankly, if she had left the agency right then it
12 would have been fine with me. But I didn't know if
13 we -- that was the appropriate thing to do. I did not
14 want her near me, in the office that she currently
15 had. I did not want her in the role as administrative
16 assistant to me or any command staff in the
17 department. And, again, I also determined during that
18 time that this whole issue was getting rather
19 personal; that she had been contacting my ex-wife
20 during the context of a difficult divorce, which I
21 thought was highly inappropriate, unprofessional and
22 absolutely out of line.
23     So for those reasons, with this final warning,
24 it was my recommendation, along with that of human
25 resources who I worked in consultation with, that we

**112**

1 laterally transfer to another position within the
2 agency.
3   Q. So where in this final written warning do you
4 mention her continuing allegations against you?
5   A. I don't. That was my thought process that I
6 gave you.
7   Q. So do you see the sentence in the first
8 paragraph that says -- that begins with further
9 investigation, it's the next to the last sentence in
10 the first paragraph?
11   A. Okay. Yes, sir, I do.
12   Q. Could you just read that?
13   A. You indicated --
14   Q. No, further investigation.
15   A. Further investigation by Don Jenkins reveals
16 that Pat Ford did not provide you with this
17 information.
18   Q. Okay. So you were telling her that Jenkins'
19 investigation had found that Ford did not tell
20 Ms. Iglesias any information relating to the person
21 that was the subject of this Fall 2004 investigation?
22   A. Yes. The issue, Mr. Monteith, for me, if I
23 may, was not about who she got it from, the issue was
24 that she passed that information on to other
25 employees. That was the issue for me. And it was the

**113**

1 issue for human resources.
2     (Pause.)
3   Q. Okay. We're now up to Exhibit 70. Have you
4 seen this document before?
5   A. I think so, but it's been a while.
6     (The document referred to was
7     marked Exhibit No. 70
8     for identification.)
9     BY MR. MONTEITH: (RESUMED.)
10   Q. Okay. Look on the second page under the
11 conclusion, and could you just read that paragraph
12 there?
13   A. First paragraph?
14   Q. Yes, sir.
15   A. Includes -- Obviously there is a situation
16 involving conflicting testimony with respect to which
17 of these employees started the rumor. Two sides of
18 the story have no correlation to each other.
19 Therefore, I'm unable to conclude definitively which
20 of the versions of this story is correct just from the
21 above information.
22   Q. Okay. So that doesn't really square when you
23 said in the warning further investigations reveal Ford
24 did not provide you with this information; is that
25 accurate?

---

**114**

1  A.  I didn't write this document.

2  Q.  But you wrote --

3  A.  I wrote the other one.

4  Q.  You wrote the one that said further

5  investigation revealed?

6  A.  Correct.

7  Q.  So you sort of exaggerated a little bit in

8  that warning?

9  MS. DAVIS:  Objection.

10  THE WITNESS:  I made -- I made a statement and

11  I -- you know, that's what I felt.

12  BY MR. MONTEITH:  (RESUMED.)

13  Q.  Okay.  Did Detective Ford ever give you any

14  sort of letter or document concerning Ms. Iglesias?

15  A.  At some point she did, yes.

16  Q.  Do you recall if you asked her to provide you

17  such a letter or if she did it on her own accord?

18  A.  Well, at one point I asked all employees who

19  had been receiving information, allegations,

20  accusations about me from Ms. Iglesias, these

21  employees were coming to me, and I asked them all, if

22  they had something, to reduce it to writing, and they

23  did.  Now, I know that she submitted -- well, I don't

24  know, I recall that she submitted a letter or a memo.

25  Q.  Okay.

---

**115**

1  A.  There have been others.

2  Q.  I'm going to hand you what's marked as Exhibit

3  71, and give you a chance to review that.

4  (Pause.)

5  (The document referred to was

6  marked Exhibit No. 71

7  for identification.)

8  THE WITNESS:  Okay.

9  BY MR. MONTEITH:  (RESUMED.)

10  Q.  Have you seen this document before?

11  A.  I -- again, it's been a while, but I recall

12  most of this, yes.

13  Q.  Who is it from?

14  A.  Detective Pat Ford.

15  Q.  Do you recall if she delivered it to you

16  personally or how you got it?

17  A.  I honestly don't recall.  It could have been

18  in an envelope in my office mailbox.  It could have

19  been delivered to me personally.  I don't recall.

20  Q.  Do you agree with the concerns that she raises

21  in this letter?

22  A.  Well, honestly, I haven't read it all.

23  Q.  Take time to read it then, please.

24  (Pause.)

25  A.  Most of it, yes.

---

**116**

1  Q.  What part don't you agree with?

2  A.  Well, I don't necessarily disagree with any of

3  it, but I -- that's what was occurring.

4  Q.  So, on the second page, the third paragraph,

5  did you read that?

6  A.  You want me to read it?

7  Q.  Please.

8  A.  This past weekend Sharon was seen at Granville

9  Corners passing out fliers for Frank Strickland.  In

10  my opinion is unacceptable behavior for any employee

11  of the City of Oxford -- second sentence, In my

12  opinion it is unacceptable behavior for any employee

13  of the City of Oxford to publicly support a person who

14  is running for any political seat that is clearly

15  attempting to destroy the reputation of our Chief and

16  the Oxford Police Department.

17  Q.  And do you agree with that?

18  A.  Well, they have a right to do it.  I don't

19  know that it's in the department's best interest for

20  someone that was aggressively going after me as his

21  primary platform.

22  Q.  So this person -- this -- this paragraph is

23  referring to Frank Strickland, in your opinion?

24  A.  Yes, sir, I do believe that.

25  Q.  And you think Frank Strickland was out to

---

**117**

1  destroy you?

2  A.  Frank Strickland has been trying to do that

3  since 2001, Mr. Monteith, every time he runs for

4  political office and otherwise.

5  Q.  Why do you think that is?

6  A.  I have no idea.

7  Q.  Did you know him prior to moving to Oxford?

8  A.  I've had five words with that man in my whole

9  life.  He was a candidate for police chief position at

10  least twice that I know of, was not selected, and

11  that's all I really know about him, except what I read

12  in the paper or hear in his campaigns, or on the 3,000

13  emails of various people in city government have

14  received.

15  Q.  Okay.  So let's go back to Sharon then.

16  A.  Uh-huh.

17  Q.  So you give her this warning, final warning,

18  September 2004.  You testified earlier that you -- it

19  wouldn't have bothered you if she left the department

20  at that time?

21  A.  Sure.

22  Q.  You transferred her?

23  A.  (Witness nods head.)

24  Q.  Then you changed your mind a month later?

25  A.  Well, when it became apparent that she could

**118**

1 not do the job in emergency communications, if I
2 recall, the city, not necessarily me, but the city
3 suspended her or put her on administrative leave
4 pending some resolution as to what we could do with
5 her and with the position. I forgot how long it was
6 that she was out on administrative leave, but a
7 decision was made to bring her back into the
8 administrative assistant's role. My request continued
9 to be to find her -- if we couldn't do anything, to
10 find her another position in city government. I was
11 advised by the city manager, and I was probably in
12 consultation with the human resource director, that
13 that wasn't possible, that she couldn't do the job in
14 dispatch, so we needed to bring her back, and I could
15 do it under conditions that I felt could be amenable
16 to getting the job done within the agency. I
17 relented. We brought her back. And I subsequently
18 met with her prior to placing her back in that
19 position with the conditions that I placed on her.
20 That's what I recollect.
21    Q. During that meeting, do you recall that you
22 told her that you had lost control of the situation?
23    A. I do recall that, and I felt bad.
24    Q. What did you mean by that?
25    A. What I meant by that is I had never had a

**119**

1 personnel matter that was not, in my experience, and
2 as I've already stated, I've been in a few ones,
3 that I didn't have more control over what was
4 happening with it. And I -- and I was frustrated, to
5 be very honest with you, with the behavior of
6 Ms. Iglesias prior to that, I wasn't really sure what
7 we could do. And so I handed over some decisions to
8 the city manager, to the city human resource director,
9 without as much input as I normally would have. And
10 when we finally realized that this was what they
11 requested me to do, then the decision was made to
12 bring her back under the conditions that I placed her
13 in.
14    So, yeah, I'm sure I -- I was expressing some
15 frustration with her at not being able to -- to deal
16 with this. This was a situation that was new to me.
17 I hadn't ever had anybody who was quite in the same --
18 same situation.
19    Q. So, eventually she came back to the same job
20 she held before you transferred her out?
21    A. Yes. With a few changes, but, yes.
22    Q. What were those changes?
23    A. Well, predominantly one was physical. I moved
24 her office away from me to another end of the
25 building. Secondly, I believe I stated that and put

**120**

1 it in writing that she would be the -- to make sure it
2 was clear, that she was the administrative assistant
3 to the Oxford Police Department, excuse me, not just
4 to the Chief of Police, and that now heretofore she'd
5 be reporting directly to members of the command staff
6 rather than just to me. Frankly, it was my desire to
7 minimize my contact with Ms. Iglesias at that point.
8 We're still a small agency, got a small building, I
9 knew we would be in contact, but I wanted to minimize
10 that contact in order to not have further issues arise
11 that I had heretofore had to deal with.
12    Q. During that meeting, did you tell her that you
13 pushed her away?
14    A. Yeah, I think I did use that term; "pushed her
15 away".
16    Q. What did you mean by that?
17    A. I pushed her out of the office she was in and
18 wanted her away from me, and that, again, in the
19 course of this conversation, I was trying to come up
20 with a -- with an amenable situation. She was
21 returning to this role, I was trying to be as honest
22 as I could with her about how I was feeling. Yes,
23 pushed away. Wasn't anything negative or positive
24 about it, that's what I did. And I was still kind of
25 pushing her. I didn't want her that close to me

**121**

1 anymore.
2    Q. Okay. I'm going to jump back in time now, I'm
3 sorry to jump around so much.
4    A. All right.
5    Q. What I'm going to do now is show you a
6 document which will be marked as Exhibit 72, and give
7 you a chance to review that.
8        (Pause.)
9             (The document referred to was
10            marked Exhibit No. 72
11            for identification.)
12        THE WITNESS: All right.
13        BY MR. MONTEITH: (RESUMED.)
14    Q. Have you seen this document before?
15    A. It's been a long time. This is the first time
16 I've seen it probably since then. I don't recall
17 seeing it since then.
18    Q. Okay. Did you receive a copy of it via email?
19    A. Probably.
20    Q. Who is Glenn Boyd?
21    A. Currently, and then I think he was lieutenant
22 then, captain now, I guess.
23    Q. And to your knowledge, when he sends an email
24 and it says to entire department, does that mean it
25 goes to everyone in the police department in the City

122

1 of Oxford?
2 A. Yeah, all employees have an email box.
3 Q. Did he talk to you before he sent this email
4 out?
5 A. I honestly don't recall.
6 Q. Did you think --
7 A. We --
8 Q. Go ahead, I'm sorry.
9 A. Go ahead with your question, sir.
10 Q. What do you recall about this email and what
11 caused it to be issued?
12 A. I believe it was -- the timing of this was
13 near about when we had the Hicks matter. And he was
14 sensitive to things that had occurred in the
15 department years before, and that's why he was
16 referring to the Royster matter.
17 Q. That was before your time, correct?
18 A. Yes.
19 Q. The Royster matter?
20 A. Yes. Yes. He was directly involved in that,
21 I think.
22 So I -- I think that's what it was about. And
23 of course, during the course of that Hicks matter and
24 then the questions about me, I think he was just
25 trying to -- to get a message out to the department

123

1 that these things -- this is the way people could feel
2 and just trying to keep -- keep going.
3 Q. So could you read the Section Number 5, what
4 he wrote?
5 A. It would become clear who our allies and who
6 our enemies on the inside and out.
7 Probably a little strong, that's probably not
8 something I would have wrote, but --
9 Q. I'm sorry?
10 A. I'm not sure who he was referring to, to be
11 honest with you.
12 I said a little strong, probably not something
13 I probably would have wrote.
14 Q. Okay.
15 A. But it wasn't -- didn't break the bank to me.
16 Q. Did you say anything to him about it after you
17 saw this language?
18 A. You know, I don't recall. I don't recall.
19 MR. MONTEITH: Could we just take a couple of
20 minutes, I want to make sure I've separated my
21 confidential portions from my nonconfidential
22 portions?
23 MS. DAVIS: Sure.
24 THE VIDEOGRAPHER: Off record at 3:04 p.m..
25 (Whereupon, at 3:04 p.m., a recess was taken

124

1 until 3:28 p.m..)
2 THE VIDEOGRAPHER: On record at 3:28 p.m..
3 FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
4 BY MR. MONTEITH: (RESUMED.)
5 Q. Chief Wolford, a little bit earlier when I was
6 asking you about the letter you received from or that
7 you viewed from Detective Ford, you said that, if I'm
8 not mistaken, you'd asked from -- comments from your
9 staff regarding Ms. Iglesias?
10 A. Yes, at some point in the Fall of 2005, I
11 believe.
12 Q. Okay. Is the document that came in at the
13 start today, it should be at the bottom of the stack,
14 Exhibit 57, if you could turn to that. It should be
15 the very bottom, I hope.
16 A. Well, I moved them a little, but I'll check.
17 It's -- which one is it again, Mr. Monteith?
18 Q. Dated October 27th, 2005.
19 A. Yes, I have it in front of me.
20 Q. Looking at this document again, first of all,
21 who did you send this to?
22 A. These were -- this was -- the -- the top
23 paragraph was exactly what the other -- what employees
24 in the department who had come to me and verbally were
25 telling me of their concerns about statements made by

125

1 Ms. Iglesias, so this paragraph went to all of those
2 people.
3 Q. Who were -- were those people; do you recall?
4 A. It wasn't sent out to -- to everyone in the
5 agency. It was sent specifically, I believe, to those
6 people who had verbally come to me and given me either
7 a singular or multiple verbal statements regarding
8 conversations with Ms. Iglesias.
9 This memo was my answer to that request that I
10 made. Essentially it says to the file, but all of
11 this was eventually provided to the city manager.
12 Q. So do you remember specifically the employees
13 that you gave this to?
14 A. I can name some of them.
15 Q. Okay.
16 A. I don't know as though I'll recall all of
17 them.
18 Q. Sure.
19 A. I know the command staff, that would be
20 Captain Boyd, now Captain Boyd; Lieutenant Griffin;
21 Lieutenant Blackwell; we've discussed Pat Ford;
22 Detectives Curl and Dickerson; building maintenance
23 person, Ronnie Davis, and there may have been two or
24 three others that I can't recall.
25 Q. Well --

126

1    A.  Detective Tingen.  I'm sorry.  I'm sorry.  I
2  do know that he submitted one.
3    Q.  Did you discuss sending this memo out to the
4  selected staff that you described prior to sending it,
5  I mean, did you talk to Mr. Marrow about it?
6    A.  I -- I recall that a discussion, the best of
7  my recollection, with Mr. Jenkins, Don Jenkins.  I
8  don't recall whether I had one, could have, with
9  Mr. Marrow or not.
10    Q.  Whose idea was it to send this out?
11    A.  I think it was a combination.  We were in
12  discussion about the -- the continuing allegations
13  that were being made by Ms. Iglesias during the Summer
14  of 2005, up to this point, that we needed to be -- to
15  document those -- that information as best we could,
16  and this was a suggestion by me or Jenkins together
17  that we do it.
18    Q.  And these continuing allegations by
19  Ms. Iglesias during the Summer of 2005, involved your
20  -- what she believed to be your use of drug fund
21  monies --
22    A.  Yeah.
23    Q.  -- for personal gain?
24    A.  No question that was a part of it.
25       Following the Spring of 2004, when I thought

127

1  -- right after the meeting with the auditor that she
2  had, I thought it most appropriate that she do what
3  she did with the auditor, thought it was in terms of
4  her freedom to do that, she had that.  Once that was
5  -- was cleared up, I answered to -- to the city
6  manager, the city attorney, the -- the board
7  eventually, even the district attorney, that I had
8  done nothing improper, those allegations continued.
9  Well, then it shifted from a responsibility she had to
10  notify the auditors to something very, very personal,
11  and that continued on until this particular point.
12    Q.  So you spoke to the city commissioners about
13  this issue?
14    A.  Oh, I don't know if she did or not.  I said in
15  terms of clearing up the specifics of the purpose of
16  my internal inquiry, at some point eventually I'm sure
17  got to the board.  I don't know if it was specifically
18  or not.
19    Q.  Did you speak to the city commissioners about
20  this issue?
21    A.  No, sir.
22       (Pause.)
23    Q.  All right.  Move on to a different document.
24       (Pause.)
25    Q.  Have you seen this document before, Chief

128

1  Wolford?
2    A.  A little while, but I recognize it, yes, sir.
3       (The document referred to was
4       marked Exhibit No. 73
5       for identification.)
6    BY MR. MONTEITH:  (RESUMED.)
7    Q.  Did you write it?
8    A.  Yes, sir, I wrote it.
9    Q.  So would it be fair to say that as of the date
10  of this document, November 22nd, 2005, that you wanted
11  to terminate Ms. Iglesias?
12    A.  Pretty clear, yes, sir.
13    Q.  Did Mr. Marrow respond to this memo that you
14  sent him?
15    A.  I -- I don't know if he responded to me in
16  writing, I don't recall.  And we were in course of
17  discussion at various times over this issue, this
18  continuing issue, we probably -- I know we probably
19  had a meeting, but I don't recall what the context was
20  at that time.  And specifically in response to your
21  question, I don't -- I don't recall whether we did.
22    Q.  If she had not made these allegations
23  concerning you and the misuse of funds, would you have
24  wanted to have let her go November of 2005?
25    A.  Clearly the allegations that continued with

129

1  her not being satisfied with answers she got from
2  anybody regarding the purpose of -- of my expenditure
3  of those funds was a -- was a big issue, and that she
4  continued to do that.  There were other issues.  There
5  were continuing allegations about various meetings she
6  had -- apparently had with my ex-wife.  There were
7  personal accusations.  There were suggestions to a
8  building maintenance person that was affiliated in
9  some way as a deacon or minister in a church, that he
10  should go out into the black community to discredit
11  me, and basically that anything I did in the black
12  community was -- was a fake, or something along those
13  lines.  And those were just -- just some of the things
14  that had continued to occur over a period of time that
15  put me in this position.  This is a pretty strong
16  memo.  I had never written one like this before in my
17  career.  I meant every word of it.
18    Q.  And when you say contact with your ex-wife,
19  you're referring to Susan?
20    A.  Yes.
21    Q.  How did you learn about this contact?
22    A.  The first time, I'm trying to recall, probably
23  in a letter -- a copy of a letter that was provided to
24  me by someone, and I honestly don't know who, that it
25  was a letter she allegedly, not allegedly, wrote to

130

1  either Iglesias or -- or Strickland, I'm not sure
2  which one, where she made various allegations.
3      MS. DAVIS:  And just so the record is clear,
4  when you're saying she, you're referring to your
5  ex-wife?
6      THE WITNESS:  Susan, ex-wife Susan, right.
7      Also, other occasions during the course of
8  this year, I think in 2005, I'm trying to recall
9  directly who I heard those from.  I did hear it from
10  Pat Ford, she had gone to -- Iglesias had gone to
11  Ford's house at some point, either in 2004 or 2005,
12  also with a copy of a ledger, I was advised, to,
13  again, question what I had done.  I believe may have
14  had a copy of a letter from the ex-wife Susan then,
15  also.
16      So there -- there were -- there were various
17  allegations made about my personal life, about what I
18  had done in my married life with this woman, that was
19  clearly, clearly out of bounds and of absolutely no
20  interest, as far as I was concerned, to Ms. Iglesias.
21  These two people apparently met when it was convenient
22  for them.
23      BY MR. MONTEITH:  (RESUMED.)
24      Q.  Did you ever ask anybody on your staff to talk
25  to Ms. Iglesias for the purpose of seeing what she

131

1  would tell them?
2      A.  No.  I -- as a matter of fact, I did the
3  opposite.  I -- please explain, the employees that
4  came to -- to -- to tell me about things that
5  Ms. Iglesias had said, most of which were about me,
6  that I was evil, that I was the devil, very -- I mean,
7  all kinds of -- of allegations such as that.  And my
8  response to them frankly was, if she approaches you
9  and she wants to talk, you can come and tell me about
10  it any time you want to.  We're -- we're trying to
11  work through this and we'll continue to try to work
12  through it.  I don't recall ever asking or signing or
13  directing anybody to go to her in an attempt to get
14  anything.  Didn't have to.  It was being done without
15  anything that I was requesting.
16      Q.  How long were you married to Susan Wolford?
17      A.  13 years.
18      Q.  And what date did you separate?
19      A.  August.
20      Q.  Approximately?
21      A.  I want to say August 8th, 2003, something like
22  that.
23      Q.  And do you know what date the divorce became
24  final?
25      A.  2000 -- 2005.  I believe in the Summer of

132

1  2005.
2      Q.  And what date did you remarry?
3      A.  December 24th, 2005.
4      Q.  Christmas Eve?
5      A.  Yes, sir.
6      Q.  How long have you known your current wife,
7  approximately?
8      A.  2002 or '3.
9      Q.  At some point did she work for the local
10  newspaper there?
11      A.  Yes, she did.  She was the editor of that
12  paper for two or three years.
13      Q.  And when did you start to date her?
14      A.  Approximately about eight months after my wife
15  left, took my child and went to Charlottesville.
16  Subsequently, I was served with papers regarding a
17  divorce proceeding, and it was approximately eight
18  months after that, that we began to see each other.
19      Q.  So when you testified earlier that you
20  separated around August 8th, 2003, is that the date
21  that she left, your ex-wife left to go to
22  Charlottesville?
23      A.  Oh, yeah.  Yes.
24      Q.  Do you ever talk to your current wife about
25  the situation involving Ms. Iglesias?

133

1      A.  I don't recall having any conversations with
2  her.  I didn't think it would do any good.  There were
3  times, very frankly, that I wanted to, but the nature
4  of that relationship at that time was not good and I
5  didn't -- didn't -- I don't recall having any; that's
6  my answer.
7      Q.  Because would it be fair to say that her
8  situation got decent amount of coverage in the local
9  press?
10      A.  Whose situation?
11      Q.  Ms. Iglesias?
12      A.  Would it be fair to say she got decent amount
13  of coverage?
14      Q.  Yeah.
15      A.  No more than I did.  I'm not sure I understand
16  your question.  Did she get decent amount --
17      Q.  How would you describe your -- the amount of
18  coverage you received prior to Ms. Iglesias'
19  termination?
20      A.  Depends on what was happening at the time.
21  For some days it was every day.  There was quite a
22  bit, you know, local media.  When I say local, I'm
23  talking about newspapers locally in Henderson or -- or
24  Oxford.
25      Q.  Uh-huh.  Did that media consist of letters to

---

**134**

1  the editor, or advertisements, or actual articles
2  written by reporters?
3    A.  Both.  Both.  I got to tell you, I have
4  difficulty separating the personal allegations that
5  were being made by Ms. Iglesias and the personal
6  allegations that were being made by Frank Strickland,
7  they seemed to intertwine at different times, and they
8  were basically the same allegations.  So, yeah, we got
9  quite a bit of media at different times, yes, sir.
10    Q.  So at some point did you decide that
11  Ms. Iglesias was working with Mr. Strickland?
12    A.  I -- I didn't -- didn't make that absolute
13  determination until probably after she was gone.  I
14  believe -- I believe that there was probably some --
15  some information being passed on by -- see that was
16  part of the whole confidentiality issue.  There was
17  some issues involving Mr. Strickland, there's no other
18  way he could have got them, because I sure didn't give
19  them to him.
20    Q.  Did you ever consider the possibility that
21  somebody else on your staff was giving Mr. Strickland
22  information?
23    A.  That is if -- oh, sure.  Sure.  Did I ever
24  consider that?
25    Q.  Uh-huh.

---

**135**

1    A.  During what period of time?
2    Q.  Let's say, 2004, first of all.
3    A.  I think at different times, probably.  But,
4  you know, considering the amount of information,
5  emails and various other things we got from
6  Strickland, I really didn't know for sure.
7    Q.  Did you ever specifically ask Ms. Iglesias if
8  she had been meeting with your ex-wife?
9    A.  Seems like I -- I don't know that I asked
10  her.  I probably told her I knew she was, and I don't
11  recall what meeting that was in.  I may have asked
12  her, and I don't -- I honestly don't recall the
13  response.
14    Q.  Okay.  So you send this memo out late November
15  22nd, actually November 22nd, 2005, to Mr. Marrow, you
16  categorize this the strongest memo you've ever written
17  regarding an employee, correct?
18    A.  Well, it was -- my memory at that time, I was,
19  yeah, pretty adamant about it, yes.
20    Q.  And he didn't -- you don't know what his
21  response was initially?
22    A.  Not initially.  This was in around holiday
23  time, and I think things just kind of -- kind of
24  stayed in obeyance for a little while.
25    Q.  Okay.  And then at some point the television

---

**136**

1  stations got involved; is that correct?
2    A.  There was a -- a short piece done on, I think
3  it was WRAL, very early January, 5th, 6th, 7th, 8th,
4  I'm not exactly sure what date, where Ms. Iglesias
5  appeared on the air again with allegations that I had
6  misused funds within the police department, and there
7  may have been some other allegations, I'm not sure.
8    Q.  It should be Exhibit 74.
9      Have you seen this document before,
10  Mr. Wolford -- Chief Wolford?
11    A.  Well, yeah, it looks like I wrote it.  Again,
12  it's one of those documents I haven't seen in a while.
13        (The document referred to was
14        marked Exhibit No. 74
15        for identification.)
16      BY MR. MONTEITH:  (RESUMED.)
17    Q.  So this is one time you communicated by email
18  rather than memorandum?
19    A.  Yeah, apparently.  Yes, sir.
20    Q.  And the email address that is listed for you
21  there, that's your email address at work?
22    A.  Yes, sir, it is.
23    Q.  Do you have a personal email address?
24    A.  No, not at that time.  Never even --
25    Q.  Do you now?

---

**137**

1    A.  Do I now; yes.
2    Q.  Did you have a personal email address during
3  any of the time that Ms. Iglesias worked for you?
4    A.  No.  No.  I did everything in my work email.
5  I didn't -- didn't have one.
6    Q.  What about your wife, does -- does she have a
7  email, personal email account?
8    A.  Cathy, yes, she has one, in a business
9  account.
10    Q.  So how did you react, Chief Wolford, when you
11  found out that Ms. Iglesias had contacted Channel 11?
12    A.  How did I react?  I don't think I was very
13  happy, but I wasn't surprised.  I had been told by
14  employees all along that she had been communicating
15  with two or three employees and that she was in
16  contact with the news media, t.v. station, I think one
17  had told me Channel 11, as this indicates here.  So I
18  wasn't surprised at that.  I was accosted in the
19  parking lot by WRAL the day they were going to run
20  that story, so, you know, that part caught me a little
21  bit by surprise.  Did my piece.
22      How did I feel?  Frankly more of the same.
23  This was in line with what had been happening in
24  previous months, continuing personal attacks,
25  continuing attempts to discredit me, to embarrass me

---

**138**

1  and my agency, it seemed to me at that point.
2  Q. So, if her -- all right. Let's -- if her
3  concerns had been true, if you had been taking money
4  for personal reasons, would you then agree that she
5  had a right to go public with that information?
6  A. Mr. Monteith, I think I've already stated, she
7  had every right to notify the auditors, and she did
8  the right thing. She had every right to have
9  concerns, the freedom to have those concerns, up to
10  the point where she was told that those concerns were
11  not valid, that I had conducted a lawful inquiry, she
12  was told that by me, she was told in so many ways,
13  city manager, human resources, the media, however else
14  she got the message. Now, after that, the attacks in
15  my opinion, and the allegations, became very
16  personal. So that's how I answer your question. I'm
17  not sure I did, but that's the way I see it.
18  Q. Did it bother you that she went to the t.v.
19  stations?
20  A. It -- of course it did. I mean, again, it
21  just added -- added more fuel to the fire in terms of
22  her continuing behavior.
23  Q. What if she went to the t.v. stations
24  immediately upon finding this information out, would
25  that have made a difference in your mind?

**139**

1  A. Well, we may have dealt with it differently
2  then. I still think that would have been improper.
3  That's not how you conduct yourself as an employee
4  when there are other ways for her to get that
5  information properly investigated or properly dealt
6  with. It's not the common thing for people to do.
7  Q. But you --
8  A. At this -- if I may.
9  Q. Yes, sir.
10  A. At this point we had gone through various
11  steps to deal with it and to deal with Ms. Iglesias
12  over a period of another year and a half before we got
13  to this point. So, you know, yeah, I was -- I was
14  expected, yet not happy about it, clearly. She was
15  disrupting my department. It had gotten to the point
16  where officers were coming to me, command staff went
17  over my head to the city manager demanding that we
18  take some action to Ms. Iglesias, or I was going to
19  lose officers. Not over John Wolford, over
20  Ms. Iglesias. They wanted something done. It was
21  impacting our ability to complete the mission for
22  which that department exists in the first place. It's
23  a small town. I don't know, I've been in some larger
24  cities, whether it would have had the same impact, but
25  it sure had impact in small town America. That's

**140**

1  where I worked and that's what was happening there.
2  Q. It's important that the citizens trust their
3  chief of police?
4  A. Without a doubt. Without a doubt. Yes, sir.
5  Q. And if there was a chief of police that was
6  committing criminal activities, it's important for the
7  citizens to know about that?
8  A. Important for the citizens to know it and for
9  it to be dealt with effectively. That was not the
10  case.
11  Q. Yet you said earlier that, when I asked you
12  who had talked to you as part of any investigation,
13  you said you had talked to Marrow?
14  A. Right.
15  Q. Briefly to the city attorney?
16  A. Right.
17  Q. Not leaving anyone out?
18  A. I talked to the district attorney.
19  Q. Briefly again?
20  A. Right.
21  Q. You asked him if there was anything else he
22  needed, and he said no?
23  A. That's correct.
24  Q. And that was it?
25  A. Uh-huh.

**141**

1  Q. Okay.
2  (Pause.)
3  Q. So you mentioned just a few minutes ago being
4  accosted, if I can use your word, by WRAL.
5  I'll show you what's marked as Exhibit 75.
6  (Pause.)
7  A. Okay.
8  (The document referred to was
9  marked Exhibit No. 75
10  for identification.)
11  BY MR. MONTEITH: (RESUMED.)
12  Q. So this is the day -- you sent this email the
13  day you were interviewed by a WRAL news reporter?
14  A. It appears that, yes, sir.
15  Q. And that reporter, according to this email,
16  told you that her primary source of allegations was
17  Frank Strickland?
18  A. That's what she limited it to, yeah. Yes,
19  sir.
20  Q. Did you ask her who her source was?
21  A. Sure.
22  Q. Did she name anybody else?
23  A. She was hedging, she didn't want to tell me.
24  She did tell me Frank Strickland.
25  Q. Did you specifically ask her if Ms. Iglesias

**142**

1  was a source?
2  A. I did not specifically ask her that. I don't
3  recall that I did that.
4  Q. Were you upset with Ms. Iglesias after you
5  were, to use your words, accosted by the WRAL
6  reporter?
7  A. I wasn't any more upset. I've been accosted
8  by reporters for the last 25 years, so I was no more
9  upset about that. I was upset about the continuing,
10  continuing process that I was having to go through
11  based on these allegations and accusations and actions
12  by this employee.
13  Q. We're up to 76.
14  A. Uh-huh.
15      (The document referred to was
16      marked Exhibit No. 76
17      for identification.)
18  BY MR. MONTEITH: (RESUMED.)
19  Q. Okay. Do you remember sending out this email
20  the same day of -- actually the day after the WRAL
21  interview?
22  A. I -- yeah. Yes, sir, I remember sending it
23  out.
24  Q. What did you mean when you say your actions
25  are not being ignored?

**143**

1  A. I believe I meant that exactly as I said it,
2  we're -- we're attempting to deal with that. I was
3  having employees come to me prior to the hearing, and
4  in the morning that this was probably written, this
5  was written at 4:40 P.M., you can -- you can rest
6  assure I had people marching into my office all day
7  long wanting to know what I was going to do. Chief,
8  how are you going to discipline anybody else if we
9  can't take any action whatsoever regarding the actions
10  of this woman? I didn't have an answer for that.
11  Q. They said how are you going to discipline
12  anyone else?
13  A. Yeah. I had -- I had employees ask me that.
14  Q. Who?
15  A. Command staff, sergeants.
16  Q. Do you recall any names?
17  A. I know the captain asked me, if he was captain
18  then, 2006, Captain Boyd. It was in a matter of a
19  discussion. We had a serious personnel issue going on
20  in our agency, so I wasn't surprised at that kind of a
21  comment or that kind of a question.
22  Q. Going back in time a little bit, did you think
23  that this situation involving Warren Hicks had also
24  created a disruption in the department there?
25  A. Oh, any time, yeah. I -- any time you have an

**144**

1  officer involved in an illegal activity, ethical --
2  serious ethical violations, then, yeah, it's
3  disruptive.
4  Q. Okay.
5  A. But I have to tell you that it went away a lot
6  quicker, a lot quicker than I thought it would.
7  Q. Because it was dealt with?
8  A. I think so.
9  Q. So it wasn't long after you were accosted by
10  the WRAL reporter that you dismissed Ms. Iglesias?
11  A. It wasn't too long.
12  Q. A couple of weeks, maybe?
13  A. Seems like that, took that long. Probably
14  longer than I liked.
15  Q. Because you really wanted to get rid of her
16  since -- I mean, when did you first decide I've got to
17  get rid of this woman?
18  A. I don't recall the exact date, Mr. Monteith.
19  It had -- it had been in there for a while, that I
20  knew that this relationship was not going to work
21  out. I needed to be able to work with an employee in
22  a small environment such as that, and I knew that her
23  feelings about me personally were just not going to
24  get corrected, and that was clearly apparent as we got
25  into late fall, into December, and then obviously into

**145**

1  January of 2006.
2      MS. DAVIS: Can we take a little break?
3      MR. MONTEITH: Yes.
4      THE VIDEOGRAPHER: Off record at 4:00 p.m..
5      (Whereupon, at 4:00 p.m., a recess was taken
6  until 4:14 p.m..)
7      THE VIDEOGRAPHER: On record at 4:14 p.m..
8      FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
9      BY MR. MONTEITH: (RESUMED.)
10  Q. So this letter of termination that you have in
11  front of you, Exhibit 77, you drafted it on January
12  24th, 2006; is that correct?
13  A. Dated the 24th. I believe I did it that day.
14      (The document referred to was
15      marked Exhibit No. 77
16      for identification.)
17  BY MR. MONTEITH: (RESUMED.)
18  Q. Did anyone else review this before you gave it
19  to Ms. Iglesias?
20  A. I believe I did review this letter or this
21  document with the human resource director.
22  Q. That would be Mr. Jenkins?
23  A. Correct.
24  Q. Anyone else that you can recall reviewing it
25  with?

146

1    A. I don't recall anyone else.
2    Q. And then was there a reason why it wasn't --
3 you didn't give it to her on the 24th?
4    A. I don't know. I don't know. I don't recall
5 any reason -- particular reason.
6    Q. So -- but you did deliver it to Ms. Iglesias
7 on January 25th?
8    A. Yes, sir.
9    Q. At the start of the day; do you recall what
10 time of the day on the 25th?
11   A. No, I don't. I -- no, I don't.
12   Q. When you write in here, I'll just -- it said
13 -- you say, While your continued public accusations
14 against me personally have been difficult and
15 unprovoked, I had resigned myself that you would
16 likely continue to make these accusations, despite the
17 fact that numerous agencies and persons have
18 determined them to be without merit.
19      When you said numerous agencies, what agencies
20 were you referring to?
21   A. I was more -- more specifically dealing with
22 the city and departments within the city government,
23 the city human resources, the city manager, city
24 attorney, district attorney's office, that I believe
25 was what I was thinking of when I said agencies.

147

1    Q. What about persons, what did you mean there?
2    A. Again, referring to those people within those
3 departments.
4      (Pause.)
5    Q. Do you know if at some point the Mayor of
6 Oxford made a public statement saying that the SBI had
7 investigated the allegations against you?
8    A. I don't even remember what was in a
9 statement. I believe the Mayor did make a statement,
10 whether it was a press release, a statement to the
11 members of the board, or a memo to someone that they
12 had been satisfied with the facts that they had
13 investigated; they, meaning the city.
14   Q. Yes, sir.
15   A. The attorney, district attorney. And I
16 honestly don't recall a statement made relative to the
17 SBI. And I don't even recall the actual wording of
18 the statement.
19   Q. But you do recall that the Mayor made some
20 sort of a statement?
21   A. There was some sort of public statement made,
22 yes.
23   Q. In the local newspaper?
24   A. Again, I don't remember whether it was a press
25 release, a memo, however it came out, in the local

148

1 radio, I just don't recall. I do know he made a
2 public statement; how he did it, I don't recall.
3    Q. After Ms. Iglesias was discharged, did you
4 speak to anyone with the Oxford newspaper concerning
5 her discharge?
6    A. No. No. I may have had an inquiry from the
7 newspaper, but I was not going to get into that, any
8 discussions of the personnel, especially in a case
9 where we had this much going on. So, no, I did not
10 speak to a newspaper. You said after she was
11 terminated?
12   Q. Yes, sir.
13   A. I don't recall doing that. It's not something
14 I would normally do.
15   Q. Did you look at or did you see any newspaper
16 accounts relating to her termination?
17   A. Yeah, I recall there was some media. I don't
18 recall what newspaper or how, but it didn't come from
19 me.
20   Q. Do you know who it would have come from?
21   A. I have no idea. If an inquiry had been made
22 to me, I would have automatically referred it to human
23 resources, and they would have answered it to the best
24 of their ability under the rules that they operate.
25   Q. Do you recall a meeting or, I think it was

149

1 some sort of luncheon that you had with some of your
2 staff in November 2005, right around -- right before
3 Thanksgiving?
4    A. I -- we had -- normally had a Thanksgiving
5 kind of a dinner/luncheon kind of thing, yes, sir.
6    Q. Was Ms. Iglesias at that dinner, luncheon,
7 whatever?
8    A. I don't think she came.
9    Q. Was she invited to come?
10   A. That is open to the department. Ms. Iglesias
11 for a number of years was involved in helping to
12 prepare that, so I don't recall. I don't know that we
13 excluded her or specifically invited anybody. It was
14 out that we were having a luncheon; whoever came,
15 came. Generally we would get maybe a third of the
16 department and a few other people.
17   Q. Where would the luncheon be held?
18   A. Right in our training conference room,
19 adjacent to the kitchen.
20   Q. And that's where it was held in November 2005,
21 to your knowledge?
22   A. Yes, sir.
23   Q. And during that luncheon did you make any
24 comments to the staff that were there concerning
25 Ms. Iglesias and her accusations?

150

1   A.  Yes.
2   Q.  What did you say?
3   A.  We had reached -- I don't recall exactly what
4   I said.  We had reached a point at that time, and that
5   was, again, as you said, right near Thanksgiving,
6   where the allegations were -- were flowing pretty
7   heavily.  I believe we had also -- at that point also
8   gotten the written statements that we discussed
9   earlier from the individual officers.  I was
10  continuing to be asked by employees about what we were
11  going to do about it.  What are you going to do about
12  it, Chief?  I had a good chunk of them in an -- in an
13  assembly and felt it appropriate that I tell them that
14  we are going to deal with this.  It's going to take
15  some time.  I'm not really sure how this is going to
16  come out.  I'm paraphrasing.  I will continue to state
17  to you that any allegations being made are not
18  accurate, and I continue to have the support of the
19  city administration, and we're going to move forward.
20  That was the essence of my comments.
21  Q.  Do you remember if you called her a liar
22  during that luncheon?
23  A.  I don't recall calling anybody a liar.
24  Obviously statements were made that weren't accurate.
25  "Liar" is not necessarily a word I'll use.

151

1   Q.  What about slanderer?
2   A.  I don't recall that, no.
3   Q.  I'm going to be jumping around now, but the
4   good news for you, Chief, is that we're getting closer
5   to the end.
6   A.  Yes, sir.
7   Q.  Trying to wrap up, cover some items.
8       Do you recall if one of Ms. Iglesias'
9   allegations involved you using some of the monies that
10  you withdrew to repair a vehicle that had been
11  damaged, a personal vehicle?
12  A.  Yes, I remember that.
13  Q.  Okay.  What -- was your wife at that time
14  involved in some sort of car accident, I believe this
15  would have been sometime in 2003?
16  A.  There was a vehicle accident.  I don't recall
17  frankly whether it was in 2003 or -- well, she was
18  still there, whether it was in 2002 or 2003, to be
19  honest with you.  So the answer to your question, I
20  recall there was an accident she was involved in.  My
21  daughter was in the vehicle.  This occurred over in
22  Henderson, I believe.
23  Q.  Were there any other vehicles involved in the
24  accident?
25  A.  Yeah, the person that was at fault.

152

1   Q.  So would there have been an accident report
2   completed as a result of that accident?
3   A.  Yes.
4   Q.  And that would have been in Henderson?
5   A.  Henderson PD would have done that accident
6   report, yes.
7   Q.  Do you recall what repairs had to be done to
8   your vehicle?
9   A.  I would say rather substantial body work on
10  the vehicle, no engine repairs or anything like that,
11  I don't recall, fenders and so forth.
12  Q.  Do you recall -- I'm sorry, I didn't mean to
13  interrupt you.
14  A.  I said fenders and things of that nature.
15  Q.  Do you recall the cost of those repairs?
16  A.  Probably well over a thousand dollars; maybe
17  more than that.  It was all paid for by the opposed
18  insurance company.  We got a rental car; their
19  insurance company covered it.
20  Q.  Did you have to pay anything out of pocket
21  up-front and get reimbursed later on by the insurance
22  company?
23  A.  I didn't pay anything out of pocket.  To my --
24  to my memory, I didn't pay anything out of pocket.
25  Q.  Who repaired your vehicle?

153

1   A.  I believe it was the Oxford Body Shop there in
2   Oxford on, good Lord, I just forgot their name,
3   located on Lewis Street, Lewis and Hillsborough
4   Street.  I just went blank on their name.
5   Q.  Do you have any sort of records, written
6   records, concerning the repairs that were done?
7   A.  I went back and tried to resurrect the records
8   when this issue came up.  I went to my insurance
9   company, State Farm, they had absolutely no record of
10  it since no claim was made to State Farm.  The
11  opposing driver, the driver at fault, was very
12  helpful, turned it over to her insurance company, and
13  it was taken care of.  I never could find any record.
14  Q.  Uh-huh.  Do you recall who her insurance
15  company was?
16  A.  I really don't.
17  Q.  But they did fix your car?
18  A.  Sure did.
19      (Pause.)
20  Q.  What is your salary as the Chief of Police of
21  Oxford?
22  A.  Currently?
23  Q.  Yes, sir.
24  A.  Man, annually, 71 something, close to 72.  I'm
25  not sure.

## 186

1  don't recall the nature of the questions. He was
2  there about two minutes and left.
3  Q. So you did meet with him?
4  A. Yeah.
5  Q. Do you recall --
6  A. Yes.
7  Q. -- what you said?
8  A. I don't recall that. As I said, he was there
9  about two minutes. Don Jenkins, Human Resource
10  Director, did the majority of any talking, which was
11  as I said, minimal. He requested to meet with us to
12  give him what was on her release, I think. I don't
13  recall any details of anything really.
14  Q. Was he from Raleigh?
15  A. Yeah, he was from an office. And, again, I'm
16  -- I'm -- I'm lost as to what department. It was
17  state government, I believe.
18  Q. Yes, sir. So he drives from Raleigh to Oxford
19  for --
20  A. That's right.
21  Q. -- a two-minute meeting and turns around and
22  goes back?
23  A. That is correct.
24  Q. Do you know if anybody on your staff, your --
25  for example, your command staff, has received any

## 187

1  inquiries from potential employers of Ms. Iglesias?
2  A. We make it -- I'm sorry. We make it rather
3  clear that if any inquiries are made about any
4  employee, and this was before and after and during
5  Ms. Iglesias' tenure, that if any inquires come in to
6  any of them, they refer them directly to me and I to
7  human resources. That's generally how I instruct
8  business. So I -- any inquiries are made to
9  employees, as far as I know, there were none, if there
10  were, I'm not aware of them, and any there were, were
11  referred to human resources.
12  (Pause.)
13  MR. MONTEITH: I have no further questions.
14  MS. DAVIS: I don't have any questions.
15  THE VIDEOGRAPHER: This concludes the
16  deposition of Chief John Wolford. The time is 5:38
17  p.m..
18  (Discussion off the record.)
19  (Whereupon, at 5:38 p.m., the taking of the
20  instant deposition ceased.)
21  (Whereupon, the reading and signing by the
22  witness is hereby reserved.)
23
24
25

## 188

1
2
3  _____
4  SIGNATURE OF THE WITNESS
5  SUBSCRIBED AND SWORN to before me this
6  _____ day of _____, 2008.
7
8  NOTARY PUBLIC
9  My Commission Expires:

SIGNATURE OF THE WITNESS

## 189

1  REPORTER: DMB
2  DATE: 10-7-08
3  T R A N S C R I P T I O N   C O R R E C T I O N S
4  CASE NAME:  SHARON B. IGLESIAS  VS.
5  JOHN WOLFORD, ET AL
6  WITNESS:  JOHN WOLFORD
7  CASE NO.:  US DISTRICT COURT, NO. 5:07-CV-00437-D
8  PAGE LINE  READS      SHOULD READ
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

190

1        CERTIFICATE OF REPORTER

2

3       I, DARLENE M. BRYANT, the reporter by

4  whom the foregoing deposition was taken, do

5  hereby certify that the testimony of the witness

6  appearing in the foregoing deposition was taken

7  by me in stenotype and thereafter reduced to

8  typewriting under my direction; that I am neither

9  counsel for, related to, nor employed by any of the

10  parties to the action in which this deposition was

11  taken; and further, that I am not a relative or

12  employee of any attorney or counsel employed by the

13  parties thereto, nor financially or otherwise

14  interested in the outcome of the action.

15

16        _____

17       DARLENE M. BRYANT, RPR, CSR

18       Notary Public in and for

19       County of Wake

20       State of North Carolina

21       NC Notary #19932840099

22

23

24

25