```
 1        IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 2               WESTERN DIVISION
               NO. 5:07-CV-00437-D
 3
 4  _____
                                    :
    SHARON B. IGLESIAS,             :
 5                                  :
              Plaintiff,            :
 6                                  :
    vs.                             :
 7                                  :
    JOHN WOLFORD, Chief of Police of :
 8                                  :
    Oxford, N.C., in his official and :
 9                                  :
    individual capacities; THOMAS MARROW,:
10                                  :
    City Manager of Oxford, N.C., in his :
11                                  :
    official and individual capacities; :
12                                  :
    DON JENKINS, Human Resources Manager :
13                                  :
    for the City of Oxford, N.C., in his :
14                                  :
    official and individual capacities; :
15                                  :
    and the CITY OF OXFORD, N.C.,   :
16                                  :
              Defendants.           :
17                                  :
    _____:
18
                Wednesday, October 15, 2008
19
                Raleigh, North Carolina
20
21        DEPOSITION of DON JENKINS, a witness
22  herein, called for examination by counsel for
23  Plaintiff in the above-entitled matter, pursuant to
24  notice, the witness being duly sworn by VALERIE
25  SMITH GREEN, Court Reporter and Notary Public in and
```

BRYANT COURT REPORTING SERVICES, INC. (919)387-5853

**2**

1  for the State of North Carolina, taken at Cranfill,
2  Sumner & Hartzog, LLP, 5420 Wade Park Boulevard,
3  Suite 300, Raleigh, North Carolina, at 9:44 a.m., on
4  Wednesday, October 15, 2008, and the proceedings
5  being taken down by stenotype by VALERIE SMITH GREEN
6  and transcribed under her direction.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1                    C O N T E N T S
2  THE WITNESS          EXAMINATION BY COUNSEL FOR
3  DON JENKINS:          Plaintiff  Defendants
4  By MS. RICE:                  7
5
6
7                    E X H I B I T S
8  EXHIBIT NO.                    PAGE NO.
9    84 - Chief Wolford's response to
            investigation          80
10
      85 - Memo dated 8-30-04          101
11
      86 - Section 6, 7 & 8 of policy manual    130
12
      87 - Mr. Jenkins response to plaintiff's
13         first set of requests       151
14
15
16
17
      ***C O N F I D E N T I A L***
18
   Beginning Confidential Portion   Page 138, Line 8
19
   Ending Confidential Portion    Page 149, Line 4
20
21
22
23
24
25

**3**

1  APPEARANCES:
2      On behalf of the Plaintiff:
3          SHELLI HENDERSON RICE, ESQ.
4          CHARLES E. MONTEITH, JR., ESQ.
5          Monteith & Rice, PLLC
6          422 St. Mary's Street, Suite 6
7          Raleigh, North Carolina  27605
8          (919) 821-2053
9
10     On behalf of the Defendants:
11         M. ROBIN DAVIS, ESQ.
12         Cranfill, Sumner & Hartzog, LLP
13         5420 Wade Park Boulevard, Suite 300
14         Raleigh, North Carolina 27607
15         (919) 828-5100
16
17  ALSO PRESENT:
18  Sharon B. Iglesias - Plaintiff
19  Tom Burnette
20
21
22
23
24
25

**5**

1          S T I P U L A T I O N S
2      It was stipulated by and between counsel
3  representing the respective parties, and the witness,
4  as follows:
5      1.  That any defect in the notice of the taking
6  of this deposition, either as to time or place, or
7  otherwise as required by statute is expressly waived,
8  and this deposition shall have the same effect as if
9  formal notice in all respects as required by statute
10  had been given and served upon the counsel in the
11  manner prescribed by law.
12      2.  That this deposition shall be taken for the
13  purpose of discovery or for use as evidence in the
14  above-entitled actin, or for both purposes.
15      3.  That this deposition is deemed opened and all
16  formalities and requirements with respect to the
17  opening of the same, expressly including notice of
18  the opening of this deposition, are hereby waived, and
19  this deposition shall have the same effect as if all
20  formalities in respect to the opening of the same had
21  been complied with in detail.
22      4.  That the undersigned, Valerie Smith Green,
23  Court Reporter and Notary Public in and for the State
24  of North Carolina, is duly qualified and constituted to
25  take this deposition.

**6**

5. Objections to questions, except as to the form thereof, and motions to strike answers need not be made during the taking of this deposition, but may be reserved until any pretrial hearing held before any judge of any court of competent jurisdiction for the purpose of ruling thereon, or at any other hearing or trial of said case at which said deposition might be used, except that an objection as to the form of a question must be made at the time such a question is asked or objection is waived as to the form of the question.

6. That the witness will reserve the reading and signing of the transcript to the deposition.

7. That the Federal Rules of Civil Procedure shall control concerning the use of the deposition in court.

**7**

PROCEEDINGS

Whereupon,

DON JENKINS,

was called as a witness by counsel for the Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MS. RICE:

Q    Good morning, Mr. Jenkins.

A    Good morning.

Q    We've already spoken off the record. To reintroduce ourselves, and you've met my co-counsel Chuck Monteith, I believe?

A    Uh-huh.

Q    How are you doing today?

A    Doing good.

Q    Good.

Have you been deposed before, sir?

A    No.

Q    Have you ever witnessed a deposition?

A    No.

Q    Are you familiar with -- with how a deposition -- what it is to be deposed?

A    Yes.

Q    You understand I'm going to ask you

**8**

questions and I expect you to provide complete answers and truthful answers?

A    I do.

Q    And if you don't understand any question I ask, which it is very likely over the course of the day because I'm sure that I'll phrase some very poorly, please just let me know and I'll do my best to rephrase the question in such a way that you can understand it.

First of all, have you -- are you on any medication today that might affect your ability to tell the truth?

A    No.

Q    And also when I ask -- at any point in time you want to take a break or need a break please just speak up and we'll do it.

A    (Witness indicating.)

Q    Exactly.  Exactly.

A    Okay.

Q    And if you could also try as much as possible to avoid any sort of nodding or nonverbal responses as the court reporter will need to get those in the record.

A    I understand.

Q    So if you could answer it I would

**9**

appreciate it.  Thank you.

Just a few questions first about your employment prior to coming to the City of Oxford.

And actually I'd like to start with your education.  What's your educational background, sir?

A    Four years undergraduate, two years graduate school.

Q    And where were your four years undergraduate?

A    High Point University.

Q    And graduate school?

A    Duke.

Q    And what was your graduate school study -- course of study?

A    Theology.

Q    Were you at Duke Divinity School?

A    Yes.

MS. DAVIS:  We've forgiven him for that.

Q    And did you complete the theology program at Duke Divinity?

A    No, third-thirds.

Q    Two-thirds?

A    Uh-huh.

**10**

1     Q     Okay. And when did you complete
2 that -- those two-thirds?
3     A     '67.
4     Q     And did you go to work following your
5 study at Duke Divinity?
6     A     Uh-huh.
7     Q     Where was that?
8     A     Camp Winaukee in Winnipesaukee, New
9 Hampshire.
10     Q     Camp Winaukee?
11     A     Uh-huh.
12     Q     And what was Camp Winaukee?
13     A     It was a Jewish youth camp, sports
14 camp.
15     Q     What was your job there?
16     A     Coached baseball.
17     Q     How long were you employed?
18     A     Two months.
19     Q     Two months?
20     A     Summer job.
21     Q     And what did you do following your
22 employment at Camp Winaukee?
23     A     Burlington Industries.
24     Q     And what was your job at Burlington
25 Industries?

**11**

1     A     Several jobs to include human resources
2 and manufacturing management and product
3 development.
4     Q     What were the order of those positions?
5 What position did you hold first?
6     A     Manufacturing management.
7     Q     How long were you in that position?
8     A     A year.
9     Q     And what position did you hold next?
10     A     Superintendent of the plant.
11     Q     And how long did you hold the position
12 of superintendent of the plant?
13     A     Two -- about two years.
14     Q     And following your position as
15 superintendent?
16     A     Transferred to division staff.
17     Q     To division staff?
18     A     Uh-huh.
19     Q     Was that a position title?
20     A     I was assigned to the division staff.
21 I was kind of in a holding pattern. There was a
22 lot of turmoil in the company.
23     Q     What did you do after your transfer
24 into the division staff?
25     A     In about another two months I was

**12**

1 assigned a plant.
2     Q     You were assigned to?
3     A     I was manufacturing manager of two
4 plants after that. About 1100 people if that
5 matters.
6     Q     That's a lot of employees. 1100?
7     A     Yeah.
8     Q     And how long did you hold the position
9 of manufacturing manager?
10     A     That job was three years.
11     Q     And following that position?
12     A     Transferred to the Granville plant in
13 Oxford.
14     Q     That was still with Burlington
15 Industries?
16     A     Still with Burlington, manufacturing
17 manager.
18     Q     How many employees were there at the
19 Granville plant?
20     A     At its peak probably about 750.
21     Q     And how long were you manufacturing
22 manager of the Granville plant?
23     A     Three years.
24     Q     And following that position?
25     A     Clarksville Finishing Plant in

**13**

1 Clarksville, Virginia.
2     (Interruption by the reporter.)
3     A     Clarksville, C-l-a-r-k-s-v-i-l-l-e.
4     Q     Finishing.
5     How long were you in Clarksville?
6     A     Thirteen plus years.
7     Q     Were you manufacturing manager at the
8 finishing plant?
9     A     I did several things. I did
10 manufacturing management and product development.
11     Q     And following your 13 plus years at
12 Clarksville what was your next position?
13     A     I was plant manager of Premier
14 Quilting.
15     Q     Was that still with Burlington
16 Industries?
17     A     No, I left Burlington after about 20
18 some years.
19     Q     So did you have any human resources
20 role while at Burlington?
21     A     Just the one year that I mentioned
22 first.
23     Q     The -- in the very beginning of your
24 employment?
25     A     That's true.

14

1   Q   Okay. And Premier Quilting, I'm sorry,
2 what was your position again?
3   A   Plant manager.
4   Q   How long did you hold that position?
5   A   A year.
6   Q   And where was that --
7   A   Oxford.
8   Q   -- what location?
9   A   Uh-huh.
10   Q   Are you from Oxford?
11   A   No.
12   Q   Where were you born?
13   A   Where was I born?
14   Q   Yes, sir.
15   A   In Raleigh.
16   Q   And what brought you back to Oxford or
17 what brought you back to North Carolina? Was it
18 the job?
19   A   Well, I still was living in North
20 Carolina and I was recruited from Burlington to
21 run this plant in Oxford.
22   Q   Okay. And what year was that that you
23 went to work for --
24   A   Eighty-six-ish.
25   Q   You said there -- you were there for a

15

1 year?
2   A   Uh-huh.
3   Q   And what did you do after the -- your
4 job at Premier Quilting?
5   A   I was plant manager of Barn Door
6 Furniture Company.
7   Q   Barn Door?
8   A   Uh-huh.
9   Q   Where is Barn Door Furniture Company
10 at?
11   A   Henderson.
12   Q   What was your job with them?
13   A   Plant manager.
14   Q   And how long were you plant manager for
15 Barn Door Furniture?
16   A   Three years.
17   Q   That would be around 1990 --
18   A   Yeah.
19   Q   -- your employment with Barn Door?
20     And what did you do following your
21 employment with Barn Door Furniture?
22   A   Opened up a management recruiting
23 business.
24   Q   You yourself opened it up?
25   A   My own franchise, yes.

16

1   Q   What was the name of your franchise?
2   A   Management Recruiters International.
3   Q   Did you have any employees?
4   A   Yes.
5   Q   How many?
6   A   Three.
7   Q   And how long did you operate Management
8 Recruiters International?
9   A   Just under a year.
10   Q   And why was that? Why did it function
11 for just under a year?
12   A   I'm sorry?
13   Q   Why was it that it was just under a
14 year that you operated Management Recruiters
15 International?
16   A   Found out that I did not want to do
17 that. It was not fun. Telephone marketing was
18 not fun.
19   Q   Is that what it was primarily?
20   A   Uh-huh.
21   Q   Okay. And so what did you do following
22 Management Recruiters International?
23   A   Well, while I was there I placed myself
24 at Granville Medical Center.
25   Q   Okay. And in what role or what

17

1 position?
2   A   Human resources director.
3   Q   What peaked your interest in human
4 resources?
5   A   Kind of what I was probably born to do.
6   Q   Why do you say that?
7   A   Because it's true.
8   Q   Why do you feel that way?
9   A   I think my skills and education lent
10 itself to that and my interest certainly did.
11   Q   At Granville Medical Center how many --
12 how many employees were employed at Granville
13 Medical Center?
14   A   Two hundred thirty-five.
15   Q   And what did you do in your position as
16 human resources director? What would a typical
17 day be if there is such a thing as a typical day?
18   A   Well, I was responsible for recruiting
19 in a pretty tough market with nurses and
20 therapists. We also had volunteers and marketing
21 under our purview.
22   Q   And how long were you employed with
23 Granville Medical Center?
24   A   About seven-and-a-half years.
25   Q   Always in a position of human resources

**18**

1  director?
2  A  Yeah.
3  Q  Were you supervised by -- who was your
4  supervisor at Granville Medical Center?
5  A  Chief executive officer.
6  Q  Was there only one CEO at the time you
7  were employed or multiple?
8  A  No, there were -- there was three.
9  Q  Do you recall their names?
10  A  Uh-huh.
11  Q  And what were they?
12  A  Chuck Owens, Andy Mannich,
13  M-a-n-n-i-c-h.  I'm not recalling the third one
14  right now.  Joe something.  Pretty forgettable.
15  Q  Was the one that you can't remember the
16  last name for was he the last one that you worked
17  for --
18  A  Uh-huh.
19  Q  -- in that order?
20  A  True.
21  Q  You said you were there for about
22  seven-and-a-half years?
23  A  Yes.
24  Q  How was it that you came to be
25  separated from your employment with Granville

**19**

1  Medical Center?
2  A  I retired.
3  Q  And how long were you retired for?
4  A  About ten months.
5  Q  Following your retirement where did you
6  go?
7  A  Well, that's not quite true.  Just --
8  just after I retired I took a job as manager of a
9  durable medical equipment store.
10  Q  Did you say durable medical equipment?
11  A  Durable medical equipment.
12  Q  Did you work there full time?
13  A  I worked full time for about a year.
14  Q  Is that in Oxford?
15  A  Yes, and Henderson.
16  Q  And following that year where were you
17  employed?
18  A  With the city.
19  Q  The City of Oxford?
20  A  Uh-huh.
21  Q  And my math is very poor.  What -- what
22  year would that -- would we be at?
23  A  Ninety-ish.  Yeah, I'm there nine years
24  this month.
25  Q  Okay.

**20**

1  A  So it must have been -- it would have
2  been '89.
3  Q  '99 perhaps?
4  A  '99.  Just before the famous Y2.
5  Q  Were you hired as the human resources
6  director for the City of Oxford?
7  A  I was.
8  Q  And how did you learn of that position?
9  A  In the newspaper.
10  Q  An advertisement in the newspaper?
11  A  And phone calls, uh-huh.
12  Q  Had you been looking for work with the
13  City of Oxford?
14  A  No.
15  Q  Why were you interested in that
16  position?
17  A  As many as five city commissioners
18  asked me to apply.
19  Q  Five of the then city commissioners?
20  A  Five of the existing city commissioners
21  asked me if I would become a candidate.
22  Q  Which five?
23  A  You want their names?
24  Q  Yes, sir.
25  A  Jack Carey, Clement Yancey, Sam Currin,

**21**

1  Paul Kiesow, K-i-e-s-o-w.
2  And what is Mr. Murfree's name?
3  MR. BURNETTE:  I.W.
4  A  I.W. Murfree.
5  Q  So each of these five asked you
6  separately to apply for the position?
7  A  They did.
8  Q  And apparently you agreed to do so?
9  A  I agreed to become a candidate.
10  Q  Who -- who hired you?
11  A  Tommy Marrow.
12  Q  Did you interview with Mr. Marrow?
13  A  I did.
14  Q  Did you interview with anyone else with
15  the city?
16  A  Yes.
17  Q  Who else?
18  A  The assessment team.
19  Q  Do you recall who was on that
20  assessment team?
21  A  I can remember some of the names.
22  Hartwell Wright, Deseree White, Becky Veazey and,
23  I think, that's all I remember.
24  Q  Was this assessment team to the best of
25  your knowledge was it assembled from employees

**22**

1 throughout the departments within the city?
2    A   No, those were HR directors in other
3 towns and one of them was a consultant. Ms.
4 Veazey was employed as a consultant to consummate
5 the search.
6    Q   Was it Mr. Marrow who offered you the
7 position?
8    A   It was.
9    Q   And do you recall what month you began?
10    A   October.
11    Q   October. So this is your anniversary
12 month?
13    A   Monday if you want to send a card.
14    Q   Okay. I'll remember that.
15      Did you have any employees working
16 directly under you in that position as --
17    A   No.
18    Q   -- human resources director?
19      Do you now?
20    A   No.
21    Q   Where was your office physically
22 located in 1999 when you went to work for the City
23 of Oxford?
24    A   In city hall, second floor.
25    Q   Is it still in city hall?

**23**

1    A   Uh-huh.
2    Q   Was Mr. Marrow located in city hall as
3 well, his office?
4    A   Yes.
5    Q   Was he on the second floor as well?
6    A   Yes.
7    Q   So you're fairly close proximity?
8    A   Yes, across the hall.
9    Q   What were your primary job
10 responsibilities when you came to the position of
11 human resources director for the City of Oxford in
12 1999?
13    A   Typical human resources
14 responsibilities of recruiting and employee
15 benefits.
16    Q   Were there a lot of job openings at the
17 time in the City of Oxford?
18    A   There were not a lot, no.
19    Q   How would you say your time was divided
20 between recruiting and -- and administrating
21 employee benefits?
22    A   Early on or now?
23    Q   Early on.
24    A   Heavily recruiting. There were high
25 level director positions open.

**24**

1    Q   Which positions were open?
2    A   City engineer, director of waste
3 water -- director of water distribution and
4 collection, and very shortly thereafter police
5 chief.
6    Q   When was it the police chief position
7 came open for recruitment?
8    A   That would have been probably -- let me
9 just guess and tell you I'm guessing about January
10 of 2000.
11    Q   As human resources director would you
12 advertise positions --
13    A   Yes.
14    Q   -- as far as recruitment?
15      And how did you advertise the position
16 of police chief?
17    A   In national periodicals.
18    Q   What periodicals?
19    A   First of all, Employment Security
20 Commission, the North Carolina League of
21 Municipalities news letter which is picked up by
22 the National League of Cities and its very broad
23 distribution.
24    Q   Any other periodicals?
25    A   Not that I recall. All the local

**25**

1 newspapers of course.
2    Q   Was the local newspapers -- what do you
3 consider to be the local newspapers?
4    A   The Oxford Ledger, the Henderson
5 Dispatch, the Butner-Creedmoor News, the Raleigh
6 News & Observer, and the Durham Herald.
7    Q   Do you routinely advertise in the -- in
8 all of those newspapers for job openings?
9    A   Director level, yes, and more.
10    Q   Director level and some other
11 positions?
12    A   Director level and higher, notably city
13 manager.
14    Q   And you mentioned a couple of other
15 positions. The city engineer you recruited for
16 that position early on during your employment?
17    A   (The witness nodded head up and down.)
18    Q   Do you recall when that position was
19 filled?
20    A   Not exactly. I could guess. Late
21 in -- late in the October quarter, quarter ending
22 December.
23    Q   Okay. Of 1999?
24    A   Yes.
25    Q   And the director of water distribution?

**Page 26**

```
 1    A    In the same quarter.
 2    Q    And back to the police chief position.
 3  Do you recall how many applicants you received or
 4  how many applications you received for that
 5  position?
 6    A    No.
 7    Q    Was it more than five?
 8    A    Yes.
 9    Q    More than ten?
10    A    Yes.
11    Q    More than 15?
12    A    More than 70.
13    Q    More than 70?
14    A    (The witness nodded head up and down.)
15    Q    And did you have an assessment team at
16  the time to assist in that hiring?
17    A  . Yes.
18    Q    Was it -- was it --
19        (Interruption.)
20    BY MS. RICE:
21    Q    Sorry about that.
22        I believe my last question was
23  regarding the assessment team.  How is that
24  assembled for the selection of police chief?
25    A    The Institute of Government in Chapel
```

**Page 27**

```
 1  Hill has a very nice methodology for doing that
 2  that involves other police chiefs and community
 3  leaders in Oxford.
 4    Q    So someone from the Institute of
 5  Government helped you assemble the assessment
 6  team; is that --
 7    A    They gave me --
 8    Q    -- accurate?
 9    A    -- the procedure.  I assembled it.
10    Q    You selected the individuals to
11  participate?
12    A    Yes.
13    Q    And who were those individuals?
14        MS. DAVIS:  Are we talking about
15    the assessment team; is that correct?
16        MS. RICE:  Yes, ma'am.
17        MS. DAVIS:  Okay.
18    A    Rick Jarvees retired now police chief
19  of Chapel Hill, the chief from Pinehurst whose
20  name alludes me, the chief from Smithfield and
21  from New Bern.  Palermo is his name.
22    Q    Anyone other than police chiefs as
23  members of that assessment team?
24    A    Not at that stage.
25    Q    Was this an initial stage?
```

**Page 28**

```
 1    A    Yes.  Well, after candidates were pared
 2  down.
 3    Q    Who did the initial paring down of
 4  candidates for that position?
 5    A    The city manager and I.
 6    Q    Just the two of you?
 7    A    Yes.
 8    Q    And how was it you pared down those
 9  applications?
10    A    We set up a grid of our requirements.
11    Q    What were those requirements?
12    A    Yikes.  Experience as a police chief,
13  four-year college degree, certain leadership
14  skills that we were looking at to include good
15  human relation skills, interpersonal confidencies,
16  those kinds of things.  Gosh, it goes on and on.
17    Q    How were you able to determine the
18  leadership skills or human resources skills from
19  looking at their initial applications?
20    A    Largely how long they've been there.
21    Q    How long they've been at their current
22  position --
23    A    Uh-huh.
24    Q    -- they hold?
25    A    And we did some -- some reference
```

**Page 29**

```
 1  checks prior to bringing them in.
 2    Q    You and Mr. Marrow did those
 3  personally?
 4    A    I did them all at that point.
 5    Q    And when you say reference checks did
 6  you call the people that were listed as
 7  references?
 8    A    And others.
 9    Q    And others?
10    A    Uh-huh.
11    Q    So there are occasions when you called
12  people who weren't provided as references?
13    A    Yes.
14    Q    How did you determine who you would
15  call for reference checks?
16    A    Small world.
17    Q    Small world?
18    A    Yeah.  Networking.
19    Q    Did you make calls outside the state of
20  North Carolina?
21    A    Yes.
22    Q    Where did you call outside the state of
23  North Carolina?
24    A    I don't remember the state.  It's in
25  the northwestern sector.  I'm sorry, I can't
```

**30**

1  remember exactly what that state is.
2  Q  Just one state though outside of North
3  Carolina?
4  A  That's true.
5  Q  How many applicants did you and Mr.
6  Marrow initially weed out in your initial review
7  of the applications?
8  A  About seven or eight.
9  Q  You just weeded out seven or eight or
10  there was seven or eight --
11  A  We narrowed it.
12  Q  You narrowed it down to seven or eight?
13  A  Uh-huh.
14  Q  Okay.
15      MS. DAVIS:  And if I can, I don't
16  know where we're going with this, but under
17  the general statutes if we're getting to the
18  names of the applicants those would be
19  confidential.  If we're not going to go there
20  then --
21      MS. RICE:  I'm not going to go
22  there right now.
23      MS. DAVIS:  All right.
24  BY MS. RICE:
25  Q  So seven or eight were left after you

**31**

1  and Mr. Marrow reviewed the applications?
2  A  Yes.
3  Q  And did you interview all seven or
4  eight of those?
5  A  No.
6  Q  How many did you interview?
7  A  Five.
8  Q  Was there just one interview of each of
9  those five?
10  A  No.
11  Q  Did some have more than one interview?
12  A  Yes.
13  Q  How many had more than one interview?
14  A  Three.
15  Q  At what point was the assessment team
16  brought in to assess the candidates?
17  A  When it was narrowed down to five.
18  Q  So they were present for the five
19  interviews?
20  A  Yes.
21  Q  Was the assessment team also
22  participating at the second level round of
23  interviews?
24  A  No.
25  Q  Who conducted those interviews?

**32**

1  A  Tommy Marrow and me.
2  Q  Did anyone have a third interview?
3  A  No.
4  Q  So this selection was made based on
5  that second round interview or following that
6  second round interview I should say?
7  A  Yes.
8  Q  Was there -- was an offer of employment
9  made to only one individual as a result of that
10  interview?
11      MS. DAVIS:  As long as we're not
12  talking about the names, I think, we're fine.
13  A  No.
14  Q  So there was more than one offer?
15  A  There was more than one offer.
16  Q  Were there more than two offers?
17  A  No.
18  Q  Was the initial offer made not accepted
19  by the individual to whom the offer was made?
20  A  Yes.
21  Q  And was the second offer accepted?
22  A  Yes.
23  Q  Did you personally extend the offer of
24  employment?
25  A  I did.

**33**

1  Q  And when did this successful candidate
2  begin his employment with the City of Oxford?
3  A  Whatever dates are in your records is
4  the correct date.  I don't remember that date.
5  Q  Was it shortly following the time that
6  you extended your offer of employment?
7  A  Yes.
8  Q  Within a month?
9  A  Within a month.
10  Q  And did Mr. Marrow approve the
11  selection of the candidate?
12  A  Yes.
13  Q  Would he have had to as city manager?
14  A  Oh, yeah, very much so.
15  Q  How do you know John Wolford?
16  A  How do I know him?
17  Q  Yes, sir.
18      When did you meet him?
19  A  First over the telephone.
20  Q  Is this while you were employed with
21  the City of Oxford?
22  A  Yes, during the recruitment process.
23  Q  So you first spoke with him on the
24  telephone?
25  A  (The witness nodded head up and down.)

34

1    Q    Did he call you or did you call him?
2    A    I called him.
3    Q    Why did you call him?
4    A    To follow up on the recruiting process.
5    Q    When did you first meet him personally
6    in person?
7    A    At -- at his interview.
8    Q    His first interview?
9    A    Yes.
10   Q    Did he have a second interview?
11   A    I'm uncertain.  Certainly by phone if
12   not by -- in person.
13   Q    Had you heard of Chief Wolford prior to
14   his application for the chief of police
15   position --
16   A    No.
17   Q    -- with the City of Oxford?
18        Do you know if Mr. Marrow had met Chief
19   Wolford prior to his selection as the --
20   A    He had not.
21   Q    You know he had not?
22   A    Yes.
23   Q    Okay.  So your only knowledge of Mr.
24   Wolford was based on his application for the
25   position and the interview process?

35

1    A    And references.
2    Q    Okay.  Did you personally contact
3    Mr. Wolford's references?
4    A    I did.
5    Q    Do you recall how many individuals you
6    contacted as references for Mr. Wolford?
7    A    No.
8    Q    Was it more than one?
9    A    It was several.
10   Q    More than five?
11   A    Yes.  Less than ten.
12   Q    Did you contact Chief Wolford's former
13   employers as references?
14   A    I or another consultant did.
15   Q    Another consultant being somebody that
16   was on the assessment team?
17   A    No.
18   Q    Okay.  Who would the other consultant
19   be?
20   A    We employed a -- an agency whose job is
21   to do background checks.
22   Q    What agency did you employ?
23   A    Johnson Detective Agency.
24        That sound right, Tom?
25   Q    Johnson Detective Agency?

36

1    A    Yeah, called Johnson.
2    Q    Are they in -- is that in Oxford?
3    A    No.
4    Q    Where is Johnson Detective Agency
5    located?
6    A    Somewhere in the Raleigh area.
7    Q    Have you used Johnson Detective Agency
8    for other background checks?
9    A    No.
10   Q    And I'm sorry, I wasn't very specific.
11   Had you used them before Chief Wolford's --
12   A    No.
13   Q    Okay.  And have you used them since
14   for --
15   A    Not for background checks.
16   Q    Have you used them for other services?
17   A    Yes.
18   Q    What other services have you used
19   Johnson Detective Agency for?
20   A    A personnel matter.
21   Q    A personnel matter within the City of
22   Oxford?
23   A    Yes.
24   Q    Was that for a background check or --
25   A    No.

37

1    Q    What other service were you employing
2    Johnson Detective Agency for?
3    A    That's a personnel matter.
4    Q    I'm not asking for the name of the
5    individual, but what -- what were you employing
6    Johnson Detective Agency to do?
7        MS. DAVIS:  You mean just in
8    general terms?
9        MS. RICE:  In general terms,
10   uh-huh.
11       MS. DAVIS:  Such as investigation.
12       THE WITNESS:  Investigation.  Yeah,
13   did an investigation.
14       BY MS. RICE:
15   Q    Was the investigation with respect to
16   use of city resources or use of city funds?
17   A    City resources.
18   Q    And when did that investigation occur?
19   A    Early 2001 or two maybe.
20   Q    Have you employed Johnson Detective
21   Agency since that time?
22   A    No.
23   Q    Any other detective agencies?
24   A    No.
25   Q    How many employees -- or how many

38

1 individuals are employed with the City of Oxford?
2     A     One hundred four full-time employees.
3     Q     One hundred four full time.  Are there
4 some part time?
5     A     Lots of part timers.
6     Q     Approximately how many part time?
7     A     Thirty-five or 40.
8     Q     What distinguishes the full-time
9 employees from the part time?
10     A     Part-time people are occasional labor,
11 maybe a recreation program for example.
12     Q     Do all the full-time employees have
13 benefits --
14     A     Yes.
15     Q     -- through the city?
16     A     Yes.
17     Q     Are you responsible for administering
18 the benefits?
19     A     Yes.
20     Q     And what are your other present primary
21 job responsibilities currently?
22     A     They haven't changed.  I still do
23 recruiting, I still do benefits, administration
24 which is a pretty big deal.
25     Q     Do you do an orientation for new

39

1 employees?
2     A     No.
3     Q     Is that the responsibility of whatever
4 department?
5     A     The supervisor.
6     Q     First line supervisor?
7     A     Yes.
8     Q     What about maintaining personnel files,
9 is that one of your job responsibilities?
10     A     Yes.
11     Q     Could you describe how those are
12 organized or maintained?
13     A     Everything having to do with an
14 employee and their employment is kept in a file
15 folder.
16     Q     In your office?
17     A     Yes.
18     Q     When you say everything does that
19 include performance evaluations?
20     A     It does.
21     Q     How often are performance evaluations
22 completed?
23     A     Rarely.
24     Q     Is there a performance evaluation form
25 that's used, you know, formally throughout the

40

1 City of Oxford?
2     A     Yes.
3     Q     Did you create that form?
4     A     No.
5     Q     Was it available for use prior to your
6 coming to the City of Oxford?
7     A     Yes.
8     Q     Have you made any changes to it?
9     A     Yes.
10     Q     What changes have you made?
11     A     Pretty subtle changes and just maybe a
12 nomenclature.
13     Q     So the categories haven't really
14 changed --
15     A     That's true.
16     Q     -- but the scales are rating scales?
17     A     That's true.
18     Q     I believe you said the performance
19 evaluations aren't done often.  I don't want to
20 put words in your mouth, but they're completed
21 rarely; is that accurate?
22     A     In the past they have been rarely.
23     Q     Why is that?
24     A     Lack of support.
25     Q     Lack of support within the departments

41

1 or lack of support in human resources?
2     A     No.
3     Q     No, not -- not lack of support in human
4 resources?
5     A     That's true.
6     Q     Okay.  So where does this lack of
7 support come from for completing performance
8 evaluations?
9     A     The top.
10     Q     The top being the city manager?
11     A     Yes.
12     Q     So Mr. Marrow specifically?  Did -- did
13 he not support performance evaluations?
14     A     That's true.
15     Q     Did he tell you why?
16     A     No.
17     Q     Did you agree with -- with Mr. Marrow's
18 opinion concerning performance evaluations?
19     A     Not at all.
20     Q     Why is that?  Why didn't you agree?
21     A     Because folks ought to know where they
22 stand.
23     Q     Did you express your opinion on this
24 matter to Mr. Marrow?
25     A     Yes.

42

1 Q What was his reaction?
2 A I'll get around to it.
3 Q Who is your present city manager?
4 A His name is Mark Donham, D-o-n-h-a-m.
5 Q Is he your immediate supervisor now?
6 A Yes.
7 Q Does he share Mr. Marrow's opinion of
8 performance evaluations to the best of your
9 knowledge?
10 A Not at all.
11 Q So Mr. Donham supports performance
12 evaluations being carried out on a regular basis?
13 A It's a priority.
14 Q Okay. And how often are performance
15 evaluations being completed or conducted
16 presently?
17 A Well, keep in mind he's new, but
18 they'll be done at least annually.
19 Q And those performance evaluations once
20 completed will be maintained in the personnel
21 files that you --
22 A They will.
23 Q -- keep in your office?
24 Do you know if individual department
25 heads or supervisors also have their own personnel

43

1 files for employees that are under their
2 supervision?
3 A I suspect they do.
4 Q How do you insure that the information
5 you maintain in your personnel files is identical
6 to that which is maintained by individual
7 supervisors?
8 A I don't.
9 Q So do you rely on the supervisors to
10 forward the appropriate information along to you?
11 A That's our culture.
12 Q And in addition to performance
13 evaluations, any sort of disciplinary actions or
14 other documents would be maintained in the
15 personnel file?
16 A Yes.
17 Q What is the procedure for issuing
18 disciplinary actions?
19 A It's exactly as you saw in policy with
20 progressive discipline.
21 Q Could you describe the progressive
22 discipline to me -- for me?
23 A I could.
24 Q Please do. Would you, please?
25 A We've got kind of a radical policy in

44

1 which we like to talk to each other. And when
2 folks don't do what they're asked to do we have a
3 little set too that may consist of a verbal, from
4 a verbal to a written, from a written to a final.
5 As an example, not all offenses are the same and
6 so it may vary.
7 Q So verbal or written and then there's
8 typically a second written warning or --
9 A There could be --
10 Q I don't understand the --
11 A -- depending on the seriousness of the
12 offense.
13 Q Okay. Are there some offenses that are
14 so serious that no warning is required?
15 A Yes.
16 Q Can you give us some example -- will
17 you please give us some examples of those
18 offenses?
19 A Coming in with a weapon.
20 Q Any other example?
21 A Those are listed in the policy. None
22 that occur to me.
23 Q What revisions have been made to the
24 policy since you've been employed as human
25 resources director?

45

1 A Too numerous to really specify. It's
2 not a static document at all. It's a dynamic
3 document which continues to change.
4 Q Is there any section or portion that's
5 changed more than another since the time -- since
6 you've been employed with the City of Oxford?
7 A Not that I remember.
8 Q And was there a policy in effect at the
9 time that you came to the City of Oxford?
10 A There was.
11 Q Is that one of your job
12 responsibilities to review the personnel policy on
13 a regular basis?
14 A Yes.
15 Q Do you have any assistance with that?
16 A I'm sorry, any what?
17 Q Do you have any assistance with that?
18 Is there anyone else who reviews the personnel
19 policy with you?
20 A Yes.
21 Q Who is that?
22 A If we change policy then that becomes a
23 board decision and the personnel committee of city
24 council would meet and discuss that.
25 Q So the board has to approve any changes

46

1 to the personnel policy?
2   A   Yes.
3   Q   Who's on the personnel committee?
4   A   Currently?
5   Q   Yes, sir.
6   A   Bob Shope, Tom Burnette, Mark Donham,
7 Steve Powell and Chance Wilkinson.
8   Q   How is that committee appointed or
9 selected?
10   A   They serve at the pleasure of the
11 mayor.
12   Q   Has that been true of the personnel
13 committee throughout the time you've been
14 employed --
15   A   Yes.
16   Q   -- with the City of Oxford?
17   So does personnel committee review any
18 policy changes and then make a recommendation to
19 the board?
20   A   Yes.
21   Q   And generally are those
22 recommendations -- does the board support those
23 recommendations?
24   A   Typically.
25   Q   In addition to policy revisions what

47

1 else does a personnel committee do?
2   A   They may also review new benefits
3 before they're finished, implemented.
4   Q   Anything else?
5   A   Anything having to do with -- with
6 personnel. They don't micromanage that piece,
7 they don't get involved, they don't call names, we
8 don't take individual personnel matters to the
9 personnel committee. They're advisory.
10   Q   How often does the personnel committee
11 meet?
12   A   There is no schedule.
13   Q   Does -- do all the members meet
14 together or --
15   A   They're invited.
16   Q   Okay. Does the personnel committee
17 typically meet several times a year or does it
18 just depend on the needs?
19   A   Depends on the chairman and the need.
20   Q   Who is the chairman of the personnel
21 committee?
22   A   Bob Shope.
23   Q   Do the members of the personnel
24 committee they serve terms or --
25   A   Yearly.

48

1   Q   -- I believe you said they work the --
2   A   Annual terms.
3   Q   Annual terms, okay.
4   How long has Bob Shope been the
5 chairman?
6   A   Since January.
7   Q   January of '08?
8   A   Yes.
9   Q   Who was chairman prior to January of
10 '08?
11   A   Steve Powell.
12   Q   And who was chairman prior to Steve
13 Powell?
14   A   Paul Kiesow was one of the people who
15 was chairman. I may be forgetting somebody
16 between that.
17   Q   Have you ever been chairman of the
18 personnel committee?
19   A   It's always a council person. Ex
20 officio as our attorney Mr. Burnette.
21   Q   And, I believe, you said you don't take
22 individual personnel matters to the personnel
23 committee?
24   A   No.
25   Q   How are individual personnel matters

49

1 addressed? I understand there is a progressive
2 disciplinary policy, but if you become aware of a
3 concern how is that addressed? For example, to
4 the city manager? How do you raise that
5 attention? Do you raise that matter to the city
6 manager personally?
7   A   If I become aware?
8   Q   Yes, sir.
9   A   Very often I could make the city
10 manager privy to it unless things are said to me
11 in confidence which case he doesn't hear it.
12   Q   So if the supervisor or -- or an
13 employee comes to you and -- and wants to maintain
14 confidentiality with respect to a certain matter
15 you'll do so?
16   A   Yes.
17   Q   Do you ever personally conduct
18 investigations into personnel matters?
19   A   Rarely, but I have.
20   Q   How often have you done that?
21   A   I can only remember one time just now.
22   Q   If a personnel matter needs to be
23 investigated who typically is responsible for that
24 investigation?
25   A   Typically it doesn't happen.

50

1    Q    Typically there's not a need for an
2  investigation to take place?
3    A    Right.
4    Q    I believe you said there were 104
5  full-time employees presently?
6    A    Yes.
7    Q    How has that number changed during the
8  time that you've been employed with the City of
9  Oxford or has it changed?
10    It's changed.  It's gone from about 96
11  or seven to 104.
12    Q    Were those additional positions in
13  multiple departments or --
14    A    Largely one department that we added.
15    Q    What department was that?
16    A    Waste water treatment.
17    Q    And that was added 2000 -- 1999, 2000;
18  is that accurate?
19    A    2000, 2001 or two.
20    Q    Do you participate in all of the hiring
21  decisions?
22    A    No.
23    .Q    How is it determined which -- which
24  hiring decisions you participate in personally?
25    A    I offer my services.  If the department

51

1  head chooses to do something different then I want
2  to know why.  And typically I -- I do everything
3  with the exception of police department.
4    Q    With the exception of the police
5  department?
6    A    Not always there.
7    Q    Has that been true throughout the time
8  that you've been employed with the City of Oxford
9  that not all hiring decisions for the police
10  department go --
11    A    Yes.
12    Q    -- or involve you?
13      MS. DAVIS:  When you get to a
14  breaking point --
15      MS. RICE:  Uh?
16      MS. DAVIS:  When you get to a
17  breaking point I could use a break.
18      MS. RICE:  Okay.  Let's take a
19  break then.
20      MS. DAVIS:  Okay.
21    (A brief recess was taken.)
22      BY MS. RICE:
23    Q    I apologize in advance.  I'm going to
24  jump around a little bit just to give you some
25  forewarning there.

52

1      But we previously discussed personnel
2  files and, I believe, you said you maintained them
3  in your office, you have a personnel file?
4    A    Yes.
5    Q    Is that true for every employee?
6    A    Yes.
7    Q    And does that have any documents that
8  might involve their hiring and their initial
9  application for employment --
10    A    Yes.
11    Q    -- is that also --
12    A    Yes.
13    Q    -- in their personnel files?
14      And how long do you maintain personnel
15  files for former employees?
16    A    I haven't thrown any away yet.
17    Q    So from -- you have all of those from
18  1999 to the present?
19    A    Yes.
20    Q    Do you keep all of them in your office
21  still?
22    A    Yes.
23    Q    Is there a copy of any of those
24  maintained elsewhere?
25    A    No.

53

1    Q    And if an employee receives any sort of
2  disciplinary action -- written disciplinary action
3  is that maintained in their personnel file
4  throughout their employment?
5    A    Yes.
6    Q    Are you made aware of all personnel
7  actions that are issued?
8    A    Yes.
9    Q    How is it that you're made aware?
10    A    By copy.
11    Q    Do you review all written personnel
12  actions?
13    A    Yes.
14    Q    Do you assist in drafting them?
15    A    If asked.
16    Q    Are you typically asked?
17    A    50/50.
18    Q    How did you meet -- or when did you
19  meet Sharon Iglesias?
20    A    In '99 -- late '99.
21    Q    When you came to the City of Oxford?
22    A    Uh-huh.
23    Q    Where did you meet her --
24    A    Don't remember.
25    Q    -- Ms. Iglesias?

54

1    Was it while you were at work?
2    A    Yeah.
3    Q    Do you recall the occasion was of your
4 first meeting?
5    A    Not at all.
6    Q    And when did you next interact with
7 Ms. Iglesias following your first meeting?
8    A    Don't remember.
9    Q    Would you have occasion to see Ms.
10 Iglesias on a monthly basis?
11    A    Happenstance.
12    (Interruption.)
13    BY MS. RICE:
14    Q    Would you -- or do you visit each
15 department within the city from time-to-time?
16    A    Yes.
17    Q    Do you have a schedule for your visits?
18    A    No.
19    Q    Is it on an as needed basis or do
20 you --
21    A    It's random.
22    Q    Do you make it a point to speak to --
23 tell the employees when you visit their offices?
24    A    Most.
25    Q    Were you aware of any concerns that

55

1 Chief Wolford had with respect to Ms. Iglesias
2 prior to 2004?
3    A    Yes.
4    Q    And what were those concerns?
5    A    The document that you've seen on
6 confidentiality as an example.
7    Q    Any other examples?
8    A    Prior to 2004 probably but, you know,
9 the -- the dates -- I can't, you know, give you an
10 example of what you're after. And I'll look at
11 it, but the date they run together a little bit.
12    Q    Okay. And the document concerning
13 confidentiality you're referring to --
14    A    If I remember that was prior to '04.
15    Q    Are you referring to an agreement
16 that -- that Chief Wolford had Ms. Iglesias and
17 other employees sign?
18    A    Yes.
19    Q    Did Chief Wolford speak with you
20 regarding that document prior to -- to addressing
21 it with Ms. Iglesias and others?
22    A    No.
23    Q    How did you become aware of it?
24    A    By the document.
25    Q    How did you become aware of the

56

1 document?
2    A    It was sent to me.
3    Q    Sent to you by Chief Wolford?
4    A    Yes.
5    Q    Did you put a copy of that document in
6 the personnel files for each of the employees who
7 had signed the document?
8    A    Yes.
9    Q    How did Chief Wolford send it to you?
10    A    Don't remember.
11    Q    How do you typically exchange
12 documents?
13    A    Interoffice mail.
14    Q    Is that true of documents that you may
15 be reviewing for a supervisor? For example,
16 disciplinary actions are those typically exchanged
17 via interoffice mail?
18    A    Typically not.
19    Q    How are those typically exchanged?
20    A    In person.
21    Q    In person.
22    Ever by e-mail?
23    A    No.
24    Q    So if you make suggestion revision to a
25 document you reviewed you would mark those in

57

1 rating the document?
2    A    Or do it together.
3    Q    And to the best of your recollection
4 this document regarding confidentiality was that
5 sent to you at about the same time it was signed
6 by Ms. Iglesias and others?
7    A    Just after.
8    Q    Had Chief Wolford spoken with you
9 concerning any concerns he may have had regarding
10 confidentiality prior to that?
11    A    Not in advance.
12    Q    Following the issuance of the document
13 did he speak with you regarding his concerns?
14    A    I don't recall a conversation but it
15 would probably have been likely.
16    Q    How often -- beginning in I believe it
17 was 2000 -- or following his hire how often would
18 Chief Wolford consult with you regarding personnel
19 matters?
20    A    Very frequently.
21    Q    More than once a month?
22    A    Yes.
23    Q    Would he ever e-mail you his concerns?
24    A    No.
25    Q    So it was always in person that he

58

1   would talk to you?
2       A    Yeah.
3       Q    Did you take notes when you would meet
4   with Chief Wolford regarding his personnel
5   concerns?
6       A    Typically not.
7       Q    Why is that?
8       A    I felt no need to.
9       Q    Did Chief Wolford ever come to you and
10  ask you to maintain confidentiality with respect
11  to a matter he'd raised with you?
12      A    Any matter?
13      Q    Any matter.
14      A    Sure.
15      Q    Any personnel matter?
16      A    Occasionally.
17      Q    How often?
18      A    Don't have any way of guessing.
19      Q    More than five times?
20      A    In what period?
21      Q    From the time that he was hired until
22  now.
23      A    Oh, yeah.
24      Q    More than ten times?
25      A    Yes.

59

1       Q    More than 20?
2       A    Probably.
3       Q    What's the turnover rate in the police
4   department?  How does it -- I -- I should ask how
5   does it compare with other departments within the
6   city?
7       A    It's not as high as some and higher
8   than others.
9       Q    How many employees are there at the
10  police department?
11      A    Around 40 with sworn officers and
12  nonsworn.
13      Q    Forty altogether?
14      A    Yes.
15      Q    What percentage of those are sworn
16  versus unsworn?
17      A    Let me guess.  Around 32, three.
18      Q    Are sworn officers?
19      A    Yes.
20      Q    Was Ms. Iglesias to the best of your
21  knowledge ever a sworn officer?
22      A    No.
23      Q    Do you recall the position that Ms.
24  Iglesias held?
25      A    Yes.

60

1       Q    And what was that?
2       A    Administrative assistant.
3       Q    Has Ms. Iglesias always been the
4   administrative assistant during the time you've
5   known her?
6       A    With the notable exception of those few
7   days.
8       Q    And what exception are you referring
9   to?
10      A    She was transferred -- a lateral
11  transfer to a dispatcher.
12      Q    When did that occur?
13      A    Don't remember the date.
14      Q    Do you recall why that occurred?
15      A    Yes.
16      Q    And why was that?  Why was Ms. Iglesias
17  transferred to dispatcher?
18      A    Just to try to retain her.
19      Q    What do you mean to try and retain her?
20      A    Put her in a position in which it would
21  improve her chances to continue to be employed.
22      Q    Why did her chances need to be
23  improved?
24      A    The things you've seen as a matter of
25  record, the concerns with confidentiality.

61

1       Q    What concerns were those?
2       A    There again, there's concerns that are
3   documented that you've seen.  There's nothing
4   other than what you've seen.
5       Q    But what's your understanding of what
6   those concerns were?
7       A    What were the concerns relating
8   confidentiality?
9       Q    Yes, sir.
10      A    The concerns that had to do with any
11  number of occasions.  You want specific examples
12  like the Melba Knott --
13          (Interruption by the reporter.)
14      A    The Melba Knott affair.
15          MS. DAVIS:  And to the extent we're
16  going to be talking about personnel
17  information we need to mark this section
18  confidential and ask Ms. Iglesias to excuse
19  herself.
20          MS. RICE:  Right now I was going to
21  address primarily other concerns with respect
22  to --
23          MS. DAVIS:  Okay.
24          MS. RICE:  -- Ms. Iglesias's
25  employment.

62

1      MS. DAVIS:  All right.
2      BY MS. RICE:
3      Q    And you mentioned the Melba Knott
4  situation.
5          What were the other concerns regarding
6  confidentiality?
7      A    As strange as it would appear I --
8  I don't -- I'm not right now recalling the other
9  incidences.  But again, those are a matter of the
10  record that you have and I concur with that
11  record.
12      Q    When did you become aware that
13  Ms. Iglesias -- Ms. Iglesias had spoken to an
14  auditor regarding her concerns with respect to
15  Chief Wolford?
16      A    A few days afterwards.
17      Q    A few days after Ms. Iglesias spoke
18  with the auditor?
19      A    Yes.
20      Q    How did you become aware that
21  Ms. Iglesias had spoken with --
22      A    By the city manager.
23      Q    Tommy Marrow --
24      A    Yes.
25      Q    -- told you?

63

1      A    Yes.
2      Q    What did he tell you?
3      A    He told me of the concern that had been
4  raised to him.
5      Q    What did he say to you?
6          MS. DAVIS:  And, I think, at this
7  point we do need to go --
8          THE WITNESS:  Yeah.
9          MS. DAVIS:  -- confidential because
10  it's going to deal with the personnel matter
11  involving the chief.
12          MS. RICE:  I'll come back to it.
13          MS. DAVIS:  Okay.
14      BY MS. RICE:
15      Q    Did Chief Wolford consult with you
16  prior to issuing Ms. Iglesias a written warning in
17  May of 2004?
18      A    Why don't you remind me what that
19  written warning concerned.
20      Q    Do you recall Chief Wolford consulting
21  with you regarding any written warning that
22  Ms. Iglesias received?
23      A    We typically would talk about it.
24      Q    Talk about it before it was issued?
25      A    Yes.

64

1          MS. RICE:  Robin, do you have your
2  copy of the exhibits?
3          MS. DAVIS:  I do.  If you'll just
4  tell me what number you're referring to.
5          MS. RICE:  I believe it's 69.
6      BY MS. RICE:
7      Q    Mr. Jenkins, if I could ask you to turn
8  to number 69, please.
9          (Document handed to witness for review.)
10      A    Okay.
11      Q    I apologize.
12          MS. DAVIS:  What are you referring
13  to?  Are you looking for 67?
14          MR. BURNETTE:  Making sure they're
15  the same.
16          MS. RICE:  Yes, thank you.
17      BY MS. RICE:
18      Q    If you could turn to 67, please, Mr.
19  Jenkins.  Just take a moment to review that
20  document and let me know --
21      A    Sure.
22      Q    -- when you're done.
23      A    Okay.
24      Q    Are you familiar with the document that
25  was --

65

1      A    I am.
2      Q    -- previously marked as --
3      A    Yes.
4      Q    -- Exhibit 67?
5      A    Yes.
6      Q    Could you describe what this document
7  is to the best of your knowledge?
8      A    This is a document in which the chief
9  saw fit to warn Ms. Iglesias regarding issues of
10  confidentiality specifically as she was soliciting
11  other people in her agenda.
12      Q    What do you mean her agenda?
13      A    She wanted a police officer to attend a
14  meeting with her.
15      Q    Attend a meeting with her?
16      A    Yes.
17      Q    Ms. Iglesias wanted another police
18  officer to attend a meeting with her and someone
19  else?
20      A    I'm sorry?
21      Q    Did you understand that Ms. Iglesias
22  wanted another police officer to attend a meeting
23  with Ms. Iglesias and another individual?
24      A    And the chief.
25      Q    And, I believe, you testified that the

**66**

1 chief saw fit to warn Ms. Iglesias. Did you agree
2 with the chief's assessment of that situation?
3   A   Yes.
4   Q   Why is that?
5   A   Because it was a matter of confidence
6 and she had engaged somebody -- I mean, went up
7 there directly to the chief.
8       (Interruption by the reporter.)
9   A   In a confidential manner.
10   Q   Did -- did Chief Wolford speak with you
11 concerning the issuance of this warning prior to
12 having issued it to Ms. Iglesias?
13   A   I don't remember that.
14   Q   Do you recall when you received a copy
15 of the warning?
16   A   No. It would have been shortly after
17 I'm sure.
18   Q   And you believe you received it by
19 interoffice mail or did the chief personally
20 deliver it to you?
21   A   I don't remember.
22   Q   What's the policy for grieving a
23 disciplinary action within the city?
24   A   It's exactly as you've seen written.
25 We go by the policy that you have seen written

**67**

1 with the stages that people may address.
2   Q   What are those stages?
3   A   You want me to recall what's in the
4 policy?
5   Q   Yes, sir.
6   A   Okay. This will be loose keep in mind.
7 If an employee has a grievance then they may
8 appeal to the department head. If that is not
9 satisfactory then they may appeal to human
10 resources, and the final appeal is to the city
11 manager.
12   Q   What actions are grieveable?
13   A   You know, in our organization most
14 anything anybody wants to grieve. Again, we --
15 talk to each other.
16   Q   So a warning is grieveable?
17   A   Warnings?
18   Q   A warning is grieveable?
19   A   Sure, if they wish.
20   Q   Are performance evaluations grieveable?
21   A   If they want to.
22   Q   And so it's department head, then your
23 department human resources the stages of
24 grievance?
25   A   Yeah, after that person's department

**68**

1 head supervisor, then that person's department
2 head, human resources and the city manager. Of
3 course there are provisions that depending on what
4 it is they could skip process. Typically you
5 would like to know why.
6   Q   Once you receive a grievance what do
7 you do?
8   A   By receiving it you mean after I --
9 after I have listened to it?
10   Q   Yes, sir.
11   A   Then I do what that employee wants me
12 to do.
13   Q   Do you issue a determination concerning
14 a grievance?
15   A   If it's indicated I will, yes.
16   Q   Do you conduct an investigation into
17 grievances?
18   A   Not very often.
19   Q   How often have you conducted
20 an investigation into a grievance?
21   A   One in nine years now.
22   Q   Is that one related to this case --
23   A   Yes.
24   Q   -- to Ms. Iglesias?
25       And, I believe, you said that an

**69**

1 individual can skip certain stages if appropriate;
2 is that accurate?
3   A   There is stages that are there and they
4 may skip. Again, I would mention to you that it
5 might be appropriate to ask why.
6   Q   And why is that?
7   A   Why is it appropriate that -- just, you
8 know, the city manager is a busy guy. If somebody
9 would say I want to go directly to the city
10 manager and skip department head and skip HR he
11 may say would I be interested in why you want to
12 skip that.
13   Q   And how many grievances have you
14 received in the nine years that you've been there?
15   A   No way of knowing that. That would be
16 a pretty big number.
17   Q   More than 20?
18   A   Oh, you said grievances --
19   Q   Yes.
20   A   -- and, I'm sorry, I was thinking about
21 reprimands and that kind of -- grievances, less
22 than 20.
23   Q   Less than ten?
24   A   Yeah, less than ten.
25   Q   Fewer than five?

70

1    A   No.
2    Q   Have the majority of those grievances
3 gone first through the department head and then to
4 human resources --
5    A   Yes.
6    Q   -- is that -- when you issue written
7 determinations with respect to a grievance do you
8 consult with the city manager prior to doing so?
9    A   Not typically.
10    Q   Do you consult the department head -- a
11 department head or the department head that may be
12 involved?
13    A   No, not typically.  If I need
14 additional information for being fair I may, but
15 there's not normally a reason to do that.
16    Q   So do you normally just consult with
17 the employee that may be grieving a certain
18 matter?  I don't want to put words in -- I just
19 want to understand what your practice is.
20    A   My practice is to seek to understand.
21 What I want to do is help that employee resolve
22 whatever issue they have with the department head
23 or the supervisor.  I'm there to mollify if I can
24 or to somehow get these people -- the supervisor
25 and the employee back into a solid trusting

71

1 relationship.
2    Q   Are you typically successful?
3    A   More often than not, yeah.
4    Q   How many employees have been discharged
5 from their employment during the time that you've
6 been employed with the City of Oxford?
7    A   I don't have a count.
8    Q   More than ten?
9    A   Probably not.
10    Q   More than five?
11    A   Yes.
12    Q   Have those discharges been from one
13 department more than others?
14    A   Yeah, yes.
15    Q   What department?
16    A   Public works.
17    Q   Are you ever contacted by any members
18 of the media with respect to your work for the
19 City of Oxford?
20    A   Members of media?
21    Q   Yes, sir.
22    A   Yes.
23    Q   How often?
24    A   Rarely.
25    Q   And do you speak with members of the

72

1 media concerning your work on behalf of the City
2 of Oxford?
3    A   Regarding what?
4    Q   Your work on behalf of the City of
5 Oxford.
6    A   Sure.
7    Q   Is there a certain newspaper that
8 you're contacted by more often than others?
9    A   Yes.
10    Q   What newspaper is that?
11    A   The Henderson Dispatch.
12    Q   When were you last contacted by the
13 Henderson Dispatch?
14    A   Within three months.
15    Q   Three months of today?
16    A   Uh-huh, yes.
17    Q   And why were you contacted most
18 recently?
19    A   Reporter wanted to know some
20 information not actually regarding the city but
21 regarding my involvement with the county human
22 relations committee.
23    Q   What is your involvement with the
24 county human relations committee?
25    A   I am appointed by a county commissioner

73

1 to serve on the human relations not to be confused
2 with human resources committee.
3    Q   What's the difference between human
4 relations and human resources?
5    A   Human relations commission of Granville
6 County has to do with diversity issues.  Been a
7 founder of -- of that group and have served for
8 about 18 or 19 years now.  Active in -- in
9 community and racial affairs, Latinos, African
10 Americans, Chinese.
11    Q   And you said you've been involved for
12 18, 19 years in that position?
13    A   Yes.
14    Q   And who appointed you that position or
15 that role?
16    A   Commissioner James Lumpkins.
17    Q   And who -- how long is that term for
18 for your involvement with that committee or are
19 you appointed to a term?
20    A   It's a four-year term.
21    Q   I'm sorry, I didn't ask earlier.  What
22 was your undergraduate degree?
23    A   Psychology.
24    Q   Did you ever meet with Ms. Iglesias and
25 Chief Wolford together?

74

1     A    I don't recall ever meeting with them
2 together except, you know, an employee meeting
3 where lots of people were there.
4     Q    But not with them --
5     A    Not with them.
6     Q    -- individually?
7     A    Not with just the three of us I don't
8 recall such a meeting.
9     Q    How did you attempt to assist them in
10 rebuilding trust or work out their work
11 relationship together?
12     A    I did not say them. I said typical
13 employees --
14     Q    Okay.
15     A    -- that's typically what I do.
16     Q    Did you attempt to assist Ms. Iglesias
17 and Chief Wolford?
18     A    Well, in so far as when the city
19 manager asked me to do an investigation I wanted
20 to -- to do that in such a manner as would help
21 everybody concerned.
22     Q    Whose idea was it to transfer
23 Ms. Iglesias to the position of dispatcher?
24     A    I recommended it or recommended some
25 sort of transfer and the chief made that decision.

75

1     Q    So you didn't specifically say that you
2 recommended that Ms. Iglesias be made a
3 dispatcher, that was the chief's decision?
4     A    That's true.
5     Q    Were there any other positions
6 available within the City of Oxford that might
7 have been more suitable for Ms. Iglesias at that time?
8     A    None that I recall.
9     Q    Did that transfer -- I believe you --
10 you stated earlier it was for several days. Do
11 you recall why it was just for several days?
12     A    Ms. Iglesias appealed the decision to
13 put her there.
14     Q    And what happened after Ms. Iglesias
15 appealed?
16     A    Finally the city capitulated and put
17 her back into her job.
18     Q    What happened immediately after
19 Ms. Iglesias appealed?
20     A    There's a series of events that
21 probably -- including a period in which we gave
22 her administrative leave, paid leave. That --
23 that series of events I'm just kind of vague on.
24     Q    Did you have anything to do with the
25 decision to place Ms. Iglesias on paid

76

1 administrative leave?
2     A    That was not my recommendation.
3     Q    What was your recommendation? ·
4     A    That she be transferred as I mentioned
5 a moment ago.
6     Q    So was your -- was it your
7 recommendation that she stay in the position of
8 dispatcher?
9     A    I did not recommend that.
10     Q    Whose decision was it to place Ms.
11 Iglesias on paid administrative leave?
12     A    I think that was kind of in conjunction
13 with the chief and the city manager.
14     Q    Did you consult with them regarding
15 that decision?
16     A    I don't remember that at all.
17     Q    Do you recall how long Ms. Iglesias was
18 on paid administrative leave?
19     A    I do not.
20     Q    When she returned from paid
21 administrative leave do you recall what position
22 Ms. Iglesias was assigned to?
23     A    She returned to the administrative
24 assistant position.
25     Q    Did you have any concerns about

77

1 Ms. Iglesias being placed in that position again?
2     A    Like what kind of concern?
3     Q    Did you have any concerns?
4     A    I don't recall any concerns that I had.
5     Q    Were you involved in the decision to
6 return Ms. Iglesias to that position the position
7 of administrative assistant?
8     A    I was not.
9     Q    And how did you become aware that the
10 decision had been made to return her to the
11 administrative assistant position?
12     A    There would have been a personnel
13 action form and it's very possible that there was
14 a discussion that I was made privy to after that
15 decision was made.
16     Q    A personnel action form is that
17 completed by the department head or the city --
18     A    It is.
19     Q    -- manager? Okay.
20     A    Yes.
21     Q    In your position as human resources
22 director do you -- do you review departmental
23 policies as well?
24     A    I'm aware of departmental policies just
25 so that they don't conflict with -- with city

**78**

1 policy.
2     Q   Are -- the various departments are they
3 able to revise their departmental policies without
4 consulting with you prior to doing so?
5     A   They are.
6     Q   How do you -- how are you made aware of
7 changes in departmental policies?
8     A   I keep -- there's a notebook with their
9 policy in it and I'm made privy to the changes.
10     Q   I'll ask you to turn to 67 again. Did
11 you ever follow up with -- with Chief Wolford
12 following the issuance of this warning to -- to
13 see whether he had reconsidered the warning six
14 months later?
15     A   I don't remember doing that.
16     Q   Or any time after that -- that six
17 months period --
18     A   No.
19     Q   -- did you?
20     A   In terms of the commitment to withdraw
21 this after six months?
22     Q   Or, I believe, it states I would
23 consider removing this letter from your file
24 sometime between six months and one year from this
25 date. Did you follow up with Chief Wolford to see

**79**

1 if that had taken place?
2     A   No.
3     Q   I'll ask you to turn to 65, please. If
4 you'll just take a moment to review that and let
5 me know when you have had an opportunity to do so.
6     A   Okay. Okay.
7     Q   Have you had an opportunity to review
8 it?
9     A   I'm sorry?
10     Q   Have you had an opportunity to review
11 the document that is marked as 65?
12     A   Yes, I'm done.
13     Q   Are you familiar with the document?
14     A   I am.
15     Q   And can you just describe what your
16 understanding is of this document?
17     A   This is an annual appraisal in which
18 the department head sits down with the employee
19 and gives them feedback regarding their work
20 performance.
21     Q   I'm sorry, I believe, you said
22 annual -- it's an annual performance evaluation?
23     A   It was at that time, yes.
24     Q   Okay. Do you know of any other
25 performance evaluations that Ms. Iglesias, at the

**80**

1 time Ms. Belcher, received in the course of her
2 employment?
3     (Interruption by the reporter.)
4     Q   At the time Ms. Belcher, B-e-l-c-h-e-r,
5 received during the time that she was employed
6 with the City of Oxford?
7     A   I'm not aware of any others.
8     Q   Was this the only one that you had in
9 your personnel file for Ms. Iglesias?
10     A   It is.
11     MS. RICE: Can we take just a five
12 minute break.
13     MS. DAVIS: Sure.
14     (A brief recess was taken.)
15     MS. RICE: I believe this is --
16 we're on 84.
17     (Mr. Jenkins Deposition Exhibit
18     No. 84 was marked for
19     identification.)
20     (Document handed to witness for review.)
21 BY MS. RICE:
22     Q   If you could take a moment to review
23 what's been marked as Exhibit 84 and let me know
24 when you've had a chance to do so. Have you had
25 an opportunity to review it --

**81**

1     A   I'm good.
2     Q   -- Exhibit 84?
3     A   Yeah.
4     Q   Are you familiar with this document,
5 Mr. Jenkins?
6     A   I am.
7     Q   And could you describe what this
8 document is, please?
9     A   This appears to be Chief Wolford's
10 response to some -- to the investigation that I
11 was tasked to do.
12     Q   Did Chief Wolford provide you with this
13 response in writing?
14     A   This -- this very response, yes.
15     Q   Okay. And how did he -- how did he
16 provide this document to you?
17     A   I don't remember.
18     Q   Do you recall when he provided this
19 document to you?
20     A   No. Shortly after the date I'm sure.
21     Q   Did you speak with Chief Wolford
22 concerning your interview with Ms. Iglesias?
23     A   I don't remember speaking with him
24 about it, but he was privy to the -- to the
25 document that I wrote.

82

1    Q    How did you make him aware of that
2  document?
3    A    Gave it to him.
4    Q    And what did you do upon receiving
5  what's been marked as 84?
6    A    Read it.
7    Q    You read it?
8    A    Uh-huh.
9    Q    Did you agree with the statements in
10  document 84?
11    A    You're asking me if I agreed with this
12  whole document in its entirety?
13    Q    Yes, sir.
14    A    A lot of it is opinion and I
15  certainly -- no, I do not disagree with this
16  document.
17    Q    Did you ask Chief Wolford to provide a
18  written response?
19    A    No.
20    Q    Did he explain why he had responded in
21  writing?
22    A    We had no discussion about that.
23    Q    So what did you do upon receiving 84
24  after -- I believe you testified you read it, but
25  then -- then what did you do?

83

1    A    Just filed it.
2    Q    Just put it in Ms. Iglesias's personnel
3  file?
4    A    Right.
5    Q    It didn't affect any decision making
6  you had from that point forward?
7    A    Okay.  Let me just -- with that
8  question in mind let me just glance again --
9    Q    Yes, sir.
10    A    -- because I want to be sure I'm saying
11  what's right.
12         Okay.  And your question was?
13    Q    Did you do anything -- I mean, did it
14  affect your decision making from that point
15  forward?
16    A    It's entirely possible that this could
17  be considered as some evidence going forward.
18  Hard to say, you know, what your psyche retains.
19    Q    If I could ask you to turn to Exhibit
20  Number 70 in the binder.  Please review that and
21  let me know when you've finished reviewing it,
22  please.
23    A    Okay.
24    Q    Are you familiar with what's been
25  marked as Exhibit 70?

84

1    A    I am.
2    Q    And whose handwriting is at the top of
3  Exhibit 70?
4    A    That looks like Tommy Marrow's
5  handwriting.
6    Q    It's not your handwriting?
7    A    That is not.
8    Q    Did you prepare what's been marked as
9  Exhibit 70?
10    A    I did.
11    Q    And when did you prepare the document
12  marked as --
13    A    It's dated 9-2, so very close to
14  9-2-04.
15    Q    Okay.  And why did you prepare what's
16  been marked as Exhibit 70?
17    A    As follow up to the investigation that
18  the city manager dispatched me to do.
19    Q    How long did that investigation take
20  for you to complete?
21    A    A couple of days.
22    Q    What did you do during the course of
23  the investigation?
24    A    I talked to the principals listed in
25  the investigation.

85

1    Q    Who are those principals?
2    A    Those are Ms. Iglesias, Pat Ford, Chief
3  Wolford and, I think, that's it.  Yeah.
4    Q    When did you speak with Ms. Iglesias?
5  Was she the first individual you spoke with?
6    A    The last part of that again?
7    Q    Was Ms. Iglesias the first individual
8  you spoke with --
9    A    It was, yes.
10    Q    -- during your investigation?
11    A    Uh-huh.
12    Q    And how long did your meeting with
13  Ms. Iglesias take?
14    A    I don't remember.
15    Q    Where did that meeting take place?
16    A    As I remember it was in PD -- in the
17  police department.
18    Q    And after you interviewed Ms. Iglesias
19  who did you next speak with?
20    A    I think next I spoke with Officer Ford.
21    Q    Did you speak with Officer Ford at the
22  police department as well?
23    A    As I remember, yes.
24    Q    And do you recall how long your meeting
25  with Ms. Ford --

**86**

1    A    I do not.
2    Q    Did you speak with Ms. Ford for longer
3  than you spoke with Ms. Iglesias?
4    A    Probably not as long.
5    Q    What questions did you ask Ms. Ford?
6    A    I don't remember what the questions
7  were. I wanted to know what her account was.
8        Again, my goal in this was to seek to
9  understand, to get facts that might be pertinent
10  to this document.
11    Q    What were you seeking to understand?
12    A    I wanted to hear what Ms. Iglesias's
13  view was and I heard that. She made certain
14  comments about how Pat Ford was involved and so I
15  went to Pat Ford and says tell me about your
16  recollection of this event, and she did.
17    Q    What was Ms. Ford's recollection?
18    A    She didn't remember having any
19  conversation with Ms. Iglesias about the subject.
20    Q    Did you next interview Chief Wolford?
21    A    I did.
22    Q    Did you interview Chief Wolford at the
23  police department as well?
24    A    I did.
25    Q    Did all these interviews take place on

**87**

1  the same day?
2    A    As I remember they did.
3    Q    And what did you ask Chief Wolford?
4    A    Just asked him an opinion about whether
5  he thought Pat Ford might had known about the
6  rumor.
7    Q    What was the chief's response?
8    A    He didn't think -- well, he certainly
9  had no conversation with her and they -- that they
10  did have a situation in which both of them were at
11  lunch, a training situation out of town, and there
12  would have been the opportunity to have said it
13  but nothing about that came up.
14    Q    When you say both of them were at lunch
15  who are you referring to?
16    A    Chief Wolford and Officer Ford.
17    Q    What would they have had an opportunity
18  to discuss at lunch?
19    A    Any concern that Pat Ford might have
20  had.
21    Q    Any concern Pat Ford might have had
22  with respect to what matter?
23    A    The rumor concerning Melba Knott.
24    Q    How would Pat Ford have any knowledge
25  of a rumor?

**88**

1    A    The contention is that she didn't. Her
2  contention was that she didn't.
3    Q    What did you conclude as a result of
4  your investigation?
5    A    Obviously could not and did not
6  conclude that one or the other was -- was more
7  truthful. And the punch line of what I said was
8  that -- well, I guess, this document is privy to
9  everybody so it's not a personnel matter?
10        MS. DAVIS:  It is a personnel
11    matter but it relates to an investigation
12    regarding Ms. Iglesias --
13    A    Okay. I --
14        MS. DAVIS:  -- and it is, I
15    believe, subject to the confidentiality
16    order.
17    A    Okay. My -- my recommendation was that
18  both of these people be cautioned, warned.
19    Q    That both Ms. Iglesias and Officer
20  Ford --
21    A    And Officer Ford, yes.
22    Q    Do you know if that caution --
23        MS. DAVIS:  At this point before he
24    answers that we are going to need to make
25    this part confidential and exclude

**89**

1  Ms. Iglesias because that would be personnel
2  with regard to Ms. Ford to the extent you're
3  asking if --
4        MS. RICE:  With respect to making
5    it confidential that's -- that's fine, but
6    the exclusion of Ms. Iglesias is problematic.
7        I mean, I don't see where the
8    protective order requires her to be excluded
9    from portions of the deposition.
10        MS. DAVIS:  If it's confidential
11    personnel information about someone else
12    she's not entitled to be present. It's in
13    the -- her -- it's in the confidentiality
14    order. It's in all the confidentiality
15    orders.
16        MS. RICE:  Where is it?  Where is
17    it?
18        MS. DAVIS:  If you have the
19    confidentiality order I can show you.
20        MS. RICE:  Yeah, I do.
21        (Document handed to attorney for review.)
22        MS. DAVIS:  Okay. It's in
23    paragraph 4C. Let me know when you're ready.
24        MS. RICE:  It's okay.
25        MR. MONTEITH:  She's got it.

90

1    MS. DAVIS: And just so the record
2  is clear. This is a normal part of all
3  confidentiality orders that the pivotal
4  concept is that while Ms. Iglesias is
5  certainly entitled to put her own personnel
6  information into question she is not entitled
7  under the statute to know all the details of
8  some other employees either current or former
9  personnel information including disciplinary
10  action except to the extent that information
11  is maintained as a public record under North
12  Carolina General Statutes. This is not
13  exclusive to Ms. Iglesias. It's a standard
14  provision in all confidentiality orders.
15    MS. RICE: I understand, but with
16  respect to her exclusion during the
17  deposition, I mean, that --
18    MS. DAVIS: You're asking for
19  information that is confidential by statute.
20  So in order to allow Mr. Jenkins to answer it
21  we have to declare this portion of the
22  deposition confidential.
23    C says except upon further order of
24  the court confidential information and
25  information derived therefrom shall be

91

1  disclosed only to counsel for the parties in
2  this action, their legal assistants and other
3  staff members, outside companies engaged by
4  attorneys for the parties to photocopy such
5  documents, public officials or employees of
6  defendant who provide material assistance in
7  the legal representation of the defendant, a
8  deponent in the action during their
9  deposition. Okay. When the confidential
10  materials are materially related to the
11  questions asked to or testimony of such
12  deponent, any court reporter utilized for
13  depositions in the course of this litigation
14  and their staff for the purposes of preparing
15  transcripts and experts consulted or
16  assisting the parties in this action and the
17  court and its regularly employed staff.
18    And the purpose for that is simple.
19  A plaintiff just simply can't learn about all
20  the personnel information of a public
21  employee simply by her filing their own
22  lawsuit.
23    It's a very limited exclusion but
24  it's a significant exclusion. We have
25  liability if we reveal what happened to

92

1  another employee in violation of 160A-168.
2    (Interruption by the reporter.)
3    MS. DAVIS: North Carolina General
4  Statute 160A-168. Okay.
5    So what we're doing is we're
6  drawing a line. We're saying Ms. Iglesias is
7  certainly entitled to be present when
8  questions are asked and answered about what
9  happened to her and the basis for the
10  decisions that were made with respect to her,
11  but she is not however entitled under any law
12  that I'm aware of to know what happened to
13  another employee.
14    MS. RICE: Are you okay?
15    MR. MONTEITH: (Mr. Monteith nodded
16  head up and down.)
17    MS. RICE: I'll go back to that.
18  I'm going to ask Ms. Iglesias to leave at
19  this time.
20    Are you okay, Chuck?
21    (A brief recess was taken.)
22    BY MS. RICE:
23  Q    We're are on Exhibit 70 -- Exhibit 70.
24    Mr. Jenkins, do you recall whether
25  Ms. Iglesias was warned following your

93

1  investigation?
2  A    If I remember correctly she was.
3  Q    Did you assist in preparing the warning
4  that was received by Ms. Iglesias?
5  A    I have no memory of assisting in that.
6  Q    Did you consult with the city manager
7  regarding whether Ms. Iglesias should receive a
8  warning as a result of this incident?
9  A    Did I consult with the city manager
10  about their appropriateness of --
11  Q    Of the issuance of a warning to
12  Ms. Iglesias.
13  A    No, I did not.
14  Q    Did you provide what's been marked as
15  Exhibit 70 to the city manager?
16  A    I did.
17  Q    Did you provide a copy of it to anyone
18  else?
19  A    Just -- just the chief and the city
20  manager.
21  Q    Okay. Do you recall when you made a
22  copy available to the chief?
23  A    It would have been shortly thereafter.
24  Q    Shortly after what?
25  A    9-2-04.

94

1    Q    And you didn't receive what was marked
2  as 84 until some time in October; is that
3  accurate?
4    A    Eight-four, oh.  I would say -- and
5  understand I'm guessing.  I would say after
6  October 5th of '84.
7    Q    Okay.
8        MS. DAVIS:  Of 2004?
9        THE WITNESS:  2004.
10       BY MS. RICE:
11   Q    Do you know why it took the chief a
12 month to respond to your report?
13   A    I have no notion.
14   Q    Did Chief Wolford tell you that he was
15 going to prepare a written response prior to
16 providing this written response?
17   A    Don't -- don't recall that.
18   Q    When you say that you believe there
19 have been a pattern of confidentiality breaches on
20 the part of Ms. Iglesias over the past --
21       (Interruption by the reporter.)
22   Q    In your report Exhibit 70 reads that it
23 appears there's been a pattern of confidentiality
24 breaches on the part of Ms. Iglesias over the
25 past --

95

1        MS. DAVIS:  What page are we on?
2        MS. RICE:  Page four.
3        MS. DAVIS:  Page four of Exhibit
4  80.
5        MS. RICE:  Seventy.
6        MS. DAVIS:  Exhibit 70.  Okay.  All
7  right.
8        THE WITNESS:  Your question?
9        BY MS. RICE:
10   Q    And my question is what were you
11 referring to when you say it appears there's been
12 a pattern of confidentiality breaches on the part
13 of Ms. Iglesias?
14   A    The items that are documented and for
15 which you have a copy and that are in her file.
16   Q    And what -- what's your knowledge of
17 what those items are?
18   A    Beginning with the first in which she
19 and some of the command staff were in the chief's
20 office and issues of confidentiality were stressed
21 following the Melba Knott and the Jason Tingen
22 issues.
23   Q    And the Jason Tingen issues what are
24 you referring to?
25   A    Jason Tingen being the person that she

96

1  confided information in and asked to go to the
2  chief with her.
3    Q    That she asked to speak with the chief
4  with her or be present while she spoke with the
5  chief is that who you're referring to Jason Tingen
6  was the individual that Ms. Iglesias asked to be
7  present when she spoke with the chief?
8    A    Right, right.
9    Q    So that's the pattern that you're
10 referring to?
11   A    Those issues -- those kinds of issues,
12 yes.
13   Q    And when you state transferring -- you
14 suggest that strong consideration be given to
15 transferring Ms. Iglesias to a nonsensitive
16 position.  What -- what did you have in mind at
17 that time?
18   A    It was -- it was beginning to be
19 apparent that she should not be in a position
20 where confidences are as vital as in the police
21 department.
22   Q    What conversations did you have with
23 Chief Wolford concerning Ms. Iglesias following
24 your receipt of his October 2004 memo that was
25 previously marked as 84?

97

1    A    I do not recall any conversation that
2  we had subsequent to this Exhibit 84 document.
3    Q    You don't recall discussing
4  Ms. Iglesias with Chief Wolford at any point in
5  time following October of 2004?
6    A    You changed the question.  Do that --
7  tell me the question you want me to answer.
8    Q    What conversations did you have with
9  Chief Wolford following -- concerning Ms. Iglesias
10 following your receipt of the document that's
11 marked as 84?
12   A    Okay.  Following this and pertaining to
13 this I don't remember having a discussion at all
14 with him concerning this.
15   Q    What conversations did you have with
16 Chief Wolford after October of 2004 concerning
17 Ms. Iglesias?
18   A    Wow.  That's -- that's a very broad
19 question.  Do you have a particular subject you
20 want to discuss or you're asking me to randomly
21 remember discussions?  I want to be helpful.  Tell
22 me.
23   Q    When did you speak with Chief Wolford
24 concerning Ms. Iglesias following her receipt of
25 written warning in or around October of 2004?

98

1    A    I have no memory of when -- when or
2  even if there were those discussions.
3    Q    Did Chief Wolford express his concerns
4  regarding Ms. Iglesias and her employment with the
5  police department after October 2004 with you at
6  any point in time?
7    A    There were probably some conversations.
8  The subject of those conversations, the timing of
9  those conversations I just -- you know, I do not
10  recall. But obviously --
11    Q    How did you learn that there was a
12  problem with Ms. Iglesias's transfer to the
13  position of police dispatcher?
14    A    How did I learn?
15    Q    Yes, sir.
16    A    The chief and the city manager made me
17  privy to that.
18    Q    Did they come and speak with you?
19    A    I can't remember if they came to speak
20  or if it was on -- more than likely it was done in
21  person.
22    Q    Did the police chief and the city
23  manager come together to speak with you?
24    A    I don't remember if they were together,
25  but I was made aware that she took serious umbrage

99

1  to being put in that lateral transfer.
2    Q    What were you told?
3    A    I was told that she considered herself
4  unqualified for the position and it made her very
5  nervous.
6    Q    Can you see how that might be a
7  concern?
8    A    That's a concern.
9    Q    Would you please turn to Exhibit 74.
10    A    Okay.
11    Q    Have you had an opportunity to review
12  Exhibit 74?
13    A    Give me just another minute, please.
14    Q    Certainly.
15    A    Okay.
16    Q    Have you had an opportunity to review
17  74?
18    A    I have.
19    Q    And could you describe this document,
20  please?
21    A    It appears that Chief Wolford is
22  writing to the city manager Tommy Marrow and to me
23  just as an FYI that -- that Channel 11 is being
24  contacted and that some of his officers are aware
25  of that. That he feels that it's kind of -- he

100

1  feels that it's -- it's affecting his ability to
2  discipline other people if they're saying, you
3  know, what am I being corrected for when this
4  person is running rampant.
5    Q    Were you aware that Ms. Iglesias had
6  made contact with a TV station prior to the
7  receipt of -- your receipt of the e-mail that's
8  marked as 74?
9    A    We had been told that she had announced
10  to any number of people that she would do it. We
11  were not surprised when she did it and --
12    Q    When you say by any number of people
13  who -- who are you referring to?
14    A    The people in the police department
15  that she spent apparently a good bit of time
16  discussing it with.
17    Q    So did those individuals come to you
18  personally and tell you?
19    A    Not at that point.
20    Q    Did they at some point?
21    A    In a point later when it became totally
22  intolerable.
23    Q    At a point later than January the 3rd,
24  2006?
25    A    Just after that time as it turns out.

101

1    Q    When you say you weren't surprised it
2  happened because you'd been told by any number of
3  people who had you been told prior to your receipt
4  of what's been marked as 74?
5      I mean, who'd spoken with you regarding
6  Ms. Iglesias prior to --
7    A    I don't remember people by name, but it
8  was just -- it was scuttlebutt if you will.
9    Q    Was it rumor that Ms. Iglesias had been
10  talking to the press?
11    A    It was.
12    Q    I'm going to jump around again.
13      I believe this will be 85.
14        (Mr. Jenkins Deposition Exhibit
15        No. 85 was marked for
16        identification.)
17      (Document handed to witness for review.)
18    BY MS. RICE:
19    Q    If you can take a moment to review 85
20  and let me know when you've had an opportunity to
21  do so.
22    A    Okay.
23    Q    Are you familiar with what's been
24  marked as 85?
25    A    I am.

**102**

1 Q And could you describe it, please?
2 A A document in which the city manager
3 Tommy Marrow tasked me, dispatched me to look into
4 the matter of confidentiality breach by
5 Ms. Iglesias and see if we can find out who said
6 what kind of thing.
7 Q Is -- was the document how you became
8 aware that you were being assigned to conduct this
9 investigation?
10 A That's true, it is.
11 Q Did you discuss this assignment with
12 Mr. Marrow prior to beginning your investigation?
13 A I don't recall it but it's possible.
14 Q Did Mr. Marrow give you any advice as
15 to who to interview during the course of your
16 investigation?
17 A It was pretty apparent. No, he did
18 not.
19 Q And what did you understand was your
20 responsibility in conducting this investigation?
21 A To -- to try to understand what had
22 happened and -- and who was complainant and who
23 was not.
24 Q Why did you understand that you were
25 being assigned to conduct the investigation?

**103**

1 A The situation came up and the chief who
2 would normally do internal investigations or task
3 somebody else to do internal investigations, both
4 because it was a personnel matter and didn't --
5 and didn't -- was nobody else's business in his
6 agency and because it -- it had to do with him, he
7 recused himself and asked the manager to appoint
8 someone else.
9 Q How did it have to do with him?
10 A Only had to do with him only because of
11 the turmoil that was going on. It was a pretty
12 classy thing to do.
13 Q By turmoil what are you referring to?
14 A The disruptiveness in the police
15 department.
16 Q What disruptiveness?
17 A Ms. Iglesias going to person after
18 person telling them information, trying to get
19 them to side with her against her boss, the chief.
20 That kind of disruptiveness.
21 Q How were you aware of that?
22 A People told me about that.
23 Q What people?
24 A Names?
25 MS. DAVIS: Yeah, I don't think

**104**

1 that's --
2 THE WITNESS: Okay. I'm fine with
3 it.
4 MS. DAVIS: -- confidential except
5 as to Ms. Iglesias --
6 THE WITNESS: Okay. Okay.
7 MS. DAVIS: -- and the folks that
8 told you --
9 THE WITNESS: I'll give you the
10 most classic example. Most classic example
11 is a custodian in the building. This
12 custodian is a long-term employee and while
13 he does his job okay he's not a candidate to
14 be police chief. And he comes to me to tell
15 me the story about -- he is also a pastor in
16 the African American community.
17 He came to me emotionally
18 distraught to the point of tears to tell me
19 that this lady was trying to get him to go
20 out into the African American community and
21 discredit him, the chief. That's an example.
22 BY MS. RICE:
23 Q And who was that?
24 A Who was that person?
25 Q Yes.

**105**

1 A His name is Ronnie Davis.
2 Q When did Mr. Davis come to you?
3 A I don't recall the date. In and around
4 this time.
5 Q In and around August of 2004?
6 A Could have been later than that. It
7 still serves as an example.
8 Q Who else came to you?
9 A Officer Ford came to me at some point,
10 and I don't remember before or after, saying that
11 Ms. Iglesias had visited her in her home with the
12 same agenda to the extent that Ms. Ford's husband
13 is alleged to have gotten angry and run her -- run
14 her out.
15 Q Run who out?
16 A Run Ms. Iglesias out of the house.
17 That's rumor. That's rumor. I can't substantiate
18 that of course. That's what I'm hearing.
19 Those are the kinds of reasons why the
20 chief recused himself and said somebody else ought
21 to do this.
22 Q Did anybody else come to you besides
23 Ronnie Davis and Officer Ford?
24 A Yes.
25 Q Who else?

**106**

1  A  Captain Glen Boyd.
2  Q  Was he a captain at that time?
3  A  I don't think he was promoted just yet.
4  He was still probably a lieutenant at that time.
5  Q  And what did --
6  A  Officer Gordan Blackwell a sergeant at
7  that time.
8  Q  Anyone else?
9  A  I'm thinking.  Probably but the names
10  allude me -- specific names right now.
11  Q  When did Glen Boyd come to you?
12  A  I don't recall the date.
13  Q  Was it in 2004?
14  A  Glen Boyd came lots of times.  He felt
15  that he owed his officers certain explanations and
16  he couldn't give them to them.
17  Q  And Sergeant Gordan Blackwell when did
18  he come to you?
19  A  It would have been after this -- after
20  this incident here.
21  MS. DAVIS:  For the record,
22  Mr. Jenkins is pointing to Exhibit --
23  THE WITNESS:  That is October 5th,
24  2004.
25  I'm sorry, we're on 85, aren't we.

**107**

1  MS. DAVIS:  So for the record, Mr.
2  Jenkins is pointing to Exhibit 85 then?
3  THE WITNESS:  Yeah.
4  MS. DAVIS:  Okay.
5  BY MS. RICE:
6  Q  So then some time after October of 2004
7  that Sergeant Gordan Blackwell came to you?
8  A  It would have been after that.
9  Q  Okay.  How long after that?
10  A  I don't know.
11  Q  More than a month?
12  A  I'd say more than a month, less than
13  two.  I'm sorry, I can't -- I don't -- specificity
14  alludes me.
15  Q  Did you take notes with respect to any
16  of these conversations that you had?
17  A  At that time, no.
18  Q  Was there another time that you kept
19  notes?
20  A  There was another time that -- that I
21  made the suggestion that these people had -- who
22  had the issues that they begin to give notes to
23  the chief regarding their concerns, that they
24  reduce to writing the issues that they had.
25  Q  To whom did you make that suggestion?

**108**

1  A  To the chief and to anybody else who
2  would come to me and say -- like an example would
3  be again Gordan Blackwell.  That if you have these
4  concerns we're now asking people just to document
5  those concerns.
6  Q  When did you make that suggestion to
7  the chief?
8  A  I don't remember the time.
9  Q  Was it --
10  A  It would probably have been late in
11  '05.
12  Q  Late in '05?
13  A  Uh-huh.
14  Q  Do you know if Chief Wolford took you
15  up on that suggestion?
16  A  He did.
17  Q  How do you know that he did?
18  A  We received documents from people.
19  Q  You personally received documents from
20  people?
21  A  They were passed on to me indirectly.
22  I mean, they were not addressed to me but they
23  came to me.
24  Q  Did they come to you from the chief?
25  A  Chief or the captain, one or the other.

**109**

1  Captain Boyd.
2  Q  Okay.  And when did you receive those
3  documents?
4  A  Late December or -- or some time in
5  December or January -- December of '05 or January
6  of '06.
7  Q  When Officer Ford came to see you did
8  you ask her to provide you with a written
9  statement?
10  A  Officer Ford?
11  Q  Yes, sir.
12  A  I -- I did not get a visit.  I don't
13  remember a visit from Officer Ford.  But she would
14  have been one of the people more than likely who
15  would have said enough already and I would have
16  said reduce it to writing.
17  Q  How long have you known Officer Ford?
18  A  I believe the entire time that I've
19  been with the city, so almost nine years.
20  Q  Did you know her before you came to the
21  City of Oxford?
22  A  Not at all.
23  Q  Have you had any relationship with her
24  outside of work?
25  A  Yes.

110

1    Q    What was the nature of that
2    relationship?
3    A    At one time she and her now husband
4    rented a house that I owned.
5    Q    Is that a house in Oxford?
6    A    It is.
7    Q    How long did she rent from you?
8    A    About a year probably.
9    Q    When was that approximately?
10    A    Between '02 and '04 would just be a
11    wild guess. I just simply don't remember.
12    Q    She's no longer renting from you; is
13    that --
14    A    That's true.
15    Q    Did you socialize -- or have you
16    socialized with Chief Wolford outside of work on
17    any occasion?
18    A    Sure.
19    Q    Beginning when?
20    A    During his interview.
21    Q    Did you go to dinner or how did you
22    socialize?
23    A    Part of the assessment process was a
24    dinner in which he and other candidates were
25    there.

111

1    Q    All the candidates together?
2    A    Yes.
3    Q    And after he was employed with the City
4    of Oxford did you continue to socialize with him
5    on occasion?
6    A    Sure.
7    Q    And what would your socializing
8    entail -- involve?
9    A    Lunches, city affairs, picnics,
10    Christmas parties, those kinds of things.
11    Q    Has he come to your home?
12    A    He has been to my home.
13    Q    Have you been to his residence as well?
14    A    I have been in his house not for a
15    social affair.
16    Q    How often has he come to your house?
17    A    Twice -- three times. Three times
18    counting a choir picnic.
19    Q    A choir picnic?
20    A    Uh-huh.
21    Q    Is that a church choir?
22    A    That's a church choir. And he's not
23    the singer. That's his wife.
24    Q    Do you all attend the same church?
25    A    We do.

112

1    Q    What church is that?
2    A    Oxford United Methodist.
3    Q    Have you socialized with Glen Boyd
4    outside of work?
5    A    City functions.
6    Q    Anything other than city functions?
7    A    No.
8    Q    And Mr. Marrow -- Tommy Marrow have you
9    socialized with him outside of work?
10    A    Christmas functions, one fishing trip
11    and I sang in his daughter's wedding.
12    Q    Where is Mr. Marrow presently employed?
13    A    The Town of Butner.
14    Q    When did he go to the Town of Butner?
15    A    Late January, early February as I
16    remember.
17    Q    Of 2008?
18    A    Yes.
19    Q    Have you kept in touch with him since
20    then?
21    A    Not so much.
22    Q    Have you talked to him at all since --
23    A    Oh, yes, we've talked a couple of
24    times.
25    Q    Have you talked about this case?

113

1    A    Not about the case. We had a
2    conversation about dates.
3    Q    About dates for?
4    A    This depositions.
5    Q    Have you seen him -- have you seen
6    Mr. Marrow since he left his employment with the
7    City of Oxford?
8    A    He was in the meeting in the city hall
9    within the last probably 60 days.
10         MS. DAVIS:  And, Mr. Jenkins, to
11    the extent you're referring to the meeting
12    that occurred with me I'm going to ask you
13    not to reveal any of the specifics of that
14    meeting. That would be attorney/client
15    privilege.
16         THE WITNESS:  Okay.
17    BY MS. RICE:
18    Q    Who else was present at that meeting?
19    A    He was there for a meeting and I was
20    not in the meeting but I spoke to him.
21    Q    And have you seen him on any other
22    occasion since he left the City of Oxford I should say?
23    A    I don't remember any other occasions.
24    Q    Did you participate in the decision to

### 114

1 discharge Ms. Iglesias from her employment with
2 the City of Oxford?
3     A    Explain participate.
4     Q    Were you -- did you meet with Chief
5 Wolford prior to Ms. Iglesias being discharged
6 from employment?
7     A    I'm sure we had a conversation about
8 that.
9     Q    Were you aware that Chief Wolford was
10 contemplating that personnel action?
11     A    I was aware that he was contemplating.
12     Q    How were you made aware that he was
13 contemplating?
14     A    He told me.
15     Q    What did he tell you?
16     A    He told me he was considering
17 termination.
18     Q    When did Chief Wolford tell you he was
19 considering termination?
20     A    January of '06 probably.
21     Q    Had he ever told you he was considering
22 termination prior to January 2006?
23     A    I don't recall any incidences but it
24 would have been likely.
25     Q    Did you assist in the preparation of

### 115

1 the letter discharging Ms. Iglesias --
2     A    No.
3     Q    -- from her employment?
4     A    No, I did not.
5     Q    Did you review that document prior to
6 it being provided to Ms. Iglesias?
7     A    I did not.
8     Q    When did you become aware of the
9 contents of the letter of termination?
10     A    Just before it was served.
11     Q    If I can ask you to turn to Exhibit 77
12 in the binder, please.
13     A    Okay.
14     Q    Have you had an opportunity to review
15 that document?
16     A    I have.
17     Q    Are you familiar with it?
18     A    I am.
19     Q    And is this the letter that was issued
20 to Ms. Iglesias terminating her from employment?
21     A    Yes.
22     Q    Were you present when Ms. Iglesias
23 received this document?
24     A    No.
25     Q    What were you told as to how

### 116

1 Ms. Iglesias received this document?
2     A    I don't remember hearing about a
3 reaction.
4     Q    How did you learn that Ms. Iglesias had
5 in fact been discharged?
6     A    The chief told me.
7     Q    When did he tell you?
8     A    Immediately after would be my guess.
9     Q    Does personnel policy require a
10 pre-disciplinary conference?
11     A    Conference, yes.
12     Q    And could you describe what a
13 pre-disciplinary conference is?
14     A    A conference is simply confronting the
15 employee with certain issues, giving them an
16 opportunity to speak to that issue and then
17 they're getting a decision regarding that in X
18 number of days, typically about three days.
19     In the case here what you will see is
20 the first two paragraphs are exactly that in which
21 I asked the chief to pause at that time and to
22 give Ms. Iglesias any opportunity to say anything
23 she wanted to about it, to consider her
24 information before he went on to the final
25 paragraph.

### 117

1     Q    You advised the chief to read the first
2 two paragraphs or --
3     A    Yes.
4     Q    -- what was the advice that you gave
5 the chief specifically?
6     A    That he serve the first two paragraphs
7 and that he pause and give her an opportunity to
8 respond any way she wanted to, to take any
9 evidence that she was able to give him into
10 consideration before he served the final
11 paragraph.
12     Q    So it's your recommendation he serve
13 two different documents? I don't want to
14 put words in your mouth.
15     A    No, it was all in one document, but
16 just simply stop after the second paragraph and
17 before the third.
18     Q    Okay. And stop just momentarily?
19     A    Stop, take any amount of time in which
20 she might have wanted to say anything she wanted
21 to say in defense as long as it took.
22     Q    Do you know if Chief Wolford took your
23 advice?
24     A    He told me he did.
25     Q    What did he tell you?

---

118

1    A    He told me that he did exactly as I
2  asked him to or advised him to.
3    Q    Did he come to you and say I did
4  exactly as you told me to or what were his words?
5    A    After it was over and I saw the
6  document I asked him did you, and he said he did.
7    Q    Did he elaborate any further?
8    A    No.
9    Q    Were you aware -- were you aware --
10  excuse me.
11        Did Ms. Iglesias grieve her termination
12  from employment?
13        (Interruption.)
14        MS. DAVIS:  You want to take just a
15  quick break?
16        MS. RICE:  Okay.
17        (A brief recess was taken.)
18        BY MS. RICE:
19    Q    Were you aware if Ms. Iglesias grieved
20  her discharge from employment?
21    A    Yes --
22    Q    How did --
23    A    -- as I remember.
24    Q    How did you become aware of
25  Ms. Iglesias's grievance?

---

119

1    A    It was -- there had been an enormous
2  amount of these kinds of things so give me a
3  moment to put this in perspective.
4    Q    Sure.
5    A    As I remember a grievance hearing was
6  scheduled, and -- and I was involved with that
7  grievance hearing.
8    Q    Were you surprised that Ms. Iglesias
9  grieved her discharge?
10    A    Not at all.
11    Q    Why not, Mr. Jenkins?
12    A    That's her -- that's what she does.
13    Q    What do you mean that's what she does?
14    A    That's her MO if you will.
15    Q    What do you mean by MO?
16    A    That is her modus operandi.
17        (Interruption by the reporter.)
18    A    That's -- that's what she does.
19  That's -- modus operandi.
20    Q    What do you mean that's what she does?
21    A    The lady spends no small amount of time
22  both on city time and lord knows wherever else
23  creating documents and that kind of thing.
24    Q    Why do you say that?
25    A    Because it's true.

---

120

1    Q    What are you referring to with respect
2  to Ms. Iglesias spending city time?  What are you
3  referring to when you say Ms. Iglesias spends city
4  time --
5    A    The numerous documents that you have in
6  your possession and are aware of the very lengthy
7  documents.
8    Q    And how are you aware that Ms. Iglesias
9  spent city time creating those documents?
10    A    Let me just say that I am not totally
11  aware of that, but it is -- it is my guess.  I
12  have been told that by the chief, but I do not
13  know that.  And I am glad to make that
14  clarification.
15    Q    What did the chief tell you with
16  respect to Ms. Iglesias's use of city time?
17    A    That he suspected that these documents
18  had been done from her office on her computer.
19    Q    Did Chief Wolford tell you why he
20  suspected --
21    A    No.
22    Q    -- these documents had been done?
23    A    No.
24    Q    What documents are you referring to?
25    A    Any number of the ones you see.  An

---

121

1  example would be -- well, any number of these very
2  lengthy documents that -- that she has.
3        First one that comes to mind was about
4  four or five pages of a withdrawal from a class
5  that she was attending.
6    Q    What class?
7    A    Class called The Seven Habits of Highly
8  Effective People.
9    Q    And was that a class through the city?
10    A    It was.
11    Q    What was the purpose of that class?
12    A    The purpose of the class was to try to
13  create a culture in the organization of
14  communications and trust.
15    Q    Was it your idea to offer this class?
16    A    It was largely my idea.
17    Q    Who elses idea was it?
18    A    It was the city manager's idea, it was
19  the idea of a local plant manager who -- who
20  brought the department heads into his plant and he
21  tied himself to all of us.  He went to city
22  council and discussed that.  And the consensus of
23  the department heads by then who had the class
24  themselves.
25    Q    When was this class offered?

---

122

1    A    I'm sorry?
2    Q    When was this class offered?
3    A    It was offered several times in the
4    early 2000s going forward. We probably had easily
5    55 or so percent of our employees to do that, and
6    the goal was to do everybody.
7    Q    Was it required?
8    A    It was not required.
9    Q    And, I believe, you testified that
10   Ms. Iglesias withdrew from the class?
11   A    She withdrew.
12   Q    Did that bother you?
13   A    You're asking for a personal --
14   Q    Yes, sir.
15   A    The reasons from withdrawal bothered me
16   personally not as a city employee, but bothered me
17   personally, yes.
18   Q    Why did they bother you personally?
19   A    Are you ready for this? You want to go
20   there?
21   Q    Yes, sir.
22   A    Because I considered it bigoted.
23   Q    In what respect?
24   A    Virtually every respect.
25   Q    What were the reasons Ms. Iglesias

123

1    withdrew from the class to your knowledge?
2    A    According to her document as I remember
3    it because the author of the book and the author
4    of the course was a devote Mormon.
5    Q    And that's -- that was the contents of
6    this four to five page document?
7         (Interruption.)
8         MS. RICE: Let's take a break.
9         (Lunch break.)
10   BY MS. RICE:
11   Q    Mr. Jenkins, before we took that break,
12   I believe, we were talking about the course of
13   Seven Habits of Highly Effective People course.
14   A    Okay.
15   Q    Were you compensated in any way for
16   administering that course?
17   A    I'm sorry?
18   Q    Were you compensated financially --
19   A    No --
20   Q    -- in any way?
21   A    -- not when I did it for the city.
22   Q    Had you been previously compensated for
23   teaching that course?
24   A    Elsewhere?
25   Q    Yes, sir.

124

1    A    Very nicely, thank you.
2    Q    And where was that?
3    A    What companies?
4    Q    Yes, sir.
5    A    Capital Associated Industries, EMC
6    Square, Talacrist (phonetic), Bank of Oakridge,
7    North Carolina Association of County
8    Commissioners, Cooper Tools several times, CAI
9    several times, the EMC Square three times.
10   Q    But not for the City of Oxford you
11   weren't compensated for teaching that course for
12   the City of Oxford --
13   A    That's true.
14   Q    -- to the City of Oxford?
15        If I could ask you to turn to what was
16   previously marked as Exhibit 79. Let me know when
17   you've had a chance to review it.
18   A    Okay.
19   Q    Are you familiar with the document
20   marked as --
21   A    I am.
22   Q    -- Exhibit 79?
23   A    Uh-huh.
24   Q    And can you describe this document,
25   please?

125

1    A    It's just a documentation of some
2    things that the mayor made me aware of. There is
3    a couple of typos in here as it turns out.
4         The first sentence should be doing
5    espionage and -- espionage. And the third
6    sentence up, Susan has now concluded their names.
7         But, yeah, I'm familiar with this.
8    Q    Did you create this document?
9    A    I did.
10   Q    And when did you create this document?
11   A    February 11th of '05.
12   Q    Why did you document these personnel
13   issues?
14   A    It's what I do. If the document is not
15   written then it doesn't exist. It was really very
16   much all about documenting all the things that
17   were going on at the time simply for that.
18   Q    How did the mayor make you -- well,
19   excuse me. Let me start over again.
20        You state in the first sentence the
21   mayor has made us aware. Who are the -- who is
22   the us that you're referring to?
23   A    I don't know that I remember who all
24   that might have been. More than likely the city
25   manager and me.

126

1    Q    And how did the mayor make you aware?
2    A    Verbally.
3    Q    Did he come to your office?
4    A    Don't remember whose office it was in.
5    Q    Was it during a workday?
6    A    It was.
7    Q    And what did the mayor say?
8    A    Just what's written. That Ms. Iglesias
9  was doing espionage for Mrs. Currin who is a -- or
10 was a city commissioner.
11   Q    Was espionage the word that the mayor
12 used?
13   A    Don't remember if he used that word.
14   Q    And just for the record, who was the
15 mayor at that time?
16   A    The mayor's name is Al Woodlief.
17   Q    So you don't recall if espionage was --
18   A    I don't know if it was his word or
19 mine.
20   Q    Okay. And how do you define espionage?
21   A    Espionage is -- is doing covert
22 investigations or just investigations it could be.
23   Q    And in the second sentence what were
24 you referring to with respect to expenses Chief
25 Wolford incurred in meetings in Raleigh?

127

1    A    It's been a long time, but apparently
2  chief was in a meeting in Raleigh and Ms. Iglesias
3  took overage to his expenses that he turned in
4  subsequent to the trip.
5    Q    When you stated it is obvious that
6  Ms. Currin has been involved why -- why did you
7  say it is obvious?
8    A    She didn't keep any secrets.
9    Q    Who doesn't keep any secrets? Who
10 doesn't keep any secrets?
11   A    Ms. Currin.
12   Q    So did Ms. Currin say something to you
13 personally?
14   A    Said something to the mayor.
15   Q    How do you know that?
16   A    He told me.
17   Q    What did the mayor tell you that
18 Ms. Currin said to him?
19   A    The things that are reported in the
20 document here. The whole spending $5,000 of her
21 own money and raising five more and all that
22 stuff, hour on the phone.
23   Q    Who is Susan Wolford?
24   A    That is Chief Wolford's former wife.
25   Q    Have you met Ms. Wolford?

128

1    A    I have.
2    Q    When did you last speak with
3  Ms. Wolford?
4    A    Don't know.
5    Q    Has it been in the last year?
6    A    No.
7    Q    Last two years?
8    A    It would have been whenever she left
9  town. It's been two or three years ago.
10   Q    Whenever she moved from Oxford?
11   A    Yeah.
12   Q    How long was your conversation with the
13 mayor on or around February 11th, 2005?
14   A    Five, ten minutes maybe.
15   Q    I don't know if it's a separate
16 paragraph, but the sentence beginning after
17 several months of Susan Wolford telling John that
18 she had no conversations or dealings with Frank
19 Strickland was that something that the mayor had
20 shared with you or is that your own personal
21 recollection?
22   A    I don't remember how I -- how I heard
23 that.
24   Q    You don't recall how you heard that
25 Susan had not included their names on a list of

129

1  witnesses?
2    A    And that should be Susan has now
3  included their names. I don't remember who told
4  me that.
5    Q    Do you know who would have had access
6  to that information?
7    A    Certainly the chief would have.
8    Q    Do you know if anybody else --
9    A    No.
10   Q    And the last sentence. When John asked
11 Susan about this, she admitted she had not been
12 truthful. How were you aware of that?
13   A    He told me.
14   Q    When did he tell you?
15   A    Just before this document.
16   Q    Was it before the mayor had come and
17 spoken with you?
18   A    I'm sure it was.
19   Q    If I can ask you to turn to what was
20 previously marked as Exhibit 83, please.
21   A    Okay.
22   Q    Are you familiar with what's been
23 marked as Exhibit 83?
24   A    I've read it.
25   Q    Have you seen this document prior to

**130**

1  today?
2    A   I have.
3    Q   Did you create Exhibit 83?
4    A   No.
5    Q   When did you become aware of its --
6    A   Shortly after it was written.
7    Q   -- existence?
8      On or around January 25th of 2006?
9    A   Yes.
10   Q   And what is your understanding of this
11 document?
12   A   That for whatever reason that Chief
13 Wolford thought he had nothing to hide and
14 anything you needed to do just do it.
15  .  Q   Do you know who prepared what's been
16 marked as Exhibit 83?
17   A   I do not.
18     MS. RICE: I believe we are on 86.
19     (Mr. Jenkins Deposition Exhibit
20     No. 86 was marked for
21     identification.)
22     (Document handed to witness for review.)
23     BY MS. RICE:
24   Q   If I can ask you to review what has
25 been marked as Exhibit 86, please.

**131**

1    A   Would you like me to read it in its
2  entirety?
3    Q   No, sir. Are you familiar with what --
4  what's been marked as 86?
5    A   I am.
6    Q   And could you describe it, please?
7    A   It's a section from our policy manual
8  which discusses parts of three items.
9    Q   Okay. And with respect to section six,
10 pre-dismissal conference is this the -- the
11 procedure that you were describing earlier?
12   A   It is.
13   Q   And what's your understanding of your
14 role in the pre-dismissal conference?
15   A   My role is -- is to -- to monitor the
16 process, to be sure the process is done according
17 to policy.
18   Q   How did you monitor the process with
19 respect to Ms. Iglesias's termination from
20 employment?
21   A   As I said before, suggestion that when
22 the chief prepare the document that he pause after
23 the first two paragraphs of that document, give
24 opportunity for Ms. Iglesias to say as much as she
25 wanted to say, consider that as some evidence and

**132**

1  decide whether he would go forward with it.
2    Q   And decide whether he would go forward
3  with the dismissal?
4    A   As a result of anything she had -- any
5  evidence that she had.
6    Q   Any evidence that she may present
7  between the reading of the first two paragraphs
8  and the final paragraph?
9    A   He gave her time -- all the time she
10 might have needed to consider, and having heard
11 that and considered that he then chose to go onto
12 the third paragraph.
13   Q   And your knowledge of what occurred
14 during that meeting is based on your conversations
15 with the chief?
16   A   Yes.
17   Q   Did you speak with anyone else
18 concerning that meeting?
19   A   No.
20   Q   Do you know who else was present?
21   A   From memory a couple -- or three people
22 from the command staff.
23   Q   Why didn't you attend this meeting?
24   A   I do not -- it's not indicated that I
25 be a part of that process. If they appeal it to

**133**

1  me I would rather not have been there.
2    Q   Why is that?
3    A   Just the way I do business. I don't
4  make decisions on those kinds of things, so I'm
5  not there.
6    Q   You don't make decisions on what kind
7  of things?
8    A   On people being terminated.
9    Q   Do you make recommendations?
10  .A   I have.
11   Q   What is your knowledge of the concerns
12 that Ms. Iglesias had raised to an auditor in May
13 of 2004?
14   A   What are my --
15   Q   What's your knowledge of --
16   A   Oh, my knowledge?
17   Q   Yes, sir.
18   A   I am aware that -- that she made some
19 allegations that there was a shortage of money in
20 the drug fund.
21   Q   By drug fund what were you referring
22 to?
23   A   That is a pool of money that is used
24 for undercover work.
25   Q   Did you speak with Chief Wolford

**134**

1  concerning the drug fund?
2  A  No.
3  Q  Do you know what investigation was
4  conducted into Ms. Iglesias's allegations
5  concerning the chief's use?
6  A  Only what I heard.
7  Q  What did you hear?
8  A  I heard that the city auditor had done
9  a complete examination of the books and that he
10  gave it a clean audit.
11  Q  Who told you?
12  A  City manager.
13  Q  When did the city manager tell you?
14  A  Just after it happened.
15  Q  In May of 2004?
16  A  Is that the date?
17  Q  Well, when do you recall --
18  A  I don't remember the date.
19  Q  Were you told of any other
20  investigation that was done concerning the
21  allegations raised by Ms. Iglesias?
22  A  I had heard that the SBI came to
23  town --
24  Q  How did you hear that?
25  A  -- on one or two occasions.

**135**

1      From the city manager.
2  Q  What did the city manager tell you with
3  respect to the SBI coming to --
4  A  He said that they had come to town,
5  they had reviewed documentary evidence and had
6  seen no reason to go further with it.
7  Q  That the SBI had seen no reason to go
8  further with it; is that what --
9  A  Yes.
10  Q  That's what the city manager told you?
11  A  Yes.
12  Q  Were you told anything else concerning
13  an investigation into the allegations raised by
14  Ms. Iglesias --
15  A  No.
16  Q  -- concerning the chief?
17      Did you personally review any
18  documentation pertaining to the drug fund?
19  A  I had seen the redacted version that
20  was requested by an outside party.
21  Q  When you say redacted version, redacted
22  version of what?
23  A  Of the drug fund ledger.
24  Q  Had you not seen the unredacted
25  version?

**136**

1  A  No.
2  Q  And who requested the drug fund ledger?
3  A  Her friend Frank Strickland.
4  Q  Whose friend?
5  A  Ms. Iglesias.
6  Q  When did Frank Strickland make this
7  request?
8  A  I don't remember the date.
9  Q  Did you provide a copy of the drug fund
10  ledger to Mr. Strickland?
11  A  No.
12  Q  How did he receive a copy of the drug
13  fund ledger?
14  A  I don't remember.  I don't remember
15  how -- how it got into his hands.
16  Q  When did you see the redacted copy of
17  the ledger?
18  A  Pretty soon after his request, but I
19  have no notion what date that was or month.
20  Q  Did you review the ledger yourself?
21  A  It didn't make any sense to me.  I just
22  glanced at it and that was it.
23  Q  Did you review any other documents in
24  addition to the drug fund ledger?
25  A  No.

**137**

1  Q  Do you know of any changes that were
2  made within the city with respect to the drug fund
3  ledger following the allegations being raised?
4  A  Yeah.
5      MS. DAVIS:  And to the extent we're
6  talking about changes that were made or
7  disciplinary action that was taken against
8  Chief Wolford --
9      THE WITNESS:  No.  The only change
10  that was made was that the fund was moved
11  from the police department to the finance
12  department at city hall.
13  BY MS. RICE:
14  Q  Why was that done?
15  A  At the auditor's suggestion just as a
16  good audit procedure.
17  Q  When was the fund moved to city hall?
18  A  I don't remember the date.
19  Q  Did the city manager express any
20  concerns to you about the allegations that
21  Ms. Iglesias had raised with respect to the drug
22  fund?
23      MS. DAVIS:  And at this point I
24  think we do have to go confidential.
25      THE WITNESS:  Yeah.

150

1  A  Almost nine years now.
2  Q  And what did you do in order to
3  identify documents in response to the document
4  requests that were made of you during the course
5  of this litigation, what did you do to identify or
6  respond to documents that --
7  A  I burned up about two copy machines. I
8  mean, I -- is that what -- I mean, I did a lot of
9  copying.
10  Q  How did you search for response
11  documents?
12  A  Just things that were in the folder.
13  Q  Just the personnel file?
14  A  Yeah. I don't remember anything that I
15  provided that was not existing in the personnel
16  folder.
17  Q  Did you review your e-mail accounts?
18  A  Can't say that I did. I typically
19  don't do these things on e-mail. Not typically, I
20  don't do these kinds of things with e-mail.
21  Q  Did you review your computer to see if
22  there were any documents that were not in the
23  personnel file?
24  A  I did, yeah.
25  Q  Were there any documents that were

151

1  maintained in your computer?
2  A  None that weren't already in the file.
3  MS. RICE: Eighty-seven, I believe.
4  (Mr. Jenkins Deposition Exhibit
5  No. 87 was marked for
6  identification.)
7  (Document handed to witness for review.)
8  BY MS. RICE:
9  Q  Ask you to take a look at that.
10  A  Do you want me to read this entire
11  document?
12  Q  It's -- I'd like to ask if you're
13  familiar with this document?
14  A  I am.
15  Q  And to the best of your knowledge are
16  the -- is the information provided therein
17  truthful and complete?
18  A  Yes.
19  MS. RICE: Thank you very much for
20  your time.
21  I don't have any further questions.
22  THE WITNESS: Okay.
23  MS. RICE: Thank you.
24  (Whereupon, at 2:08 p.m., the taking
25  of the instant deposition ceased.)

152

1  (Whereupon, the reading and signing by the
2  witness to the deposition is hereby reserved.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

153

1
2
3
4
5
6
7
8
9  _____
10  SIGNATURE OF WITNESS
11  SUBSCRIBED AND SWORN to before me this _____ day of
12  _____, 2008.
13
14  _____
15  NOTARY PUBLIC
16  My Commission expires:
17
18
19
20
21
22
23
24
25

154

1      TRANSCRIPTION OF CORRECTIONS
2  CASE NAME: Iglesias vs. Wolford, etc.
3  WITNESS NAME: Don Jenkins
4  CASE NO. 5:07-CV-00437-D
5
6  PAGE  LINE    READS     SHOULD READ
7  _____:_____:_____:_____
8  _____:_____:_____:_____
9  _____:_____:_____:_____
10  _____:_____:_____:_____
11  _____:_____:_____:_____
12  _____:_____:_____:_____
13  _____:_____:_____:_____
14  _____:_____:_____:_____
15  _____:_____:_____:_____
16  _____:_____:_____:_____
17  _____:_____:_____:_____
18  _____:_____:_____:_____
19  _____:_____:_____:_____
20  _____:_____:_____:_____
21  _____:_____:_____:_____
22  _____:_____:_____:_____
23  _____:_____:_____:_____
24  _____:_____:_____:_____
25  _____:_____:_____:_____

155

1      CERTIFICATE OF REPORTER
2
3  STATE OF NORTH CAROLINA  )
    COUNTY OF WAKE      )
4
5      I, VALERIE SMITH GREEN, the reporter by
6  whom the foregoing deposition was taken, do hereby
7  certify that the witness whose testimony appears in
8  the forgoing deposition was duly sworn by me; that
9  the testimony of said witness was taken by me to the
10  best of my ability and thereafter reduced to
11  typewriting under my direction; that I am neither
12  counsel for, related to, nor employed by any of the
13  parties to the action in which this deposition was
14  taken, and further that I am not a relative or
15  employee of any attorney or counsel employed by the
16  parties thereto, nor financially or otherwise
17  interested in the outcome of the action.
18      This, the 7th day of November, 2008.
19
20  _____
    VALERIE SMITH GREEN - REPORTER
21  Notary Public #19981560010
22
23
24
25