```
 1           IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 2                      WESTERN DIVISION
                    NO. 5:07-CV-00437-D
 3
 4  _____

    SHARON B. IGLESIAS,                    :
 5
               Plaintiff,                  :
 6
    vs.                                    :
 7
    JOHN WOLFORD, Chief of Police of       :
 8
    Oxford, N.C., in his official and      :
 9
    individual capacities; THOMAS MARROW,  :
10
    City Manager of Oxford, N.C., in his   :
11
    official and individual capacities;    :
12
    DON JENKINS, Human Resources Manager   :
13
    for the City of Oxford, N.C., in his   :
14
    official and individual capacities;    :
15
    and the CITY OF OXFORD, N.C.,          :
16
               Defendants.                 :
17
    _____    :
18
                        Tuesday, October 28, 2008
19
                        Raleigh, North Carolina
20
21        DEPOSITION of THOMAS MARROW, a witness
22  herein, called for examination by counsel for
23  Plaintiff in the above-entitled matter, pursuant to
24  notice, the witness being duly sworn by VALERIE
25  SMITH GREEN, Court Reporter and Notary Public in and
```

### Page 2

1  for the State of North Carolina, taken at Cranfill,
2  Sumner & Hartzog, LLP, 5420 Wade Park Boulevard,
3  Suite 300, Raleigh, North Carolina, at 9:36 a.m., on
4  Tuesday, October 28, 2008, and the proceedings being
5  taken down by stenotype by VALERIE SMITH GREEN and
6  transcribed under her direction.

### Page 3

1  APPEARANCES:
2     On behalf of the Plaintiff:
3       SHELLI HENDERSON RICE, ESQ.
4       CHARLES E. MONTEITH, JR., ESQ.
5       Monteith & Rice, PLLC
6       422 St. Mary's Street, Suite 6
7       Raleigh, North Carolina 27605
8       (919) 821-2053
9
10     On behalf of the Defendants:
11       M. ROBIN DAVIS, ESQ.
12       Cranfill, Sumner & Hartzog, LLP
13       5420 Wade Park Boulevard, Suite 300
14       Raleigh, North Carolina 27607
15       (919) 828-5100
16
17  ALSO PRESENT:
18  Sharon B. Iglesias - Plaintiff
19  Tom Burnette

### Page 4

CONTENTS

| THE WITNESS | EXAMINATION BY COUNSEL FOR | |
|---|---|---|
| THOMAS MARROW: | Plaintiff | Defendants |
| By MS. RICE: | 7 | |
| By Ms. Davis: | | 150 |

EXHIBITS

| EXHIBIT NO. | PAGE NO. |
|---|---|
| 88 - Memo from Oxford Police Department to Thomas Marrow dated January 10, 2006 | 128 |
| 89 - Defendant Marrow's response to plaintiff's first set of requests | 134 |
| 90 - Memo from Chief Wolford to Tommy Marrow dated August 24, 2004 | 143 |

***CONFIDENTIAL***

| | |
|---|---|
| Beginning Confidential Portion | Page 52, Line 12 |
| Ending Confidential Portion | Page 112, Line 17 |
| Beginning Confidential Portion | Page 142, Line 6 |
| Ending Confidential Portion | Page 153, Line 17 |

### Page 5

STIPULATIONS

It was stipulated by and between counsel representing the respective parties, and the witness, as follows:

1. That any defect in the notice of the taking of this deposition, either as to time or place, or otherwise as required by statute is expressly waived, and this deposition shall have the same effect as if formal notice in all respects as required by statute had been given and served upon the counsel in the manner prescribed by law.

2. That this deposition shall be taken for the purpose of discovery or for use as evidence in the above-entitled actin, or for both purposes.

3. That this deposition is deemed opened and all formalities and requirements with respect to the opening of the same, expressly including notice of the opening of this deposition, are hereby waived, and this deposition shall have the same effect as if all formalities in respect to the opening of the same had been complied with in detail.

4. That the undersigned, Valerie Smith Green, Court Reporter and Notary Public in and for the State of North Carolina, is duly qualified and constituted to take this deposition.

**Page 6**

5. Objections to questions, except as to the form thereof, and motions to strike answers need not be made during the taking of this deposition, but may be reserved until any pretrial hearing held before any judge of any court of competent jurisdiction for the purpose of ruling thereon, or at any other hearing or trial of said case at which said deposition might be used, except that an objection as to the form of a question must be made at the time such a question is asked or objection is waived as to the form of the question.

6. That the witness will reserve the reading and signing of the transcript to the deposition.

7. That the Federal Rules of Civil Procedure shall control concerning the use of the deposition in court.

**Page 7**

PROCEEDINGS

Whereupon,

THOMAS MARROW,

was called as a witness by counsel for the Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MS. RICE:

Q   Good morning, Mr. Marrow.
A   Good morning.
Q   We just introduced ourselves off the record but I'm going to do it for the record as well.
A   Okay.
Q   My name is Shelli Rice and I'm one of the two attorneys that's representing Ms. Iglesias in this matter and my co-counsel sitting to my right is Chuck Monteith.
    I just have a couple of preliminary questions for you. Have you been deposed before?
A   No.
Q   Are you familiar with how a deposition works?
A   Yes.
Q   I'm going to ask you some questions and

**Page 8**

I'm going to ask you to just listen to the question. If you don't understand what I'm asking just let me know and I'll be happy to try --
A   Okay.
Q   -- and rephrase it.
A   Okay.
Q   Please as much as possible try and give verbal responses for the court reporter's purposes. In other words, try to avoid nodding or nonverbal gestures.
A   Okay.
Q   If you need to take a break at any point in time please let me know and we'll do so as soon as possible.
A   Okay.
Q   And let me just ask you are you taking any medication that might affect your ability to tell the truth today?
A   No.
Q   Is there any other reason why you wouldn't be able to answer the questions --
A   No.
Q   -- that I'm going to ask you today truthfully?
A   No.

**Page 9**

Q   Just a little bit of background information. Could you describe your educational experience for me?
A   I have a degree in urban regional planning from East Carolina University.
Q   And when did you graduate from East Carolina?
A   '78.
Q   Is that a four-year degree?
A   Yes.
Q   A B.A. or a B.S.?
A   B.S. A Minor in geography.
Q   A Minor in geography?
A   Yes, it's important to get around.
Q   Yes, it is.
    And any postgraduate education?
A   No.
Q   What was your first employment following college graduation?
A   City of Henderson.
Q   What was your job with the City of Henderson?
A   Planning, zoning, building inspections.
Q   What was your job title with the City of Henderson?

**Page 10**

1  A   Depends on which day it was.
2  Q   Did it change?
3  A   Well, yeah. Probably zoning
4  administrator.
5  Q   How long were you with the City of
6  Henderson?
7  A   Four years.
8  Q   Always same job duties?
9  A   Yeah, yes.
10 Q   And following your employment with the
11 City of Henderson where did you next work?
12 A   It's called Kerr Tar Regional Council
13 of Governments, short version is Region K.
14 Q   Region K?
15 A   K, yeah. Like 18 regions in North
16 Carolina and I was Region K. It's a five county
17 planning organization.
18 Q   And how long were you at Region K?
19 A   Approximately seven years.
20 Q   What was your job position with Region
21 K?
22 A   Again, planning work and my title, I
23 guess, was economic development director.
24 Q   The whole time you were with Region K
25 was that your title?

**Page 11**

1  A   Uh-huh.
2  Q   And following your employment with
3  Region K where did you next work?
4  A   City of Oxford.
5  Q   What was you job position with -- when
6  you were hired with the City of Oxford?
7  A   When I was hired assistant city
8  manager.
9  Q   Who hired you with the City of Oxford?
10 A   The current town city manager Tom
11 Ragland.
12 Q   When was that that you were first
13 hired?
14 A   1991.
15 Q   How long were you assistant city
16 manager?
17 A   '91 to like January of '95.
18 Q   What happened in January of 1995?
19 A   Mr. Ragland retired and I became city
20 manager.
21 Q   Was there any interim city manager
22 between Mr. Ragland's retirement and
23 your receiving the position?
24 A   No, not that I recall.
25 Q   Who promoted you to the position of

**Page 12**

1  city manager?
2  A   Excuse me?
3  Q   Who promoted you to the position of
4  city manager?
5  A   Town board.
6  Q   Do you recall who was on the board at
7  that time?
8  A   Yes.
9  Q   Could you give me their names, please?
10 A   That's a trivial question. Hubert Cox.
11 That's a hoot. Hubert Cox, Al Woodlief, Howard
12 Herring. I believe Howard was the commissioner
13 there. Brian -- Brian -- I have to go back to
14 Brian. Gee, I haven't thought about that in
15 awhile.
16 Q   If you remember any other names over
17 the course of the day will you --
18 A   Yeah.
19 Q   -- tell me?
20 A   Uh-huh.
21 Q   Okay. And who extended you the offer
22 for the position of city manager?
23 A   Excuse me?
24 Q   Who extended the offer?
25 A   Who extended?

**Page 13**

1  Q   Yes, sir.
2  A   The town board.
3  Q   Collectively?
4  A   Yes.
5  Q   Was that in writing or verbally?
6  A   Well, both but I had an employment
7  agreement with the town.
8  Q   An employment agreement as the
9  assistant city manager?
10 A   Town manager -- city manager.
11 Q   Was that for a length of time?
12 A   No.
13 Q   What were the terms of your employment
14 agreement?
15 A   Just what they expected of me, my
16 responsibilities and then that, you know, I would
17 be expected to attend state and regional, national
18 meetings, you know, to try to stay current of
19 modern management practices. Be members of
20 certain organizations like ICMA. That's
21 International City County Managers Association.
22 Things of that nature.
23 Q   What was your pay at the time -- excuse
24 me, at the time you became city manager?
25 A   $50,000.

**Page 14**

1  Q   And you're no longer with the City of
2  Oxford; is that correct?
3  A   That's right.
4  Q   When did you leave your employment with
5  the City of Oxford?
6  A   February of 2008.
7  Q   Where have you been employed since
8  February of 2008?
9  A   Town of Butner.
10 Q   In what position with the Town of
11 Butner?
12 A   Town manager.
13 Q   Was that a position that you applied
14 for?
15 A   No.
16 Q   How was it that you came to be employed
17 with the Town of Butner?
18 A   They recruited me.
19 Q   Who specifically recruited you?
20 A   Members of town board.
21 Q   When did they first contact you
22 concerning that position?
23 A   Probably mid December.
24 Q   2007?
25 A   Seven, yeah.

**Page 15**

1      MS. DAVIS: Ms. Rice, I neglected
2  to say at the beginning, it's my fault.
3  Mr. Marrow has a back problem so he may need
4  to stand up and stretch. He said it's
5  perfectly okay if it's okay with you to keep
6  asking him questions while he's stretching,
7  but if he's --
8      THE WITNESS: I can pick this chair
9  up and put it over my head no problems, but
10 sitting in it --
11     MS. RICE: Do whatever you need to
12 do to feel comfortable.
13     THE WITNESS: Sitting in it makes
14 it uncomfortable.
15     MS. RICE: Please feel free to do
16 that whenever you need to.
17     THE WITNESS: No problem.
18     BY MS. RICE:
19 Q   So, I believe, you said mid December is
20 when you were first contacted concerning that
21 position?
22 A   Uh-huh.
23 Q   Did you interview for the town manager
24 position?
25 A   Yes, I did.

**Page 16**

1  Q   Who did you interview with?
2  A   Town board.
3  Q   All the town board?
4  A   I think the majority were there, yeah.
5  Q   Anybody else in addition to the board
6  members?
7  A   Town attorney.
8  Q   When were you extended the offer of the
9  town manager for Town of Butner?
10 A   Probably in January.
11 Q   Did you immediately give notice at the
12 City of Oxford that you were leaving?
13 A   Uh-huh.
14 Q   And to whom did you give notice?
15 A   That was the town board. They're the
16 city board and Butner is a town board. So the
17 city -- the city board. I dealt with the city
18 board.
19 Q   How much notice did you give that you
20 were leaving?
21 A   Thirty days.
22 Q   And did you work out your notice?
23 A   Excuse me?
24 Q   Did you work out your entire 30-day
25 notice?

**Page 17**

1  A   Yes, I did.
2  Q   And had you been continuously employed
3  as city manager from your promotion in
4  January 1995 until you left --
5  A   That's correct.
6  Q   -- in February of 2008?
7  A   That's correct.
8  Q   Could you describe your duties and
9  responsibilities as city manager with the City of
10 Oxford.
11 A   City of Oxford. Responsibilities,
12 prepare the budget, responsibilities were carry
13 out the policies of the town, my responsibility to
14 carry out the -- or enforce the ordinances of the
15 town. It was my responsibility to carry out the
16 motions of the board. In other words, they voted
17 to do a certain project it was my responsibility
18 to see it through. And it was my responsibility
19 to handle all personnel matters, oversee the
20 personnel matter process.
21 Q   When you say handle all personnel
22 matters what do you mean by that?
23 A   Well, ultimately the city manager is
24 responsible for all personnel matters.
25 Q   What do you mean when you say

**Page 18**

1 responsible for all personnel matters?
2   A   Well, number one is the manager's job
3 to keep the personnel policy updated. It was the
4 city manager's job to employ all the department
5 heads and it was the city manager's job to
6 terminate all the department heads if need be.
7   Q   Were you the immediate supervisor for
8 all the department heads?
9   A   Yes.
10   Q   And did the hiring decision -- did you
11 participate in the hiring of all the department
12 heads --
13   A   Yeah.
14   Q   -- under your supervision?
15   A   Yeah.
16   Q   How many different departments are
17 there within the City of Oxford?
18   A   Probably about ten. Approximately ten.
19   Q   What were your methods of supervising
20 the different department heads?
21   A   The methods? We had weekly staff
22 meetings. Every Wednesday we had a staff meeting.
23 We met and discussed what projects each individual
24 department head was involved in and shared
25 information with other departments to let them

**Page 19**

1 know what was going on in the city. I would visit
2 their offices and sit down and talk with them
3 individually about what they were involved in, was
4 there anything I need to know about.
5   Q   Did you perform performance
6 evaluations?
7   A   On occasion.
8   Q   On occasion. How often do you mean by
9 on occasion?
10   A   We updated our personnel policy in the
11 late '90s or 2000. In early 2000, several years
12 we conducted personnel employee evaluations. Then
13 the town board didn't -- it was somewhat connected
14 to merit increases. Town board stopped funding
15 the merit process and the evaluation process was a
16 little complicated. Some department heads did a
17 good job, some did not. About that time we were
18 having a turnover in the department heads. A lot
19 of them were retiring. There were several to
20 retire. And so it was hard to find time to
21 retrain everyone. So probably didn't do as good a
22 job in evaluations as we should have, but I did
23 meet with them on a regular basis and had frank
24 discussions about what they were doing.
25   Q   And these weekly meetings, I believe,

**Page 20**

1 you said they took place on Wednesday?
2   A   Uh-huh.
3   Q   Was that with all the department heads?
4   A   Yes.
5   Q   Each week?
6   A   Each week, every Wednesday morning at 9
7 o'clock.
8   Q   Was it mandatory for all the department
9 heads to attend?
10   A   They were highly encouraged.
11   Q   And, I believe, you said you also would
12 visit their offices from time-to-time?
13   A   Yes.
14   Q   How often would you --
15   A   Weekly.
16   Q   -- visit?
17       Okay. So every week you went to each
18 department head --
19   A   Yeah, I just worked around.
20   Q   -- at least once?
21   A   Yeah.
22   Q   Okay. And what kind of information
23 would be discussed in these weekly staff meetings?
24   A   Weekly staff meetings we discussed --
25 well, first -- it was always -- not always. We

**Page 21**

1 picked Wednesday because it's the day after a
2 board meeting so when assignments were given to me
3 from board meetings I'd pass those assignments
4 along to department heads and then let them know
5 what took place at board meetings.
6       On days that we weren't having --
7 immediately following a board meeting we basically
8 talked about what projects they were involved in
9 and they would share that information with other
10 department heads so everyone would know what is
11 going on within the town, but that's it.
12   Q   Did you attend all the board meetings?
13   A   Yes, I did.
14   Q   And how often would you have an
15 assignment to pass along to a department head
16 based on the board meeting from the night before?
17   A   Repeat it.
18   Q   How often would you have an assignment
19 to pass along to a department head --
20   A   How often?
21   Q   -- based on the meeting?
22   A   Every -- after every board meeting.
23   Q   After every meeting?
24   A   Yeah. Not necessarily every department
25 head got an assignment, but someone in that room

Page 22

1  probably received an assignment or, you know,
2  things to do.
3      (Mr. Burnette exits conference room.)
4      Q   Would Don Jenkins attend those staff
5  meetings --
6      A   Yes, he did.
7      Q   -- as well?
8          Would anyone keep minutes of those
9  staff meetings?
10     A   No.
11     Q   Did you personally take notes at the
12 staff meetings or at the staff meetings?
13     A   Not really. Normally I use the agenda
14 at the staff meeting immediately following a board
15 meeting. That was my -- those were my notes was
16 the actual agenda itself.
17     Q   Okay. Was that the agenda for the
18 board meeting?
19     A   Town board.
20     Q   Okay. So you didn't have a separate
21 agenda that you prepared --
22     A   No.
23     Q   -- for the staff meetings?
24     A   I used it because I had my notes on the
25 agenda.

Page 23

1      Q   Would you take notes at all of the town
2  board meetings or city board meetings?
3      A   Uh-huh, it was items that affected me
4  and duties I was to carry out.
5      Q   And who assisted you in preparing the
6  budget?
7      A   First the department heads would. I
8  would ask for their requests. Department heads
9  would turn in their requests for the departmental
10 budgets. I would take those requests and review
11 them, and it's kind of a two-step process. One
12 was line item departmental budget requests and
13 then capital outlay requests. Purchase of
14 large -- larger items. Purchase of a fire truck
15 or purchase of a fleet of cars, things of that
16 nature, purchase of a backhoe and I would review
17 those as well.
18         Of course we couldn't afford everyone's
19 requests so at that point we'd sit down and try to
20 comb through what they really needed to have
21 versus what they would like to have.
22     Q   When you say we would sit down together
23 would that be you and the department heads?
24     A   Uh-huh.
25     Q   When was the budget prepared for each

Page 24

1  year?
2      A   It varied. We would start process
3  sometime February -- February, maybe March of each
4  year and we would go full throttle all the way to
5  June -- to the last meeting in June. Sometimes we
6  had special called meetings in June in order to
7  adopt a budget.
8      Q   So is the budget effective July 1st of
9  each year?
10     A   Yes.
11     Q   Do you know John Wolford?
12     A   Yes, I do.
13     Q   How do you know Mr. Wolford?
14     A   I hired Mr. Wolford.
15     Q   Did you know him prior to --
16     A   No, I did not.
17     Q   -- hiring him?
18     A   No, I did not.
19     Q   What position did you hire Mr. Wolford
20 for?
21     A   Chief of police.
22     Q   For the City of Oxford?
23     A   For the City of Oxford.
24     Q   When did you hire Mr. Wolford?
25     A   In around 2000 I guess.

Page 25

1      Q   Was he replacing another chief?
2      A   Yes.
3      Q   Who did Mr. Wolford replace?
4      A   Roger Paul.
5      Q   Had Chief Paul retired?
6      A   Yes.
7      Q   Did you have any knowledge of
8  Mr. Wolford prior to hiring him for the position
9  of chief of police?
10     A   No.
11     Q   Did you personally interview
12 Mr. Wolford?
13     A   Yes, I did.
14     Q   Do you recall how often, how many
15 times?
16     A   Several.
17     Q   Did you interview him in the City of
18 Oxford?
19     A   Yes, I did.
20     Q   Did you conduct any phone interviews of
21 Mr. Wolford?
22     A   Such as?
23     Q   Did you ever call him and ask him any
24 questions over the phone prior to hiring him
25 referring to Mr. Wolford?

26

1  A   Did I call him with follow-up
2  questions. I don't recall.
3  Q   Who else participated with you during
4  the hiring process for the position that was
5  filled by Chief Wolford?
6  A   Several police chiefs, the city manager
7  and maybe an HR person.
8  Q   A city manager from another city?
9  A   Uh-huh.
10 Q   What city?
11 A   I believe it was Louisburg. It's
12 called an assessment process.
13 Q   How many other individuals in addition
14 to John Wolford were interviewed for the chief of
15 police position? How many other individuals in
16 addition to John Wolford were interviewed for the
17 chief of police position?
18     MS. DAVIS: Mr. Marrow, I'm going
19 to caution you that we shouldn't mention any
20 names --
21     THE WITNESS: Right.
22     MS. DAVIS: -- unless we're going
23 to go confidential --
24     THE WITNESS: Right.
25     MS. DAVIS: -- because that's

27

1  protected under the statute.
2  A   One, two, three -- four, I believe.
3  Four or five.
4  Q   Four or five in addition to John
5  Wolford?
6  A   Including John Wolford.
7  Q   Including, okay.
8      Was John Wolford the first individual
9  to receive the offer for the position of chief of
10 police?
11 A   No, he wasn't.
12 Q   Was he the second?
13 A   Yes, he was.
14 Q   Did you make the offer to John Wolford
15 directly?
16 A   Yes.
17 Q   Was anybody else present when you
18 extended the offer --
19 A   I don't think, no.
20 Q   -- for that position?
21     Was that in writing or verbally?
22 A   When I made the offer?
23 Q   Yes, sir.
24 A   Verbally and then probably followed up
25 in writing.

28

1      (Mr. Burnette enters conference room.)
2  Q   Did Mr. Wolford immediately accept your
3  offer?
4  A   I believe he did.
5  Q   What were the job duties for the chief
6  of police position during the time that you were
7  employed with the City of Oxford?
8  A   He was to run the department, the
9  Oxford Police Department. He was in charge of
10 hiring all the sworn and unsworn people within the
11 department.
12 Q   In addition to hiring all the sworn and
13 unsworn employees what other duties did Chief
14 Wolford have with respect to personnel?
15 A   To personnel. Well, he had the
16 authority to terminate or discipline.
17 Q   Anything else?
18 A   He was in charge of scheduling. They
19 work 12-hour shifts. They rotate -- rotating
20 shifts. He was in charge of making sure everyone
21 had proper equipment to provide public safety to
22 the citizens of Oxford, the proper equipment and
23 resources.
24 Q   When did you meet Sharon Iglesias?
25 A   I guess early 2000.

29

1  Q   What --
2  A   I'm not sure of her employment date,
3  but I'm sure I met her immediately after being
4  employed with the City of Oxford.
5  Q   Where did you meet Ms. Iglesias?
6  A   Probably the police department.
7  Q   During one of your weekly visits to the
8  police department? Do you think it was on one of
9  those occasions you met Ms. Iglesias?
10 A   It could have been, yes.
11 Q   Would you have been informed at the
12 time of Ms. Iglesias's hiring at the police
13 department?
14 A   No, probably not.
15 Q   Do you recall who was chief when Ms.
16 Iglesias was hired?
17 A   I think it was Roger Paul.
18 Q   How often did you have occasion to
19 speak with Ms. Iglesias after you first met?
20 A   Just on occasion.
21 Q   Would you say weekly or less
22 frequently?
23 A   Probably less weekly, but I don't know.
24 Just whenever I -- you know, there was days when I
25 went straight to see someone specific. If she was

**Page 30**

1  in the chief's office or adjacent, you know, I
2  probably spoke to her. But I would not go down
3  weekly and speak to everyone in the police
4  department. I don't know if I even probably did
5  that monthly.
6     Q   Was there any -- ever a time that you
7  went to the police department for the purpose of
8  speaking with Ms. Iglesias?
9     A   Specifically?
10    Q   Yes, sir.
11    A   I don't recall or if I had any reason
12 to specifically.
13    Q   If an employee was disciplined at the
14 police department how would you be aware -- made
15 aware of any disciplinary action haven been taken?
16    A   That may vary. There were times when a
17 police chief if he thought it was important enough
18 to let me know the severity -- if it's -- you
19 know, a disciplinary action had quite a bit of
20 substance to it he would let me know.
21    Q   When you say quite a bit of substance
22 what do you mean by that?
23    A   Well, sometimes someone may receive a
24 verbal warning, put it in the file, he wouldn't
25 tell me about those. If there was written

**Page 31**

1  disciplinary action generally I felt like he would
2  let me know.
3     Q   When you say he you're referring to
4  Chief Wolford?
5     A   Yes or Roger Paul at that time.
6     Q   Would they let you know in writing or
7  verbally if disciplinary action had taken place?
8     A   Both probably.
9     Q   Were disciplinary actions discussed
10 during the course of the weekly staff meeting?
11    A   No.
12    Q   Never?
13    A   Never.
14    Q   Were there ever circumstances where
15 department heads were required to get prior
16 approval from you before taking any disciplinary
17 action?
18    A   No, there wasn't a requirement. If
19 they wanted to that was fine. If they felt like
20 they were, you know, comfortable in what -- in
21 what they were doing that was -- they had the
22 leeway to do that.
23    Q   So they could come and speak with you?
24    A   Sure.
25    Q   Did you retain personnel files?

**Page 32**

1     A   No, I did not.
2     Q   Not for your department heads?
3     A   No.
4     Q   Okay. Or personnel files maintained by
5  another office?
6     A   Yes.
7     Q   What office was that?
8     A   HR.
9     Q   Did you keep any records concerning any
10 of the department heads that you supervised in
11 your office?
12    A   No.
13    Q   With the exception of the staff
14 meetings and the visits how would you correspond
15 with the department heads? Would it be through
16 interoffice mail or electronic mail?
17    A   I -- there were on occasions I would
18 use electronic mailing, but a lot of times I like
19 to speak to them verbally. Gave me a chance to
20 get out and visit and sit down and talk to them.
21    Q   Did you have an e-mail group for all
22 department heads? If you say for instance wanted
23 to send an e-mail to all the department heads do
24 you have them in a designated group?
25    A   I know I had the mayor and the board.

**Page 33**

1  And probably what you're referring to is a
2  designated group of department heads, I don't
3  think so. I don't recall.
4     Q   What was your e-mail address when you
5  were employed with the City of Oxford?
6     A   City of Oxford was
7  TMarrow@OxfordNC.org.
8     Q   Did you have any other work e-mail
9  addresses?
10    A   No, I did not.
11    Q   How about any personal e-mail
12 addresses?
13    A   Personal?
14    Q   Yes.
15    A   No, I did not.
16    Q   Are you married?
17    A   Yes.
18    Q   What's your wife's name?
19    A   Julia.
20    Q   Julia Marrow?
21    A   Uh-huh.
22    Q   Did Mrs. Marrow have a personal e-mail
23 address?
24    A   No, she does not.
25    Q   She does not now?

**Page 34**

1  A   She never has.
2  Q   Do you have a home computer?
3  A   No, I do not.
4  Q   Have you ever had a computer at home?
5  A   Had one probably let's see, 12, 14 --
6  14 -- 12, 14 years ago.
7  Q   Did you have a laptop?
8  A   No, I did not.
9  Q   You do not now?
10 A   No.
11 Q   Have you ever had a laptop?
12 A   No.
13 Q   Have you ever had the use of a laptop
14 at work?
15 A   No. Could not operate one if I had to.
16 Q   You could not -- excuse me?
17 A   I couldn't operate one if I had to.
18 Q   Did you have any personal assistance
19 while -- or administrative assistance while you
20 were employed with the City of Oxford?
21 A   Did I have?
22 Q   Any administrative assistance.
23 A   Yes.
24 Q   Throughout the time that you were city
25 manager?

**Page 35**

1  A   Uh-huh.
2  Q   Was it the same?
3  A   City manager, yes.
4  Q   Okay. Same person throughout that
5  whole time period?
6  A   No.
7  Q   Who was employed as your administrative
8  assistant during that time?
9  A   Ann Parrott was city clerk, Barb Rote
10 was city clerk and Tanya Weary was city clerk.
11 And then we also had -- we had administrative
12 assistants in addition to the city clerk. So
13 between the two, you know, they were my assistants
14 when I needed assistance.
15 Q   Did the city clerk work in your
16 immediate proximity?
17 A   Yes.
18 Q   And any other administrative assistants
19 that you supervised they also work in your
20 immediate vicinity?
21 A   Yes.
22 Q   And that's in city hall or was it --
23 A   Yes.
24 Q   -- city hall?
25     How many of the department heads had

**Page 36**

1  offices in city hall?
2  A   How many of the departments?
3  Q   Yes, sir.
4  A   Finance, planning, economic
5  development, HR, engineering, building maintenance
6  and executive suite which was my suite.
7  Q   And where was your office in proximity
8  to Don Jenkins?
9  A   He was across the building.
10 Q   Across the building?
11 A   Uh-huh.
12 Q   How far across the building?
13 A   In feet?
14 Q   Yes, sir, roughly.
15 A   A hundred feet.
16 Q   Same floor?
17 A   Yes.
18 Q   How often would you meet with
19 Mr. Jenkins -- Don Jenkins?
20 A   Almost daily.
21 Q   Almost daily?
22 A   Uh-huh.
23 Q   Concerning what matters?
24 A   Just various matters. His office was
25 across the hall from the coffee room. Many

**Page 37**

1  mornings we met at the coffee pot.
2  Q   I believe you mentioned that the
3  finance office -- the finance department is one of
4  the offices that is housed in city hall or was
5  housed --
6  A   Yes, that's correct. They are on the
7  first floor.
8  Q   And who was the finance director during
9  the time that you were employed with the City of
10 Oxford?
11 A   We had two. Kelly Howard and Steve
12 McNally. Kelly is retired and Steve is the
13 current finance officer.
14 Q   Is Mr. Howard employed elsewhere now?
15 A   Excuse me?
16 Q   Is Kelly Howard employed elsewhere?
17 A   He contracts part time with the Town of
18 Butner.
19 Q   Do you ever see his contract?
20 A   Have I seen his contract?
21 Q   Do you oversee his contract or do you
22 supervise him --
23 A   Yes.
24 Q   -- in that position?
25 A   Yes.

**Page 38**

1  Q    And for what position is he
2  contracted -- for what work is he contracted?
3  A    Finance.
4  Q    Do you have any full-time finance staff
5  at the Town of Butner?
6  A    No.
7  Q    And do you recall when Mr. Howard
8  retired from the City of Oxford?
9  A    Approximately 2004.
10 Q    Was Mr. McNally -- excuse me. Was Mr.
11 Howard immediately replaced by Mr. McNally?
12 A    Yes.
13 Q    What were the duties of the finance
14 director?
15 A    Look after the cash management of the
16 town, charge accounts payable, accounts
17 receivable, general ledger, collection and billing
18 of the water and sewer fund.
19 Q    I'm sorry, for the what fund?
20 A    Water.
21 Q    Water?
22 A    Send out the water bill and collecting
23 water bills.
24 Q    What do you mean by cash management?
25 A    Well, we -- town had several million

**Page 39**

1  dollars in water, sewer and in the general fund
2  and it was his responsibility to invest that money
3  and to oversee the investment of those monies. Of
4  course make sure we had enough money in the
5  checking account to pay bills, things of that
6  nature.
7  Q    Did each of the departments have their
8  own petty cash funds?
9  A    Some did, not every department. Some
10 did.
11 Q    What departments did?
12 A    Planning, recreation. I guess my
13 department had one, but I never -- I don't think
14 I've ever used it. I guess the police department.
15 Q    Any others that you can think of?
16 A    Finance probably had petty cash.
17 That's all I can think of. Only those that for
18 whatever reasons would handle cash or have to make
19 change with permits, things of that nature handled
20 some money, had petty cash. Not everyone had
21 petty cash.
22 Q    And how were those petty cash funds
23 funded?
24 A    How were they funded?
25 Q    Yes, sir.

**Page 40**

1  A    By the town. We would put X number of
2  dollars into it and we would require -- as it was
3  used you document and turn it in. Once you got a
4  certain amount you would turn it in -- or if you
5  collected a certain amount you would turn it in.
6  Q    And each of those expenditures was to
7  be documented?
8  A    Uh-huh.
9  Q    How were the expenditures from the
10 petty cash funds to be documented?
11 A    It could be just handwritten or for a
12 receipt if you took a receipt. Depends on if the
13 receipt -- sometimes receipts are used and
14 sometimes they were not depending on the
15 department.
16 Q    Would it have been Mr. Howard's and
17 later Mr. McNally's job to oversee those funds as
18 well ultimately?
19 A    Yes, probably so when they were turned
20 in, yes.
21 Q    And were they turned in on a regular
22 basis or just when a certain amount of money had
23 been spent?
24 A    Generally when a certain amount of
25 money accumulated. We don't want folks sitting

**Page 41**

1  there with large sums of money just to protect
2  them.
3  Q    Do you know of any other funds in
4  addition to the petty cash fund that was
5  administered within the police department of the
6  City of Oxford?
7  A    Other than petty cash?
8  Q    Yes, sir.
9  A    There was a police undercover fund and
10 there was an evidence fund.
11 Q    What's the police undercover fund?
12 A    Those are monies given to the city by
13 the court system to be used for certain police
14 activities.
15 Q    What police activities?
16 A    Purchase of information. Probably
17 purchase of some -- some equipment, some resources
18 to conduct certain type surveillance activities.
19 It's fairly restrictive.
20 Q    Restrictive?
21 A    Or use of. Couldn't give raises or
22 anything like that with it.
23 Q    And you mentioned the evidence fund.
24 What was the evidence fund?
25 A    The evidence fund was really not part

**42**

1  of the town's budget. That was -- I believe if
2  I'm correct that was money that was evidence in --
3  in -- well, the custodian of monies that he
4  confiscated in a drug raid or this or that. We
5  held that money or guns or whatever it was until
6  court trials came about and until the judge
7  determined how that money was to be disbursed.
8     Q   How were expenditures what you
9  described as the police undercover fund how were
10 those to be documented?
11    A   If they were used to purchase say
12 information or whatever it was to be signed by two
13 people.
14    Q   What two people?
15    A   Those who were authorized to use it.
16 There were certain folks authorized to use it.
17 Not just anyone could go in and get it.
18    Q   Who was authorized to use it to the
19 best of your knowledge?
20    A   Undercover detectives, I guess, you
21 would call them, ultimately the chief since he was
22 in charge of the police department. Probably
23 certain command staff could have access to it as
24 well.
25    Q   How were expenditures from the police

**43**

1  undercover fund how were they monitored by your
2  office?
3     A   Periodically I would send the finance
4  officer down to audit the undercover fund.
5     Q   When you say periodically how often
6  would you send the finance director?
7     A   It was -- he went down on irregular
8  basis to audit many times. I did not have to ask
9  him. It was part of his job duties.
10    Q   Was it audited more than once a year?
11    A   Probably yearly.
12    Q   And what do you mean when you say
13 audit?
14    A   He would go down and check ledgers, see
15 if it balanced, money in money out. That was
16 mainly what he was concerned about as finance
17 officer.
18    Q   When was the last time that you
19 directed the finance director to audit the police
20 undercover fund?
21    A   Me specifically?
22    Q   Yes, sir.
23    A   That's a good question. The city
24 management form of government I guess I could say
25 in a roundabout way I did that in the Fall of '03.

**44**

1     Q   Fall of 2003?
2     A   Yeah.
3     Q   And why did you do that the Fall of
4  2003?
5     A   We had a finance committee meeting and
6  they wanted for some reason to have it audited and
7  I okayed it.
8     Q   Who was on the finance committee?
9     A   Commissioner Jack Carey, Commissioner
10 Clement Yancey. At that time I'm not sure. It
11 moved around a little bit. Different people
12 served on it. I don't know if it was Commissioner
13 Herring or Commissioner Currin. I'm not sure who
14 the third person was at that time.
15    Q   Did the finance committee specifically
16 want the police undercover fund investigated or
17 audited at that time?
18    A   The undercover fund.
19    Q   Okay.
20    A   Yeah, just the undercover fund.
21    Q   Just the undercover fund?
22    A   Yeah.
23    Q   Did -- did anyone in the fiance
24 committee tell you why they wanted the undercover
25 fund audited?

**45**

1     A   No, not really.
2     Q   Did you think it was an unusual
3  request?
4     A   Well, a little bit, yes.
5     Q   Why is that?
6     A   Just because why now, I mean, but I had
7  no quarrels with it.
8     Q   You had no problems with the request
9  that --
10    A   Absolutely not, no.
11    Q   -- it be audited?
12    A   Absolutely not.
13    Q   And do you know if Mr. Howard
14 thereafter audited the undercover fund in or
15 around the Fall of 2003?
16    A   He did. He did. To satisfy the
17 finance committee I asked him to go unannounced
18 even to me.
19    Q   Why did you think that would satisfy
20 the finance committee?
21    A   Just trying to be accommodating.
22    Q   Did the finance committee want
23 Mr. Howard to go unannounced?
24    A   They agreed to that, thought it was a
25 good idea.

Page 46

1  Q  Why did they think it was a good idea?
2  A  I don't know. I can't speak for them.
3  Q  Did Mr. Howard find any irregularities?
4  A  No, he did not.
5  Q  And do you know if Mr. Howard looked at
6  any documents in addition to the ledger for the
7  undercover fund?
8  A  I imagine he did not. He went and
9  looked at the undercover fund ledger.
10 Q  Did you personally look at the drug
11 undercover fund ledger in or around Fall of 2003?
12 Did you personally look at the ledger for the
13 undercover fund?
14 A  In '03?
15 Q  In '03.
16 A  No.
17 Q  When did you first look at the drug --
18 the ledger for the undercover fund?
19 A  Spring of '04.
20 Q  When in the Spring of '04?
21 A  Around May. Sometime around May
22 possibly.
23 Q  And why did you look at the ledger for
24 the undercover fund in the Spring of '04?
25 A  The city's external auditor had audited

Page 47

1  the undercover fund and found that the monies in
2  matched the monies out, but he was told by
3  Ms. Iglesias that there was some issues with the
4  way the money was withdrawn by the chief in the
5  undercover fund. So the external auditor brought
6  copies of the ledger and I think some of
7  Ms. Iglesias's notes to me for my review. We
8  thought we ought to take a look at them.
9  Q  Who brought you the ledger and the
10 outside notes -- excuse me, Ms. Iglesias's notes?
11 A  I'm thinking it was outside auditor.
12 Q  And outside that's the same thing as
13 the external auditor?
14 A  Yeah. The internal auditor is finance
15 officer Kelly Howard. External is Jim Winston who
16 conducts the audits for the City of Oxford.
17 Q  So did Mr. --
18 A  Annual audit for the City of Oxford.
19 Q  When is that annual audit conducted?
20 A  It starts right around July, August and
21 it's normally completed -- it's supposed to be
22 completed by October of each year but we normally
23 receive it around January.
24 Q  Are all the -- are all the departments
25 audited each year?

Page 48

1  A  Well, the City of Oxford is audited.
2  The entire city is audited and so it's more --
3  yeah, I guess so in a roundabout way. The auditor
4  doesn't go to each individual department and
5  audit. They do the audits from the financial
6  information turned into the fiance department. But
7  that auditor can go to a department. I imagine
8  they did but I didn't follow them around.
9  Q  Had Mr. Winston audited the undercover
10 fund in or around the Spring of 2004 as part of
11 this annual audit?
12 A  No.
13 Q  Why -- why had this --
14    MS. DAVIS: And at this point, I
15 think, we're going to get into some personnel
16 matters because when you ask the question of
17 why he's going to have to answer in relation
18 to personnel matters. So if you want to go
19 there we can make this part confidential.
20    MS. RICE: I think I'll come back
21 to it.
22    MS. DAVIS: Okay.
23    BY MS. RICE:
24 Q  What did you do after -- well, did you
25 speak with Mr. Winston in May of 2004 concerning

Page 49

1  his audit of the undercover fund?
2  A  I spoke to him about it, yes.
3  Q  Did you receive anything in writing
4  from Mr. Winston?
5  A  I think he gave me copies of the ledger
6  and some notes from Ms. Iglesias.
7  Q  Any documents created by Mr. Winston?
8  Did he give you any documents that he had created
9  personally?
10 A  Such as? I mean --
11 Q  Do you know if Mr. Winston prepared a
12 report concerning his audit?
13 A  I think he did prepare a report.
14 Q  A written report?
15 A  Yes, to me.
16 Q  Did that written report state the
17 findings of Mr. Winston's audit?
18 A  Yes, it basically said money in and
19 money out was accounted for as I recall.
20 Q  What did you understand that to mean
21 money in and money out is accounted for?
22 A  The monies that were used were
23 accounted for. So if you matched the monies taken
24 out and accounted for it balanced back to the
25 amount that was in there.

**Page 114**

1  Q   Was it in January of 2006?
2  A   Yes.
3  Q   And what did you mean by proper
4  documentation?
5  A   Just that he had grounds and reasons to
6  terminate.
7  Q   Do you know if Chief Wolford had any
8  other -- had any assistance in the preparation of
9  the document that's been marked as Exhibit 77?
10     MS. DAVIS:  Do you mean other than
11     counsel?
12 Q   Did Chief Wolford have any assistance
13 in the preparation of Exhibit 77 to your
14 knowledge?
15 A   He may have had counsel helping in
16 preparation of the document.
17 Q   Do you know if he discussed this
18 document or had assistance with this document from
19 Don Jenkins?
20 A   Being an HR person I wouldn't have been
21 surprised if he had.
22 Q   When did you first see what's been
23 marked as Exhibit 77?
24 A   When did I first see it?
25 Q   Yes, sir.

**Page 115**

1  A   When did I first see it.  I don't
2  recall a date when I first saw it.  January.
3  Q   Was it --
4  A   Probably several days before maybe,
5  yeah.
6  Q   Several days before when?
7  A   The date of the letter.
8  Q   By the date of the letter you're
9  referring to the date at the top of the letter or
10 the date at the bottom of the letter?
11 A   The top, January 24th.
12 Q   So several days prior to
13 January 24th --
14 A   Uh-huh.
15 Q   -- 2006 you first saw this letter?
16 A   Uh-huh.
17 Q   Did you agree with the contents of the
18 letter?
19 A   Yes.
20 Q   In the first paragraph where it reads
21 despite the fact that numerous agencies and
22 persons have determined them to be without merit
23 what did you understand Chief Wolford to be
24 referring to?
25 A   Where do you see that?

**Page 116**

1  Q   In the first paragraph --
2  A   Yeah.
3  Q   -- where it reads despite the fact that
4  numerous agencies and persons have determined them
5  to be without merit what did you understand Chief
6  Wolford to be referring to in that sentence?
7  A   I can't find it.
8  Q   I believe it's approximately midway
9  down in the first paragraph.
10 A   Oh, okay.  The agency would probably be
11 the town attorney, the D.A. and SBI.
12 Q   The city attorney Mr. Burnette?
13 A   Uh-huh, yes.
14 Q   The district attorney is that Sam
15 Currin?
16 A   Sam Currin.
17 Q   And the SBI, the State Bureau of
18 Investigations?
19 A   Yes.
20 Q   What is your understanding of what it
21 is to have a predisciplinary conference?
22 A   That is a conference you have with the
23 individual before termination.  It's basically to
24 as I understand it to just give them a heads up of
25 what's getting ready to take place.

**Page 117**

1  Q   And you say --
2  A   If they have anything to say they need
3  to say it right then -- right then and there.
4  Q   When you say give them a heads up are
5  you referring to whatever employee is subject to
6  the disciplinary action being taken?
7  A   Uh-huh.
8      MS. DAVIS:  You need to say yes or
9      no, Mr. Marrow.
10 A   Yes.
11 Q   Whose responsibility was it to insure
12 that the policy concerning predisciplinary
13 conferences was followed?
14 A   Ultimate it's the chief's but I would
15 have had -- the chief's.
16 Q   When did you become aware that
17 Ms. Iglesias had in fact been terminated?
18 A   I imagine I received a phone call the
19 day of or the day after.
20 Q   From whom did you receive a phone call?
21 A   I imagine Chief Wolford.
22 Q   What did Chief Wolford tell you?
23 A   That he had followed through and
24 terminated Ms. Iglesias.
25 Q   Did he tell you anything concerning any

COMPRESSED COPY

**Page 118**

1 efforts on his part to insure that Ms. Iglesias
2 had received a predisciplinary conference?
3   A   He said he had given that
4 predisciplinary conference. He held it, yes.
5   Q   Is that all the chief informed you?
6   A   Yes.
7   Q   Did he tell you anything about
8 Ms. Iglesias's reaction to having been terminated?
9   A   I don't recall, no. I don't recall the
10 details of it.
11   Q   If I could ask you to turn to Exhibit
12 74, please. Take a moment to review that document
13 and let me know when you've finished doing so.
14   A   Okay.
15   Q   Have you had an opportunity to review
16 what's been marked as Exhibit 74?
17   A   Yes.
18   Q   And are you familiar with the document
19 that's been marked as Exhibit 74?
20   A   Yes.
21   Q   Could you describe Exhibit 74?
22   A   Describe it? It's a memo from John
23 Wolford to Tommy Marrow and Don Jenkins. Subject
24 matter is -- is that Ms. Iglesias is still making
25 contact with local television stations and that

**Page 119**

1 it -- the fact that -- well, what else you want me
2 to say?
3   Q   Were you aware prior to receiving
4 Exhibit 74 that Ms. Iglesias had made contact with
5 the local news stations?
6   A   Yes, I think, in the Fall of '05 there
7 was some rumors that she was trying to get some to
8 come over but they just hadn't had a chance to get
9 over. I'm not sure why. So this didn't really
10 surprise me at all.
11   Q   Did you respond in writing to what's
12 been marked as Exhibit 74?
13   A   I don't believe I did.
14   Q   Did you receive any other e-mails from
15 Chief Wolford on or around January 3rd, 2006
16 concerning Ms. Iglesias?
17   A   I don't -- not on or around, within a
18 week maybe. But not -- not that day or a day
19 before or day after not that I recall.
20   Q   If I could ask you to turn now to
21 Exhibit 83, please. Actually I'll come back to
22 that.
23        I'm sorry, could you turn to Exhibit
24 75, please.
25   A   Okay.

**Page 120**

1   Q   And I'm sorry, are you on Exhibit 75?
2   A   Yes.
3   Q   Okay. If you could just take a moment
4 to review that document and let me know when
5 you've finished doing so.
6   A   Okay. I've read it.
7   Q   Okay. Do you recall receiving what's
8 been marked as Exhibit 75?
9   A   Uh-huh.
10   Q   And did you receive it on or about
11 January 9th of 2006?
12   A   Uh-huh, yes.
13   Q   And what did you understand to have
14 occurred based on --
15   A   What occurred --
16   Q   -- the contents of the document?
17   A   -- was WRAL was -- came to the Oxford
18 Police Department and -- to do an interview
19 concerning Chief Wolford and, I believe, this
20 suggested chief went out and spoke to them, tried
21 to clear up any questions that may exist about his
22 allegations to misuse of funds.
23   Q   Did anyone from the news media approach
24 you --
25   A   No.

**Page 121**

1   Q   -- in January 2006 regarding
2 Ms. Iglesias?
3   A   I don't remember so, no. I had some
4 media for other things but I don't recall that.
5   Q   Did you respond to what's been marked
6 as Exhibit 75?
7   A   No.
8   Q   Did you discuss what's been -- did you
9 discuss Chief Wolford's interactions with the news
10 media on or around January 9th, 2006 with Chief
11 Wolford or Don Jenkins?
12   A   I may have mentioned -- talked to chief
13 about him going on camera. But he just felt
14 like -- asked him why he did so and he said he
15 felt like it was something he needed to do. So I
16 said okay.
17   Q   Was that after he had been interviewed?
18   A   Yes.
19   Q   Were you upset with the fact that he
20 had gone on camera?
21   A   No. If it had been my choice I
22 probably wouldn't have recommended it, but since
23 he had already done so it didn't seem -- it seemed
24 okay.
25   Q   Why would you probably not have


**Page 122**

1  recommended it?
2  A    Well, it's just -- gosh -- you never
3  know what the reporters are going to ask and it's
4  just probably best not to talk to television
5  stations unless it's something you just need to
6  do.
7  Q    Based on what he told you did you
8  understand that Chief Wolford felt as though he
9  needed to go and answer questions --
10 A    He felt like he did.
11 Q    Did you ever discuss Ms. Iglesias,
12 Sharon Iglesias with any of the commissioners
13 outside of a board meeting?
14 A    Outside of a board meeting?
15 Q    Yes, sir.
16 A    If it was it was in a very generic way.
17 I would never discuss personnel matters with a
18 city commissioner.
19 Q    You would never discuss a personnel
20 matter with a city commissioner?
21 A    That's correct.
22 Q    Did you ever discuss Chief Wolford with
23 any of the commissioners?
24 A    More specifically about?
25 Q    Did you ever discuss any investigation

**Page 123**

1  that had been done concerning Chief Wolford --
2  A    No.
3  Q    -- with any commissioner?
4  A    No, not any great details, no.
5       MS. DAVIS: And to be clear, this
6  is outside the context of a board meeting?
7       MS. RICE: Right.
8       MS. DAVIS: Okay.
9  A    No.
10 Q    How long have you known Jack Carey?
11 A    Probably 20 years.
12 Q    How did you first meet Mr. Carey?
13 A    When I was working at Kerr Tar Regional
14 Council Governments, I believe, he was on their
15 board of directors. And also I was in charge of a
16 loan program and he helped sit on a board that
17 reviewed loans.
18 Q    Do you consider Mr. Carey to be
19 trustworthy?
20 A    Yes.
21 Q    How long have you known Mr. Jenkins?
22 A    Probably the same amount of years, 20
23 years.
24 Q    How did you know Mr. Jenkins? How did
25 you first meet Mr. Jenkins?

**Page 124**

1  A    He and I go to the same church.
2  Q    Did you have any occasion to work with
3  him prior to your employment with the City of
4  Oxford?
5  A    No.
6  Q    Do you socialize with Mr. Jenkins
7  outside of work? Have you ever socialized with
8  him outside of work?
9  A    Have I ever?
10 Q    Yes, sir.
11 A    I think we went fishing at a lake one
12 day. That's about it.
13 Q    How about Chief Wolford, you ever
14 socialize with Chief Wolford outside of work?
15 A    I may have taken him fishing one day --
16 once. That's all.
17 Q    When did you take him fishing?
18 A    Kerr Lake.
19 Q    When?
20 A    When?
21 Q    Yes, sir.
22 A    Just during those eight years.
23 Probably 2002, 2003 maybe. Not any time recent.
24 Q    Was it just you and Chief Wolford?
25 A    Yes.

**Page 125**

1  Q    How long have you known Al Woodlief?
2  Am I pronouncing it correctly?
3  A    Yeah, Woodlief. Since 1991.
4  Q    What were the circumstances under which
5  you met Al Woodlief?
6  A    When I became employed with the City of
7  Oxford he was on the town board.
8  Q    Was he the mayor at that time?
9  A    No.
10 Q    When was he first elected mayor?
11 A    Probably about 2001. That's a hard
12 question. I think about 2001. Our election is
13 every odd year so I'm just trying to go by odd
14 years. Yeah, 2001.
15 Q    What's the relationship of the mayor to
16 the city commissioners?
17 A    Mayor in the City of Oxford is the
18 ceremonial figurehead for the city. He cuts the
19 ribbons and he kisses the babies and that sort of
20 thing. But he also is the chairman of the board.
21 Not literally but he serves as capacity as the
22 chairman of the board of commissioners. He
23 resides at all the meetings.
24 Q    I'm sorry, he --
25 A    Presides at all the --

**Page 126**

1 Q -- presides -- okay.
2 A -- meetings. That's probably true;
3 isn't it? Excuse me.
4 Q Does the mayor have a vote on the
5 board?
6 A No, only if there's a tie. And they're
7 not many ties because it's seven commissioners.
8 So one would have to be absent and then there may
9 be an opportunity to vote to break a tie or
10 someone excuses themself for a conflict of
11 interest.
12 Q Did you ever speak with the Mayor Al
13 Woodlief about Sharon Iglesias -- concerning
14 Sharon Iglesias?
15 A Did I discuss personnel matters with
16 the mayor concerning Sharon Iglesias, no. Did I
17 talk to him on occasion in general, probably so.
18 Q What did you discuss with him generally
19 speaking?
20 A Just how things were going.
21 Q Did you ever discuss any
22 investigation -- did you ever discuss the
23 investigation that you had conducted concerning
24 allegations raised by Ms. Iglesias with respect to
25 Chief Wolford with Al Woodlief?

**Page 127**

1 A No.
2 Q When did Chief Wolford take the oath of
3 office for his position as chief of police?
4 A Soon after he was hired.
5 Q How soon after he was hired?
6 A Not immediately. He should have been
7 sworn in the protocol probably would have been at
8 our next board meeting would have had him sworn
9 in. But I don't think that took place because our
10 current sitting mayor passed away and we were
11 extremely preoccupied with that, trying to deal
12 with that loss -- his loss and what we needed to
13 do to replace the mayor. That was an interesting
14 process. And we just got sidetracked with that,
15 and I dropped the ball on that.
16 Q When you say you dropped the ball are
17 you referring to --
18 A I should have seen to it that chief was
19 sworn in in a timely manner, and I just got
20 preoccupied with the mayor's passing and I dropped
21 the ball and I didn't get it done.
22 Q Did anything happen to cause you to
23 pick up the ball on that to insure that the chief
24 was sworn in?
25 A Someone pointed it out that the chief

**Page 128**

1 hadn't been sworn in.
2 Q Who pointed it out?
3 A I think it was a gentleman named Frank
4 Strickland.
5 Q What did you do after it was pointed
6 out that the chief hadn't been sworn in?
7 A I went to the chief and asked him had
8 we sworn you in. And he said no, I was waiting on
9 you. And I said well, I guess, we need to swear
10 you in. So we did the very next -- well, we did
11 soon after.
12 Q Was it done at a board meeting?
13 A You know, I don't recall. The protocol
14 would of had it to do so, but since an inordinate
15 amount of time had passed we may not have done
16 that. I don't recall what meeting it was at. I
17 want to say we did it in the police department but
18 I'm not real clear on that. I know we did it
19 quickly. Whatever method it was done quickly.
20 Q Was the chief sworn in more than once?
21 A No. If he was I wasn't aware of it.
22 MS. RICE: We're on 88. Mark that
23 as 88, please.
24 (Mr. Marrow's Deposition Exhibit
25 No. 88 was marked for

**Page 129**

1 identification.)
2 (Document handed to witness for review.)
3 BY MS. RICE:
4 Q If you could take what's been marked as
5 Exhibit 88 and review that document and let me
6 know when you're done.
7 A Okay.
8 Q Are you familiar with the document
9 that's been marked as Exhibit 88?
10 A Yes.
11 Q Can you describe it for the record,
12 please?
13 A It's a memo to Tommy Marrow, city
14 manager from the Oxford Police Department command
15 staff concerning Sharon Iglesias's employment.
16 Q Was it received on or about
17 January 10th, 2006?
18 A Apparently so.
19 Q And I'm sorry, was it received by you
20 on or about January 10th, 2006?
21 A Yes.
22 Q Was this the first correspondence you
23 received from the command staff regarding Sharon
24 Iglesias?
25 A From the command staff, yes, I believe

**Page 130**

1  it was.
2  Q    What did you do upon receiving what's
3  been marked as Exhibit 88?
4  A    I reviewed it. Actually I think they
5  hand delivered it.
6  Q    Who?
7  A    We sat down and we talked about it.
8  Q    Who hand delivered it?
9  A    The command staff.
10 Q    All of the command staff?
11 A    Uh-huh. We sat down and talked about
12 it and they were very very very very serious about
13 the contents of this memo and that they
14 respectively requested for me to -- to take some
15 form of action.
16      But I told them I just at that point
17 could not do so but this was -- this was something
18 very important. It basically said if -- that
19 someone needed to go. Either Ms. Iglesias needed
20 to go and/or we may lose some police officers,
21 even members of the command staff. So I took this
22 very seriously.
23 Q    And when you're referring to the
24 command staff who -- who are you referring to?
25 A    Well, at the time it was Floyd Griffin,

**Page 131**

1  Glen Boyd and Bob Williamson.
2  Q    Did all three -- did Bob Williamson,
3  Glen Boyd and Floyd Griffin --
4  A    Uh-huh.
5  Q    -- all come and speak with you at the
6  same time?
7       Was anyone else present?
8  A    No.
9  Q    And, I believe, you said that this was
10 hand delivered?
11 A    I believe it was.
12 Q    How long did you meet with the command
13 staff?
14 A    How long did I meet with them?
15 Q    Yes, sir.
16 A    Thirty minutes maybe.
17 Q    What did you discuss during the
18 meeting?
19 A    The contents of this.
20 Q    Okay. What specifically?
21 A    How she is being disruptive to the
22 police department. Explained how she was talking
23 to other officers, talking disrespectful, trying
24 to discredit the chief in any way she could. And
25 it was basically undermining their ability to

**Page 132**

1  provide public safety in the City of Oxford.
2  Q    If you could read the last two
3  sentences of Exhibit 88 on the first page.
4  A    Okay. And you and -- excuse me. It's
5  all capitalized.
6       Ms. Iglesias is now damaging the
7  department's ability to work as a unit. She has
8  publically damaged the Oxford Police Department
9  and the city as a whole. We therefore
10 respectfully request that some action be taken to
11 either terminate her or remove her from this
12 building immediately. We realize the position
13 this puts you in but we need some relief. More
14 than 90 percent of the department supports the
15 chief and has come to us at one time or another
16 wanting to know when something is going to be
17 done. She has repeatedly violated her final,
18 final warning regarding confidentiality. Now is
19 the time for swift and decisive action.
20 Q    Did you ask the command staff how they
21 knew that more than 90 percent of the department
22 supports the chief?
23 A    That was -- no, I didn't ask them
24 specifically, but the command staff -- that
25 command staff is in charge of a hundred percent of

**Page 133**

1  the employees of the Oxford Police Department.
2  Each has a section of the police department
3  they're responsible for. Even civilians -- from
4  sworn officers down to the civilians. Someone
5  reports to those three people.
6  Q    Did you ask them who in the department
7  didn't support the chief?
8  A    No, I wasn't that interested in who was
9  and who wasn't.
10 Q    Do you know which of the three members
11 of the command staff drafted the document marked
12 as Exhibit 88?
13 A    I do not.
14 Q    Where the document reads she has
15 repeatedly violated her final, final warning
16 regarding confidentiality --
17 A    Uh-huh.
18 Q    -- how would the command staff be privy
19 to the contents of Ms. Iglesias's warning?
20 A    By her -- by her breaching it. They're
21 aware that she breached it.
22 Q    They -- you're saying that the command
23 staff was aware that she breached it. You're
24 referring to her final warning?
25 A    Well, that's what they typed up that

134

1 they -- they had thought she had repeatedly
2 violated her final warnings.
3 Q And I'm sorry if I'm repeating myself.
4 Was this the only written correspondence you
5 received from the command staff regarding
6 Ms. Iglesias?
7 A Yes.
8     MS. RICE: Eighty-nine.
9         (Mr. Marrow's Deposition Exhibit
10         No. 89 was marked for
11         identification.)
12     (Document handed to witness for review.)
13     BY MS. RICE:
14 Q Can you review what's been marked as 89
15 and let me know when you have had an opportunity
16 to do that.
17     (Pause.)
18 A Okay. I thumbed through it.
19 Q All right. Are you familiar with the
20 document that's been --
21 A Yes.
22 Q -- marked as 89?
23     And are these your responses --
24 A Yes.
25 Q -- to Ms. Iglesias's first set of

135

1 requests for admissions, interrogatories and
2 requests for production of documents?
3 A Yes.
4 Q And to the best of your knowledge are
5 they accurate -- truthful and accurate?
6 A Yes.
7 Q If I could ask you to turn to I believe
8 it's interrogatory number three of Exhibit 89.
9 A Okay. What's your question?
10 Q You reference in your response your
11 answer. I recall in one press release which was
12 released approximately January 27th, 2006 which
13 was published in various media outlets. And any
14 statements by me to the media would have been
15 published around the same time period.
16     Do you recall the contents of the press
17 release -- the June 27th, 2006 press release to
18 which you're referring?
19 A I couldn't recite it to you but I
20 remember doing it, yes.
21 Q And I understand that you can't recite
22 it verbatim.
23 A Right.
24 Q But do you recall generally its
25 contents?

136

1 A That the city manager, the attorney,
2 the other agencies had reviewed the undercover
3 fund and in the handling of those funds by Chief
4 Wolford and found no -- basically found no basis
5 to pursue it any further as it was unfounded,
6 nothing was -- documentation was -- supported his
7 explanations.
8     MS. RICE: I believe we're almost
9     done. If we could just have a few minutes.
10     MS. DAVIS: Sure.
11     (A brief recess was taken.)
12     BY MS. RICE:
13 Q I apologize in advance. I'm going to
14 jump around a little bit here. I'm trying to tie
15 up some lose ends.
16 A Okay.
17 Q You testified earlier about presiding
18 over, I believe, you called it a name clearing
19 hearing?
20 A Uh-huh.
21 Q And that was sometime in the Fall of
22 2004?
23 A Uh-huh.
24 Q Is that -- is the description of the
25 term name clearing hearing is that one that you

137

1 came up with or --
2 A I don't know. I don't think I did.
3 I'm not sure who did.
4 Q What's the purpose of a name clearing
5 hearing?
6 A I don't even know. I'm not a lawyer.
7 I don't know. That was a term that was used but I
8 don't recall what it stands for.
9 Q Did you consider the transfer of
10 Ms. Iglesias -- prior to that name clearing
11 hearing did you consider that to be a disciplinary
12 action?
13 A No.
14 Q Why not?
15 A Not the lateral transfer, no. Because
16 it's a lateral transfer at the same rate of pay.
17 Hopefully with adequate training we were hoping it
18 would work out.
19 Q So the responsibilities of the job were
20 different; is that --
21 A Yes, responsibilities of the job were
22 different.
23 Q And I believe that you testified
24 earlier that during the name clearing hearing
25 Ms. Iglesias or her attorney at the time provided

**Page 138**

1  you with an affidavit; is that accurate?
2  A   Ms. Iglesias submitted one or two
3  affidavits.
4  Q   Was one of those from Susan Wolford?
5  A   Yes.
6  Q   Did you review the contents of the
7  affidavits that were provided to you?
8  A   Yes, I perused them, but I wasn't there
9  to discuss that. I was there to discuss the
10 breach of confidentiality issues.
11 Q   At any point in time did you personally
12 speak with Susan Wolford concerning Chief Wolford?
13 A   She tried to contact me early '04 or
14 late '03. She called me by cell phone. I
15 couldn't understand a word she was saying. I knew
16 who -- I got the gist of who it was but I couldn't
17 understand a word she was saying. I said please
18 call back. She called back a few minutes later.
19 We tried to talk again and could not hear a word
20 she says. It was all broken up. I said call me
21 on a land line. Never heard from her again.
22 Q   She called you from her cell phone?
23 A   Uh-huh.
24 Q   Did she --
25 A   Well, it appeared to be a cell phone.

**Page 139**

1  It was in and out, in and out breaking up.
2  Q   Did she call you on your cell phone?
3  A   No, she called me -- I think she called
4  me on my phone. So I told her go get a land line
5  and call me. And she never did.
6  Q   Did she call you at work?
7  A   Uh-huh.
8      (Interruption by reporter.)
9  A   Yes. Wait. What was the question?
10 Q   Did Susan Wolford call you on your work
11 phone?
12 A   Yes.
13 Q   And that's your work land line phone?
14 A   Land line phone. Work land line phone.
15 Q   Did you ever share with the internal or
16 external auditors any of the information that was
17 provided to you by Chief Wolford concerning the
18 drug fund?
19     MS. DAVIS: I think this actually
20     ought to be in the confidential section
21     because this is talking about the
22     investigation so.
23     MS. RICE: I do have a couple of
24     other confidential questions.
25     MS. DAVIS: So we'll leave this to

**Page 140**

1  that?
2      MS. RICE: Yeah.
3      MS. DAVIS: Okay.
4      BY MS. RICE:
5  Q   What did you do in preparation for
6  today's deposition?
7  A   Met with Robin to just review
8  chronological order of events.
9  Q   Did you review any documents?
10 A   Just some of the documents that you
11 provided me today. Interrogatories, the whole
12 things we have had and looked at.
13 Q   Did you review any transcripts at the
14 time?
15 A   The only transcript I reviewed was the
16 one with Mayor Rumley sitting in my capacity as
17 manager on her appeal. That's the only one.
18 Q   That was the appeal following
19 Ms. Iglesias's --
20 A   Uh-huh.
21 Q   -- termination?
22 A   Yes.
23 Q   And did you review your own testimony
24 at that hearing?
25 A   Excuse me?

**Page 141**

1  Q   Did you review your own testimony
2  provided at that hearing?
3  A   Yes.
4  Q   And was your testimony at that time
5  truthful and accurate?
6  A   Yes.
7  Q   Why did you reinstate Ms. Iglesias to
8  her prior position following the name clearing
9  hearing in the Fall of 2004?
10 A   I wanted to try to give her one more
11 chance to be successful in the organization.
12 Government -- local government is somewhat
13 forgiving, I think, more so than the private
14 sector.
15 Q   And, I believe, you testified earlier
16 that -- that everything ran fairly smoothly until
17 what point in time?
18 A   Fall of '05.
19 Q   Was there a mayoral reelection in the
20 Fall of 2005?
21 A   Yes, every odd year.
22 Q   Based on your own investigation you
23 concluded that Chief Wolford had not embezzled
24 funds?
25     MS. DAVIS: This is going to have