```
 1        IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 2                    WESTERN DIVISION
                   NO. 5:07-CV-00437-D
 3
    _____
 4
    SHARON B. IGLESIAS,                        :
 5
              Plaintiff,                       :
 6
    vs.                                        :
 7
    JOHN WOLFORD, Chief of Police of           :
 8
    Oxford, N.C., in his official and          :
 9
    individual capacities; THOMAS MARROW,:
10
    City Manager of Oxford, N.C., in his :
11
    official and individual capacities;        :
12
    DON JENKINS, Human Resources Manager :
13
    for the City of Oxford, N.C., in his :
14
    official and individual capacities;        :
15
    and the CITY OF OXFORD, N.C.,              :
16
              Defendants.                      :
17
    _____:
18
                        Wednesday, October 15, 2008
19
                        Raleigh, North Carolina
20

21        DEPOSITION of JAMES CAREY, a witness

22   herein, called for examination by counsel for

23   Plaintiff in the above-entitled matter, pursuant to

24   notice, the witness being duly sworn by VALERIE

25   SMITH GREEN, Court Reporter and Notary Public in and
```

EXHIBIT J

## Page 2

1 for the State of North Carolina, taken at Cranfill,
2 Sumner & Hartzog, LLP, 5420 Wade Park Boulevard,
3 Suite 300, Raleigh, North Carolina, at 2:20 p.m., on
4 Wednesday, October 15, 2008, and the proceedings
5 being taken down by stenotype by VALERIE SMITH GREEN
6 and transcribed under her direction.

## Page 3

1  APPEARANCES:
2      On behalf of the Plaintiff:
3          CHARLES E. MONTEITH, JR., ESQ.
4          SHELLI HENDERSON RICE, ESQ.
5          Monteith & Rice, PLLC
6          422 St. Mary's Street, Suite 6
7          Raleigh, North Carolina  27605
8          (919) 821-2053
9
10     On behalf of the Defendants:
11         M. ROBIN DAVIS, ESQ.
12         Cranfill, Sumner & Hartzog, LLP
13         5420 Wade Park Boulevard, Suite 300
14         Raleigh, North Carolina 27607
15         (919) 828-5100
16
17 ALSO PRESENT:
18 Sharon B. Iglesias - Plaintiff
19 Tom Burnette

## Page 4

1           CONTENTS
2 THE WITNESS       EXAMINATION BY COUNSEL FOR
3 JAMES CAREY:         Plaintiff   Defendants
4 By Mr. Monteith:      7, 91
5 By Ms. Davis:                      48

8           EXHIBITS
9 EXHIBIT NO.                 PAGE NO.
10 A - Stipulation              10
11 (Exhibit was retained by the attorneys.)

15      ***CONFIDENTIAL***
16 Beginning Confidential Portion   Page 20, Line 9
17 Ending Confidential Portion      Page 43, Line 8

19 Beginning Confidential Portion   Page 76, Line 7
20 Ending Confidential Portion      Page 92, Line 4

## Page 5

1        STIPULATIONS
2   It was stipulated by and between counsel
3 representing the respective parties, and the witness,
4 as follows:
5    1. That any defect in the notice of the taking
6 of this deposition, either as to time or place, or
7 otherwise as required by statute is expressly waived,
8 and this deposition shall have the same effect as if
9 formal notice in all respects as required by statute
10 had been given and served upon the counsel in the
11 manner prescribed by law.
12   2. That this deposition shall be taken for the
13 purpose of discovery or for use as evidence in the
14 above-entitled actin, or for both purposes.
15   3. That this deposition is deemed opened and all
16 formalities and requirements with respect to the
17 opening of the same, expressly including notice of
18 the opening of this deposition, are hereby waived, and
19 this deposition shall have the same effect as if all
20 formalities in respect to the opening of the same had
21 been complied with in detail.
22   4. That the undersigned, Valerie Smith Green,
23 Court Reporter and Notary Public in and for the State
24 of North Carolina, is duly qualified and constituted to
25 take this deposition.

## Page 6

5. Objections to questions, except as to the form thereof, and motions to strike answers need not be made during the taking of this deposition, but may be reserved until any pretrial hearing held before any judge of any court of competent jurisdiction for the purpose of ruling thereon, or at any other hearing or trial of said case at which said deposition might be used, except that an objection as to the form of a question must be made at the time such a question is asked or objection is waived as to the form of the question.

6. That the witness will waive the reading and signing of the transcript to the deposition.

7. That the Federal Rules of Civil Procedure shall control concerning the use of the deposition in court.

## Page 7

PROCEEDINGS

Whereupon,

JAMES CAREY,

was called as a witness by counsel for the Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. MONTEITH:

Q  Good afternoon, Mr. Carey. My name is Chuck Monteith. We just met. I'm one of the attorneys representing Ms. Iglesias. My co-counsel is Shelli Rice.

So I may have put on the subpoena Jack Carey. Is it James, Jack?

A  Well, I can explain that. My name is James I. Carey, but I've been known Jack since I was born. So when I ran for the city commission it was James I, parentheses, Jack Carey, and that's where that came from.

Q  Okay, thank you. All right.

A  And everybody calls me Jack.

Q  I'll call you Mr. Carey just to be respectful if you don't mind, but I appreciate that.

A  Okay.

## Page 8

Q  So Mr. Carey, you received a subpoena to appear here today?

A  I did.

Q  And as part of that subpoena we requested that you bring any documents that you might have that were -- you thought responsive to what we attached to the subpoena on Schedule A.

A  I did bring what I had.

Q  You brought what you have, okay.

What we've done because there's a concern that some of those documents may be subject to the attorney/client privilege --

A  May be what?

Q  May be subject to attorney/client privilege. Meaning we don't know without seeing them.

A  Okay.

Q  But the city may have a right to withhold some of those documents from us due to that privilege. So we've reached an agreement with opposing counsel that we're going to give the city's attorneys a chance to review those documents before I ask you any questions about them and before I see them to see if any of those might be privileged documents. Do you understand?

## Page 9

A  That's fine with me.

MR. MONTEITH: Okay. Is that fair enough --

MS. DAVIS: Yes.

MR. MONTEITH: -- description of what we agreed?

And there's a letter of understanding that was reached between the parties. And we want this a part of the record or not or are you okay with it not being --

MS. DAVIS: I think as long as -- maybe it's appropriate to reflect that as our stipulated agreement with regard to the deposition and give it to the court reporter. I'm not sure it needs to be an exhibit.

MR. MONTEITH: Okay. Maybe I misunderstood your e-mail.

I don't -- it doesn't matter. I mean --

MS. DAVIS: It can be an exhibit to the transcript if you think that's easier.

MR. MONTEITH: I think that's easier than explaining what a stipulated agreement is.

**Page 10**

1  MS. DAVIS: Okay.
2  MR. MONTEITH: So if we could
3  just -- you already have a copy of it?
4  MS. DAVIS: Right, I have it so
5  we're good.
6  (Discussion off the record.)
7  (Mr. Carey's Deposition Exhibit
8  A, stipulation, was marked for
9  identification.)
10  (A break was taken at 2:25 p.m. until
11  4:33 p.m. at which time attorneys reviewed records
12  produced by Mr. Carey.)
13  MS. DAVIS: Okay. For the record,
14  Mr. Burnette and I have reviewed all of the
15  documents produced by Mr. Carey and with the
16  exception of eight pages of documents which
17  constitute handwritten notes relative to the
18  meetings of council I have determined that
19  none of the documents that have been produced
20  by Mr. Carey are privileged in any way.
21  All of the other documents produced
22  by Mr. Carey some appear to contain personnel
23  information, and after consultation with Mr.
24  Monteith and Ms. Rice we have determined as a
25  precaution we will mark those as confidential

**Page 11**

1  simply for the purpose of getting them
2  marked, and in order to expedite things today
3  we'll just proceed forward under the
4  assumption that they're confidential and then
5  the attorneys will work out at a later date
6  which of those might not be confidential,
7  personnel or other information.
8  And Mr. Monteith and Ms. Rice have
9  had the opportunity to review those documents
10  that were produced -- that are being produced
11  pursuant at least at this point to the
12  confidentiality order, and I believe are now
13  ready to proceed with the deposition of Mr.
14  Carey pursuant to the stipulations amongst
15  counsel. Is that correct, Mr. Monteith?
16  MR. MONTEITH: Yes, ma'am, that's
17  all correct. That was shorter for me to say
18  than her.
19  BY MR. MONTEITH:
20  Q  Okay. Mr. Carey, sorry to make you
21  wait so long. I'll try and be --
22  A  I understand.
23  Q  -- as brief as possible.
24  First of all, thank you again for
25  coming today and thank you for making the effort

**Page 12**

1  to provide all these documents that we requested.
2  Have you ever been deposed before?
3  A  Yes, I have.
4  Q  Okay. So you understand how the
5  process works.
6  Let me just ask you a couple of
7  introductory questions. One of the questions that
8  attorneys like to ask in these depositions is they
9  want to make sure that the witness is able to
10  answer questions on the day of the deposition. So
11  are you feeling well today?
12  A  I -- I think I'm able to answer most of
13  the questions.
14  Q  Okay. And are you taking any sort of
15  medication --
16  A  No, I take --
17  Q  -- that could affect you?
18  A  -- normal heart medicine but it doesn't
19  affect my thinking.
20  Q  Your memory or anything like that?
21  A  No.
22  Q  Okay. Tell us a little bit about your
23  background. Where did you go -- first of all,
24  where did you grow up?
25  A  I grew up in Virginia at a little town

**Page 13**

1  called Burkeville, Virginia and I came to North
2  Carolina in 1964.
3  Q  And where did you go to college?
4  A  I did not. I went to the University of
5  Virginia to banking school.
6  Q  Banking school there, okay.
7  And when you came to North Carolina in
8  1964 was that to Oxford or was that somewhere
9  else?
10  A  To Oxford.
11  Q  And you lived in Oxford ever since?
12  A  That's correct.
13  Q  So your work experience has that
14  primarily been in the banking industry; would that
15  be fair to say?
16  A  I've done 44 years in banking and 16
17  years -- eight years on Granville County Board of
18  Commissioners, eight years on the City Board of
19  Commissioners and prior to that in Virginia I was
20  on the -- on the town board and mayor for 11
21  years, I believe. Nine -- eleven years,
22  something --
23  Q  So you were a mayor at some point?
24  A  Beg your pardon?
25  Q  You were a mayor in Virginia at some

14

1  point?
2  A  Yes, I was.
3  Q  Okay. When were you on the Granville
4  County Board of Commissioners, what time period
5  was that?
6  A  1976 through 1984.
7  Q  And then when were you on the City
8  Board of Commissioners?
9  A  1997 to 2005.
10  Q  And is the City Board of Commissioners
11  is that an elected position?
12  A  Yes, it is.
13  Q  Do you know Sharon Iglesias the
14  plaintiff in this matter?
15  A  I do know her. She was Sharon Belcher
16  and she's married since she -- not too long ago.
17  How many years I don't know, but I do know her.
18  Q  How long have you known Sharon?
19  A  I knew her mother and her father. Her
20  father used to work at Penny Furniture, Maynard
21  Belcher, and I -- he was working there when I came
22  to Oxford and of course she -- she -- I don't know
23  how long I've known her but I've known her for a
24  good while.
25  Q  Okay. And what's your opinion of

15

1  Sharon?
2  A  The family was an excellent family.
3  They were well thought of, they had high
4  integrity, no problems in the community. They
5  were -- her mother was a nurse at the hospital and
6  they were well thought of.
7  Q  Okay. I'm going to ask you some
8  questions now about some other individuals that
9  are involved in the case.
10     First of all, the Chief John Wolford do
11  you know him?
12  A  Yes, I do.
13  Q  How well do you know him?
14  A  I was on the city board when he was
15  employed and I have known him since that time. I
16  believe it was in 2000 that he was employed with
17  the city and I've known him since then.
18  Q  And what's your opinion of Chief
19  Wolford?
20  A  Well, my dealings with Chief Wolford
21  has been mostly through the city and I really
22  haven't -- haven't had a lot of personal dealings
23  with him, you know. There -- there have been
24  allegations and things of that nature but I have
25  not been involved in those particular type things.

16

1  Q  Okay. Never had any discussions with
2  the chief concerning the allegations against him?
3  A  No, I have not. I've discussed other
4  things with the chief at times. But I was on the
5  police committee one time and, you know, we went
6  into things involving city policing and so forth,
7  but nothing concerning personnel of this nature.
8  Q  Did you ever have any conversations
9  with Chief Wolford concerning Sharon Iglesias?
10  A  No, I did not.
11  Q  Do you know Don --
12  A  Let me --
13  Q  I'm sorry.
14  A  Let me correct that. Only -- only
15  thing that I heard was what he said in the board
16  meetings. And I don't know whether he said
17  anything about her, but I heard him speak about
18  personnel and so forth in the board meetings.
19  Q  Do you know Don Jenkins?
20  A  Yes, I do.
21  Q  How long have you known Mr. Jenkins?
22  A  I would guess ten, 12 years, something
23  like that.
24  Q  And to your knowledge what is his
25  position with the City of Oxford?

17

1  A  Beg your --
2  Q  What is his position with the city?
3  A  Human resources officer. I was on the
4  board when he was employed.
5  Q  Have you had any interactions with him?
6  A  I've had some. Him and I don't always
7  agree.
8  Q  Okay. Where are the -- what are some
9  of the things you haven't agreed with him on?
10  A  Well, I guess, the most important
11  things that we have disagreed on is that now
12  filling positions and he didn't want the city
13  board to have any input into the employment of
14  city clerk -- or assistant city clerk which we
15  thought that was our responsibility.
16  Q  Can you think of anything else that
17  you've disagreed with Mr. Jenkins on?
18  A  That would be a number of things.
19  Health insurance for some of them. I was chairman
20  of the finance committee and we disagreed on some
21  of the -- the budget requirements that he
22  requested and things of that nature. But this is
23  normal disagreement.
24  Q  I understand.
25     So you expect to have disagreement with

46

1 knowledge the board members did not engage in
2 personnel problems. That was left to the city
3 manager.
4      And I did not feel that Mr. Jenkins was
5 the man to -- or the person -- or the position he
6 held was -- was to help employees rather than to
7 hurt employees. And that's the position he took
8 in some cases. He was there to develop programs
9 and look after the employees, make sure that their
10 insurance was right, filed and things of this
11 nature. And I did not feel his position -- when
12 he was employed that his position was to
13 investigate people.
14      I would -- I would go further to say
15 that Mr. Marrow was very weak in dealing with
16 staff members. He did not follow through on
17 getting appraisals done as he should have and that
18 was one of the reasons that Mr. Jenkins was
19 employed is to give him some assistance.
20   Q   So did you have any involvement in
21 Mr. Jenkins selection for the position as HR
22 manager?
23   A   Do I what?
24   Q   Were you involved in the selection of
25 Mr. Jenkins for HR manager?

47

1   A   This was a position that was -- was not
2 a position of the city and the city board had to
3 approve the position.
4   Q   It was a new position?
5   A   A new position.
6   Q   Okay.
7   A   And we did that.
8      As far as selecting is concerned, no, I
9 did not. We were informed of the people that the
10 city manager had interviewed and some of them we
11 knew, some of them we didn't. I knew Mr. Jenkins
12 at that time. But I did not have anything to do
13 with employing him. The manager made that
14 decision himself.
15   Q   Did you tell Mr. Jenkins that you
16 thought he should apply for the position?
17   A   No, I did not. He was without a job at
18 the time.
19      MR. MONTEITH: All right.
20 Mr. Carey, I really want to thank you for
21 your patience in answering my questions and
22 having to sit here for so long today. That's
23 all I have.
24      Ms. Davis may have some questions.
25      MS. DAVIS: I will have a few. I

48

1 need to step out and talk to Mr. Burnette for
2 just a moment. If you want to take a break
3 you're welcome to do that.
4      (A brief recess was taken.)
5      EXAMINATION BY COUNSEL FOR DEFENDANTS
6      BY MS. DAVIS:
7   Q   Mr. Carey, I like to first start and
8 ask you who did you talk to about the fact that
9 you were going to be deposed today?
10   A   Well, I talked to my wife. She was
11 there when the subpoena was filed on me. I talked
12 to Mr. Yancey and told him I had to appear for a
13 deposition today. And in answering the question
14 that was posed to me by Mr. Strickland at church I
15 told him I was going to do a deposition. Other
16 than that I don't know I've talked to anybody.
17   Q   Did Ms. Iglesias tell you that you were
18 going to be deposed in this case?
19   A   Did what?
20   Q   Did Ms. Iglesias tell you you were
21 going to be deposed in this case?
22   A   She may have told me but that was many
23 months ago. I don't recall her telling me. I
24 haven't seen Sharon for two or three years -- a
25 couple of years I recon since I got off the board

49

1 much. She has called me on maybe two, maybe three
2 occasions to tell me that she was giving my name
3 as a reference for employment purposes. And I
4 agreed to give her a reference.
5   Q   So you gave her a personal reference
6 for employment?
7   A   Yes, I did.
8   Q   Okay. Do you recall for what employers
9 you gave her a personal reference?
10   A   I don't recall who they were, but I
11 know it was two or three times.
12   Q   And that was -- Ms. Iglesias never
13 worked for you; is that correct?
14   A   Had not, no, ma'am.
15   Q   Okay. So the reference you would have
16 given her would be a personal reference?
17   A   My knowledge of her, yes.
18   Q   Okay. And if -- if I understood what
19 you were saying earlier it's fair to say that
20 you've known Ms. Iglesias's family or
21 Ms. Belcher's family for a long time; is that
22 correct?
23   A   That's correct.
24   Q   And you would consider yourself a
25 friend of Ms. Iglesias, a friend of the family?

Page 50

1   A   Well, I was a friend to everybody in
2   Oxford.
3   Q   Including Ms. Iglesias?
4   A   That's correct, but --
5   Q   Okay.
6   A   -- but, you know, I don't say that we
7   socialized or did anything like that together. We
8   didn't.
9   Q   Okay. Other than providing her with a
10  personal reference has Ms. Iglesias ever asked you
11  to do any other favors for her?
12  A   Not that I recall.
13  Q   She ever ask you to help her with this
14  lawsuit that she has against the city?
15  A   She had told me that she didn't have
16  anybody else to go to but the commissioners and
17  she did that.
18  Q   Okay.
19  A   But as far as helping her with this
20  lawsuit I -- I told her at one time that she
21  needed to get legal representation.
22  Q   Did she --
23  A   She did -- she needed to have some
24  legal advice.
25  Q   Did she ask you to help her out by

Page 51

1   testifying for her in this lawsuit?
2   A   Well, let me -- let me tell you that
3   her attorneys that she -- that she employed came
4   to my house and they asked me some questions and
5   asked me if I would be willing to testify in a
6   case that came about. And I says, well, I'm going
7   to tell the truth whatever you ask me.
8   Q   Okay. Was Ms. Iglesias with them when
9   they came?
10  A   Yes, she was.
11  Q   So Ms. Iglesias and her attorneys came
12  and asked you to help --
13  A   That's correct.
14  Q   -- to help?
15      All right. Did either Ms. Iglesias or
16  her attorneys tell you what they wanted your help
17  with -- what topics they wanted your help with?
18  A   They asked me if I told Sharon -- I'm
19  going to call her Sharon because I can't say her
20  last name. Sharon. If I told her that a trap was
21  being set for her. And I told her -- them that I
22  told her at sometime when to be careful in her
23  work that she may be trapped.
24  Q   All right. And you said you talked to
25  Mr. -- you talked to your wife about the

Page 52

1   deposition?
2   A   Yes, I did.
3   Q   Okay. Did you talk to your wife about
4   what you might be asked about here today?
5   A   No.
6   Q   Okay. And you talked to Mr. --
7   A   We don't talk business.
8   Q   All right.
9   A   We talk personal things but not
10  business.
11  Q   That's a very wise decision. Hopefully
12  you've been married a long time with that kind of
13  decision making.
14      You talked to Mr. Yancey; is that
15  correct?
16  A   I did.
17  Q   Okay. And is Mr. Yancey still on the
18  city council?
19  A   He's not.
20  Q   Okay.
21  A   The only thing I told Mr. Yancey that I
22  had to appear here to give a deposition today.
23  Other than that we did not discuss it any further.
24  Q   Did you tell him that it was in Sharon
25  Iglesias's lawsuit?

Page 53

1   A   Yes, I did.
2   Q   Did you all talk about what you might
3   be asked?
4   A   No, we did not.
5   Q   All right. And Mr. Strickland you said
6   asked you at church if you were coming today?
7   A   He asked me if I was going to have to
8   give a deposition.
9   Q   Okay.
10  A   And I told him the truth. I told him
11  yes.
12  Q   Okay. When did Mr. Strickland ask you
13  if you were going to have to do a deposition?
14  A   This past Sunday.
15  Q   Sunday, all right.
16      You all go to the same church?
17  A   Yes, we do.
18  Q   All right. Did he tell you how he knew
19  that you were going to be deposed?
20  A   No, he didn't. He said that he had
21  already been given a deposition. That's all he
22  told me.
23  Q   Mr. Strickland --
24  A   And he would probably be called back.
25  Q   Mr. Strickland told you that he had

**Page 54**

1  given a deposition in this case?
2  A   He told me that.
3  Q   Okay. Did he tell you what his
4  deposition was about?
5  A   No, he did not.
6  Q   Okay. All right. And did he ask you
7  what your deposition was going to be about?
8  A   No, he did not.
9  Q   All right.
10 A   He gave me some advice.
11 Q   What kind of advice did Mr. Strickland
12 give you?
13 A   He told me two or three things I would
14 be asked.
15 Q   What did he tell you you might be
16 asked?
17 A   He told me I might be asked about the
18 chief living with a lady while he was married to
19 another lady.
20 Q   Okay.
21 A   Told me that I would probably be asked
22 about Mr. -- Chief Wolford driving the car.
23 Q   Okay.
24 A   And he told me one or two other things
25 but I didn't pay too much attention because I'm --

**Page 55**

1  you know, I'm my own man. I make my own
2  decisions.
3  Q   Well, since it was just Sunday I'm
4  going to ask you to try to remember a little more
5  specifically what he might have said. So he -- he
6  said you might be asked about the chief living
7  with a lady while he wasn't married to her?
8  A   That's correct.
9  Q   And he said you might be asked about
10 Chief Wolford driving the car which of course you
11 were asked today?
12 A   That's correct.
13 Q   All right. Did he tell you you might
14 be asked about anything else?
15 A   He told me something else but I don't
16 remember what it was. I'll be honest with you I
17 just don't --
18 Q   Did he tell you you might be asked
19 about the drug fund?
20 A   I don't believe so, no.
21 Q   Did he tell you you might be asked
22 about a discussion with Tommy Marrow back in 2004?
23 A   No.
24 Q   Okay. Did he tell you you might be
25 asked something about Ms. Iglesias being setup?

**Page 56**

1  A   No.
2  Q   No, all right.
3      And you can't recall what
4  Mr. Strickland said to you on Sunday about
5  anything else you might be asked?
6  A   No, Mr. Strickland was the greeter at
7  the church Sunday and -- and we had very little
8  conversation. I was trying to get into church. I
9  was -- so.
10 Q   Trying to get past the door?
11 A   I do go to church regularly. Try to.
12 Q   Many of us do. Many of us do.
13     Did Mr. Strickland suggest to you what
14 your answers ought to be to any of these
15 questions?
16 A   No, not that he -- Mr. Strickland knows
17 I've got my own mind and I make my own decisions
18 and that he will not influence me.
19 Q   All right. All right.
20 A   I did make the remark one thing that I
21 can take care of myself. I told him that.
22 Q   You told Mr. Strickland --
23 A   I did.
24 Q   -- you could take care of yourself?
25 A   I did, yes.

**Page 57**

1  Q   And it was in that same conversation
2  that Mr. Strickland told you he had already been
3  deposed in this -- in this case?
4  A   Yes, he did.
5  Q   All right. And that he might even be
6  called back in this case?
7  A   Yes, he did.
8  Q   All right.
9  A   I don't know that he put it in the
10 frame words that he'd been deposed. He said I
11 have already met with them. That's what he said.
12 And I presumed that was for this deposition, I
13 guess.
14 Q   Okay.
15 A   And that he would probably be called
16 back.
17 Q   So he said he'd already met with them
18 meaning the attorneys?
19 A   That's -- well, I -- I guess I put it
20 in my mind that he had met with the attorneys to
21 do a deposition.
22 Q   Okay.
23 A   Because that's what he -- what he asked
24 me have you -- have you been called for a
25 deposition.

Page 58

Q All right. Has anybody asked you to give anyone any money to either investigate the chief or to help Ms. Iglesias with her lawsuit?
A They have not.
Q Okay. All right. And when did you -- you -- you rolled off the city council in November of 2005; is that correct?
A December 13th, 2005.
Q December 13th was when the new council was sworn in?
A That's correct. We had our final meeting, they were sworn in after the final meeting.
Q Okay. December 13th, 2005.
And do you recall as you sit here today when Ms. Iglesias was terminated, even what year she was terminated?
A She was terminated after I went off the city board. I presume it was either 2005, 2006, in that area.
Q Do you recall as you sit here today exactly what day it was or --
A No, I do not.
Q -- even what year it was?
A I do not.

Page 59

Q Okay. All right. Go ahead.
A Not specific year. I know the range, 2005, 2006 but I don't know what year or what date of the year.
Q Okay. So you know that she was terminated in either 2005 or 2006; is that correct?
A That's right, because she told me when she got terminated. She informed me that she was terminated.
Q And you're 100 percent sure that you were not on the city council when she was terminated?
A I'm absolutely sure.
Q Okay. All right. Since you left the city council have you had any discussions at all with Tommy Marrow that you can recall?
A I haven't seen Tommy but one time and that was at the Council of Government banquet maybe a month ago -- two, three weeks ago and we spoke at that time.
Q All right. And other than that one meeting you haven't had any discussions with Tommy Marrow at all since December 13th, 2005 when you left city council?

Page 60

A I have -- not to my knowledge.
Q All right.
A I can't remember anything.
Q All right. At this one meeting -- this one meeting that you had with Tommy Marrow since December the 13th, 2005 did you discuss Sharon Iglesias at all?
A No, we did not. I congratulated him on becoming city manager with Town of Butner and it was in a banquet facility and he came over and spoke to me.
Q So it would be fair to say then that you've never had a discussion with Tommy Marrow about why Sharon Iglesias was fired?
A I have not.
Q Okay. All right. Have you had any discussions with Don Jenkins since --
A I have --
Q -- you left the city council?
A I have not.
Q Okay. And let me explain. The court reporter is trying to get a record of my question and then your answer, so I'm not trying to be difficult but if you don't -- let me just get my question out and then we'll wait and you can

Page 61

answer. And she's probably going to start kicking both of us if we don't do that in just a minute. Okay?
A I'm sorry.
Q That's all right. Let me go back and ask. My question was have you had any discussions with Don Jenkins since you rolled off the city council in December -- on December 13th, 2005?
A I have not.
Q Okay. And it would be fair to say that you haven't had any discussions with Don Jenkins about Sharon Iglesias or why she was fired since you left the city council; is that correct?
A That would be a fair -- I have not had any discussion with him period.
Q All right. Have you had any discussions with Chief Wolford since you left the city council on December the 13th, 2005?
A I have seen Chief Wolford several times and went by the police station and asked them to check on my house while I was out of town several times and I did speak to him, but other than that we did not have any discussions.
Q Okay.
A I asked him how things were going,

BRYANT COURT REPORTING SERVICES, INC. (919)387-5853

Case 5:07-cv-00437-D   Document 34-22   Filed 01/07/2009   Page 9 of 12

**Page 62**

1 things like that.
2   Q   All right.
3   A   But we did not discuss city business at
4 all.
5   Q   Just general cordial conversation; is
6 that correct?
7   A   That's correct.
8   Q   Since you came off the city council
9 December the 13th, 2005 have you had any
10 discussions with Chief Wolford about Sharon
11 Iglesias?
12   A   I have not.
13   Q   Have you ever asked Chief Wolford why
14 Sharon Iglesias was fired?
15   A   Never have, no.
16   Q   Have you ever asked Don Jenkins why
17 Sharon Iglesias was fired?
18   A   I have not.
19   Q   Have you ever asked Tommy Marrow why
20 Sharon Iglesias --
21   A   No.
22   Q   -- was fired?
23   A   No, I have not.
24       (A brief recess was taken.)
25       BY MS. DAVIS:

**Page 63**

1   Q   You indicated that you had had some
2 discussions with Ms. Iglesias and her attorneys
3 about her desire, I think, you said to pursue a
4 lawsuit against the city; is that correct?
5   A   That's correct.
6   Q   All right. At the time you met with
7 them did you give them any documents or
8 information?
9   A   I don't recall giving them any
10 documents.
11   Q   All right. All right. Do you recall
12 giving Sharon Iglesias any documents to help her
13 with her lawsuit against the city?
14   A   I don't recall giving her any
15 documents.
16   Q   All right. How about Frank Strickland?
17   A   No.
18   Q   All right. Do you recall giving
19 Ms. Iglesias any information about something that
20 happened in closed session in order to assist her
21 with her litigation against the city?
22   A   I did not give it to her or anybody
23 else what happened in closed session.
24   Q   Okay. All right. And I apologize --
25   A   The only thing you've heard is what

**Page 64**

1 I've told you today.
2   Q   That's great. But I do have to make a
3 record of that. All right. All right.
4       Now, you said that Sharon Iglesias
5 called you after she was terminated; is that
6 correct?
7   A   I -- I think that is correct. She -- I
8 got notice some sort of way, either I saw her or
9 she called me. This is four or five years ago.
10   Q   Right.
11   A   And I -- you know, I'm pretty sure that
12 it was after December 13th, 2005. And I
13 answered -- absolutely sure. It made me think a
14 little bit. I don't know when she was fired but I
15 know she was fired from City of Oxford. Whether
16 it was in that time range or not but I think it
17 was after that time.
18   Q   And you're pretty sure that the way you
19 learned that she had been fired was from her
20 directly?
21   A   That's correct.
22   Q   Okay. All right. What did Ms.
23 Iglesias tell you when she said to you she'd been
24 fired?
25   A   I don't recall exactly what she told

**Page 65**

1 me, but she -- I -- I think I asked her a question
2 why and she said that she was fired for -- for
3 giving out information.
4   Q   So Ms. Iglesias --
5   A   And violating a third -- I believe she
6 said a third warning that she claims she did not
7 do.
8   Q   Okay. That's what Ms. Iglesias told
9 you?
10   A   That's correct.
11   Q   Did Ms. Iglesias ever share with you
12 any of the termination documentation that she was
13 given when she was terminated?
14   A   The only thing that I have is what you
15 found in the files.
16   Q   All right. So --
17   A   And that doesn't have anything to do I
18 don't think with termination.
19   Q   All right. So Ms. Iglesias didn't show
20 you a copy of any document that she received
21 explaining why she was terminated?
22   A   I don't recall any of it, no.
23   Q   All right.
24   A   I'm sorry.
25   Q   And the only thing she told you is that

Page 66

1  she believes she'd been fired for giving out
2  information; is that correct?
3     A    She told me that she had been fired
4  because she was -- she was accused of giving out
5  information.
6     Q    Okay. Fired because she was accused of
7  giving out information.
8          All right. Did anybody else speak to
9  you about why they thought Sharon Iglesias was
10 fired?
11    A    I don't recall anybody else talking to
12 me about that. I'm sure that the city board
13 members discussed it among themselves, but I can't
14 give you any specific examples.
15    Q    All right. But -- and I don't expect
16 you to know what somebody said to somebody else.
17 All I'm asking about is what somebody might have
18 said to you. And so far I understand that Sharon
19 Iglesias told you why she thought she had been
20 fired.
21         My question is has anybody else since
22 the date Ms. Iglesias was terminated spoken to you
23 about why they thought or they knew that Ms.
24 Iglesias was fired?
25    A    I have over the -- in that time range

Page 67

1  at -- people that worked for the City of Oxford
2  asked me if I knew she had been fired. And these
3  are people that work for the public works
4  department and -- and also some of the police
5  officers --
6     Q    Okay.
7     A    -- who travels my street.
8     Q    To watch your house while you're gone?
9     A    They do a good job.
10    Q    Good, that's excellent.
11    A    I hope so. They hadn't broke in one
12 time since.
13    Q    Okay. So several people who worked at
14 the city asked you did you know that Sharon has
15 been fired; is that correct?
16    A    Just -- just during random
17 conversation. They see me working in the yard and
18 stuff while they're going down the street and talk
19 about different things and talk about their
20 working in the city and what they were doing and
21 then that would come out in conversation.
22    Q    Okay. And it was just -- was it just
23 general did you know questions, did you know that
24 Sharon had been fired type of questions?
25    A    That's correct.

Page 68

1     Q    All right. Do you --
2     A    They didn't ask me why.
3     Q    They didn't ask you why?
4     A    And I didn't know. I didn't offer to
5  tell them.
6     Q    Well, you didn't know why?
7     A    Right. I knew what she told me.
8     Q    You knew what she told you?
9     A    Right.
10    Q    But other than that you didn't know
11 why?
12    A    No.
13    Q    Okay. Do you recall the names of any
14 of these people who -- city employees who may have
15 stopped and asked you about Sharon being fired?
16    A    Well, if I recall right David Cottrell
17 who is head of the public works who works on roads
18 and the city roads and all he comes by quite often
19 and I'm sure he was one of them.
20    Q    Okay.
21    A    I can't give you the names. I'm sorry,
22 I just don't remember.
23    Q    That's okay. Are there any others that
24 you recall other than Mr. Cottrell, any other
25 names at all? And I know you're not going to be

Page 69

1  able to remember them all but I'm just --
2     A    No, it -- that's been four or five
3  years ago and I done forgot a lot of the
4  conversations that was held at that time.
5     Q    Yeah, it's hard to remember
6  conversations four or five years ago. I
7  understand that.
8     A    I talk to people every day about
9  something and I don't try to remember. I got --
10    Q    Right.
11    A    -- to the age I don't try to remember.
12    Q    Right.
13         Okay. So at least a few employees in
14 random conversations said something along the
15 lines of did you know Sharon got fired; is that
16 correct?
17    A    That's correct.
18    Q    Did any of those employees tell you why
19 Sharon got fired?
20    A    I need to correct that about getting
21 fired. They asked me if I knew Sharon was no
22 longer with the city.
23    Q    Okay.
24    A    Okay.
25    Q    All right. So they didn't use the word

Page 70

1  fired?
2      A    That's correct.
3      Q    All right. Well then let me rephrase
4  my question.
5      A    Okay.
6      Q    Did any of those folks tell you why
7  they thought Sharon was no longer with the city?
8      A    Not that I recall.
9      Q    Okay. Do you have any idea why people
10 would just stop and ask you questions about
11 Sharon?
12     A    Well, Oxford is a small city --
13     Q    Okay.
14     A    -- and they know everything that's
15 going on everywhere.
16     Q    All right.
17     A    And it's not uncommon for them to make
18 comments and some of them are true and some of
19 them aren't.
20     Q    So some comments that people make are
21 true and some just aren't true?
22     A    That's correct.
23     Q    All right. And it would --
24     A    Some of them are just rumors --
25     Q    Right.

Page 71

1      A    -- that they think are true probably
2  when they tell them but they aren't.
3      Q    Right.
4           And it would probably be fair to say
5  that most folks would know that you were friendly
6  with Ms. Belcher's family and knew Ms. Belcher
7  personally?
8      A    Most folks knew that I was on the city
9  board at one time and the county board at one time
10 and they felt like that -- that I knew what was
11 happening in the city and the county.
12     Q    Okay. All right. Would they know of
13 your personal relationship with Ms. Iglesias --
14 Ms. Belcher? Is it easier for you if I call her
15 Belcher?
16     A    That's okay.
17     Q    All right.
18     A    I can understand you. Let -- let --
19 let me say this. That --
20          (Interruption.)
21          BY MS. DAVIS:
22     Q    Okay. Go ahead, I'm sorry.
23     A    I don't think they knew anything about
24 my friendship with Sharon any more than they knew
25 my friendship with every employee with the City of

Page 72

1  Oxford.
2      Q    Okay.
3      A    I knew most of them personally, knew
4  them by name. And I would always speak to them
5  and -- and give them some complementary remarks
6  most of the time.
7      Q    All right. Okay. I'm going to go back
8  and ask you again a question that Mr. Monteith
9  asked you earlier. He asked you if you had any
10 recollection of encouraging or asking Don Jenkins
11 to at least put his name in the hat for the
12 position of human resources for the City of
13 Oxford. And, I believe, you said that you didn't
14 have any recollection of that.
15          Do you -- what I need to ask you is do
16 you specifically recall that you did not ask him
17 to put his name in the hat or are you just saying
18 that you just don't have any recollection --
19     A    I never --
20     Q    -- of having done that?
21     A    -- asked Don Jenkins to put his name in
22 the hat. In fact, to tell you the truth, he would
23 not have been my selection if we -- if I had to
24 select -- if I had any input.
25     Q    Is there a reason Mr. Jenkins wouldn't

Page 73

1  have been selected?
2      A    I thought they had some better
3  candidates.
4      Q    At least the tone of your voice is
5  indicating to me that perhaps you're not a big fan
6  of Mr. Jenkins. Would that be fair to say?
7      A    I don't know what you mean by fan,
8  but --
9      Q    Well, let me rephrase the question.
10     A    -- Mr. Jenkins and I while I was on the
11 city board worked on a lot of projects. We got
12 along. We disagreed at times.
13     Q    Okay.
14     A    But, you know, as far as -- as -- as me
15 being a fan I won't a fan of Mr. Jenkins, I won't
16 a fan of Chief Wolford, I won't a fan of Tommy
17 Marrow. They were employees and we were -- we
18 looked at them as that.
19     Q    It sounded when you were -- when you
20 were answering my question it sounded as though
21 you were implying that you just didn't like Mr.
22 Jenkins. Did I misunderstand?
23     A    I did not say that. No, I had no
24 dis -- if you're saying did I have a dislike for
25 Mr. Jenkins when he was employed, no, I did not.