IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:07-CV-437-D

| | | |
|---|---|---|
| SHARON B. IGLESIAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN WOLFORD, Chief of Police of Oxford, | ) | **ORDER** |
| N.C., in his official and personal capacities; | ) | |
| THOMAS MARROW, City Manager of | ) | |
| Oxford, N.C., in his official and personal | ) | |
| capacities; DON JENKINS, Human Resources | ) | |
| Manager for the City of Oxford, N.C., in his | ) | |
| official and personal capacities; and the | ) | |
| CITY OF OXFORD, N.C., | ) | |
| | ) | |
| Defendants. | ) | |

Sharon Iglesias ("Iglesias" or "plaintiff") contends that the City of Oxford, North Carolina ("City") and various City officials violated 42 U.S.C. § 1983 and North Carolina law when the City terminated her employment. Essentially, Iglesias contends that she was fired for speaking out about Chief of Police John Wolford's alleged embezzlement from a police fund designed to finance police investigations. On December 15, 2008, defendants John Wolford, Thomas Marrow, Don Jenkins (collectively "individual defendants") and the City moved for summary judgment [D.E. 30]. Plaintiff responded in opposition [D.E. 34, 36, 37], and defendants replied [D.E. 44]. As explained below, the court grants defendants' motion for summary judgment.

I.

On December 2, 1999, Iglesias began working for the City as the administrative assistant to Chief of Police Roger Paul. Iglesias Dep. 22; Iglesias Aff. ¶ 3. In her capacity as administrative assistant, Iglesias answered the telephone, greeted visitors to the Oxford Police Department ("the Department"), prepared and mailed correspondence, and provided assistance with payroll, petty cash,

and other accounts. Iglesias Aff. ¶ 4. Chief Paul resigned in February 2000. Id. ¶ 3.

In approximately June 2000, the city, through City Manager Thomas Marrow ("Marrow") hired John Wolford ("Wolford or "Chief Wolford") as Chief of Police. Marrow Dep. 27–28; see Iglesias Aff. ¶ 3; Iglesias Dep. 22–23. As Chief of Police, Wolford had access to the Drug and Alcohol Law Enforcement Special Fund ("Fund"). Wolford Dep. 32–39. The Fund contains assets from criminal forfeitures, and the Fund's only permitted use is to finance police investigations. Iglesias Aff. ¶ 5. All police officers, including Chief Wolford, were required to follow procedures with multiple means of verification before obtaining money from the Fund. See id. ¶ 6. For example, an officer wishing to withdraw money from the Fund would be required to sign a receipt evidencing the transaction, and the officer would be required to have a witness present when actually withdrawing the money. Id.

As administrative assistant to Chief Wolford, Iglesias' duties included maintaining the signed receipts from officers who had withdrawn money from the Fund. See id. ¶¶ 4, 6. In this capacity, Iglesias suspected that Wolford was embezzling money from the Fund for his own personal use. See Iglesias Dep. 58–65, 78–79, 82–93, 97–106; Iglesias Aff. ¶ 11–20. Iglesias believed that Wolford first began embezzling on or about November 16, 2001, and that he did so on seven different occasions between that date and November 26, 2003. Iglesias Aff. ¶¶ 11–20; see Defs.' Sealed Mem. in Supp. of Mot. for Summ. J. [hereinafter "Defs.' Mem."], Ex. 9. On each occasion, Wolford took money from the Fund without properly documenting his withdrawal and without having a witness present. See Iglesias Aff. ¶¶ 11–20; see Burnette Dep. 38, 47; Pl.'s Sealed Mem. in Opp. to Defs.' Mot. for Summ. J. [hereinafter "Pl.'s Mem."], Ex. K. Iglesias also noticed that Wolford made these withdrawals when she was not in the office. Iglesias Aff. ¶ 9. In total, Iglesias suspected that Wolford embezzled $940.00. See Defs.' Mem., Ex. 9; Pl.'s Mem., Ex. 91.

Iglesias told Mamie Pleasants, a records clerk in the Department, about her suspicions. Iglesias Dep. 59–60. Iglesias also raised her concerns with several other coworkers, including

2

Detective Mark Blair, Lieutenant Glen Boyd, Officer Kevin Dickerson, Officer Lynn Curl, Dispatcher Angelia Downey, and Officer Kevin Cook. Id. at 71–77, 82–97, 108, 109. She started keeping her own "personal file," documenting each Fund transaction. See id. at 96. Iglesias did not initially report any of her concerns to Wolford's superiors. See id. at 63, 65, 75–76, 80, 108, 109. In April 2003, she did report her suspicions concerning Wolford and the Fund to City Commissioner Alice Currin. Id. at 229–30.

In July 2003, Iglesias became acquainted with Chief Wolford's now-ex wife, Susan Wolford ("Ms. Wolford"). See id. at 110–12. Ms. Wolford called Iglesias, was upset with her husband, and asked if she could come to the office and speak with Iglesias. See id. at 110. Instead, Iglesias visited Ms. Wolford in the Wolford home. Id. at 110–11. Chief Wolford was not in town at the time. Id. at 110. Ms. Wolford was crying and told Iglesias about Chief Wolford's purported marital indiscretions and other character flaws. See id. at 113–16. In March 2004, Ms. Wolford again called Iglesias. They met, and Ms. Wolford suggested that Chief Wolford was having an extramarital affair. See id. at 122–23. Iglesias and Ms. Wolford continued to confide in one another. See id. at 126–28.

In early May 2004, the Department began investigating an officer allegedly misappropriating items from the Department's property and evidence room. Id. at 55–56; see Wolford Dep. 75–76. As part of the investigation into the alleged misappropriation, the City's independent auditor, Jim Winston ("Winston"), audited the Department's funds. Iglesias Dep. 56; Iglesias Aff. ¶ 23; Wolford Dep. 79. When Winston visited the Department, Iglesias reported her concerns about Chief Wolford's alleged embezzlement from the Fund. Iglesias Aff. ¶ 23. Winston requested "copies of everything" Iglesias had regarding the Fund. Iglesias Dep. 56–57. Winston received the copies of Iglesias' personal file and promised to investigate. See id. at 58.

Winston then reported Iglesias' accusations about Chief Wolford to Marrow. Marrow Dep. 46–47. Marrow and City Attorney Tom Burnette reviewed the materials that Iglesias had provided

3

to Winston. Id. at 49, 63; Burnette Dep. 18–20. Marrow decided that he should approach Chief Wolford directly and request any documentation that would explain how the Fund proceeds were actually used. Marrow Dep. 63; see Burnette Dep. 15–18. Before this meeting, Lieutenant Glen Boyd informed Wolford of Iglesias' allegations against him. See Wolford Dep. 80–83. On May 5, 2004, Wolford sent Marrow a memorandum explaining the reasons for the withdrawals from the Fund. Pl.'s Mem., Ex. 64.

On May 11, 2004, Marrow visited Chief Wolford in his office and requested the documentation. See Marrow Dep. 64. Wolford produced materials relating to his use of the Fund and again explained that he was purchasing information from confidential informants while investigating accusations that certain officers were protecting local drug dealers. See id. at 64, 70–74; cf. Pl.'s Mem., Ex. 64. Marrow was satisfied with Wolford's explanation. See Marrow Dep. 70–75. During his visit to the Department, Marrow did not speak directly with Iglesias. Id. at 78.

On May 13, 2004, Chief Wolford met with Iglesias. Iglesias Aff. ¶ 26; Iglesias Dep. 212–13. Captain Bob Williamson was present. Iglesias Aff. ¶ 26. Wolford told Iglesias that sharing her concerns with the external auditor (Winston) was appropriate but that sharing the information with coworkers in the Department (such as Officer Jason Tingen) was a breach of confidentiality. Wolford Dep. 94–95; see Iglesias Aff. ¶ 26. Wolford shared with Iglesias his reason for the withdrawals from the Fund, that is, to investigate whether any City police officers were protecting drug dealers. See Iglesias Aff. ¶ 26; Iglesias Dep. 241–42; cf. Pl.'s Mem., Ex. 66. Wolford also instructed her not to eavesdrop on his conversations. See Wolford Dep. 94–95.

On May 17, 2004, Iglesias wrote Chief Wolford a letter in response to the May 13, 2004 meeting. Defs.' Mem., Ex. 34. In her letter, Iglesias recognized the need for confidentiality in the Department and expressed her concern about the recent alleged corruption in the Department. Id. She then asked Wolford not to "memo this perceived 'breach of confidentiality' to [her] employee file, based on the grounds that [she] was unaware of [Wolford's] internal investigation and the

4

sensitivity of it, and in fact, was only doing [her] job." Id. She also expressed her disappointment that Chief Wolford might not trust her. Id. As to the eavesdropping, she denied doing it but did admit that she occasionally overheard conversations when Wolford raised his voice. Id. Finally, Iglesias' letter addressed the rumors circulating in the Department about Wolford's personal life. Id. She expressed regret about knowing certain things about his personal life but denied spreading rumors. Id.

On May 17, 2004, Wolford orally reprimanded Iglesias and issued a written warning to her. Defs.' Mem., Ex. 33; see Iglesias Dep. 240; Iglesias Aff. ¶ 28. On May 18, 2004, Iglesias appealed the written warning to Marrow. Defs.' Mem., Ex. 35; see Iglesias Dep. 243–44. On May 25, 2004, Iglesias received a response letter from Marrow, which denied her appeal regarding her written warning from Wolford. Iglesias Dep. 244.

In June 2004, Iglesias contacted Frank Strickland ("Strickland"), who was then Chief of Police for Meredith College in Raleigh, for assistance with her concerns regarding Wolford. Iglesias Aff. ¶ 30; Iglesias Dep. 140–41; Strickland Aff. ¶¶ 3, 10–11. Strickland had previously criticized Wolford, including during Strickland's campaign for Oxford City Commissioner in 2003. See Strickland Aff. ¶¶ 4, 6–9, 12–19. Iglesias described to Strickland specific entries of Wolford's withdrawals from the Fund and told him about her suspicions. Iglesias Dep. 141–42. Strickland then used this information from Iglesias to complain about Wolford to the North Carolina Department of Justice Training and Standards Commission and the Office of the United States Attorney for the Eastern District of North Carolina. See Defs.' Mem., Exs. 13, 14.

In July 2004, Iglesias contacted the North Carolina State Bureau of Investigation ("SBI") to report Wolford's alleged misconduct. See Defs.' Mem., Ex. A, at 87 (Iglesias grievance transcript). SBI Agent Teresa West ("Agent West") scheduled a meeting with Iglesias in Raleigh. Iglesias Dep. 215–16. On or about July 23, 2004, Agent West and Iglesias met, and Iglesias provided Agent West with documents and information regarding Wolford's alleged embezzlement from the Fund. Id. at

5

216–18; see Iglesias Aff. ¶ 31. In early August 2004, Agent West informed Iglesias that the SBI had spoken with the Granville County District Attorney about the case and that the District Attorney was not interested in pursuing the investigation. Iglesias Aff. ¶ 31; Iglesias Dep. 218.

In August 2004, Winston reported to Marrow concerns that an employee in the City's Finance Department had embezzled funds. See Marrow Dep. 81. Marrow directed Winston to investigate and also notified Wolford that the personnel investigation might become a criminal matter. See id. Iglesias learned about the investigation from Detective Patricia Ford and called two Finance Department workers to ask if a coworker had been fired. See Iglesias Aff. ¶ 33; Defs.' Mem., Ex. A, at 74–75. Wolford confronted Iglesias about her disclosure of the investigation to the Finance Department employees. Wolford Dep. 106–09. Marrow believed that Iglesias' breach of confidentiality disrupted the investigation. See Marrow Dep. 81–82.

On August 30, 2004, Marrow asked Oxford Human Resources Manager Don Jenkins ("Jenkins") to investigate this breach of confidentiality. Pl.'s Mem., Ex. 85; see Marrow Dep. 82–83, 86; Jenkins Dep. 101–02. On September 2, 2004, Jenkins went to Iglesias' office as part of the investigation. Jenkins Dep. 84–85; see Pl.'s Mem., Ex. 70. Iglesias explained that she did not intend to inform anyone that the Finance Department employee had been fired, but was checking on the employee to make sure she was still working. Pl.'s Mem., Ex. 70. Jenkins also interviewed Detective Ford (who denied telling Iglesias anything about the personnel matter) and Chief Wolford. Id. Jenkins concluded that "[r]egardless of how [Iglesias] received the information, it is a serious breach of confidentiality to discuss private personnel information with anyone. This is a violation of [N.C. Gen. Stat. §] 160A-168 and in this situation, has impaired an ongoing investigation of an employee issue within the organization." Id.

After completing the investigation, Jenkins recommended issuing Iglesias a final warning "with respect to confidentiality breaches." Id. On September 24, 2004, Wolford issued Iglesias another warning and informed her that the Department was transferring her (without any reduction

6

in compensation) from administrative assistant to police dispatcher because she had "breached confidentiality" regarding an internal investigation of another city employee. Pl.'s Mem., Ex. 69; see Iglesias Dep. 193; Iglesias Aff. ¶ 34; Marrow Dep. 90–91; Wolford Dep. 103, 110–20.

On September 27, 2004, Iglesias filed a grievance regarding her transfer. Iglesias Aff. ¶ 34; Iglesias Dep. 193. The Department placed Iglesias on administrative leave with pay pending resolution of her grievance. Iglesias Aff. ¶ 37; Wolford Dep. 118; Jenkins Dep. 75–76. On October 6, 2004, Iglesias and her attorney met with Jenkins. Iglesias Aff. ¶ 38. Jenkins declined to change her transfer, and Iglesias appealed Jenkins' decision to Marrow. On October 14, 2004, Marrow held a hearing on the appeal. See Defs.' Mem., Ex. A, at 76–77; Marrow Dep. 91–92. After the hearing, Marrow wrote to Iglesias and reinstated Iglesias to her former position as administrative assistant. Iglesias Aff. ¶ 39, Pl.'s Mem., Ex. 44. Instead of working directly under Chief Wolford, however, Iglesias reported to Lieutenants Boyd and Griffin and Captain Williamson. Iglesias Aff. ¶ 39; Marrow Dep. 94–95. In the letter, Marrow also upheld the written warning and issued Iglesias a "FINAL WARNING that you are not to discuss or disseminate, in any manner whatsoever, any confidential information that you obtain during the course and scope of your employment, unless the discussion or dissemination is relevant to the performance of your job duties." Pl.'s Mem., Ex. 44; Marrow Dep. 94–96. On October 27, 2004, Iglesias returned to work. Iglesias Aff. ¶ 39.

In the fall of 2005, the City held a mayoral election. Strickland ran for mayor, and Iglesias actively supported him. Strickland Aff. ¶ 15; see Iglesias Dep. 199. During the campaign, the incumbent mayor defended Wolford against the allegations of misconduct. See Strickland Aff. ¶ 15. Strickland, on the other hand, criticized Wolford and promised to investigate him if elected. See Iglesias Dep. 198–200. Strickland lost the election. Id. at 200.

On October 27, 2005, Wolford contacted Department employees about their opinion of Iglesias. Pl.'s Mem., Ex. 57; see Wolford Dep. 114. In response to Wolford's solicitation, Detective Ford wrote a memorandum, dated October 31, 2005, expressing her dismay that Iglesias

7

has been distributing confidential information outside of the Department and stating that Iglesias is "creating hate and discontent" within the Department. Defs.' Mem., Ex. 71. In late November 2005, Wolford wrote a memorandum to Marrow, recommending Iglesias' termination or her immediate separation from the Department. Defs.' Mem., Ex. 73; Wolford Dep. 128–30. Marrow decided not to take any action before the holidays. Marrow Dep. 110–12. During this time, Jenkins received reports of Iglesias discussing her concerns regarding Wolford with coworkers in the Department. See Jenkins Dep. 104–09.

In early 2006, Iglesias spoke with a WRAL television reporter concerning her allegations of Wolford's misconduct. Pl.'s Mem., Exs. 16–28; see Iglesias Aff. ¶ 40; Iglesias Dep. 225–26. On January 9, 2006, WRAL televised a story about the embezzlement allegations in the Oxford Police Department. Defs.' Mem., Ex. 29; see Iglesias Dep. 234–35; Wolford Dep. 136. WRAL aired an interview with Iglesias as part of its story. Defs.' Mem., Ex. 29. On January 10, 2006, Wolford e-mailed all Oxford Police Department employees except Iglesias. Pl.'s Mem., Ex. 76; Wolford Dep. 142–43. Wolford's e-mail stated, in part, "Regarding recent actions by Sharon Iglesias going on WRAL, on air, continuing to discredit me and this department. Her actions are not being ignored." Pl.'s Mem., Ex. 76.

Also on January 10, 2006, Lieutenants Griffin and Boyd and Captain Williamson presented Marrow with a memorandum, describing Iglesias' disruptiveness within the Department and her impact on morale and efficiency. Defs.' Mem., Ex. 88; see Marrow Dep. 129–33. On January 20, 2006, Lieutenant Boyd, after another incident involving Iglesias, again recommended that Wolford terminate Iglesias. See Defs.' Mem., Ex. A, at 150–52; see also id., Ex. 50. Wolford agreed and informed Marrow that he had decided to terminate Iglesias. See, e.g., Defs.' Mem., Ex. A, at 178–79.

On January 25, 2006, Wolford fired Iglesias, effective immediately. See Defs.' Mem., Ex. 77. Iglesias appealed her termination. See Defs.' Mem., Ex. A. Because of Iglesias' accusation

8

that Marrow was involved in a conspiracy against her, the City retained an independent hearing officer. See id. at 4. On March 23, 2006, the independent hearing officer held a hearing. See id. On March 29, 2009, the independent hearing officer recommended upholding the termination. See Defs.'Mem. 16. On May 1, 2006, Marrow informed Iglesias that he accepted this recommendation and upheld the termination. See id.

On August 10, 2007, Iglesias filed suit in Granville County Superior Court. After Iglesias filed an amended complaint and added a claim under 42 U.S.C. § 1983, defendants timely removed the action to this court [D.E. 1]. Iglesias' amended complaint contained several claims: a civil conspiracy claim in violation of North Carolina law against Marrow, Jenkins, and Wolford in their individual capacities (Am. Compl. ¶¶ 54–61); a North Carolina Constitution free-speech claim against defendant City and the individual defendants in their individual capacities (id. ¶¶ 62–71); a wrongful-discharge claim in violation of North Carolina public policy against all defendants; (id. ¶¶ 72–79), and a 42 U.S.C. § 1983 claim based on the First Amendment of the United States Constitution against all defendants (id. ¶¶ 80–89). Iglesias seeks compensatory and punitive damages. Id. at 11 (prayer for relief).

On November 21, 2007, defendants filed a motion to dismiss certain claims [D.E. 7]. On March 18, 2008, the court dismissed plaintiff's civil conspiracy claim and her North Carolina Constitution claim in full, and dismissed her wrongful-discharge claim and request for punitive damages in part. See Iglesias v. Wolford, 539 F. Supp. 2d 831 (E.D.N.C. 2008). The following claims remain: (1) a 42 U.S.C. § 1983 claim based on the First Amendment of the United States Constitution against all defendants, and (2) a North Carolina wrongful-discharge claim against the City. After discovery closed, defendants filed a motion for summary judgment [D.E. 30], plaintiff responded [D.E. 34, 37, 36], and defendants replied [D.E. 41].

II.

Summary judgment is appropriate when, after reviewing the record taken as a whole, no

9

genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation omitted) (emphasis removed). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn from the evidence in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 377 (2007).

## A.

Defendants Wolford, Marrow, and Jenkins contend that qualified immunity bars plaintiff's section 1983 claim for money damages. Qualified immunity protects governmental officials performing discretionary functions against lawsuits seeking money damages from them in their individual capacities. See, e.g., Brandon v. Holt, 469 U.S. 464, 472–73 (1985); Unus v. Kane, 565 F.3d 103, 123 (4th Cir. 2009); Waterman v. Batton, 393 F.3d 471, 476 (4th Cir. 2005). Qualified immunity "shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law [or the facts] governing the circumstances she confronted." Brosseau v. Haugen, 543 U.S. 194, 198 (2004); see Pearson v. Callahan, 129 S. Ct. 808, 815 (2009). Qualified immunity is "'an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" Pearson, 129 S. Ct. at 815 (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). Defendant officials have the burden of pleading and proving qualified immunity. See, e.g., Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 332 n.10 (4th Cir. 2009); Wilson

10

v. Kittoe, 337 F.3d 392, 397 (4th Cir. 2003).

The court must ask two questions to determine whether an official is protected by qualified immunity. See, e.g., Pearson, 129 S. Ct. at 818; Saucier v. Katz, 533 U.S. 194, 200–02 (2001); Unus, 565 F.3d at 123; Miller v. Prince George's County, Md., 475 F.3d 621, 626–27 (4th Cir. 2007). First,

> [t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? . . . [I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable.

Saucier, 533 U.S. at 201; see, e.g., Miller, 475 F.3d at 626–27.

In Pearson, the Supreme Court clarified that the qualified-immunity analysis need not proceed in the sequence set forth in Saucier, and that "[t]he judges of the district courts and the courts of appeals [may] exercise their sound discretion in deciding which of the two prongs . . . should be addressed first in light of the circumstances in the particular case at hand." Pearson, 129 S. Ct. at 818. Thus, defendants are entitled to summary judgment on qualified immunity grounds if the answer to either question in the two-prong analysis is "no." See, e.g., Miller, 475 F.3d at 627.

As for the "clearly established right" prong,

> the right the official is alleged to have violated . . . must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

Saucier, 533 U.S. at 202 (quotations and citations omitted); see, e.g., Cloaninger, 555 F.3d at 331. The right is defined "at a high level of particularity." Edwards v. City of Goldsboro, 178 F.3d 231, 250–51 (4th Cir. 1999). In Wilson v. Layne, 141 F.3d 111 (4th Cir. 1998) (en banc), aff'd, 526 U.S. 603 (1999), the Fourth Circuit held that for a plaintiff to prevail over the defense of qualified immunity, the right at issue must have been "authoritatively decided by the Supreme Court, the

11

appropriate United States Court of Appeals, or the highest court of the state." 141 F.3d at 114 (quotation omitted). When the Supreme Court affirmed the Fourth Circuit's decision in Wilson, it observed that plaintiffs "have not brought to our attention any cases of controlling authority in their jurisdiction at the time of the incident which clearly established the rule on which they seek to rely, nor have they identified a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." 526 U.S. at 617; see Safford Unified Sch. Dist. # 1 v. Redding, 129 S. Ct. 2633, 2643 (2009).

In most cases, the qualified immunity analysis does not require factual findings, because the inquiry is a "purely legal one: whether the facts alleged . . . support a claim of violation of clearly established law." Mitchell, 472 U.S. at 528 n.9. When asserting qualified immunity at the summary judgment stage, however, a defendant may challenge the adequacy of the evidence to support the complaint's allegations. See Cloaninger, 555 F.3d at 331. In this situation, a defendant is entitled to summary judgment if the record does not create a genuine issue of material fact as to whether the defendant committed the acts alleged in the complaint. See Mitchell, 472 U.S. at 526; Cloaninger, 555 F.3d at 331.

B.

Defendants Wolford, Marrow, and Jenkins argue that Iglesias' speech was not addressing a matter of public concern. Alternatively, defendants argue that the City's interest in maintaining a disciplined and harmonious workplace outweighs any speech interest that Iglesias has. Accordingly, defendants contend that plaintiff's First Amendment claim fails.

"It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." Rankin v. McPherson, 483 U.S. 378, 383 (1987); see, e.g., Garcetti v. Ceballos, 547 U.S. 410, 418 (2006); Connick v. Myers, 461 U.S. 138, 142 (1983). Moreover, expressive conduct may constitute speech for purposes of the First Amendment. See, e.g., Texas v. Johnson, 491 U.S. 397, 404 (1989); Willis v. Town of

12

<u>Marshall</u>, 426 F.3d 251, 257 (4th Cir. 2005).

To establish a free-speech claim under the First Amendment, plaintiff must establish (1) that the speech complained of was protected speech, and (2) that this protected speech was a "substantial" or "motivating" factor in the adverse employment action taken against the plaintiff. <u>See</u>, <u>e.g.</u>, <u>Wilkie v. Robbins</u>, 551 U.S. 537, 556 (2007); <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287 (1977); <u>Smith v. Frye</u>, 488 F.3d 263, 267 (4th Cir. 2007); <u>McVey v. Stacy</u>, 157 F.3d 271, 277–78 (4th Cir. 1998). In determining whether a government employer's adverse employment action violates the employee's First Amendment rights, the court "must balance the employee's interest 'as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" <u>Campbell v. Galloway</u>, 483 F.3d 258, 266 (4th Cir. 2007) (quoting <u>Connick</u>, 461 U.S. at 142); <u>see</u> <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563, 568 (1968); <u>Love-Lane v. Martin</u>, 355 F.3d 766, 776 (4th Cir. 2004); <u>McVey</u>, 157 F.3d at 277–78.

In analyzing whether the speech complained of was protected speech, the court first determines whether the speech at issue may be "fairly characterized as constituting speech on a matter of public concern." <u>Connick</u>, 461 U.S. at 146; <u>see</u> <u>Garcetti</u>, 547 U.S. at 418; <u>Campbell</u>, 483 F.3d at 266. "If the speech does involve a matter of public concern, then [the court] must determine whether the employee's First Amendment interest 'outweighs the public employer's interest in what the employer has determined to be the appropriate operation of the workplace.'" <u>Campbell</u>, 483 F.3d at 266 (quoting <u>Urofsky v. Gilmore</u>, 216 F.3d 401, 406 (4th Cir. 2000) (en banc)); <u>see</u> <u>Connick</u>, 461 U.S. at 151–54; <u>Pickering</u>, 391 U.S. at 568; <u>Stroman v. Colleton County Sch. Dist.</u>, 981 F.2d 152, 156 (4th Cir. 1992). This balancing test is known as the <u>Connick</u>-<u>Pickering</u> balancing test. <u>See</u> <u>Edwards</u>, 178 F.3d at 246.

Whether speech involves a matter of public concern is a question of law. <u>See</u>, <u>e.g.</u>, <u>id.</u> "Speech involves a matter of public concern when it involves an issue of social, political, or other

13

interest to a community." Kirby v. City of Elizabeth City, 388 F.3d 440, 446 (4th Cir. 2004); see Connick, 461 U.S. at 146. "Personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment, but are matters more immediately concerned with the self-interest of the speaker as employee." Stroman, 981 F.2d at 156. In determining whether an employee's speech addresses a matter of public concern, the court must consider "the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147–48.

If the court determines that the speech does not involve a matter of public concern, the First Amendment analysis ends and plaintiff loses. See, e.g., Garcetti, 547 U.S. at 418; Connick, 461 U.S. at 146; Edwards, 178 F.3d at 246. However, if the court determines that the speech does involve a matter of public concern, then the court must apply the Connick-Pickering balancing test to see whether a valid First Amendment claim arises. See Garcetti, 547 U.S. at 418; Connick, 461 U.S. at 150–54. Under the Connick-Pickering balancing test, "[t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." Garcetti, 547 U.S. at 418. A public employer "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." United States v. Nat'l Treasury Employees Union, 513 U.S. 454, 465 (1995); see, e.g., Garcetti, 547 U.S. at 418; Waters v. Churchill, 511 U.S. 661, 671–74 (1994) (plurality opinion); Urofsky, 216 F.3d at 406; McVey, 157 F.3d at 277. When the government functions "[a]s an employer, the government is entitled to maintain discipline and ensure harmony as necessary to the operation and mission of its agencies." McVey, 157 F.3d at 277; see Rankin, 483 U.S. at 388. After all, the "First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." Connick, 461 U.S. at 149.

As the Court noted in Garcetti: "Government employers, like private employers, need a

14

significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. Public employees, moreover, often occupy trusted positions in society." 547 U.S. at 418–19 (citation omitted). "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." Connick, 461 U.S. at 151–52. Police departments have a particularly strong interest in maintaining discipline and order within their ranks. See, e.g., Maciariello v. Sumner, 973 F.2d 295, 300 (4th Cir. 1992); Jurgensen v. Fairfax County, Va., 745 F.2d 868, 880 (4th Cir. 1984). As the Fourth Circuit stated in Maciariello,

> A police department has an undeniable interest in discouraging unofficial internal investigations. If personal investigations were the usual way for an officer to check out suspicious activities of a fellow officer, the effect on efficiency and morale could be very disrupting, and the effectiveness of the police force might deteriorate. Instead of concentrating on their traditional duties in the community, officers with personal hostilities could become preoccupied with personal investigations of one another. Esprit de corps could collapse into a kafkaesque nightmare of improper investigations into the impropriety of improper investigations.

973 F.2d at 300; see, e.g., Breuer v. Hart, 909 F.2d 1035, 1040–42 (7th Cir. 1990).

Further, the court need not require the government "employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." Connick, 461 U.S. at 152; see Waters, 511 U.S. at 673; Maciariello, 973 F.2d at 300; Jurgensen, 745 F.2d at 879–80. The court may also consider the interests of the larger community in performing the Connick-Pickering balancing test. See Piver v. Pender County Bd. of Educ., 835 F.2d 1076, 1078 (4th Cir. 1987). If the Connick-Pickering balancing test tips in favor of the government employer, the First Amendment analysis ends and plaintiff losses. See, e.g., Garcetti, 547 U.S. at 418–26.

For the purposes of summary judgment, the court assumes (without deciding) that Iglesias' speech was expressive conduct and that her speech involved a matter of public concern. See, e.g., Campbell v. Towse, 99 F.3d 820, 828 (7th Cir. 1996); Cromer v. Brown, 88 F.3d 1315, 1330 (4th

15

Cir. 1996). Accordingly, the court moves to the Connick-Pickering balancing test and considers the government's interest in maintaining a disciplined and harmonious workplace. See, e.g., Garcetti, 547 U.S. at 418; Connick, 461 U.S. at 151–54.

As mentioned, a public employer may restrain job-related speech in order "to maintain discipline and ensure harmony as necessary to the operation and mission of its agencies." McVey, 157 F.3d at 277. A court must "look to the facts as the employer reasonably found them to be" and apply the Connick-Pickering standard to those facts. Waters, 511 U.S. at 677. In a given public employment situation, more than one reasonable course of action may be available. Id. at 678. "Only procedures outside of the range of what a reasonable manager would use may be condemned as unreasonable." Id.

In this case, Iglesias became concerned that Chief Wolford began embezzling funds in November 2001. She spoke with certain coworkers about her concerns. In April 2003, she reported her concerns to City Commissioner Alice Currin. In July 2003, Iglesias began communicating with Susan Wolford. In May 2004, the City investigated Iglesias' allegations concerning the Chief's alleged embezzlement and was satisfied with Chief Wolford's explanation. Iglesias was not. Thus, in June 2004, Iglesias spoke to Strickland in an effort to out Wolford's alleged wrongdoing. See id. at 140–42.

In 2005, defendants noticed Iglesias' continued efforts to discredit Chief Wolford and challenge his authority within the Department. Iglesias spread rumors about Chief Wolford's alleged embezzlement and about other alleged indiscretions in his personal life. Iglesias' behavior led her coworkers to inform the individual defendants that Iglesias was out to get Chief Wolford and complain that Iglesias was disrupting the workplace. See Defs.' Mem., Exs. 71, 88. For example, Detective Ford described Iglesias' disruption in an October 31, 2005 memorandum. See Defs.' Mem., Ex. 71. Further, Captain Williamson, Lieutenant Griffin, and Lieutenant Boyd prepared a January 10, 2006 memorandum describing this same behavioral pattern and the resulting

16

disruption. See id., Ex. 88. Chief Wolford relied on this information in making his decision in January 2006 to terminate plaintiff, and Marrow relied on the information to uphold Wolford's decision. See, e.g., Defs.' Mem., Ex. 77.

Iglesias argues that defendants' evidence of actual disruption "reveals very little in the way of specific incidents." Pl.'s Mem. 21. The record, however, is replete with specific instances in which Iglesias' behavior caused disharmony within the Department. For example, her initial suspicions of Wolford's misconduct and her disclosure of this sensitive information to several coworkers alarmed Wolford. Wolford Dep. 94–95; see Iglesias Dep. 62, 71–77, 82–97, 212–13. Notwithstanding the City's investigation in May 2004, Iglesias contacted Strickland, a man with no connection to the Department, in June 2004, and he filed two complaints against Wolford. See Defs.' Mem., Exs. 13, 14. Then, Iglesias asked the SBI to investigate. See Defs.' Mem., Ex. A, at 87; Iglesias Dep. 215–18. Also, regardless of whether Iglesias intended any harm, she revealed information about the Finance Department embezzlement, which disrupted that August 2004 investigation. See Marrow Dep. 81–82. Further, Detective Ford's October 31, 2005 memorandum describes Iglesias spreading rumors about Chief Wolford, Iglesias' disclosures to Strickland, a newspaper article written by Iglesias' husband, which aired the Department's internal issues, and Iglesias seeking support from coworkers in her campaign against Chief Wolford. See Defs.' Mem., Ex. 71. Additionally, Iglesias spoke with a WRAL reporter in January 2006, and WRAL aired a television story concerning Wolford's alleged embezzlement. See Pl.'s Mem., Exs. 16–28; Defs.' Mem., Ex. 29; Iglesias Aff. ¶ 40; Iglesias Dep. 225–26, 234–35; Wolford Dep. 136.

Notably, Iglesias' protests and accusations continued after the May 2004 investigation had determined that Chief Wolford had not engaged in any wrongdoing. Even assuming that Iglesias' initial allegations of misconduct touched on a matter of public concern, once the alleged misconduct had been investigated and not substantiated, the disruptive effect of her continued conduct outweighed any continued interest in her speech. See, e.g., Maciariello, 973 F.2d at 300; Breuer,

17

909 F.2d at 1040–42; Bryson v. City of Waycross, 888 F.2d 1562, 1567 (11th Cir. 1989). Thus, plaintiff's persistent disruptiveness outweighed any interest the public had in knowing about Chief Wolford's alleged misconduct, after the investigation had revealed no impropriety. See, e.g., Bishop v. City of Suffolk, No. 95-2000, 1996 WL 281949, at *3 (4th Cir. May 29, 1996) (per curiam) (unpublished); Maciariello, 973 F.2d at 300; Bryson, 888 F.2d 1567. Finally, regardless of how much plaintiff's activities actually disrupted the Department, defendants reasonably perceived that plaintiff's behavior created disharmony in the workplace. See, e.g., Waters, 511 U.S. at 678; Connick, 461 U.S. at 151–52.

In opposition to these conclusions, Iglesias argues that the heightened deference to a law enforcement agency's employment decisions ought not to apply to her because she was not a sworn officer. Plaintiff's non-sworn status is immaterial. Defendants reasonably believed that plaintiff's behavior disrupted the mission of the Department, thus disrupting the Department's ability to effectively protect the community. See, e.g., Maciariello, 973 F.2d at 300; Breuer, 909 F.2d at 1040–41. Further, her unique role within the Department further accentuates the defendants' interest in maintaining discipline and harmony. See Connick, 461 U.S. at 151–52. As the Chief of Police's administrative assistant, Iglesias had access to confidential information and close proximity to other sensitive material. Moreover, even as administrative assistant to a captain and two lieutenants, plaintiff had access to confidential and sensitive material. Plaintiff has not cited a single case in which a public employee with similar job duties who engaged in materially indistinguishable conduct prevailed on a free-speech claim. Her efforts to distinguish the cases that defendants cite only highlight the similarities between those cases and this one. See Tyler v. City of Mountain Home, Ark., 72 F.3d 568, 569–70 (8th Cir. 1995); Maciariello, 973 F.2d at 297, 300; Breuer, 909 F.2d at 1036–37, 1040–42; Bryson, 888 F.2d at 1564, 1576.

The defendants' interest in maintaining a disciplined and harmonious workplace outweighed Iglesias' interest in her speech. Because Iglesias' speech is not protected, the court need not address

18

whether this speech was a substantial or motivating factor in the adverse employment action. <u>See</u>, e.g., <u>Garcetti</u>, 547 U.S. at 418–26; <u>Dwyer v. Smith</u>, 867 F.2d 184, 193–94 (4th Cir. 1989). The court also need not address the individual defendants' other arguments concerning qualified immunity. Thus, the court grants summary judgment to Wolford, Marrow, and Jenkins on plaintiff's section 1983 claim.

C.

As for plaintiff's section 1983 claim against the City, the City is not entitled to qualified immunity. <u>See</u>, e.g., <u>Owens v. City of Independence, Mo.</u>, 445 U.S. 622, 633, 650 (1980). Nonetheless, because plaintiff's First Amendment claim fails against the individual defendants, her derivative claim against the City also fails. <u>See</u>, e.g., <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986) (per curiam); <u>Kopf v. Wing</u>, 942 F.2d 265, 269 (4th Cir. 1991).

Alternatively, even if there was a constitutional deprivation, the alleged constitutional deprivation was not a result of the City's official policy or custom. A municipality is not liable under section 1983 for the actions of its employees or agents unless the plaintiff can show that the alleged constitutional deprivation stemmed from a municipal policy or custom. <u>Monell v. Dep't of Soc. Servs. of New York</u>, 436 U.S. 658, 694 (1978); <u>see</u> <u>Bd. of County Comm'rs of Bryan County, Okla. v. Brown</u>, 520 U.S. 397, 403 (1997) ("We have consistently refused to hold municipalities liable under a theory of <u>respondeat superior</u>.").

An isolated personnel decision may support municipal liability "[i]f the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 481 (1986); <u>see</u>, e.g., <u>Edwards</u>, 178 F.3d at 244 & n.9. However, recovery from a municipality is limited to acts that are, properly speaking, acts of the municipality, "that is, acts which the municipality has officially sanctioned or ordered." <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 123 (1988) (plurality opinion) (quotation omitted); <u>see</u> <u>Pembaur</u>, 475 U.S. at 481. Further, "the authority to make municipal policy is necessarily the authority to

19

make _final_ policy." Praprotnik, 485 U.S. at 127.

The court's identification of policymaking officials is a question of state law, not of fact. Id. at 124. "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority . . . ." Pembaur, 475 U.S. at 483. Under North Carolina law, the city council is vested with the authority to make personnel policies. See N.C. Gen. Stat. § 160A-164. Although the city council may, as it did in this case, delegate the authority to implement individual personnel decisions, the ultimate authority to make personnel policy remains with the city council. See Praprotnik, 485 U.S. at 126 ("[A] federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it.").

The parties agree that Chief Wolford made the decision to terminate Iglesias. See Defs.' Mem., 16, Ex. A, at 179–80; id. Ex. 77; Pl.'s Mem. 13–14. The fact that the City Council may have delegated the discretion to make certain decisions to Marrow and Marrow may have delegated this discretion further to Wolford does not impact the analysis. Plaintiff does not challenge any official policy or custom or allege that the City Council "was aware of the constitutional violation and either participated in, or otherwise condoned it." Love-Lane, 355 F.3d at 783. Therefore, under Monell and its progeny, the court grants summary judgment to the City on plaintiff's section 1983 claim.

D.

Iglesias also alleges that the City wrongfully discharged her in violation of North Carolina public policy. North Carolina recognizes a cause of action for wrongful discharge in violation of the state's public policy. See, e.g., Garner v. Rentenbach Constructors, Inc., 350 N.C. 567, 568–72, 515 S.E.2d 438, 439–41 (1999); Amos v. Oakdale Knitting Co., 331 N.C. 348, 350–54, 416 S.E.2d 166, 168–70 (1992); Coman v. Thomas Mfg. Co., 325 N.C. 172, 176–78, 381 S.E.2d 445, 447–49 (1989). Under North Carolina law, a plaintiff may only bring a wrongful-discharge action against the plaintiff's employer, not against the employer's agents. See Iglesias, 539 F. Supp. 2d at 839;

20

Garner, 350 N.C. at 572, 515 S.E.2d at 441. The City employed plaintiff; therefore, the court analyzes her wrongful-discharge claim against the City. Because the wrongful-discharge claim is made under North Carolina law, the court must determine how the North Carolina Supreme Court would rule on any disputed issues. See, e.g., Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005); Private Mortgage Inv. Servs., Inc. v. Hotel & Club Assocs., Inc., 296 F.3d 308, 312 (4th Cir. 2002).

In support of her wrongful-discharge claim, plaintiff relies on the free-speech clause in Article I, Section 14 of the North Carolina Constitution. See Pl.'s Resp. 28; cf. Am. Compl. ¶¶ 72–79. Assuming without deciding that a public employee may rely on the North Carolina Constitution as a source of public policy in a North Carolina wrongful-discharge claim, the standard for a free-speech claim under the North Carolina Constitution and the United States Constitution are nearly identical. See, e.g., Sheaffer v. County of Chartham, 337 F. Supp. 2d 709, 729–30 (M.D.N.C. 2004); DeWitt v. Mecklenburg County, 73 F. Supp. 2d 589, 606 n.11 (W.D.N.C. 1999); State v. Petersilie, 334 N.C. 169, 184, 432 S.E. 2d 832, 841 (1993); Evans v. Cowan, 132 N.C. App. 1, 9, 510 S.E. 2d 170, 175–76 (1999). In fact, North Carolina courts apply the Connick-Pickering standard under Section 14. See Evans, 132 N.C. App. at 9, 510 S.E. 2d at 175–76. Thus, for the same reasons that plaintiff's section 1983 claim fails, her wrongful-discharge claim fails.

III.

For the reasons discussed above, defendants' motion for summary judgment [D.E. 30] is GRANTED. The Clerk of Court is directed to close the case.

SO ORDERED. This **28** day of September 2009.

JAMES C. DEVER III
United States District Judge

21